**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No. 4:11-CV-00077-RWS** |
| **v.** ) | |
| ) | **Judge Rodney W. Sippel** |
| **AMEREN MISSOURI,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**UNITED STATES' OPPOSITION TO**
**AMEREN'S SECOND MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)**

**EXHIBIT B**

May 20, 1999


Mr. Robert Hodanbosi
Mr. Charles Lagges
STAPPA/ALAPCO
444 North Capitol Street, NW
Washington, DC  20001

Dear Messrs. Hodanbosi and Lagges:

I am writing in response to your May 15, 1998 and December 11, 1998 letters.  Your May 15, 1998 letter addressed the Environmental Protection Agency's (EPA's) use of its authority to object to permits proposed by State permitting authorities under the Clean Air Act's (CAA's or the Act's) title V operating permit program and focused primarily on interface issues between title V and title I [or new source review (NSR)] of the Act.  You expressed concern that EPA's use of its review authority leading to comments and objections to proposed permits was impacting permit issuance rates.  Your letter also detailed a number of concerns and disagreements with the positions underlying certain objections and comments that have been made by EPA Regions.  In your December 11, 1998 letter, you raised concerns regarding maximum achievable control technology (MACT)/title V interface issues.

As you are aware, EPA has listened to your concerns and thoroughly evaluated your views.  Since receipt of your letters, there has been continued dialogue on the many issues raised in the letters among permitting authorities, Regions, and EPA Headquarters.  Examples include our July 8, 1998 meeting, monthly STAPPA/ALAPCO title V committee calls, Regional/State title V workshops, specialty meetings such as the MACT/title V issues meeting, and, most recently, the STAPPA title V workshop in Dallas.  In these interactions we have heard each other's views and, in most cases, reached some common understanding of the issues and solutions.  In fact, the number of objection letters has dropped significantly over the past few months.  Through the efforts of the permitting authorities and Regions, we have become increasingly successful at resolving specific permit issues.

I believe it is important to share EPA's views on the issues your letters highlighted.  Thus, Enclosure A sets forth EPA's policy on the title I/title V interface issues and concerns raised in your May 15, 1998 letter.  Enclosure B provides our present understanding of the

2

MACT-title V interface issues raised in your December 11, 1998 letter.  I seek your thoughts on these MACT-title V issues with a view toward resolving any disagreements we may have as soon as possible.

Two issues in your May 15 letter that do not readily fall into either attachment are periodic monitoring and the State implementation plan (SIP) backlog.  Our views on these follow.

Periodic Monitoring

We believe that the issuance of the September 15, 1998 periodic monitoring guidance addressed your questions on this issue.  Presently, we are working on the Periodic Monitoring Technical Reference Document.  This document will provide general technical guidance for complying with the title V periodic monitoring requirements and will present specific examples of monitoring that satisfy these requirements.  This document is primarily targeted toward the plant managers and operators who will design and operate such monitoring appropriate to site-specific situations.  The document will also be helpful for permitting authorities and permit writers who review and supplement or prescribe monitoring for individual permits.  A draft of this document was made available for public review via EPA's website on April 30.

SIP Backlog

The EPA understands that the SIP backlog is limited primarily to California.  Budgetary constraints in FY 1999 will hamper our ability to completely eliminate the backlog in the near term.  However, Region IX has redirected significant resources within its air program to address this issue during FY 2000.  Region IX will continue to work closely with the California Air Resources Board and local air districts to prioritize their crucial SIP submittals for expeditious action by EPA in order to minimize the impact on title V permit issuance.  The Region is also actively exploring additional mechanisms to expedite SIP actions.

I believe that the responses set forth in this letter and the enclosures will be helpful in informing you of the principles that will guide future EPA action in reviewing draft and proposed title V permits.  Together we can move forward to fulfill the recent Agency goal of issuing all permits by January 2001.  Whether and how EPA applies these policies in any particular permit proceeding will depend upon the specific review undertaken for particular permits.  As you develop permits over the coming months, I ask that you work with our Regional Offices on implementation and involve management where you feel it necessary.  Finally, the responses in this letter are not binding on any party, do not represent final Agency action, and cannot be relied upon to create any legal rights or obligations enforceable by any party.

3

I appreciate your interest in identifying issues you feel affect the successful implementation of the title V program.  The upcoming STAPPA/ALAPCO meeting in May might provide a good forum to discuss EPA's positions on these matters.

