# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

<table>
<tr><td>_____<br>)<br>UNITED STATES OF AMERICA,   )<br>)<br>   Plaintiff,   )<br>)<br>   v.   )<br>)<br>AMEREN MISSOURI,   )<br>)<br>   Defendant.   )<br>_____ )</td><td>Civil Action No. 4:11-cv-00077-RWS</td></tr>
</table>

## AMENDED COMPLAINT

The United States of America ("United States"), by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("U.S. EPA"), alleges as follows:

## NATURE OF THE ACTION

1.      This is a civil action against Ameren Missouri ("Defendant" or "Ameren") for violations of the Clean Air Act ("CAA" or "the Act"), 42 U.S.C. §§ 7401 *et seq.*, at the Rush Island Plant in Festus, Missouri.  Pursuant to Sections 113 and 167 of the Act, 42 U.S.C. §§ 7413(b) and 7477, the United States seeks injunctive relief and civil penalties for violations of: (a) the New Source Review ("NSR"), Prevention of Significant Deterioration ("PSD") provisions of the CAA, 42 U.S.C. §§ 7470-92 and applicable implementing regulations; (b) the federally

approved and enforceable Missouri State Implementation Plan ("Missouri SIP"); (c) Title V of the Act, 42 U.S.C. §§ 7661-7661f; (d) federal regulations implementing Title V of the Act at 40 C.F.R. Part 70; and (e) Missouri's federally approved Title V program, 10 C.S.R. 10-6.065.

2.      Ameren performed major modifications of the Rush Island Plant in violation of the CAA.  Ameren failed to obtain the required permits for these multi-million dollar modifications.  Nor did Ameren install and operate state-of-the-art air pollution controls, as the law requires, including the best available control technology ("BACT") to reduce emissions of sulfur dioxide ("$SO_2$").

3.      As a result of Ameren's operation of the Rush Island Plant following these unlawful modifications, significant amounts of $SO_2$ pollution have been, and continue to be, released into the air.  The Rush Island Plant ranks among the largest sources of air pollution in Missouri and the nation, emitting tens of thousands of tons of $SO_2$ each year.  These emissions harm public health and the environment, contributing to premature mortality, asthma attacks, acid rain and other adverse effects in downwind communities and natural areas.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action pursuant to Sections 113(b) and 167 of the Act, 42 U.S.C. §§ 7413(b) and 7477, and pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1395(a).

5.      Venue is proper in this District pursuant to Sections 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c) because the violations which constitute the basis of this Amended Complaint occurred in this District and the Rush Island Plant is operated by Defendant in this District.

## NOTICES

6. On May 27, 2011, U.S. EPA issued an amended Notice of Violation ("NOV") to Defendant pursuant to Section 113(a)(1) and (b)(1) of the Act, 42 U.S.C. §§ 7413(a)(1) and (b)(1), and provided a copy of the amended NOV to the State of Missouri. U.S. EPA previously issued the NOVs to Defendant on October 14, 2010 and January 26, 2010 and provided a copy of these NOVs to the State of Missouri.

7. The 30-day period between issuance of the NOV and commencement of a civil action, required under CAA Section 113, 42 U.S.C. § 7413, has elapsed.

8. The United States has provided notice of the commencement of this action to the State of Missouri, pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b).

## AUTHORITY

9. Authority to bring this action is vested in the Attorney General of the United States by CAA Section 305, 42 U.S.C. § 7605, and pursuant to 28 U.S.C. §§ 516 and 519.

## DEFENDANT

10. Defendant Ameren is a Missouri corporation. Defendant's incorporated name is Union Electric Company, but Defendant conducts business under the name Ameren Missouri.

11. As a corporate entity, Ameren is a "person" within the meaning of CAA Section 302(e), 42 U.S.C. § 7602(e), and 10 C.S.R. 10-6.020(2).

12. Ameren is the owner and/or operator of the Rush Island Plant in Festus, Jefferson County, Missouri.

13. Ameren's Rush Island Plant consists, in part, of Units 1 and 2, which are coal-fired electric generating units. Coal-fired units include boilers that burn coal to generate heat that converts water into steam. Hot gases from burning coal flow through duct work and pass

across a series of major components in the unit, which heat water into steam and ultimately pass the high temperature, high-pressure steam through steel tubes in the components to turbines that spin a generator to produce electricity. Each of these major boiler components consists of a massive array of numerous large steel tubes or, in the case of components that help preheat air in the boiler, non-pressure part tube bundles or baskets with corrugated metal heat exchanging surface. These components can weigh many tons and cost millions of dollars to replace. Major components of a coal-fired boiler include the superheater, economizer, reheater, lower slope tubes, and air preheater. When a major component in a coal-fired electric generating unit breaks down, such as one of the components replaced by Ameren, it causes the unit to be taken out of service for repairs - events known as "forced outages." A deteriorated major component can cause increasing numbers of forced outages, as well as maintenance and scheduled outages needed to maintain the worn-out equipment, preventing the unit from generating electricity when it is needed. By replacing the worn-out component that is causing the outages, a utility can improve the unit's availability to operate more hours in a year. At Rush Island Units 1 and 2, the newly available hours of operation enabled by the project would be expected to be used to generate electricity. Rush Island Units 1 and 2 are both baseload coal-fired electric generating units that operate nearly continuously when available to supply the electricity needed to meet minimum levels of customer demand. These additional hours of operation translate into increased amounts of coal burned in the unit, and more annual pollution emitted from the unit's smokestack into the atmosphere.

