**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** )<br><br> )<br>**Plaintiff,** )<br> )<br>**v.** )<br> )<br>**AMEREN MISSOURI,** )<br> )<br>**Defendant.** )<br>_____ ) | **Case No. 4:11-CV-00077-RWS**<br><br>**Judge Rodney W. Sippel** |

**AMEREN MISSOURI'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**<u>RULE 12(b)(6) MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................. 1

II.  FACTUAL AND LEGAL BACKGROUND .................................................... 3

    A.  The Projects at Issue and When They Occurred .................................... 3

    B.  The Pre-Construction PSD Permitting Program .................................... 3

III.  APPLICABLE LEGAL STANDARDS ............................................................ 4

IV.  ARGUMENT ....................................................................................................... 4

    A.  The Amended Complaint Does Not State A Claim Because It Only
        Alleges The Possibility Of A Violation. ................................................ 4

    B.  In the Alternative, Certain Penalty Claims Should Be Dismissed. ........ 9

V.  CONCLUSION .................................................................................................. 15

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ashcroft v. Iqbal,*
  129 S. Ct. 1937 (2009) .................................................................................. passim

*Atwell v. KW Plastics Recycling Div.,*
  173 F. Supp. 2d 1213 (M.D. Ala. 2001) ............................................................ 15

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ..................................................................................... passim

*Francis v. Giacomelli,*
  588 F.3d 186 (4th Cir. 2009) ............................................................................. 4

*Friends of Agric. for Reform of Missiouri Envtl. Regulations v. Zimmerman,*
  51 S.W.3d 64 (Mo. Ct. App. 2001) ..................................................................... 14

*Hughes Aircraft Co. v. Jacobson,*
  525 U.S. 432 (1999) ......................................................................................... 10

*In re UMETCO Minerals Corp.,*
  No. CAA-113-VIII-92-03,1996 WL 691531 (EPA Mar. 29, 1996) ......................... 15

*Missouri Hosp. Assoc. v. Air Conservation Comm'n,*
  874 S.W.2d 380 (Mo. Ct. App. 1994) .................................................................. 14

*Nat'l Parks & Conservation Assoc., Inc. v. Tennessee Valley Auth.,*
  502 F.3d 1316 (11th Cir. 2007) ................................................................... 12, 13

*New York v. Niagara Mohawk Power Corp.,*
  263 F. Supp. 2d 650 (W.D.N.Y. 2003) ....................................................... 10, 11, 12

*Pennsylvania v. Allegheny Energy, Inc.,*
  No. Civ. A. 05-885, 2006 WL 1509061 (W.D. Pa. Apr. 19, 2006) .......................... 13

*Saunders v. Farmers Ins. Exch.,*
  537 F.3d 961 (8th Cir. 2008) ............................................................................. 4

*Sierra Club v. Duke Energy Ind., Inc.,*
  No. 1:08-cv-437, 2010 WL 3667002, (S.D. Ind. Sept. 20, 2010) .......................... 13

*Sierra Club v. Otter Tail Power Co.,*
  615 F.3d 1008 (8th Cir. 2010) ..................................................................... passim

*United States v. Alabama Power Co.,*
  No. 2:01-cv-152, 2011 WL 1158020 (N.D. Ala. Mar. 14, 2011) ...................... 2, 3, 8

*United States v. Cinergy Corp.,*
  623 F.3d 455 (7th Cir. 2010) ....................................................................... 2, 3, 8

*United States v. Cinergy Corp.,*
  397 F. Supp. 2d 1025 (S.D. Ind. 2005) ............................................................... 13

*United States v. E. Ky. Power Coop., Inc.,*
  498 F. Supp. 2d 970 (E.D. Ky. 2007) .................................................................. 15

*United States v. Illinois Power Co.,*
  245 F. Supp. 2d 951 (S.D. Ill. 2003) ........................................................... 13, 15

## TABLE OF AUTHORITIES
(continued)

**Page**

*United States v. Midwest Generation, LLC,*
  694 F. Supp. 2d 999 (N.D. Ill. 2010) ........................................................................ 13

*United States v. S. Ind. Gas & Elec. Co.,*
  245 F. Supp. 2d 994 (S.D. Ind. 2003) ......................................................................... 4

*United States v. S. Ind. Gas & Elec. Co.,*
  No. IP-99-1692, 2002 WL 1760752 (S.D. Ind. July 26, 2002) ............................. 13

*United States v. Westvaco Corp.,*
  144 F. Supp. 2d 439 (D. Md. 2001) ........................................................................ 13