Sincerely,

/s/

John S. Seitz
Director
Office of Air Quality Planning
and Standards

Enclosures

cc:     Bill Becker, STAPPA/ALAPCO
        Bruce Buckheit, EPA/OECA
        Robert Colby, Chattanooga-Hamilton County, Tennessee
        Alan Eckert, EPA/OGC
        Bliss Higgins, Louisiana
        Director, Office of Ecosystem Protection, Region I
        Director, Division of Environmental Planning and Protection, Region II
        Director, Air Protection Division, Region III
        Director, Air, Pesticides, and Toxics Management Division, Region IV
        Director, Air and Radiation Division, Region V
        Director, Multimedia Planning and Permitting Division, Region VI
        Director, Air, RCRA, and Toxics Division, Region VII
        Assistant Regional Administrator, Office of Partnerships and Regulatory Assistance,
          Region VIII
        Director, Air Division, Region IX
        Director, Office of Air, Region X

OAQPS/ITPID/OPG:SHitte:pfinch:MD-12:541-5281:5/3/99
Hitte #2\stappa\hodan7.fnl

# ENCLOSURE A

**FEDERAL ENFORCEABILITY**

Title V and the part 70 regulations are designed to incorporate all Federal applicable requirements for a source into a single title V operating permit.  To fulfill this charge, it is important that all Federal regulations applicable to the source such as our national emission standards for hazardous air pollutants, new source performance standards, and the applicable requirements of SIP's and permits issued under SIP-approved permit programs, are carried over into a title V permit.[1]  All provisions contained in an EPA-approved SIP and all terms and conditions in SIP-approved permits are already federally enforceable (see 40 CFR § 52.23).[2]  The enactment of title V did not change this.  To the contrary, all such terms and conditions are also federally enforceable "applicable requirements" that must be incorporated into the Federal side of a title V permit [see CAA § 504(a); 40 CFR § 70.2)].  Thus, if a State does not want a SIP provision or SIP-approved permit condition to be listed on the Federal side of a title V permit, it must take appropriate steps in accordance with title I substantive and procedural requirements to delete those conditions from its SIP or SIP-approved permit.  If there is not such an approved deletion and a SIP provision or condition in a SIP-approved permit is not carried over to the title V permit, then that permit would be subject to an objection by EPA.

---

[1]The term "SIP-approved permit" is used in this letter to refer to permits issued pursuant to major or minor new source review (NSR) or prevention of significant deterioration (PSD) permit programs approved into SIP's (or promulgated under 40 CFR § 52.21 in States implementing the federal PSD program via delegation from EPA), as well as federally enforceable State operating permits (FESOP's) issued pursuant to SIP-approved operating permit programs. For purposes of this discussion, the term "NSR" includes major nonattainment NSR, minor NSR and PSD.

[2]By the term "federally enforceable," I refer to EPA's and citizens' ability to enforce a provision under sections 113/167 and 304 of the Clean Air Act, respectively.  The term "Federally enforceable" has also been used in the past in another context to identify a smaller subset of provisions that may be used to limit a source's "potential to emit."  See memorandum from John S. Seitz, Director, Office of Air Quality and Planning Standards, EPA, re Options for Limiting the Potential to Emit (PTE) of a Stationary Source Under Section 112 and Title V of the Clean Air Act (Jan. 25, 1995), at 2 (explaining that for purposes of limiting a source's PTE, "limitations must be enforceable as a practical matter").  This letter does not address this second usage.

2

**NEW SOURCE REVIEW LOOKBACK (INCLUDES BEST AVAILABLE CONTROL TECHNOLOGY/LOWEST ACHIEVABLE EMISSION RATE LOOKBACK)**

All sources subject to title V must have a permit to operate that "assures compliance by the source with all applicable requirements."  See 40 CFR § 70.1(b); CAA section 504(a). Applicable requirements are defined in section 70.2 to include:  "(1) any standard or other requirement provided for in the applicable implementation plan approved or promulgated by EPA through rulemaking under Title I of the [Clean Air] Act. . . ."  Such applicable requirements include the requirement to obtain preconstruction permits that comply with applicable preconstruction review requirements under the Act, EPA regulations, and SIP's.  See generally CAA sections 110(a)(2)(C), 160-69, & 173; 40 CFR §§ 51.160-66 & 52.21.

For the PSD and major nonattainment NSR permit programs, as you know, preconstruction review requirements include use of best available control technology (BACT) or lowest achievable emission rates (LAER), respectively, for each regulated pollutant that would be emitted in significant amounts and at each emissions unit at which an emissions increase would occur.  In determining BACT and LAER, as in implementing other aspects of the PSD or NSR programs, the State exercises considerable discretion.  Thus, EPA lacks authority to take corrective action merely because the Agency disagrees with a State's lawful exercise of discretion in making BACT and LAER or related determinations.  State discretion is bounded, however, by the fundamental requirements of administrative law that agency decisions not be arbitrary or capricious, be beyond statutory authority, or fail to comply with applicable procedures. Consequently, State-issued preconstruction permits must conform to the applicable requirements of the Clean Air Act and the SIP, and failure to do so may result in corrective action by EPA.

In addition to Clean Air Act enforcement authorities, another form of corrective action available to EPA is the title V objection authority under CAA section 505(b).  The Agency may object to issuance of any permit that EPA determines is "not in compliance with the applicable requirements of the Act, including the requirements of an applicable implementation plan."  See CAA section 505(b)(1); see also CAA section 113(b)(1) (enforcement authority available for violations of "any requirement or prohibition of an applicable implementation plan or permit.")