14.     In addition to improving the availability of a coal-fired generating unit, replacing deteriorated components with new, improved components can also increase the capacity of the boiler to pass steam through the components to the turbines at greater volumes and/or at higher

temperatures.  This can result in an increase in the amount of coal burned, and pollution emitted, during each hour of the unit's operation.  Even if a project does not increase the amount of coal burned per hour, an improved component can increase the capacity and/or efficiency of the unit, which for a coal-fired generating unit like Rush Island Units 1 and 2, can make the unit more cost-effective and thus more economical to operate than other units.  This can lead the utility to operate that improved unit during more hours of operation and/or at higher levels of operation, which in turn can lead to increases in coal burned at the unit and $SO_2$ and other pollutants emitted from the unit's smokestack on an annual basis.

## STATUTORY AND REGULATORY BACKGROUND

15.     The Clean Air Act is designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population. Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1).

### A.   The National Ambient Air Quality Standards

16.     Section 109 of the Act, 42 U.S.C. § 7409, requires the Administrator of U.S. EPA to promulgate regulations establishing primary and secondary national ambient air quality standards ("NAAQS" or "ambient air quality standards") for those air pollutants ("criteria pollutants") for which air quality criteria have been issued pursuant to Section 108 of the Act, 42 U.S.C. § 7408.  The primary ambient air quality standards are to be adequate to protect the public health with an adequate margin of safety, and the secondary ambient air quality standards are to be adequate to protect the public welfare from any known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air.

17.     Pursuant to Sections 108 and 109, 42 U.S.C. §§ 7408 and 7409, U.S. EPA has identified $SO_2$ as a criteria pollutant and has promulgated NAAQS for this pollutant.  40 C.F.R.

§§ 50.4, 50.5. Emissions of $SO_2$ contribute to the formation of another air pollutant, particulate matter smaller than 2.5 microns ("$PM_{2.5}$" or "PM"). U.S. EPA has designated $PM_{2.5}$ as a criteria pollutant and established an annual and daily NAAQS for it. 40 C.F.R. §§ 50.7, 50.13. Effective July 15, 2008, $SO_2$ is regulated as a precursor to $PM_{2.5}$. 73 Fed. Reg. 28,321, 28,327-28 (May 16, 2008).

18.     Under Section 107(d) of the Act, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data. An area that meets the NAAQS for a particular pollutant is termed an "attainment" area with respect to such pollutant. An area that does not meet the NAAQS for a particular pollutant is termed a "nonattainment" area with respect to such pollutant. An area that cannot be classified as either "attainment" or "nonattainment" with respect to a particular pollutant due to insufficient data is termed "unclassifiable" with respect to such pollutant.

19.     The Rush Island Plant is located in Jefferson County, Missouri. At all times relevant to this Complaint, Jefferson County has been classified as attainment for $SO_2$. 40 C.F.R. § 81.326.

### B.  The Prevention of Significant Deterioration Requirements

20.     Part C of Title I of the Act, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration of air quality in those areas designated as either attainment or unclassifiable for purposes of meeting the NAAQS standards. These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources, and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the

consequences of such a decision and after public participation in the decision making process. 42 U.S.C. § 7470. These provisions are referred to herein as the "PSD program."

21.     As part of the PSD program, Section 165(a) of the Act, 42 U.S.C. § 7475(a), among other things, prohibits the "construction" of a "major emitting facility" in an area designated as attainment or unclassifiable unless a permit has been issued that comports with the requirements of Section 165 and the facility employs the "Best Available Control Technology" ("BACT") for each pollutant subject to regulation under the Act that is emitted from the facility.

22.     Section 169(2)(c) of the Act, 42 U.S.C. § 7479(2)(c), defines "construction" as including "modification" (as defined in CAA Section 111(a)). "Modification" is defined in CAA Section 111(a), 42 U.S.C. § 7411(a), to be "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."

23.     Section 169(1) of the Act, 42 U.S.C. § 7479(1), designates fossil-fuel fired steam electric plants of more than 250 million British thermal units per hour heat input that emit or have the potential to emit 100 tons per year or more of any air pollutant to be "major emitting facilities."

24.     Section 169(3) of the Act, 42 U.S.C. § 7479(3) defines BACT, in pertinent part, as "an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility . . . .  In no event shall application of 'best available control technology' result in

7

emissions of any pollutants which will exceed the emissions allowed by any applicable standard established pursuant to section 7411 . . . of this title."

25.     Pursuant to CAA Section 110(j), 42 U.S.C. § 7410(j), governing permits issued under Title I of the Act, "the owner or operator of each . . . modified stationary source which is required to obtain such a permit must show . . . that the technological system of continuous emission reduction which is to be used will enable such source to comply with the standards of performance which are to apply to such source and that the construction or modification and operation of such source will be in compliance with all other requirements of this chapter." CAA Section 165(a)(3), 42 U.S.C. § 7475(a)(3), allows issuance of a PSD permit only if "the owner or operator of such facility demonstrates, as required pursuant to section 7410(j) of this title, that emissions from construction or operation of such facility" will not compromise compliance with applicable air quality standards.

26.     Pursuant to CAA Section 110, 42 U.S.C. § 7410, each State must adopt and submit to U.S. EPA for approval a State Implementation Plan ("SIP") that includes, among other things, regulations to prevent the significant deterioration of air quality under CAA Sections 161-165, 42 U.S.C. §§ 7471-7475. Section 161 of the Act, 42 U.S.C. § 7471, requires that each applicable SIP contain a PSD program.

27.     Pursuant to CAA Section 302(q), 42 U.S.C. § 7602(q), an applicable implementation plan is the implementation plan, or most recent revision thereof, which has been approved by U.S. EPA pursuant to CAA Section 110, 42 U.S.C. § 7410, or promulgated by U.S. EPA pursuant to CAA Section 110(c), 42 U.S.C. § 7410(c), and which implements the relevant requirements of the Act. Upon U.S. EPA approval, SIP requirements are federally enforceable under Section 113 of the Act, 42 U.S.C. § 7413, and 40 C.F.R. § 52.23.