**STATUTES**

28 U.S.C. § 2462 .......................................................................................................... 10

42 U.S.C. § 7470 ............................................................................................................ 3

42 U.S.C. § 7475 ................................................................................................... 3, 4, 11

42 U.S.C. § 7479 ....................................................................................................... 4, 9

MO. Rev. Stat. § 643.055(1) ....................................................................................... 14

**REGULATIONS**

10 C.S.R. § 10-6.060 .............................................................................................. 11, 12

10 C.S.R. § 10-6.065 .................................................................................................... 15

40 C.F.R. § 52.21 .................................................................................................... 4, 11

57 Fed. Reg. 32251 ...................................................................................................... 14

## I.   <u>INTRODUCTION</u>

The Amended Complaint accuses Ameren Missouri ("Ameren") of violating the Prevention of Significant Deterioration ("PSD") provisions of the Clean Air Act ("CAA") by performing routine maintenance on its Rush Island power plant without obtaining allegedly necessary permits.  For decades, Ameren and other utilities had performed the maintenance necessary to keep such power plants operating efficiently, with no complaint from Plaintiff ("EPA") or any other regulators.  Starting in 1999, however, EPA embarked on a litigation initiative that sought to penalize utilities for the routine repair and maintenance of their coal-fired power plants.  In 2008, EPA began its investigation of Ameren, and since then Ameren has produced over 200,000 pages of information to EPA, including its emissions data.

But despite three years of investigation and two complaints, EPA still fails to allege any facts that show that Ameren violated the CAA.  EPA began this litigation by filing a complaint that alleged no facts whatsoever.  Ameren moved to dismiss under *Twombly* and *Iqbal*, and EPA has now amended its complaint in an effort to cure its pleading flaws.  But while the Amended Complaint appears to add substance, the new allegations again fail to state a claim, for a different reason.

The Amended Complaint's new allegations identify various theories of how some power plant maintenance projects might cause emissions to increase.  But the Amended Complaint stops there.  It fails to allege any facts that show how those theories apply to Ameren.  Parsing its words carefully, EPA alleges only that projects "like" those at issue "can" cause emissions to increase.  Other than its boilerplate conclusory allegations, EPA does not allege that *Ameren's* projects *did* cause emissions to increase.  Nor does EPA allege that Ameren projected (or even should have projected) that its emissions would increase.  Boiled down, EPA's Amended Complaint only alleges that Ameren's conduct might – or might not – have caused emissions to

increase.  It is well-settled that alleging the *possibility* of a violation does not state a claim.  *See, e.g., Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

EPA knows how to make a direct allegation when it has the facts to support it, but even on its second attempt, it has not done so here.  EPA's circuitous pleading style is likely no accident:  Ameren did not expect any of the Projects at issue to result in emissions increases.  And the emissions data shows that emissions actually decreased substantially after some of the Projects at issue.  Compounding EPA's failure to allege facts in either of its two complaints, EPA has also refused to provide Ameren with its emissions calculations in response to Ameren's formal and informal requests for those calculations.  EPA is steadfast in its refusal to disclose the factual basis for its claims.

In that regard, it bears noting that the method EPA employed to determine that Ameren's routine maintenance allegedly violated the PSD regulations is not based in the law.  It is not set forth in the CAA, the Missouri SIP, or any other regulation.  It is a creation of EPA's expert witnesses, and did not exist before EPA began its NSR litigation initiative in 1999.  And it is the same theory recently rejected by the Seventh Circuit and the Northern District of Alabama.[1]  EPA's emissions methodology is not just a portion of EPA's case, it is all of it: once the court in *Alabama Power* found that it was flawed, the court *sua sponte* dismissed EPA's entire case.  But even when addressing the heart of its case, EPA can only allege that some maintenance projects that are "like" Ameren's projects "can" increase emissions.

EPA's continued pleading failures have real-world consequences.  If this case is allowed to proceed on EPA's insufficient allegations and flawed emissions theory, Ameren likely will not

---

[1] *United States v. Cinergy Corp.*, 623 F.3d 455 (7th Cir. 2010); *United States v. Alabama Power Co.*, No. 2:01-cv-152, 2011 WL 1158020 (N.D. Ala. Mar. 14, 2011) (for accompanying mem. opins. *see* 2011 WL 1158037 and 2011 WL 1158252).

be able to defend against EPA's emissions case until expert discovery.  In the meantime, significant judicial and party resources could be wasted if EPA's methodology is deemed to be flawed, as happened in *Cinergy* and *Alabama Power*.  The Amended Complaint should be dismissed, with prejudice.  EPA has had two chances to get it right.  That is enough.