Pursuant to EPA policy, the Agency generally will not object to the issuance of a title V permit due to concerns over BACT, LAER, or related determinations made long ago during a prior preconstruction permitting process.  However, regarding recently issued NSR/PSD permits, note that EPA policy is to provide adverse comments concerning the substantive or procedural deficiencies of a preconstruction permit during the NSR/PSD permitting process.  EPA may thereafter take corrective action, including objecting to the title V permit if its comments were not resolved by the State.  Similarly, where the BACT/LAER determination is made during a concurrent or "merged" preconstruction permit and title V permit process, EPA may object to the title V permit due to an improper determination.  Finally, the Agency may object to or reopen a

3

title V permit in response to a public petition showing that title I preconstruction permitting requirements have not been met.

Moreover, where EPA believes that an emission unit has not gone through the proper preconstruction permitting process (and therefore one or more applicable requirements are not incorporated in the draft or proposed title V permit), EPA may object to the title V permit.  The permitting authority may then resolve the issue either by demonstrating to EPA's satisfaction that preconstruction permitting requirements were not applicable or by incorporating a schedule requiring the source to obtain a preconstruction permit.

Where an EPA Region is unable to obtain adequate information during its review period to support an objection, the permit may be issued with "placeholder" language stating that the permit shield does not attach to the emission units at issue.  In such instances, the permitting office should also consider a referral to the enforcement office for further investigation.  The placeholder language would say that while EPA is evaluating the applicability of the PSD/NSR program, a permit shield is not available with respect to applicability of PSD/NSR and that additional applicable requirements may apply should EPA's evaluation show that PSD/NSR applies.  If EPA determines that the source is not subject to any additional requirements, the permit can be reopened to provide a permit shield with respect to these requirements.

As a final point, EPA believes that confusion over the "lookback" issue may have arisen from a misunderstanding of language in White Paper I.  We would like to take this opportunity to clarify the meaning of that language.  Specifically, White Paper I states that:

Companies are not federally required to reconsider previous applicability determinations as part of their inquiry in preparing part 70 permit applications.  However, EPA expects companies to rectify past noncompliance as it is discovered.  Companies remain subject to enforcement actions for any past noncompliance with requirements to obtain a permit or meet air pollution control obligations.  In addition, the part 70 permit shield is not available for noncompliance with applicable requirements that occurred prior to or continues after submission of the application.  [White Paper for Streamlined Development of Part 70 Permit Applications, Office of Air Quality Planning and  Standards, EPA (July 10, 1995) at 24].

This passage is intended to convey EPA's belief that a company's responsible official does not have a federal obligation to reconsider previous applicability determinations for the purpose of certifying to the truth, accuracy and completeness of the permit application.  Noncompliance of which companies are aware must be reported in the title V applications and corrected expeditiously.  This passage further states that noncompliance arising from previous applicability determinations is subject to enforcement and is not covered by the part 70 permit shield.  This language does not limit EPA's ability or authority to object to proposed title V permits based on such previous determinations or to request information (from States and sources) related to such decisions in order to assure compliance with applicable requirements.

4

**SUPERSESSION**

It is the Agency's view that title V permits may not supersede, void, replace, or otherwise eliminate the independent enforceability of terms and conditions in SIP-approved permits. To assure compliance with "applicable requirements" such as SIP-approved permit terms and conditions, title V permits must record those requirements, but may not eliminate their independent existence and enforceability under title I of the Clean Air Act (i.e., may not supersede them). Title V permits may state that they "subsume" or "incorporate" SIP-approved permit terms and conditions as EPA interprets such statements to mean that the title V permit includes all SIP-approved permit terms, but does not supersede, void, replace, or otherwise eliminate their independent legal existence and enforceability. Regardless of terminology, to the extent that title V permits are used to accomplish the legal result of supersession, EPA believes that such use is improper.

As noted in the previous section, title V permits must assure compliance with terms and conditions in SIP-approved permits. In enacting title V, Congress did not amend title I of the Act and did not intend the title V permitting program to replace the title I permitting programs. SIP-approved permits must remain in effect because they are the legal mechanism through which underlying NSR requirements (from the Act, federal regulations and federally-approved SIP regulations) become applicable, and remain applicable, to individual sources. NSR programs provide the relevant permitting entity with the authority to impose source-specific NSR terms and conditions in legally enforceable permits, and provide States, EPA and citizens with the authority to enforce these permits. Because State title V programs do not provide the authority for the establishment and maintenance of SIP-approved permit requirements, the title V permit cannot "assure compliance" with those requirements unless the underlying implementation and enforcement mechanism for the NSR requirements--the SIP-approved permit--remains valid.

The supersession of SIP-approved permits poses additional problems that EPA believes are inconsistent with the structure and purposes of title V and title I of the Act. First, while SIP-approved permits impose continual operational requirements and restrictions upon a source's air pollution activities and, accordingly, may not expire so long as the source operates, title V permits could expire or become unnecessary.[3] If the title V permit supersedes the source's SIP-approved permit and then subsequently expires, neither the superseded SIP-approved permit nor the expired title V permit would provide the legal authority to enforce the site-specific operational requirements and restrictions imposed upon the source pursuant to preconstruction

---

[3]Title V permits could expire if a source fails to submit a timely and complete title V permit renewal application. See 40 CFR §§ 70.5(a)(1)(iii), 71.5(a)(1)(iii), 70.7(c) & 71.7(c). In addition, a title V permit could become unnecessary if a source limits its actual and potential emissions below major source thresholds, and the source is not otherwise required to maintain its title V permit.