28.     A state may comply with CAA Section 161, 42 U.S.C. § 7471, by having its own

PSD regulations approved by U.S. EPA as part of its SIP, which must be at least as stringent as

those set forth at 40 C.F.R. § 51.166.  If a state does not have a PSD program that has been

approved by U.S. EPA and incorporated into the SIP, then the U.S. EPA federal PSD regulations

set forth at 40 C.F.R. § 52.21 shall  be incorporated by reference into the SIP.  40 C.F.R.

§ 52.21(a).

29.     The state of Missouri's PSD program is part of Missouri Rule 10 C.S.R. 10-6.060.

On June 22, 1982, U.S. EPA fully approved the Missouri Department of Natural Resources'

("MDNR" or "Missouri") PSD program as a revision to Missouri's SIP.  47 Fed. Reg. 26,833.

Since then, the Missouri SIP, including 10 C.S.R. 10-6.060, has been amended and approved by

U.S. EPA on several occasions.  51 Fed. Reg. 4,916 (Feb. 10, 1986); 54 Fed. Reg. 31,524 (July

31, 1989); 56 Fed. Reg. 9,172 (Mar. 5, 1991); 61 Fed. Reg. 7,714 (Feb. 29, 1996); 63 Fed. Reg.

70,665 (Dec. 22, 1998); 71 Fed. Reg. 36,486 (June 27, 2006); 74 Fed. Reg. 17,086 (April 14,

2009).  The citations below refer to the version of 10 C.S.R. 10-6.060 in effect and approved by

U.S. EPA in the Missouri SIP at the time the alleged violations began.  *See* 63 Fed. Reg. 70,665

(Dec. 22, 1998); 71 Fed. Reg. 36,486 (June 27, 2006); 74 Fed. Reg. 17,086 (April 14, 2009).

30.     The Missouri PSD program, as codified in the SIP, has required PSD permits for

"major modification" to major sources of air pollution. 10 C.S.R. 10-6.060(8).  The major

sources of air pollution include certain "installations" listed in the Missouri PSD program such as

fossil-fuel fired steam electric plants of more than 250 million British thermal units per hour heat

input that have the potential to emit 100 tons per year or more of any air pollutant.  10 C.S.R. 10-

6.020(3)(B), Table 2.

31.     The Missouri PSD program, as codified in the SIP, has defined "major modification" as "[a]ny physical change or change in the method of operation . . . that would result in a significant net emissions increase of any pollutant."  10 C.S.R. 10-6.020(2)(M)3 (4/30/1999); *see also* 10 C.S.R. 10-6.020(2)(M)2. (8/31/08).

32.     The Missouri PSD program, as codified in the SIP, has defined a "net emissions increase" as "[a] condition when the increases in pollutant emissions at an installation exceed the decreases of the same pollutant."  10 C.S.R. 10-6.020(2)(N)2 (4/30/1999); *see also id.* (1/29/06). The definition of "net emission increase" further explained that "[i]n determining whether a net emissions increase has occurred, all creditable increases and decreases of actual emissions shall be included...."  *Id.*  "Actual emissions" are to be calculated in "tons per year" based on "actual operating hours, production rates and types of materials processed, stored or combusted...." 10 C.S.R. 10-6.020(2)(A)4.

33.     The Missouri PSD program, as codified in the SIP, has defined a "significant" net emission increase as a net emissions increase "equal to or exceeding" certain *"de minimis* levels."  10 C.S.R. 10-6.020(2)(S)10.  The *de minimis* level for $SO_2$ is 40 "tons per year."  10 C.S.R. 10-6.020(2)(D)4; 10 C.S.R. 10-6.020(3)(A), Table 1.

34.     The Missouri PSD program, as codified in the SIP, has provided that BACT "shall apply" to the air pollutants triggering PSD review as "major modifications."  In addition, each application for a permit for construction or major modification must include, among other things, an analysis of ambient air quality and the impact of the construction or major modification on air quality, visibility, soils and vegetation.  10 C.S.R. 10-6.060(8)(B), (C) (4/30/1999); *see also* 10 C.S.R. 10-6.060(8) (1/29/06).

35.     Missouri's SIP has expressly prohibited "operation" of sources that have undergone a major modification unless that modification was properly permitted under the PSD program, providing, in pertinent part:   "Construction/Operation Prohibited: No owner or operator shall commence construction or modification of any installation subject to this rule, begin operation after that construction or modification, or begin operation of any installation which has been shut down longer than five (5) years without first obtaining a permit from the permitting authority under this rule."   10 C.S.R. 10-6.060(1)(C).

C.   Title V Permit Program

36.     Title V of the Act, 42 U.S.C. §§ 7661-7661f, establishes an operating permit program for certain sources, including "major sources" and any source required to have a PSD permit.  42 U.S.C. § 7661a(a).   A "major source" for purposes of Title V is defined, among other things, as a source with a potential to emit greater than 100 tons per year of any criteria pollutant.  42 U.S.C. § 7661(2); *id.* § 7602.

37.     The purpose of Title V is to ensure that all "applicable requirements" for compliance with the Act, including PSD and SIP requirements, are collected in one place.

38.     Pursuant to Section 502(b) of the Act, 42 U.S.C. § 7661a(b), on July 21, 1992, U.S. EPA promulgated regulations implementing the requirements of Title V and establishing the minimum elements of a major source operating permit program to be administered by any air pollution control agency.  57 Fed. Reg. 32,250 (July 21, 1992).  These regulations are codified at 40 C.F.R. Part 70.