Finally, even if the Court declines to dismiss the entire Amended Complaint, many of the claims for civil monetary penalties should be dismissed as time-barred under both the CAA and the Missouri SIP, as explained further below.

## II.     FACTUAL AND LEGAL BACKGROUND

### A.     The Projects at Issue and When They Occurred.

The Amended Complaint attacks six projects allegedly involving replacement of: (1) the primary superheater and (2) turbine at Rush Island Unit 1, performed between September 2001 and February 2002 (Amended Complaint ("AC") ¶ 67); (3) the primary superheater and (4) turbine at Rush Island Unit 2, performed between November 2003 to January 2004 (*Id.* at ¶ 73); (5) various components at Rush Island 1 in 2007 (*Id.* at ¶ 78); and (6) various components at Rush Island 2 in 2010 (*Id.* at ¶ 83) (the "Projects").

### B.     The Pre-Construction PSD Permitting Program.

Congress created the current New Source Review ("NSR") program in 1977.  The NSR program consists of PSD, which is potentially applicable to major emitting facilities located in areas that are "in attainment" for a particular pollutant, 42 U.S.C. §§ 7470-7492, and Non-Attainment NSR, 42 U.S.C. §§ 7501-7515, which applies to pollutants for which the area is not in attainment.  Sulfur dioxide ($SO_2$) is the only pollutant at issue in the Amended Complaint, and the area of Missouri at issue is in attainment for $SO_2$ – so only PSD is at issue.  (AC ¶ 19.)  Here, the PSD program only applies if and when a "major modification" occurs.  42 U.S.C. §

7475(a)(1); 40 C.F.R. §§ 52.21(a)(2), (b)(2).[2]

If a source plans a "major modification," PSD requires the operator to seek a construction permit before the modification begins.  *Id.* Conversely, if the operator does not expect the planned modification to increase net emissions above a significance level, or it is otherwise not covered by the PSD program, it does not need a permit.  *Id.*; 40 C.F.R. § 52.21(b)(23).

## III.   APPLICABLE LEGAL STANDARDS

Plaintiff bears the burden of pleading and proving facts that establish all elements of a "major modification."  *See e.g., United States v. S. Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994, 998 (S.D. Ind. 2003).  To state a claim, allegations must cross "the line between possibility and plausibility of entitlement to relief."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *see also Saunders v. Farmers Ins. Exch.*, 537 F.3d 961, 965 (8th Cir. 2008).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief, as required by Rule 8."  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (applying *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) and affirming dismissal of complaint).

## IV.   ARGUMENT

### A.   The Amended Complaint Does Not State A Claim Because It Only Alleges The Possibility Of A Violation.

As an initial matter, and as Ameren demonstrated in its initial motion to dismiss, the original complaint consisted almost exclusively of legal conclusions – either direct quotes from the applicable regulations, or verbatim recitations of the regulations couched as if they were factual allegations.  These do not state a claim.  *Twombly*, 550 U.S. at 555.

---

[2] The CAA defines "construction" to include "modification."  *See* 42 U.S.C. § 7479(2)(C).  The Projects are alleged to involve "modification" of existing units.

While the Amended Complaint now adds some factual allegations, those facts – even when assumed to be 100% true – only permit the conclusion that Ameren's Projects *possibly* violated the CAA.  Such allegations do not "cross the line to plausibility," as they must to state a claim.  *Iqbal*, 129 S. Ct. at 1950.  Paragraphs 13 and 14 of the Amended Complaint hold all the factual substance of EPA's amendments:[3]

> A deteriorated major component **can** cause increasing numbers of forced outages, as well as maintenance and scheduled outages needed to maintain the worn-out equipment, preventing the unit from generating electricity when it is needed.  By replacing the worn-out component that is causing the outages, a utility **can** improve the unit's availability to operate more hours in a year.   * * *
>
> In addition to improving the availability of a coal-fired generating unit, replacing deteriorated components with new, improved components **can** also increase the capacity of the boiler to pass steam through the components to the turbines at greater volumes and/or at higher temperatures. This **can** result in an increase in the amount of coal burned, and pollution emitted, during each hour of the unit's operation.  Even if a project does not increase the amount of coal burned per hour, an improved component **can** increase the capacity and/or efficiency of the unit, which for a coal-fired generating unit like Rush Island Units 1 and 2, **can** make the unit more cost-effective and thus more economical to operate than other units.  This **can** lead the utility to operate that improved unit during more hours of operation and/or at higher levels of operation, which in turn **can** lead to increases in coal burned at the unit and $SO_2$ and other pollutants emitted from the unit's smokestack on an annual basis.