5

review.  Even if title V permits expire, of course, sources are still required to comply with applicable requirements that remain independently enforceable outside of title V permits, as all applicable requirements must.

Moreover, the continuing existence of SIP-approved permits independent of title V preserves the ability of permitting authorities and EPA to reopen title V permits that failed to include all SIP-approved permit terms, or to make such corrections upon permit renewal. Finally, title V regulations allow a permitting authority to include in the title V permit a "permit shield" stating that "compliance with the conditions of the [title V] permit shall be deemed compliance with any applicable requirements as of the date of permit issuance" [40 CFR §§ 70.6(f) & 71.6(f)].  The fact that compliance with the title V permit may be "deemed compliance" with underlying applicable requirements, including applicable requirements contained in SIP-approved permits, indicates that those underlying requirements must remain in force and may not be superseded.  If those requirements could be superseded by the title V permit, there would be no need for a mechanism in the title V permit clarifying the source's obligations and compliance status.

DRAFT -- DO NOT CITE OR QUOTE

# ENCLOSURE B

## Response to STAPPA/ALAPCO Recommendations
## On MACT/Title V Interface Issues
## (from December 11, 1998 Letter to John Seitz)

```
[General note: Any responses referring to part 70, or permit
revision processes, are based on the present part 70 rule
promulgated in 1992.]

A.   MANAGEMENT OF CHANGE
```

**A-1.    Retrospective application of 112(g)**

*STAPPA/ALAPCO Recommendation:*  In cases where NSR violations are addressed for historical construction projects that pre-date the effective date of the Section 112(g) rule, 61 Fed. Reg. 68,384 (December 27, 1996), STAPPA and ALAPCO recommend that Section 112(g) MACT controls not be mandated by EPA.

*EPA Response:* The EPA agrees that, for historical construction projects which pre-date the effective date of the section 112(g) rule, where a source has violations for operating without valid NSR permits, the EPA will not mandate section 112(g) MACT controls on those historical construction projects.

**A-2.    Issuance of the permit before MACT compliance details are available**

*STAPPA/ALAPCO Recommendation:*  When the title V permit is issued prior to the compliance date of the MACT standard or prior to specific compliance details being available, STAPPA and ALAPCO suggest that the permit initially may include an identification of applicable requirements for the facility at the Subpart level, and that additional details may be added through minor permit modification procedures with public and EPA review occurring at permit renewal.

*EPA Response:* The EPA agrees that when a permit is issued prior to the MACT compliance date, one option is for the initial permit to describe MACT applicability at the Subpart level, and for all other compliance requirements (including compliance options and parameter ranges) of the MACT that apply below the Subpart level to be added at a later time.  Because this more detailed information describes for the first time in the permit specifically how the source will comply with the standard, it is important to have EPA and public review and thus, it must be added as a significant  permit modification.

Another option is for the initial permit to identify the MACT standards or requirements

that apply at the section or subsection level, including anticipated compliance options, along with the information identified in the Initial Notification required by the General Provisions, see 40 CFR Part 63, Subpart A, or by the applicable Subpart.  For example, a permit for a source subject to 40 CFR Part 63, Subpart T would identify, in part, each solvent cleaning machine and the anticipated compliance option. [See 40 CFR § 63.468(a) and (b)].  Additional compliance information required in the Notice of Compliance Status (e.g., parameter values) would be added as a minor permit modification when the NCS is submitted.   As clarified at the Dallas workshop, the current Part 70 regulations require that minor permit modifications have an EPA review (but no public review) at the time of the permit modification.

## A-3.    Changes in the selected compliance option

*STAPPA/ALAPCO Recommendation:*  Where the permit does not initially contain a compliance option that the source wishes to use, STAPPA and ALAPCO recommend that EPA permit additional compliance options already allowed under the MACT standard to be added to the permit as a minor modification with public and EPA review occurring at renewal.

*EPA Response:*  We agree that if a source wishes to add compliance options that are a part of the MACT standard, the compliance options usually can be added to the permit through the minor permit modification process.  However, some compliance options, such as those with emissions averaging, would require a significant permit modification due to the amount of judgment involved.  Again, the current Part 70 regulations require that minor permit modifications have an EPA review at the time of the permit modification..  As you know, a permit modification may be avoided if the initial permit includes compliance options as alternative operating scenarios under § 70.6(a)(9).

## A-4.    "Once-In-Always-In" and pollution prevention

*STAPPA/ALAPCO Recommendation:*  STAPPA and ALAPCO recommend that EPA revise its current guidance to recognize that, where greater reductions are achieved through pollution prevention and those emission reductions are practically enforceable, the MACT-specific requirements should no longer apply.