39.     Missouri's operating permit program under Title V of the CAA was granted final approval by U.S. EPA on May 14, 1997.  62 Fed. Reg. 26,405 (May 14, 1997).  These

regulations are codified at 10 C.S.R. 10-6.065 and are incorporated into the federally enforceable Missouri SIP.  *See* 40 C.F.R. § 52.1320.

40.     The regulations at 10 C.S.R. 10-6.065 apply to "existing, modified, reconstructed and new installations, whether part 70, intermediate or basic state, throughout Missouri." 10 C.S.R. 10-6.065(3)(A) (3/31/1998); *see also* 10 C.S.R. 10-6.065(1)(A) (6/30/2006).  A "part 70 installation" is defined as, *inter alia*, a source which emits or has the potential to emit one hundred (100) tons per year or more of any air pollutant.  10 C.S.R. 10-6.065(1)(D)2 (3/31/1998); *see also* 10 C.S.R. 10-6.065(2)(D)2 (6/30/2006).

41.     Missouri's Title V regulations require that no person shall operate a Part 70 installation except in compliance with an operating permit issued by the permitting authority. 10 C.S.R. 10-6.065(2)(A) (3/31/1998); *see also* 10 C.S.R. 10-6.065(1)(D) (6/30/2006).  Section 502(a) of the CAA and federal regulations implementing Title V of the Act similarly provide that no source may operate without a Title V permit after the effective date of any permit program approved or promulgated under Title V of the Act.  42 U.S.C. § 7661a(a); 40 C.F.R. § 70.7(b).

42.     Section 503(c) of the Act, federal regulations implementing Title V of the Act, and Missouri's Title V regulations approved by U.S. EPA, require a source to submit a timely, accurate, and complete application for a permit, including, among other things:  the citations and descriptions of all requirements applicable to the source (including any requirement to comply with an emission rate that meets BACT pursuant to PSD); a description of, and compliance plan for, requirements for which the source is not in compliance; and a certification by a responsible official of the truth, accuracy, and completeness of the application.  42 U.S.C. § 7661b(c); 40 C.F.R. § 70.5(a) and (c); 10 C.S.R. 10-6.065(6)(B).

43.     Section 504(a) of the Act, federal regulations implementing Title V of the Act and Missouri's Title V regulations approved by U.S. EPA require that each Title V operating permit include, among other things, enforceable emissions limitations and standards and such other conditions as are necessary to assure compliance with applicable requirements of the Act and the requirements of the Missouri SIP, including any applicable PSD requirement to comply with an emission rate that meets BACT.  42 U.S.C. § 7661c(a); 40 C.F.R. § 70.6; 10 C.S.R. 10-6.065(6).

44.     Federal regulations implementing Title V of the Act and Missouri's Title V regulations approved by U.S. EPA require that all Part 70 installations have a permit to operate that contains operational requirements or limitations necessary to assure compliance with all applicable requirements.  40 C.F.R. § 70.1; 10 C.S.R. 10-6.065(6)(C).

45.     Federal regulations implementing Title V of the Act and Missouri's Title V regulations approved by U.S. EPA define "applicable requirement" to include any standard or requirement provided for in the implementation plan approved or promulgated by EPA through rulemaking under Title I of the Act that implements the relevant requirements, including any revisions to that plan promulgated in 40 C.F.R. part 52.  10 C.S.R. 10-6.020(2)(A)27; *see also* 10 C.S.R. 10-6.020(2)(A)(23) (8/31/2008); 40 C.F.R. § 70.2.

46.     Federal regulations implementing Title V of the Act and Missouri's Title V regulations approved by U.S. EPA provide that any applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application shall, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information.  10 C.S.R. 10-6.065(6); 40 C.F.R. § 70.5(b).

47.     Federal regulations implementing Title V of the Act and Missouri's Title V regulations approved by U.S. EPA provide that each Title V operating permit must include

13

requirements for annual certification to U.S. EPA and the permitting authority of compliance with the terms and conditions contained in the permit that are federally enforceable, including emissions limitations, standards or work practices. 40 C.F.R. 70.6; 10 C.S.R. 10-6.065(6)(C)3 (3/31/1998); *see also* 10 C.S.R. 10-6.065(6)(B)3.J. (8/31/2005).

48.     The MDNR issued Title V Operating Permit Number OP2000061 to Defendant for operation of its Rush Island Plant. Title V Operating Permit Number OP2000061 became effective on May 18, 2000 and remained in effect until MDNR issued Ameren Missouri Title V Operating Permit Number OP2010-047 for the Rush Island Plant. Title V Operating Permit Number OP2010-047 became effective on August 30, 2010.

49.     At all times relevant to this Complaint, the Title V Operating Permits for Defendant's Rush Island Plant have provided that Defendant shall not change a permitted installation without a permit revision, if that change is subject to, *inter alia*, the PSD regulations under the Missouri SIP. *See also* 10 C.S.R. 10-6.065(6)(C)9.

50.     At all times relevant to this Complaint, the Title V Operating Permits for Defendant's Rush Island Plant have provided that Defendant shall not commence a major modification of any installation subject to 10 C.S.R. 10-6.060 or begin operation after that construction without first obtaining a permit from the permitting authority.

51.     At all times relevant to this Complaint, the Title V Operating Permits for Defendant's Rush Island Plant have provided that Ameren shall annually certify that it is in compliance with all of the federally enforceable terms and conditions contained in those permits. *See also* 40 C.F.R. 70.6; 10 C.S.R. 10-6.065(6)(C)3 (3/31/1998); 10 C.S.R. 10-6.065(6)(B)3.J. (8/31/2005).