(AC ¶¶ 13-14 (emphasis added)).  The new allegations are insufficient in two ways.  First, they speak in generalities.  They do not discuss the Projects at issue here, but instead discuss the replacement of non-specific "deteriorated components" at non-specific "coal fired generating units."   Second, they do not allege that Ameren's Projects actually caused net emissions to increase significantly, or that Ameren projected such an increase.  Instead, they allege only that similar maintenance work "can" cause emissions increases.  EPA itself acknowledges that to

---

[3] Attached as Exhibit A hereto is a document comparing the Amended Complaint to the original Complaint.  Double-underlined text shows text added in the Amended Complaint; strikethrough text shows text present in the original Complaint but deleted in the Amended Complaint.

state a claim, it must plead that the Projects would be projected to cause a "significant net emissions increase." (AC ¶ 31.)

This is a curiously indirect way to plead any claim, let alone a claim EPA has taken three years to investigate, and where EPA has already filed one insufficient complaint. The Amended Complaint alleges only that the Projects *might or might not* lead to increased emissions. Without more, it would be speculation to say that the Projects caused emissions to increase. Rule 8 requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).

But EPA does not offer anything more. EPA does not allege that the Projects actually **did** increase emissions, **did** improve unit availability or **did** increase capacity or that Ameren projected these things would happen. Indeed, EPA even fails to allege the facts necessary to make its own theory state a claim. EPA's theory is that over time, power plant components degrade, and that when utilities perform maintenance to repair or replace those degraded components, the power plant regains the ability to operate as it did before the maintenance. Thus, EPA theorizes, the plant can burn more coal, and can emit more $SO_2$, than before the maintenance was performed. (AC ¶¶ 13-14.)[4]

But EPA simply fails to allege the *facts* needed to make each step of its theory apply to the Projects at issue here to move from events that "can" happen to those that did:

- First, EPA does not actually allege facts showing that any of the Projects increased (or were projected to increase) the unit's availability to operate.

- Second, having additional availability to operate is one thing, but using it is another. EPA does not allege facts showing that Ameren used (or projected it would use) the allegedly regained availability such that the Project would cause a "significant net emissions increase."

---

[4] This theory has numerous flaws, but because this is a motion to dismiss, Ameren addresses EPA's theory as if it were sound, as the rules require.

- Third, power plants do not operate like an on/off switch.  Much like a car, which routinely is operated at less than its top speed, a power plant often is operated at a portion of its total capacity.  So, even if it is assumed to be true, EPA's allegation that the plant would operate for "additional hours" (AC ¶ 13) says nothing about how much fuel the plant would burn (and thus, emissions it would generate) during those hours.  One hour at 100% capacity would likely generate more emissions than would three hours at 30% capacity.  EPA's allegations are missing the relevant facts – the effect on emissions.[5]

These are serious factual gaps in the Amended Complaint's logic.  To be clear, Ameren is not suggesting that the level of factual detail referred to above must be pleaded to state a claim in every instance.  But where, as here, EPA alleges only a *possibility* of increased emissions, something more must be alleged.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Iqbal*, 129 S. Ct. at 1951.

EPA will likely argue, incorrectly, that these gaps in its claims are filled by new allegations in each Count that allege that Ameren violated the CAA by doing "one or more" of the actions alleged in Paragraphs 13 and 14.  (AC ¶¶ 67, 73, 78, 83.)  But the allegations in Paragraphs 67, 73, 78, and 83 are insufficient, for two reasons.  First, they are mere conclusions.  As shown above, they are unsupported by any specific factual allegations about the Projects at issue here.  *See Iqbal*, 129 S. Ct. at 1950 (holding that *Twombly* properly disregarded as mere conclusions allegations of the existence of a conspiracy; such conclusions are "not entitled to the assumption of truth").  Second, they merely parrot the insufficient allegations in Paragraphs 13 and 14, which only allege that the conduct at issue might or might not be unlawful.