*EPA Response:*  A workgroup consisting of representatives from STAPPA/ALAPCO, OECA, OPPT, and OAQPS has been established to address this issue.  Our staff continues to work on this issue with the workgroup.  Once the workgroup has completed its efforts and has made a recommendation, a decision will be made by EPA and sent to STAPPA/ALAPCO.

B.     LEVEL OF DETAIL FOR POINT SOURCES

**B-1.    Use of generic groups that do not identify specific emission units**

*STAPPA/ALAPCO Recommendation:* STAPPA and ALAPCO recommend that EPA allow the identification of emission units by generic groups in permits for smaller MACT-affected emission units that are frequently added, removed or changed and for similar multiple control devices subject to the same monitoring, recordkeeping, reporting and testing requirements.  This approach would allow emissions units subject to specific applicable requirements not to be specifically identified or listed in the permit.  A contemporaneous on-site log could be used to identify specific units and to document changes to and from generic groups.

*EPA Response:*   We interpret your suggestion to recommend that small units subject to MACT standards which are frequently added, removed or changed could be identified in an on-site log, rather than specifically identified in the permit.  We further interpret your suggestion as recommending that control devices to which similar MACT requirements apply could be identified in a log, rather than specifically identified in the permit.   Finally, we understand your suggestion for a log to be a voluntary mechanism to help the source keep track of units or control devices added to the facility without revising the permit.

      As a general rule, the permit must identify not only the applicable requirements, but the specific emissions units to which those requirements apply, to assure compliance by specific units with specific applicable requirements.  Linking of applicable requirements to emission units in the permit is important  because it retains applicability decisions with the permitting authority instead of transferring these decisions to the source.  It also clearly identifies the requirements that apply to each unit and eliminates any disputes as to whether a unit fits a generic group description.  Therefore, we believe it is appropriate for the permit to identify specific units.  As a practical matter, however, we believe that generic grouping could be appropriate in two  situations:  1) where the applicable requirements apply generically; and 2) in certain circumstances where many small units make identification of individual units infeasible.  In addition, we are currently involved in several pilot projects that may identify other situations in which generic grouping of emission units may be appropriate.

      The first situation where generic grouping may be appropriate is where applicable requirements apply generically to a facility, rather than to an identified class of units.  The EPA's White Paper I allowed for the use of generic groups to identify units subject to requirements that apply in the same way to all units at a facility, such as facility-wide opacity limits of the implementation plan (SIP).  See White Paper I at 24.  An example is a regulation that states "no person shall cause emissions in excess of 20% opacity."  Since the requirements do not apply to specific types of units, it is not necessary for the permit to identify specific units subject to the requirement, and hence, generic grouping may be appropriate.  [See § II.4 of White Paper I.]

4                      DRAFT -- DO NOT CITE OR QUOTE

The second situation where generic grouping may be appropriate is where the sheer numbers of units make identification of individual units infeasible, and where the applicable requirement is open to such an approach. Examples where this could be the case include pumps, valves, or flanges covered by leak detection and repair (LDAR) requirements, and manhole covers or drains covered by wastewater work practice standards. In these situations, instead of identifying specific units, the permit could place affected units into a group in which all units are subject to the same applicable requirement, provided that the permit clearly defines the type of unit in each group and the applicability criteria. If required by the MACT standard, the owner or operator must develop a mechanism to identify which individual units belong to which group, and the permit should reflect this obligation. For example, 40 CFR Part 63, Subpart H requires the source to maintain lists of equipment subject to different requirements of the Subpart, but provides that an on-site recordkeeping system may satisfy this requirement. [See 40 CFR § 63.181(b).]

As to your recommendation of generic grouping for control devices subject to similar requirements, however, we cannot agree. We think it is important for the permit to clearly link emission units to control devices and, in turn, to applicable requirements, so that it is clear which control device is being used to meet which standard for which units. We do not yet understand how this can be done categorically for control devices. We are now working on pilot projects that will allow us to see if certain control devices can be advance-approved and generically grouped. We expect that the size of emission units and the nature of control devices will be considerations.

## B-2.   Incorporation of multiple compliance options into Title V permits

*STAPPA/ALAPCO Recommendation:* STAPPA and ALAPCO recommend that EPA recognize that various compliance options authorized by MACT standards can be placed directly in the permit by referencing the MACT provisions, without identifying them as Alternative Operating Scenarios (AOS). The MACT standard provisions (e.g. periodic reports, Notice of Compliance Status) would provide recordkeeping and notification of changes to compliance options. In addition, STAPPA and ALAPCO believe that once the compliance date is past, the source is obligated to maintain continual compliance even if the compliance option changes.

*EPA Response:* We read your suggestion to recommend that different compliance options of a MACT standard may be referenced in the permit, but not identified as an AOS.