52.     Federal regulations implementing Title V of the Act and Missouri's Title V regulations approved by U.S. EPA each provide that all terms and conditions of any Title V operating permit are enforceable by, *inter alia*, U.S. EPA.  40 C.F.R. §70.6(b); 10 C.S.R. 10-6.065(6)(C)2.

## ENFORCEMENT PROVISIONS

53.     Sections 113(a)(1) and (3) of the Act, 42 U.S.C. §§ 7413(a)(1) and (3), provide that the Administrator may bring a civil action in accordance with Section 113(b) of the Act, 42 U.S.C. § 7413(b), whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated or is in violation of any requirement or prohibition of, *inter alia*, the PSD requirements of Section 165(a) of the Act, 42 U.S.C. § 7475(a); Title V of the Act, 42 U.S.C. §§ 7661-7661f, or any rule or permit issued thereunder; or the provisions of any approved SIP or any permit issued thereunder.

54.     Section 113(b) of the Act, 42 U.S.C. § 7413(b), authorizes the Administrator to initiate a judicial enforcement action against "the owner or operator of an affected source, a major emitting facility, or a major stationary source" or "any other person" for a permanent or temporary injunction, and/or for a civil penalty of up to $25,000 per day for each violation occurring on or before January 30, 1997; up to $27,500 per day for each such violation occurring on or after January 31, 1997 and up to and including March 15, 2004; and up to $32,500 per day for each such violation occurring on or after March 16, 2004 and up to and including January 12, 2009; and up to $37,500 per day for each such violation occurring on or after January 13, 2009, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, and 40 C.F.R. § 19.4, whenever such person has violated, or is in violation of, *inter alia,* the requirements or prohibitions described in the preceding paragraph.

15

55.     40 C.F.R. § 52.23 provides, *inter alia*, that any failure by a person to comply with any provision of 40 C.F.R. Part 52, or with any approved regulatory provision of a SIP, shall render such person in violation of the applicable SIP, and subject to enforcement action pursuant to Section 113 of the Act, 42 U.S.C. §7413.

56.     Section 167 of the Act, 42 U.S.C. § 7477, authorizes the Administrator to initiate an action for injunctive relief, as necessary to prevent the construction, modification or operation of a major emitting facility which does not conform to the PSD requirements in Part C of the Act.

## GENERAL ALLEGATIONS

57.     At all times relevant to this Amended Complaint, Defendant was and is the owner and/or operator of the Rush Island Plant.

58.     At all times relevant to this Amended Complaint, the Rush Island Plant has had the potential to emit more than 100 tons per year of pollutants subject to regulation under the Act, including, but not limited to, $SO_2$.

59.     At all times relevant to this Amended Complaint, the Rush Island Plant was and is a fossil-fuel-fired steam electric plant of more than 250 million British thermal units (BTU) per hour heat input.

60.     At all times relevant to this Amended Complaint, the Rush Island Plant was and is a "major stationary source" within the meaning of 42 U.S.C. § 7479(1) and a "major stationary source" within the meaning of 40 C.F.R. § 52.21(b)(1)(i)(a).

61.     At all times relevant to this Amended Complaint, the Rush Island Plant was and is an "installation" subject to the requirements of Missouri's PSD program.  10 C.S.R. 10-6.060(6) and (8).

62.     At all times relevant to this Amended Complaint, the Rush Island Plant was and is a "major source" within the meaning of Title V of the Act and the federal Title V regulations. 42 U.S.C. § 7661(2); 40 C.F.R. § 70.2.

63.     At all times pertinent to this Amended Complaint, the Rush Island Plant was and is a "Part 70 installation" within the meaning of the Missouri Title V regulations. 10 C.S.R. 10-6.065(2)(D).

64.      U.S. EPA is charged with the oversight and enforcement for thousands of major sources of air pollution in the nation.  PSD is a self-reporting permitting regime, and the agency depends on sources to follow the law in the first instance.  Here, Ameren did not disclose to U.S. EPA the major modifications of Rush Island that are at issue.  On the contrary, Ameren filed annual statements with Missouri and U.S. EPA that certified compliance with the CAA.  The facts giving rise to the alleged violations only came to light during and after 2008 as the result of U.S. EPA's enforcement investigation of Ameren.  The company's response to that investigation highlights why U.S. EPA did not learn of the alleged violations earlier.   For example, Ameren asserted that the documents relating to the alleged violations were "confidential business information" ("CBI"), a designation reserved for trade secrets and other matters not known by the public.  40 C.F.R. § 2.201(e).

## FIRST CLAIM FOR RELIEF

(PSD Violations at Rush Island Unit 1 in 2001/2002)

65.     Paragraphs 1 through 64 are realleged and incorporated herein by reference.

66.     Rush Island Unit 1 began operating in 1976.

67.     From approximately September 2001 to February 2002, Defendant began actual construction and operation of one or more "major modifications", as defined in the CAA and the

Missouri SIP, on Rush Island Unit 1. These major modifications included one or more physical changes and/or changes in the method of operation at Rush Island Unit 1, including, but not limited to: a project to replace the complete primary superheater with a modified and expanded component, as well as associated turbine replacements. These multi-million dollar modifications were described in the notices of violation dated January 26, October 14, 2010, and May 27, 2011. These physical changes and/or changes in the method of operation resulted in a significant net emissions increase of $SO_2$, as defined in the Missouri SIP, by enabling and causing Rush Island Unit 1 to burn more coal and release greater amounts of $SO_2$ into the atmosphere in one or more of the following ways: (i) by increasing the capacity of Rush Island Unit 1 to burn more coal per hour of operation and emit greater amounts of $SO_2$ on an annual basis than it emitted during the applicable period before the major modification; (ii) by increasing the availability of Rush Island Unit 1 to operate more hours, burn more coal, and emit greater amounts of $SO_2$ on an annual basis than it did during the applicable period before the major modification; and/or (iii) by increasing the cost-effectiveness of Rush Island Unit 1 to operate more hours, burn more coal, and emit greater amounts of $SO_2$ on an annual basis than it did during the applicable period before the major modification.