As the Supreme Court has held, such conclusory allegations do not state a claim, either

---

[5] In Paragraph 13 of the Amended Complaint, EPA alleges that "At Rush Island Units 1 and 2, the newly available hours of operation enabled by the project would be expected to be used to generate electricity."  This allegation adds nothing, because it does not assert that the alleged additional hours would cause a "significant net increase" in emissions, which is what is required to state a claim.  Instead, EPA carefully alleges only that the additional hours would result in "more" emissions.

by themselves or taken together.  Indeed, in *Iqbal* and *Twombly*, the Supreme Court specifically rejected the notion that a plaintiff can state a claim – as EPA tries to do here – by combining conclusory allegations (like those in Paragraphs 67, 73, 78 and 83) with allegations of conduct that are just as consistent with lawful behavior as they are with unlawful behavior (like those alleging that replacement of deteriorated components "can" cause emissions to increase).  *Iqbal*, 129 S. Ct. at 1950 (describing the Court's analysis in *Twombly*, 550 U.S. at 565-67).

EPA has had three years to investigate its case against Ameren.  Before EPA filed its original Complaint, Ameren produced over 200,000 pages of information in response to EPA's investigatory requests, including its emissions and operations data.  Based on its investigation, EPA analyzed Ameren's emissions to support its issuance of a Notice of Violation and filing of this case.  Yet EPA's original complaint did not include any of those facts.  And even after amending, EPA only asserts that Ameren's alleged conduct *might* lead to increased emissions.

Ameren previously noted that EPA's emissions calculation methods have been recently rejected by both the Northern District of Alabama (in the *Alabama Power* case) and by the Seventh Circuit (in the *Cinergy* case).  Those cases consumed enormous amounts of judicial and party resources, each lasting over a decade before those Courts ruled that EPA's emissions calculation methods were fundamentally flawed from the beginning.  Ameren's concern is that if this litigation is allowed to proceed on the speculative allegations in the Amended Complaint, and EPA does not produce any facts to support its legal theory until expert discovery, untold judicial and party resources will have been spent on a claim that was flawed from the very beginning, a result that might be avoided if EPA provides the relevant facts now.  The *Twombly* Court specifically cautioned against allowing cases to proceed on weak allegations where the cost to the parties and the judicial system is as high as it will be here.  *Twombly*, 550 U.S. at 557-

58.

EPA's refusal to allege the facts of its emissions case is also significant because EPA's emissions theories as applied to the Amended Complaint's turbine projects are particularly baseless.  In the first place, turbines do not generate any emissions at all, so the notion that turbine projects can cause increased emissions makes no sense.  EPA's turbine emissions theory appears to be that Ameren violated the CAA by installing new, more efficient turbine technology, which produces fewer emissions for the same amount of electricity generated.  Thus, even though emissions would *decrease*, EPA alleges that by being more efficient, the units with the improved turbines would run more often and generate more emissions overall. (AC at ¶¶ 67, 73, 78, 83.)  EPA's theory turns the CAA on its head.

EPA also makes the counter-intuitive allegation that by making its units more cost-effective, it has violated the CAA.  (*Id.*)  The CAA was not intended to penalize improvements in the cost-effectiveness of units when such improvements have no effect on emissions.  The beneficial link between cost-effectiveness and lowered electricity rates cannot be discounted.

EPA's Amended Complaint is thus predicated on insufficient allegations that only allege the possibility of a violation.  The Amended Complaint should be dismissed, and the dismissal should be with prejudice.  EPA has had three years of investigation to prepare its case and has now had two chances to state a claim.  It has failed and does not warrant another chance.

### B.  In the Alternative, Certain Penalty Claims Should Be Dismissed.

If the Amended Complaint is not dismissed in its entirety, then the Court should dismiss the claims for certain statutory penalties arising under the 2001 and 2003 Projects.  (AC ¶¶ 70, 76, 95, 104).  It is undisputed that the applicable statute of limitations is five years, and as shown above, construction on these Projects took place, and thus those claims accrued, more than five years ago.  In a recent decision on this precise issue, the Eighth Circuit held that PSD claims for

civil penalties regarding projects that began construction outside the statute of limitations period are time-barred. *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008 (8th Cir. 2010).

This argument is directed to those civil penalty claims that arise out of the 2001 and 2003 Projects insofar as they allege a violation of: (1) the PSD permitting program (AC, Counts I and II); or (2) the Title V permit's provisions pertaining to: (a) PSD (*id.* ¶¶ 50, 92, 95, 101 and 104); and (b) compliance certification (*id.* ¶¶ 89, 95, 100 and 104). Collectively, we will refer to these as the "2001-2003 PSD Penalty Claims."