As to your suggestion not to identify compliance options as an AOS, EPA believes that the appropriate way to define different compliance options is as one or more AOS. This is important because to assure compliance with a MACT standard by specific emissions units, the permit must clearly specify which compliance options a source may utilize, using the on-site log required by 40 CFR § 70.6(a)(9) to indicate which compliance option is in effect at a given time. Part 70's AOS provisions supply the appropriate mechanism to ensure that the permit reflects applicability determinations made by the permitting authority for specific emission units, and that

inspectors will have historical records and current information on which compliance option the source is following.  The EPA is working on ways to streamline the addition of compliance options into the permit.

When the source changes MACT compliance options, part 63 will require a notification (40 CFR § 63.9(j)) in those cases where the newly instituted option was not already incorporated into the permit.  That is, § 63.9(j) triggers a notification only in the instance where "information not previously provided" becomes available.  A notification would not be necessary if the permit already included all necessary provisions for employing alternate MACT compliance options.

## B-3.    Level of Detail Needed to Incorporate General Provisions into Permits

*STAPPA/ALAPCO Recommendation:* With regard to the General Provisions (40 CFR Part 63, Subpart A), STAPPA and ALAPCO recommend that it be sufficient for the permit to specify that the facility is subject to Subpart A as specified in Table 1 of the applicable MACT standard. While state and local agencies may also choose to include summary conditions for key General Provisions requirements, the reference to Subpart A and the MACT-specific Table 1 should be sufficient to meet Part 70 requirements.

*EPA Response:* Generally, the EPA agrees with this recommendation, including the recommendation that it is sufficient for the permit to reference the appropriate table in the MACT rule (not always Table 1).  In cases where the requirements of the General Provisions are not clear enough to cross-reference, however, then the permit may need to contain additional clarification as to how the General Provisions apply to the facility.

## B-4.    Level of Detail Needed to Incorporate MACT Standards into Permits

*STAPPA/ALAPCO Recommendation:*  STAPPA and ALAPCO recommend that state and local agencies be allowed to specify only that the source is subject to the relevant Subpart, or to include additional detail as circumstances dictate.  For example, under STAPPA and ALAPCO's recommended approach, standards such as the MACT standard for Industrial Process Cooling Towers, 40 CFR Part 63, Subpart Q, may be appropriately addressed at the Subpart level.  Generally, state and local agencies favor including a summary of conditions of the applicable requirement at the section level or lower, along with a reference statement or, alternatively, including a summary of conditions at the section level, along with specification of the applicable Subpart.  However, since there may be times when only specifying the Subpart is sufficient, that should be the minimum requirement.

*EPA Response:*  We interpret your suggestion to recommend that EPA endorse a reference to the Subpart level as generally acceptable except where further specificity is required by the permitting authority. We also interpret your suggestion to apply at any stage of the permit, not just prior to the compliance date of a MACT standard.

The permit needs to cite to whatever level is necessary to identify the applicable requirements that apply to each emissions unit or group of emission units (if generic grouping is used), and to identify how those units will comply with the requirements.   As EPA indicated in White Paper II, the permit must at least specify the applicable emission limit or standard, and the emissions unit to which the limit or standard applies.   The White Paper also stated that the permit may use referencing where it is specific enough to define how the applicable requirement applies and where using this approach assures compliance with all applicable requirements.  We interpret this to require the permit to identify (or reference) the monitoring, recordkeeping and reporting requirements.   Accordingly, we cannot agree with your recommendation that a reference to Subpart level is acceptable at the discretion of the permitting authority.

In the example of the Industrial Process Cooling Towers MACT (Subpart Q), we recommend that the permit identify the standard to be met (i.e., a ban on chromium-based water treatment chemicals), and the unit(s) subject to the standard (i.e., industrial process cooling towers).  The permit should also reference the notification requirements of 40 CFR § 63.405, the recordkeeping and reporting requirements of 40 CFR § 63.406, and the applicable General Provisions in Table 1 of Subpart Q.

C.    LEVEL OF DETAIL FOR NON-POINT SOURCES

**C-1.    Identification of wastewater streams subject to MACT in the Title V permit**

*STAPPA/ALAPCO Recommendation:*  STAPPA and ALAPCO recommend that each wastewater stream need not be identified individually in the permit. The permit should contain 1) a description of the criteria for determining a wastewater stream's status, or a reference to the relevant MACT provisions that establish those criteria, and 2) the applicable requirements for Group 1 and Group 2 streams.  The identification of the wastewater streams affected by MACT (i.e., Group 1 and Group 2 streams) and the applicable group status will be provided in the implementation plan or periodic reports as required by the MACT.

*EPA Response:*  We understand your recommendation to mean that the permit would define wastewater streams as a class (i.e., one class for Group 1, another class Group 2), and would not identify individual wastewater streams within each class.   As clarified in Dallas, we interpret your recommendation  to apply not only to how the permit identifies wastewater streams existing at the time of permit issuance,  but also to how the permit might provide for the addition of new streams without a permit revision.