68. Defendant did not comply with the PSD requirements in the Act and the Missouri SIP with respect to the major modifications and subsequent operations at Rush Island Unit 1. Among other things, Defendant: (i) undertook such major modifications without first obtaining a PSD permit for the construction and operation of the modified unit; (ii) undertook such major modifications without undergoing a BACT determination in connection with the major modifications; (iii) undertook such major modifications without installing BACT for control of $SO_2$ emissions; (iv) has failed to operate BACT for control of $SO_2$ emissions pursuant to a BACT

determination; (v) has failed to operate in compliance with BACT emission limitations,

including limitations that are no less stringent than applicable standards under Section 111 of the

CAA; and (vi) operated after undergoing an unpermitted major modification, despite the express

prohibition in the Missouri SIP against operating an unlawfully modified source.

69.     Defendant has violated and continues to violate Section 165(a) of the Act, 42

U.S.C. § 7475(a) and the PSD regulations contained in the federally enforceable Missouri SIP.

Unless restrained by an order of this Court, these violations will continue.

70.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of

the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendant to injunctive relief

and/or a civil penalty of up to up to $27,500 per day for each such violation occurring on or after

January 31, 1997 and up to and including March 15, 2004; up to $32,500 per day for each such

violation occurring on or after March 16, 2004 and up to and including January 12, 2009; and up

to $37,500 per day for each such violation occurring on or after January 13, 2009 pursuant to the

Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31

U.S.C. § 3701, and 40 C.F.R. § 19.4.

## SECOND CLAIM FOR RELIEF

(PSD Violations at Rush Island Unit 2 in 2003/2004)

71.     Paragraphs 1 through 70 are realleged and incorporated herein by reference.

72.     Rush Island Unit 2 began operating in 1977.

73.     From November, 2003 to January, 2004, Defendant began actual construction and

operation of one or more "major modifications," as defined in the CAA and Missouri SIP, on

Rush Island Unit 2.  These major modifications included one or more physical changes and/or

changes in the method of operation at Rush Island Unit 2, including, but not limited to: a project

to replace the complete primary superheater with a modified and expanded component, as well as associated turbine replacements. These multi-million dollar modifications were described in the notices of violation dated January 26, 2010, October 14, 2010, and May 27, 2011. These physical changes and/or changes in the method of operation resulted in a significant net emissions increase of $SO_2$, as defined in the Missouri SIP, by enabling and causing Rush Island Unit 2 to burn more coal and release greater amounts of $SO_2$ into the atmosphere in one or more of the following ways: (i) by increasing the capacity of Rush Island Unit 2 to burn more coal per hour of operation and emit greater amounts of $SO_2$ on an annual basis than it emitted during the applicable period before the major modification; (ii) by increasing the availability of Rush Island Unit 2 to operate more hours, burn more coal, and emit greater amounts of $SO_2$ on an annual basis than it did during the applicable period before the major modification; and/or (iii) by increasing the cost-effectiveness of Rush Island Unit 2 to operate more hours, burn more coal, and emit greater amounts of $SO_2$ on an annual basis than it did during the applicable period before the major modification.

74. Defendant did not comply with the PSD requirements in the Act and the Missouri SIP with respect to the major modifications and subsequent operations at Rush Island Unit 2. Among other things, Defendant: (i) undertook such major modifications without first obtaining a PSD permit for the construction and operation of the modified unit; (ii) undertook such major modifications without undergoing a BACT determination in connection with the major modifications; (iii) undertook such major modifications without installing BACT for control of $SO_2$ emissions; (iv) has failed to operate BACT for control of $SO_2$ emissions pursuant to a BACT determination; (v) has failed to operate in compliance with BACT emission limitations, including limitations that are no less stringent than applicable standards under Section 111 of the

CAA; and (vi) operated the unit after undergoing an unpermitted major modification, despite the express prohibition in the Missouri SIP against operating an unlawfully modified source.

75.     Defendant has violated and continues to violate Section 165(a) of the Act, 42 U.S.C. § 7475(a) and the PSD regulations contained in the federally enforceable Missouri SIP. Unless restrained by an order of this Court, these violations will continue.

76.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendant to injunctive relief and/or a civil penalty of up to up to $27,500 per day for each such violation occurring on or after January 31, 1997 and up to and including March 15, 2004; up to $32,500 per day for each such violation occurring on or after March 16, 2004 and up to and including January 12, 2009; and up to $37,500 per day for each such violation occurring on or after January 13, 2009 pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, and 40 C.F.R. § 19.4.

## THIRD CLAIM FOR RELIEF

### (PSD Violations at Rush Island Unit 1 in 2007)

77.     Paragraphs 1 through 76 are realleged and incorporated herein by reference.

78.     From approximately February 2007 to May 2007, Defendant began actual construction and operation of one or more "major modifications," as defined in the CAA and Missouri SIP, on Rush Island Unit 1.  These major modifications included one or more physical changes and/or changes in the method of operation at Rush Island Unit 1, including, but not limited to: a project to replace the economizer, reheater, lower slope tubes, and air preheater. These multi-million dollar modifications were described in the notices of violation dated January 26, 2010, October 14, 2010, and May 27, 2011.  These physical changes and/or changes in the

method of operation resulted in a significant net emissions increase of $SO_2$, as defined in the Missouri SIP, by increasing the availability of Rush Island Unit 1 to operate more hours than it did during the applicable period before the major modification, thus enabling and causing Rush Island Unit 1 to burn more coal and release greater amounts of $SO_2$ into the atmosphere on an annual basis.