### 1.     The Relevant Statute of Limitations is Five Years.

The parties agree that the five-year federal limitations period set forth in 28 U.S.C. § 2462 applies to CAA enforcement actions, including those asserting alleged NSR violations. *See,* 28 U.S.C. § 2462; ECF No. 18 at 9 (EPA agrees that five-year statute applies). The five-year statute runs from the "date when the claim first accrued." 28 U.S.C. § 2462. A claim first accrues on the date a violation first occurs. *See Otter Tail*, 615 F.3d at 1014. Here, the alleged violations occurred, if at all, no later than 2004, when the last of the 2001 and 2003 Projects concluded. (AC ¶¶ 67, 73.) The 2001 and 2003 Projects are well outside the limitations period.

### 2.     Any Obligation to Obtain a PSD Construction Permit Begins and Ends at the Time of Construction.

The issue of when a PSD construction permitting claim accrues is a "pure question of statutory interpretation." *Otter Tail*, 615 F.3d at 1014. Where the plain language of a statute is unambiguous, no further inquiry is necessary and a court must simply give effect to its clear meaning. *See New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 658 (W.D.N.Y. 2003) (citing *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999)).

The plain language of the federal PSD statute, 42 U.S.C. § 7475, creates permitting obligations that begin and end at the time of construction. Entitled "Preconstruction

requirements," Section 7475 requires that "[n]o major emitting facility...may be *constructed* in any area" unless the conditions in subsections (a)(1)-(8) are satisfied.  42 U.S.C. § 7475(a). Those conditions identify requirements that are applicable prior to, or at the time of, construction.  *See, e.g.*, 42 U.S.C. § 7475(a)(1) (requiring that a "permit has been issued for such *proposed* facility..."); 42 U.S.C. § 7475(a)(3) (the owner or operator of the proposed facility must "demonstrate[]...that emissions from construction or operation of such facility *will* not cause, or contribute to, air pollution..."); 42 U.S.C. § 7475(a)(4) (the "*proposed* facility is subject to the best available control technology"); *see also Niagara Mohawk*, 263 F. Supp. 2d at 661 (permitting requirements occur at the time of construction).  Consistent with the statutory language, U.S. EPA's own regulations implementing the PSD program also create permit obligations only at the time of construction.  *See* 40 C.F.R. § 52.21(a)(2)(i) (the requirements of the PSD regulations "apply to the *construction* of...any project at an existing major stationary source"); 40 C.F.R. § 52.21(a)(2)(iii) ("no...major modification...shall *begin actual construction* without a permit that states that the...major modification will meet those requirements").

At all relevant times, the Missouri SIP has contained a construction permitting program that implemented the federal PSD program.  *See* Mo. Code Regs. Ann. Tit. 10 ("10 C.S.R.") §§ 10-6.060 (Construction Permit program); 10-6.060(8) (PSD program).  Like the federal PSD program, the plain language of the Missouri PSD rules set forth requirements that arise only at the time of construction.  Specifically, Missouri's construction permit program "establishes requirements to be *met prior to construction or modification* of any of these sources," and sources subject to Missouri's construction permit program may not "commence construction or modification…[or] begin operation after that construction or modification…without first obtaining a permit…."  10 C.S.R. §§ 10-6.060, 10-6.060(1)(C).  Notably, the regulation

- 11 -

specifically refers to "begin[ning] operation after the modification – not "operating" generally. 10 C.S.R. § 10-6.060(1)(C).  The specificity of the regulatory language shows that a source's obligation to obtain a preconstruction permit exists only during the period from when construction commences to the point that construction ends and operation begins.  *Accord Otter Tail*, 615 F.3d at 1017-18.

Moreover, Missouri's PSD rules all address pre-construction requirements.  *See, e.g.,* 10 C.S.R. §§ 10-6.060(8)(B)2 ("The requirement for BACT in the case of a major modification shall apply to the physical change(s)…contained in the [construction] *permit application*…"), 10-6.060(8)(B)3 (BACT determination is reviewed at the "latest reasonable time prior to *commencement of construction*"), 10-6.060(8)(C)1.A (regarding pre-application modeling and monitoring, "[e]ach [construction permit] *application* shall contain an analysis of ambient air quality…").

While the failure to obtain a required PSD construction permit may have consequences that extend into the future, such consequences do not create PSD violations that extend into the future indefinitely.  There is a critical distinction between "the 'present consequences of a one-time violation,' which do not extend the limitations period, and 'a continuation of a violation into the present,' which does."  *Nat'l Parks & Conservation Assoc., Inc. v. Tennessee Valley Auth.*, 502 F.3d 1316, 1322 (11th Cir. 2007) (citation omitted) (applying statute of limitations to bar claim for civil penalties in NSR case); *Niagara Mohawk*, 263 F. Supp. 2d at 660-63 (same). Thus, any allegations of present ill effects from any past NSR violation are "not sufficient to bring . . . [the] New Source Review claims within the five-year statute of limitations, which serves several important purposes including barring stale claims and protecting expectations that have settled over time."  *Nat'l Parks*, 502 F.3d at 1326.