We do not agree with the idea that individual streams need not be identified. The permit must include a listing of all wastewater streams that designates their status as Group 1 or Group 2, because each Group has different applicable requirements, including monitoring, reporting, recordkeeping and testing requirements.   The linkage between individual streams and their Group 1/Group 2 status may be set up as an Alternative Operating Scenario, which would allow individual streams to change status during the permit term, provided that the new status is

identified in the on-site log required by part 70.  Under this approach, the permit would need to contain or reference the procedures by which the source determines Group 1 or Group 2 status.  Also, the permit must be revised in order to identify new wastewater streams.  Note that we are experimenting with advance approval of wastewater streams under the MACT standard for pharmaceutical production, see 63 Fed. Reg. 50, 280 (September 21, 1998) (to be codified at 40 CFR Part 63, Subpart GGG), and may have additional guidance on this topic in the future.

Finally, the permit needs to require the source to provide notification for any change in Group status as required in MACT regulations.  For example, Subpart G requires a source to report in the next periodic report any Group 2 emission point that becomes a Group 1 emission point, and include a schedule of compliance as required by § 63.100 of Subpart F.  [See 40 CFR § 63.152(c)(4)(iii).]

## C-2.    Specification of requirements for fugitive and wastewater sources

*STAPPA/ALAPCO Recommendation:*  For fugitive emission requirements, STAPPA and ALAPCO recommend that detail at the Subpart level is generally sufficient (e.g., Subpart H).  For wastewater requirements, STAPPA and ALAPCO recommend that the permit contain detail at the section level.  If the MACT does not require the source to keep records of the current operating options, the permit could specify such a recordkeeping requirement.  Finally, the state and local agencies believe Part 70 does not require the source to notify permitting authorities when they switch compliance options.

*EPA Response:* We understand your recommendation to apply to equipment leak requirements ("fugitive emission requirements") and wastewater emission points ("wastewater sources.")

As we stated in the response to recommendation B-4, we do not believe that Subpart citation by itself is appropriate.  For equipment leak requirements (e.g., Subpart H of part 63, Subpart VV of part 60),  different standards, recordkeeping and reporting requirements apply to different types of equipment subject to the rule.  For example, one standard applies to pumps in light liquid service, and another standard applies to pumps in heavy liquid service.  For this reason, we believe that the applicable requirements of Subpart H (and other similar rules) should be cited at appropriate levels below the Subpart, consistent with the need discussed above to clearly designate the specific applicable requirements for different and specific emission units.

For wastewater streams, citation to the section level (or lower) level of citation is needed to clearly convey the emission limitations of the rules with no ambiguity .  We agree that part 70 does not require sources to notify permitting authorities when they switch compliance options that are part of an AOS.  However, as noted in the response to recommendation B-2, the MACT general provisions do require reporting and notification when switching to a new compliance option (unless the permit includes the information as an AOS), and these requirements must be met.  As we have noted elsewhere, permit revisions can be minimized by including all anticipated options in the permit as AOS's.

## C-3.    Specification of operating parameters in the permit

*STAPPA/ALAPCO Recommendation:*  STAPPA and ALAPCO recommend that either the actual value for operating parameters or the process to develop those values be considered sufficient to meet Title V permit requirements. Where operating parameter values are identified in the permit, STAPPA and ALAPCO recommend that the minor permit modification process be used to add or change operating parameter values. Public and EPA review would occur at permit renewal.

*EPA Response:*  We interpret your suggestion as applying to the parameter ranges or maximum/minimum parameter values (from here on we will refer to them as "parameter ranges"). These parameter ranges are required by many MACT standards.  However, we interpret your suggestion as not limited solely to MACT standards; for example, it could apply to NSPS standards that require parameter ranges.  We further interpret your suggestion as allowing a permit authority to put in the permit either a process for determining the parameter range, or the parameter range itself.  We understand the suggestion to put just the process in the permit to mean that the range itself would not be in the initial permit, and also that the permit would not be revised when a new parameter range is set using the process.  In addition, you are recommending that if the actual parameter range is identified in the permit, and then a new parameter range is established, the minor permit modification could be used to incorporate the new parameter range.

We believe that the parameter range must be included in the permit.  The parameter range is one of the applicable requirements comprising MACT standards, and is often the means for determining compliance with the emission standard.  Including the parameter range as a permit term ensures that the source will be required to promptly report deviations from the range [40 CFR § 70.6(a)(3)(iii)(B)], to submit semiannual reports of such deviations and parameter monitoring [40 CFR § 70.6(a)(3)(iii)(A)], and to certify compliance with the range [40 CFR § 70.6(c)(5)].

We agree that for incorporating a new parameter range into a permit, a minor permit modification could be used.  We are also investigating whether this could be done as an administrative change to the permit.  This is because we believe that most changes to a parameter range will not be a significant change to monitoring, recordkeeping, or reporting [40 CFR §70.7(e)(2)(i)(A)(2)].  Note that in accordance with 40 CFR § 70.7(e)(2)(i)(A), a significant change to monitoring, recordkeeping, or reporting would require the significant modification process.  Again, the current Part 70 regulations require that minor permit modifications have an EPA review at the time of the permit modification. [40 CFR § 70.7(e)(iii) & (iv)].