79.     Defendant did not comply with the PSD requirements in the Act and the Missouri SIP with respect to the major modifications and subsequent operations at Rush Island Unit 1. Among other things, Defendant: (i) undertook such major modifications without first obtaining a PSD permit for the construction and operation of the modified unit; (ii) undertook such major modifications without undergoing a BACT determination in connection with the major modifications; (iii) undertook such major modifications without installing BACT for control of $SO_2$ emissions; (iv) has failed to operate BACT for control of $SO_2$ emissions pursuant to a BACT determination; (v) has failed to operate in compliance with BACT emission limitations, including limitations that are no less stringent than applicable standards under Section 111 of the CAA; and (vi) operated the unit after undergoing an unpermitted major modification, despite the express prohibition in the Missouri SIP against operating an unlawfully modified source.

80.     Defendant has violated and continues to violate Section 165(a) of the Act, 42 U.S.C. § 7475(a), and the PSD regulations contained in the federally enforceable Missouri SIP. Unless restrained by an order of this Court, these violations will continue.

81.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendant to injunctive relief and/or a civil penalty of up to $32,500 per day for each such violation occurring on or after March 16, 2004 and up to and including January 12, 2009 and up to $37,500 per day for each

such violation occurring on or after January 13, 2009 pursuant to the Federal Civil Penalties

Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, and 40

C.F.R. § 19.4.

## FOURTH CLAIM FOR RELIEF

(PSD Violations at Rush Island Unit 2 in 2010)

82.     Paragraphs 1 through 81 are realleged and incorporated herein by reference.

83.     From approximately January 2010 to April 2010, Defendant began actual

construction and operation of one or more "major modifications," as defined in the CAA and

Missouri SIP, on Rush Island Unit 2.  These major modifications included one or more physical

changes and/or changes in the method of operation at Rush Island Unit 2, including, but not

limited to: a project to replace the economizer, reheater, and air preheater.   These multi-million

dollar modifications were described in the notices of violation dated October 14, 2010 and May

27, 2011.  These physical changes and/or changes in the method of operation resulted in a

significant net emissions increase of $SO_2$, as defined in the Missouri SIP, by increasing the

availability of Rush Island Unit 2 to operate more hours than it did during the applicable period

before the major modification, thus enabling and causing Rush Island Unit 2 to burn more coal

and release greater amounts of $SO_2$ into the atmosphere on an annual basis.

84.     Defendant did not comply with the PSD requirements in the Act and the Missouri

SIP with respect to the major modifications and subsequent operations at Rush Island Unit 2.

Among other things, Defendant: (i) undertook such major modifications without first obtaining a

PSD permit for the construction and operation of the modified unit; (ii) undertook such major

modifications without undergoing a BACT determination in connection with the major

modifications; (iii) undertook such major modifications without installing BACT for control of

SO$_2$ emissions; (iv) has failed to operate BACT for control of SO$_2$ emissions pursuant to a BACT determination; (v) has failed to operate in compliance with BACT emission limitations, including limitations that are no less stringent than applicable standards under Section 111 of the CAA; and (vi) operated the unit after undergoing an unpermitted major modification, despite the express prohibition in the Missouri SIP against operating an unlawfully modified source.

85.     Defendant has violated and continues to violate Section 165(a) of the Act, 42 U.S.C. § 7475(a) and the PSD regulations contained in the federally enforceable Missouri SIP. Unless restrained by an order of this Court, these violations will continue.

86.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendant to injunctive relief and/or a civil penalty of up to $37,500 per day for each such violation occurring on or after January 13, 2009 pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, and 40 C.F.R. § 19.4.

## FIFTH CLAIM FOR RELIEF

(Title V Violations at Rush Island Unit 1)

87.     Paragraphs 1 through 86 are realleged and incorporated herein by reference.

88.     As set forth above, Defendant commenced construction of major modifications at Rush Island Unit 1.  As a result, these major modifications triggered the requirements to, *inter alia*, undergo a BACT determination, obtain a PSD permit establishing emissions limitations that meet BACT requirements pursuant to such a determination, and operate in compliance with such limitations.  Defendant has failed to satisfy these requirements.

89.     Subsequently, Defendant failed to submit an accurate and complete Title V permit application for Rush Island Unit 1 that identifies all applicable requirements, accurately certifies

compliance with such requirements, contains a compliance plan for all applicable requirements for which the source was not in compliance, including the requirement to meet BACT pursuant to a determination under PSD, and other specific information that may be necessary to implement and enforce the applicable requirements of the Act and/or Missouri's Title V regulations or determine the applicability of such requirements. Defendant also failed to supplement or correct the Title V permit applications containing such information for Rush Island Unit 1.

90.     Defendant has failed to obtain a proper or adequate Title V operating permit for Rush Island Unit 1 that contains one or more emissions limitations for $SO_2$ that meet BACT. Defendant has thereafter operated Rush Island Unit 1 without meeting such limitations and without having an adequate operating permit that requires compliance with such limitations or that contains a compliance plan for all applicable requirements for which the source is not in compliance.

91.     Defendant has violated its Title V Operating Permit applicable to Rush Island Unit 1 during the times relevant to this Amended Complaint by failing to accurately certify compliance with all of the federally enforceable terms and conditions contained in the permit.

92.     Defendant has violated its Title V Operating Permit applicable to Rush Island Unit 1 during the times relevant to this Amended Complaint by commencing one or more major modifications of Rush Island Unit 1 and by operating Rush Island Unit 1 after the major modification(s) without obtaining a permit from the permitting authority under 10 C.S.R. 10-6.060.