The Eighth Circuit's decision in *Otter Tail* definitively answered the question of whether the PSD program requirements (and thus, any violation thereof) extend beyond the period of construction.  There, the plaintiff argued that because an issued PSD permit could create obligations that governed future operation of the defendant's power plant, the failure to obtain a PSD permit created a continuing violation during operation, long after the alleged modification. The Eighth Circuit, construing a provision from South Dakota's SIP parallel to that here, rejected plaintiff's argument, explaining that while the defendant may have violated the PSD program "by failing to apply for PSD permits in the first place, it does not continue to do so by failing to comply with a hypothetical set of operational parameters that would have been developed through the permitting process." *Otter Tail*, 615 F.3d at 1016.  The Eighth Circuit further explained that just because emission limitations are typically set during the preconstruction permit process, that "does not necessarily mean that such parameters are enforceable independent of the permitting process."  *Id.* at 1017.  Accordingly, the court dismissed the alleged PSD violations because they occurred only once, if at all, more than five years before the complaint was filed.  The *Otter Tail* decision has strong support from numerous other courts.[6]

---

[6]  *See Nat'l Parks & Conservation Assoc. v. Tennessee Valley Auth.*, 502 F.3d 1316, 1326 (11th Cir. 2007); *Sierra Club v. Duke Energy Ind., Inc.*, No. 1:08-cv-437, 2010 WL 3667002, at *6 (S.D. Ind. Sept. 20, 2010) (applying *Otter Tail* and holding that any violation for failure to obtain a PSD permit occurs only at the time of the modification that triggered PSD); *United States v. Midwest Generation, LLC*, 694 F. Supp. 2d 999, 1008 (N.D. Ill. 2010) ("a violation of 42 U.S.C. § 7475 occurs at the time of construction and no later"); *Pennsylvania v. Allegheny Energy, Inc.*, No. Civ. A. 05-885, 2006 WL 1509061, at *4 (W.D. Pa. Apr. 19, 2006) (same); *United States v. Cinergy Corp.*, 397 F. Supp. 2d 1025, 1030 (S.D. Ind. 2005) (same); *United States v. Illinois Power Co.*, 245 F. Supp. 2d 951, 956 (S.D. Ill. 2003) (same); *United States v. S. Ind. Gas & Elec. Co.*, No. IP 99-1692, 2002 WL 1760752, at *5 (S.D. Ind. July 26, 2002) (same); *United States v. Westvaco Corp.*, 144 F. Supp. 2d 439, 443 (D. Md. 2001) (same); *but see Otter Tail*, 615 F.3d at 1017 (noting that the 6th Circuit in *Nat'l Parks & Conservation. Assoc., Inc. v. Tennessee Valley Auth.*, 480 F.3d 410 (6th Cir. 2007), found that a violation of the PSD program is a continuing violation; but distinguishing that decision on the ground that the 6th Circuit relied upon the presence of a state regulatory program unique to Tennessee that explicitly allowed for a determination of BACT emission limits after the time of construction).  Like the South Dakota SIP at issue in *Otter Tail*, the Missouri SIP contains no such provisions allowing post-construction permitting.

The analysis and conclusion are the same under the Missouri SIP.  As shown above, Missouri SIP's PSD preconstruction permitting requirements all arise only at the time of construction.  Moreover, construing this language to apply to continued operation after construction – a prohibition not imposed by the federal PSD program – would be inconsistent with the plain language of the Missouri SIP.  Missouri law expressly prohibits the adoption of regulations more stringent than their federal counterparts.  *See* Mo. Rev. Stat. § 643.055(1) (2010); *Missouri Hosp. Assoc. v. Air Conservation Comm'n*, 874 S.W.2d 380, 396 (Mo. Ct. App. 1994); *Friends of Agric. for Reform of Missouri Envtl. Regulations v. Zimmerman*, 51 S.W.3d 64, 79 (Mo. Ct. App. 2001).  Accordingly, the penalties sought for the alleged PSD violations related to the 2001 and 2003 projects are time-barred.