In situations where parameter ranges are expected to change so often that a minor permit modification for each change would be impractical, we suggest that you consider the group processing provisions for minor modifications.  See 40 CFR § 70.7(e)(3).  These provisions are available for changes that are collectively below the thresholds identified in 40 CFR § 70.7(e)(3)(i)(B).  We expect that many changes to parameter ranges would be small enough to fit below these thresholds.  If so, group processing allows the permitting authority to group up to

a quarter's worth of changes, and then to take up to 180 days to act on the group of permit revisions.

This guidance does not alter the flexibility provided under the "Change Management Strategy" set forth in the preamble to the MACT standard for Pharmaceutical Production, or in future Subparts with similar flexibility. In addition, this guidance does not alter the provisions of the compliance assurance monitoring (CAM) rule, which specifically authorize the permit to include procedures for establishing parameter indicator ranges, designated conditions or excursion triggers, rather the particular ranges, conditions or triggers. See 40 CFR 64.4(a)(2) and (c)(2).

**C-4.    Incorporation of startup, shutdown, and malfunction plans, operating and maintenance plans, and periodic reports in Title V permits**

*STAPPA/ALAPCO Recommendation:* STAPPA and ALAPCO recommend that EPA use the same approach for operation and maintenance (O&M) plans and periodic reports that is contained in a memorandum from John Seitz dated January 17, 1996 addressing startup, shutdown and malfunction (SSM) plans. The associations further recommend that changes in O&M plans not trigger a permit modification procedure.

*EPA Response:* We understand your recommendation to be that the approach used in the Seitz memorandum [which applies to startup, shutdown and malfunction (SSM) plans] should also apply to O&M plans and to periodic reports. We further understand your recommendation to be that EPA should not require a permit revision when changes are made to an operation and maintenance plan.

To put your recommendation in context, we need to clarify that the General Provisions of part 63 require any SSM plan to be incorporated by reference into the title V permit [§63.6(e)(3)]. In addition, Subpart N requires an O&M plan to be incorporated by reference into the permit [§63.342(f)(3)(i)]. As far as we are presently aware, Part 63 does not require any periodic reports or any other O&M plans to be incorporated by reference into the permit. Since these periodic reports and O&M plans (except Subpart N) are not required to be incorporated by reference into title V permits, these documents need not be incorporated by reference, nor must their content be included as permit terms, in order to assure compliance with the relevant part 63 applicable requirements. Consequently, we agree that a permit revision would not be required when changes are made to these reports or O&M plans. Of course, permits must still require that sources develop, implement or submit, retain, and revise as necessary these plans or reports, consistent with the applicable MACT standard.

That still leaves the SSM plans required under the General Provisions and the O&M plan required under Subpart N. We recognize that requiring the incorporation of these plans by reference into the permit renders the content of the plans enforceable permit conditions and, accordingly, means that changes to plans could result in permit revisions. We believe that this outcome can be avoided, however, by a general reference in the permit to the SSM plan. The

**DRAFT -- DO NOT CITE OR QUOTE**

permit would still incorporate the plan by reference, but the reference would not cite the date or specific content of any particular SSM plan. This approach would allow the plan to change without triggering a permit revision. To implement this approach, the permit would state that the SSM plan required under § 63.6(e)(3), and any revision to that plan, is incorporated by reference and is enforceable as a term and condition of the permit. The permit would further state that revisions to the SSM plan are automatically incorporated by reference and do not require a permit revision.

Although incorporation by reference of a document required by an applicable requirement would normally require reference to the document as it exists on a specific date, we believe the approach outlined here for SSM plans is appropriate because it is more consistent with the intent of the General Provisions, which were promulgated subsequent to part 70 and which contemplate that the source will be able to make changes to the SSM plan without the prior approval of the EPA or the permitting authority. See, e.g., §§ 63.6(e)(3)(v) and (e)(3)(vii). For example, any time the SSM plan fails to address or inadequately addresses an event that meets the characteristics of a malfunction, the source must revise the SSM plan to include procedures for operating and maintaining the source during similar malfunction events, and a program of correction actions for similar malfunctions of process or air pollution control equipment. See § 63.6(e)(3)(viii). In addition, compliance with an SSM plan does not relieve a facility from the responsibility to comply with good air pollution control practices as required by § 63.6(e)(1).

Finally, the permit must contain language that reiterates an enforceable obligation for the source to develop, implement, retain, and revise as necessary the SSM plan. The permit must also contain a reference to the applicable rule requirement that requires the plan. Permit authorities also have the authority to request that the SSM plan be submitted to them. They also can require essential parts of the plan, such as the definition of startup, shutdown and malfunction events, to be included in a permit application, pursuant to § 70.5(c)(5), which states that applications must include all information needed to determine applicability of requirements.

Of course, States retain the authority to incorporate specifically identified SSM plans by reference into title V permits, if a permitting authority believes it is important to review certain changes to particular SSM plans pursuant to its approved part 70 program. Note that the requirement to incorporate the SSM plan by reference is under review by EPA as part of the settlement of the litigation on the Part 63 General Provisions and may be the subject of future rulemaking.