93.     Defendant's conduct has violated and continues to violate Sections 502(a), 503(c) and 504(a) of the Act, 42 U.S.C. §§ 7661a(a), 7661b(c), and 7661c(a), and the Title V implementing regulations including 40 C.F.R. §§ 70.5-70.6, and 10 C.S.R. 10-6.065.

94.     Unless restrained by an order of this Court, these violations of the Act will continue.

95.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendant to injunctive relief and/or a civil penalty of up to $27,500 per day for each such violation occurring on or after January 31, 1997 and up to and including March 15, 2004; up to $32,500 per day for each such violation occurring on or after March 16, 2004 and up to and including January 12, 2009; and up to $37,500 per day for each such violation occurring on or after January 13, 2009 pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, and 40 C.F.R. § 19.4.

## SIXTH CLAIM FOR RELIEF

### (Title V Violations at Rush Island Unit 2)

96.     Paragraphs 1 through 95 are realleged and incorporated herein by reference.

97.     As set forth above, Defendant commenced construction of major modifications at Rush Island Unit 2.  As a result, these major modifications triggered the requirements to, *inter alia*, undergo a BACT determination, obtain a PSD permit establishing emissions limitations that meet BACT requirements pursuant to such a determination, and operate in compliance with such limitations.  Defendant has failed to satisfy these requirements.

98.     Subsequently, Defendant failed to submit an accurate and complete Title V permit application for Rush Island Unit 2 that identifies all applicable requirements, accurately certifies

compliance with such requirements, contains a compliance plan for all applicable requirements for which the source was not in compliance, including the requirement to meet BACT pursuant to a determination under PSD, and other specific information that may be necessary to implement and enforce the applicable requirements of the Act and/or Missouri's Title V regulations or determine the applicability of such requirements. Defendant also failed to supplement or correct the Title V permit applications containing such information for Rush Island Unit 2.

99. Defendant has failed to obtain a proper or adequate Title V operating permit for Rush Island Unit 2 that contains one or more emissions limitations for $SO_2$ that meet BACT. Defendant has thereafter operated Rush Island Unit 2 without meeting such limitations and without having an adequate operating permit that requires compliance with such limitations or that contains a compliance plan for all applicable requirements for which the source is not in compliance.

100. Defendant has violated its Title V Operating Permit applicable to Rush Island Unit 2 during the times relevant to this Amended Complaint by failing to accurately certify compliance with all of the federally enforceable terms and conditions contained in the permit.

101. Defendant has violated its Title V Operating Permit applicable to Rush Island Unit 2 during the times relevant to this Amended Complaint by commencing one or more major modifications at Rush Island Unit 2 and by operating Rush Island Unit 2 after the major modification(s) without obtaining a permit from the permitting authority under 10 C.S.R. 10-6.060.

102.     Defendant's conduct has violated and continues to violate Sections 502(a), 503(c) and 504(a) of the Act, 42 U.S.C. §§ 7661a(a), 7661b(c), and 7661c(a), and the Title V implementing regulations including 40 C.F.R. §§ 70.5-70.6, and 10 C.S.R. 10-6.065.

103.     Unless restrained by an order of this Court, these violations of the Act will continue.

104.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendant to injunctive relief and/or a civil penalty of up to $27,500 per day for each such violation occurring on or after January 31, 1997 and up to and including March 15, 2004; up to $32,500 per day for each such violation occurring on or after March 16, 2004 and up to and including January 12, 2009; and up to $37,500 per day for each such violation occurring on or after January 13, 2009 pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, and 40 C.F.R. § 19.4.

## PRAYER FOR RELIEF

WHEREFORE, based upon all the allegations contained in Paragraphs 1 through 104 above, the United States requests that this Court:

1.     Permanently enjoin the Defendant from operating the Rush Island Plant except in accordance with the CAA and any applicable regulatory requirements;

2.     Order the Defendant to apply for and comply with permits for the Rush Island Plant that are in conformity with the requirements of the PSD program, the Missouri SIP, and with the federal and Missouri Title V programs;

3.      Order the Defendant to remedy its past and ongoing violations by, among other things, requiring Defendant to install and operate BACT at the Rush Island Plant to control emissions of $SO_2$;

4.      Order Defendant to conduct audits of its operations to determine if any additional modifications have occurred which would require it to meet the requirements of PSD and report the results of these audits to the United States;

5.      Order Defendant to surrender emission allowances or credits to offset and mitigate its illegal emissions;

6.      Order Defendant to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the CAA alleged above;

7.      Assess a civil penalty against Defendant of up to $32,500 per day for each such violation occurring on or after March 15, 2004 and within the statute of limitations period; and up to $37,500 per day for each such violation occurring on or after January 13, 2009;

8.      Award the United States its costs of this action; and,

9.   Grant such other relief as the Court deems just and proper.

Respectfully Submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

JUSTIN A. SAVAGE
Senior Counsel
ANDREW C. HANSON
BRADFORD T. MCLANE
Trial Attorneys
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
Telephone:  (202) 514-9859
Facsimile:  (202) 616-6584
E-mail: Andrew.hanson2@usdoj.gov

RICHARD G. CALLAHAN
United States Attorney for the
Eastern District of Missouri

Assistant United States Attorney
United States Attorney's Office
Eastern District of Missouri
Thomas Eagleton U.S. Courthouse
111 South 10th Street, 20th Floor
St. Louis, Missouri 63102
Telephone: (314) 539-2547
Facsimile: (314) 539-2309
E-mail: Suzanne.Moore@usdoj.gov

OF COUNSEL:

SEEMA KAKADE
Attorney-Advisor
U.S. EPA, Air Enforcement Division
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

ALEX CHEN
Senior Counsel
Office of Regional Counsel
U.S. EPA, Region 7
901 North 5th Street
Kansas City, Kansas 66101