### 3.    Certain Title V Penalty Claims Should Be Dismissed.

Counts V and VI assert that certain provisions of Ameren Missouri's Title V permit were violated by the same conduct that gave rise to the alleged PSD violations in Counts I and II. Because any alleged PSD violation occurred at the time of the Projects, any alleged Title V violation occurred, if at all, at the same time.   In contrast to PSD permits, which deal with modifications, Title V permits deal with operation of the emissions source.    The Title V operating permit program is described in greater detail in Ameren's contemporaneously-filed Rule 12(b)(1) Motion to Dismiss.

As to the first category of claims, a Title V permit serves to collect all "existing substantive requirements applicable" to a source – but does not impose any new substantive requirements.  *See* 57 Fed. Reg. 32251.  Accordingly, any claim that Ameren Missouri violated the Title V permit's provision regarding PSD construction permits is merely a restatement of the PSD claims, and is time-barred, for the same reasons.

The second category of penalty claims is also time-barred because any alleged certification violation occurred, if at all, only once: at the time of construction.  The Rush Island Title V permit requires that Ameren Missouri annually certify its "*current* compliance status." *See* 10 C.S.R. §§ 10-6.065(6)(C)3.E.(I), 10-6.065(6)(C)3.E.(III)(b).  Because this obligation is not cumulative of prior years, any violation of a reporting obligation, such as a compliance certification, is a discrete event that only occurs at the time the report is due.  *Id.; Otter Tail,* 615 F.3d 1016-18; *United States v. E. Ky. Power Coop., Inc.*, 498 F. Supp. 2d 970, 976 (E.D. Ky. 2007) (finding certain CAA reporting violations to constitute "discrete events that were required at discrete times" and thus time-barred); *United States v. Illinois Power Co.*, 245 F. Supp. 2d 951, 958 (S.D. Ill. 2003); *In re UMETCO Minerals Corp.*, No. CAA-113-VIII-92-03, 1996 WL 691531, at * 5 (EPA Mar. 29 1996) (under another CAA provision, "a violation is complete" for limitations purposes as of the date the report is due); *Atwell v. KW Plastics Recycling Div.*, 173 F.Supp.2d 1213, 1227-28 (M.D. Ala. 2001) (under Clean Water Act, a violation of permit's reporting requirements does not continue until corrected).

Thus, even assuming Ameren Missouri was in non-compliance with a term of its Title V operating permit for not obtaining a PSD pre-construction permit, only its certification for the year in which the PSD violation allegedly occurred (*i.e.*, the year the Project was begun) was required to identify that non-compliance.  *Id.*  Any alleged failure to identify such non-compliance occurred, if at all, more than five years ago and is time-barred.  *Otter Tail,* 615 F.3d at 1018.

## V.    CONCLUSION

The Court should dismiss the Amended Complaint in its entirety.  In the alternative, the Court should dismiss the 2001-2003 PSD Penalty Claims, as defined above.

Dated:   July 15, 2011                    Respectfully submitted,

                                          /s Patricia Brown Holmes


                                          Ronald S. Safer (*pro hac vice*)
                                          Patricia Brown Holmes (*pro hac vice*)
                                          Renee Cipriano (*pro hac vice*)
                                          Steven J. Bonebrake (*pro hac vice*)
                                          Matthew B. Mock (*pro hac vice*)
                                          SCHIFF HARDIN LLP
                                          233 South Wacker Drive, Suite 6600
                                          Chicago, Illinois 60606
                                          (312) 258-5500
                                          Fax:  (312) 258-5600

                                          James J. Virtel
                                          ARMSTRONG TEASDALE LLP
                                          7700 Forsyth Boulevard Suite 1800
                                          St. Louis, Missouri  63105
                                          (314) 621-5070
                                          Fax: (314) 612-2298
                                          jvirtel@armstrongteasdale.com

                                          *Counsel for Defendant Ameren Missouri*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 15, 2011, I electronically filed the foregoing **Ameren Missouri's Memorandum of Law in Support of Its Rule 12(b)(6) Motion to Dismiss** with the Clerk of Court using the CM/ECF system, which will cause an electronic copy to be served on counsel of record, who are listed below:

> Justin A. Savage
> Andrew C. Hanson
> Bradford T. McLane
> Trial Attorneys
> Environmental Enforcement Section
> Environment and Natural Resources Division
> U.S. Department of Justice
> P.O. Box 7611
> Washington, DC  20044-7611
> Telephone:  (202) 514-5293
> Facsimile:  (202) 514-0097

> /s/ Patricia Brown Holmes
> Patricia Brown Holmes