# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 4:11-CV-00077-RWS** |
| **v.** | ) | |
| | ) | **Judge Rodney W. Sippel** |
| **AMEREN MISSOURI,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## AMEREN MISSOURI'S MEMORANDUM IN SUPPORT OF ITS
## PARTIAL MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1)

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL AND LEGAL BACKGROUND .................................................... 2

      A.      The Pre-Construction PSD Permitting Program and BACT ................................. 2

      B.      The Title V Operating Permit Program ................................ 4

      C.      Requirements of the Title V Permit Application ................................. 4

      D.      The Amended Complaint's Title V Claims ................................. 5

III.    LEGAL STANDARDS ...................................................................................... 6

IV.     ARGUMENT ...................................................................................................... 7

      A.      The Omitted BACT Claims Are Contingent on Events That May Never Occur and Facts That Cannot Yet be Determined ................................. 7

      B.      Hypothetical BACT Operating Parameters Are Not "Applicable Requirements" 10

      C.      EPA and MDNR Have Confirmed That Hypothetical BACT Parameters Need Not Be Included in a Title V Permit Application ................................. 11

      D.      Allegations of Non-Compliance Are Not "Applicable Requirements" ................ 13

      E.      Title V Does Not Require Applicants or Permit Holders to "Look Back" .......... 14

V.      CONCLUSION ................................................................................................ 15

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967) ............................................................................ 7, 10

*Appalachian Power Co. v. EPA*,
  208 F.3d 1015 (D.C. Cir 2000) ................................................................ 4

*Efron v. United States*,
  1 F. Supp. 2d 1468 (S.D. Fla. 1998) ......................................................... 9

*In re BP Prods. North America, Inc.*,
  2009 WL 7513856 (EPA Oct. 16, 2009) .................................................. 14

*In re Georgia Power Co.*,
  (EPA Jan. 8, 2007) .................................................................................. 14

*In re Hillman Power Co., LLC*,
  10 E.A.D. 673, 2002 WL 1822719 (EAB July 31, 2002) ........................... 3

*In re Valero Ref. Co.*,
  2004 WL 5917581 (EPA 2004) ............................................................... 14

*Jones v. Gale*,
  470 F.3d 1261 (8th Cir. 2006) .................................................................. 6

*Minnesota Pub. Util. Comm'n v. FCC*,
  483 F.3d 570 (8th Cir. 2007) ................................................................ 2, 9

*Missouri v. Cuffley*,
  112 F.3d 1332 (8th Cir. 1997) .................................................................. 9

*Preiser v. Newkirk*,
  422 U.S. 395 (1975) .................................................................................. 6

*Pub. Water Supply Dist. No. 8 v. City of Kearney*,
  401 F.3d 930 (8th Cir. 2005) ............................................................ 6, 7, 8

*Sierra Club v. EPA*,
  557 F.3d 401 (6th Cir. 2009) .................................................................. 13

*Sierra Club v. Johnson*,
  541 F.3d 1257 (11th Cir. 2008) .............................................................. 13

*Sierra Club v. Otter Tail Power Co.*,
  615 F.3d 1008 (8th Cir. 2010) .......................................................... 3, 4, 13

*Texas v. United States*,
  523 U.S. 296 (1998) .................................................................................. 9

*United States v. Midwest Generation, LLC*,
  694 F. Supp. 2d 999 (Mar. 9, 2010) ...................................................... 3, 8

*United States v. Midwest Generation, LLC*,
  No. 09-cv-5277, 2011 WL 1003916 (N.D. Ill. Mar. 16, 2011) .............. 3, 8, 10

*Wilderness Society v. Alcock*,
  83 F.3d 386 (11th Cir. 1996) .................................................................... 9

*Yankton Sioux Tribe v. Podhradsky*,
  606 F.3d 994 (8th Cir. 2010) .................................................................... 8

*Yankton Sioux Tribe v. U.S. Army Corps of Engineers*,
    194 F. Supp. 2d 977 (D.S.D. 2002) .................................................................... 10

## STATUTES

42 U.S.C. § 7475 ................................................................................................... 2

42 U.S.C. § 7479 ................................................................................................... 2

42 U.S.C. § 7661 ................................................................................................... 4

42 U.S.C. § 7661a .................................................................................................. 6

42 U.S.C. § 7661b .................................................................................................. 5

42 U.S.C. § 7661c .................................................................................................. 4

## REGULATIONS

10 C.S.R. § 10-6.020 ......................................................................................... 4, 5

10 C.S.R. § 10-6.060 ............................................................................................. 3

10 C.S.R. § 10-6.065 ..................................................................................... 4, 5, 10

40 C.F.R. § 52.21 ............................................................................................... 2, 3

40 C.F.R. § 70.5 .................................................................................................... 5

40 C.F.R. § 70.6 .................................................................................................... 4

*Final Rule*, 57 Fed. Reg. 32250, 32251 (July 21, 1992) ....................................... 4

## OTHER AUTHORITIES

*Letter from John S. Seitz, Director, Office of Air Quality Planning and Standards,*
    *U.S. EPA to Mr. Hodanbosi and Mr. Lagges, STAPPA/ALAPCO,* (May 20,
    1999) ................................................................................................................. 15

*U.S. EPA White Paper for Streamlined Development of Part 70 Permit*
    *Applications*, (July 10, 1995) ......................................................................... 5, 14

I.      __INTRODUCTION__

The Amended Complaint alleges that Ameren Missouri ("Ameren") violated Title V of the Clean Air Act ("CAA") because the Title V operating permits issued for the Rush Island power plant are allegedly inadequate.  As explained below, certain of the Amended Complaint's Title V claims are not yet and may never be ripe for review.  Accordingly, they should be dismissed for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

Title V of the CAA is a federal permitting program that governs operation of power plants.  A Title V permit captures, in a single document, the existing "applicable requirements" contained in other permits and regulatory obligations, but a Title V permit does not and cannot impose new legal obligations by itself.  The Amended Complaint's allegations incorrectly suggest otherwise.  EPA alleges that when Ameren performed the challenged projects years ago, it should have obtained a PSD permit, and had it done so, the PSD permitting process hypothetically would have specified a set of operating parameters related to emissions – termed "BACT" (for "best available control technology") – with which Ameren would have had to comply.  But EPA does not allege what those parameters would have been – nor could it, because such parameters can only be determined through a unit-specific, fact-intensive inquiry.  Allegedly, those hypothetical BACT parameters would have been added to Ameren's Title V operating permits years ago – but were not, because no PSD permit was obtained, so no determination of BACT was made.  This motion addresses the Amended Complaint's Title V claims that the hypothetical BACT parameters were improperly "omitted" from Ameren's Title V permits.

Those claims are unripe, for several reasons.  First, the threshold requirement – that a PSD permit was required at the time of the projects – has not been established, and there is no

obligation outside of the PSD permit process, including under Title V, to determine or apply BACT.  Second, no BACT determination has ever been made.  Accordingly, for Ameren's Rush Island units, such "BACT" operating parameters are hypothetical – they do not now and may never exist, a fact that EPA has admitted.  Third, even if BACT parameters are determined in the future, the Title V claims would *still* be unripe unless and until Ameren fails to include those parameters in its Title V permit or, having included them, fails to abide by them.  It is well-settled that "[a] claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Minnesota Pub. Util. Comm'n v. FCC*, 483 F.3d 570, 582 (8th Cir. 2007) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

The Amended Complaint's claims with respect to the alleged omission of hypothetical BACT operating parameters from Ameren's Title V permits do not present a controversy ripe for adjudication.  The Court should dismiss them for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

## II.     FACTUAL AND LEGAL BACKGROUND

### A.     The Pre-Construction PSD Permitting Program and BACT.

Ameren has described the New Source Review program ("NSR Program"), PSD permitting program, and the portions of the Missouri State Implementation Plan ("SIP") that implement the PSD program, in its contemporaneously-filed brief in support of its 12(b)(6) Motion to Dismiss the Amended Complaint.  For the sake of brevity, we refer the Court to that discussion.  In brief, if a plant operator plans to undertake a project that qualifies as a "major modification," the PSD Program requires that operator to obtain a permit before beginning construction.  As part of that permitting process, the permitting agency determines the operating parameters that establish the applicable BACT parameters.  42 U.S.C. §§ 7475(a), 7479(3); 40

- 2 -

C.F.R. §§ 52.21(b)(12), (j)-(r); Mo. Code Regs. Ann. tit. 10 ("10 C.S.R.") §§ 10-6.020(2)(B)5, 10-6.060(8)(B).

BACT is not a pre-determined set of requirements that can be "looked up" in a statute or regulation. *United States v. Midwest Generation, LLC*, No. 09-cv-5277, 2011 WL 1003916, at *12 (N.D. Ill. Mar. 16, 2011) ("In the absence of [a PSD permit, they [BACT requirements] do not exist."). Instead, determinations of BACT operating parameters are "tailored to each facility on a case-by-case basis" and pollutant-by-pollutant basis, taking into account various energy, environmental, economic and other cost impacts. *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1017 (8th Cir. 2010); 42 U.S.C. §§ 7475(a), 7479(3); 40 C.F.R. §§ 52.21(b)(12), (j)-(r); 10 C.S.R. §§ 10-6.020(2)(B)5, 10-6.060(8)(B).

Such BACT determinations are "inextricably linked to the [PSD] permitting process" and the PSD program does not "establish[] an ongoing duty to apply BACT independent of the permitting process." *Otter Tail*, 615 F.3d at 1016-1017 ("[T]he command to apply BACT is not a freestanding requirement. Rather, it is tied specifically to the construction process."); *United States v. Midwest Generation, LLC*, 694 F. Supp. 2d 999, 1007 (N.D. Ill. 2010) (there "is no obligation to apply [BACT] in the abstract").

Given the fact-intensive and unit-specific BACT inquiry, only some "major modifications" result in emission limitations that require additional controls. Thus, depending on the circumstances at the time the BACT determination is made, a plant may already have sufficient controls in place, or the economic analysis may result in no additional requirements being imposed. "In some cases . . . no add-on pollution controls may be employed, but as long as the BACT emission limits are attained by the facility, the permittee will be in compliance with the BACT component of the CAA." *In re Hillman Power Co., LLC*, 10 E.A.D. 673, 2002 WL

1822719, at *15 (EAB July 31, 2002).

**B.**     **The Title V Operating Permit Program.**

Ameren operates the Rush Island Plant in compliance with a Title V operating permit issued by MDNR pursuant to Title V of the CAA. 42 U.S.C. §§ 7661-7661f; 10 C.S.R. § 10-6.065. The Title V operating permit is essentially the "three-ring binder" of the CAA – such permits "are meant to accomplish the largely procedural task of identifying and recording existing substantive requirements applicable to regulated sources and to assure compliance with these existing requirements." *U.S. EPA White Paper for Streamlined Development of Part 70 Permit Applications*, at 1 (July 10, 1995) ("White Paper #1"); *see also* 42 U.S.C. § 7661c(a); 40 C.F.R. § 70.6(a)(1); 10 C.S.R. § 10-6.065(6)(C)1.

Thus, a Title V permit does not impose, and cannot be used to impose, new requirements on the permit holder, such as BACT emission limitations. *Final Rule*, 57 Fed. Reg. 32250, 32251 (July 21, 1992); 10 C.S.R. § 10-6.065 (Missouri's operating permit rules do "not establish any air quality standards or guidelines"). "Title V permits do not generally impose any new emission limits, but are simply intended to incorporate into a single document all of the CAA requirements governing a facility." *Otter Tail*, 615 F.3d at 1012; *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1026-1027 (D.C. Cir. 2000). EPA concedes this is true. (ECF No. 25 at 2.)

**C.**     **Requirements of the Title V Permit Application.**

Title V permit applications are required to contain only those requirements applicable "at the time of issuance" of the Title V operating permit. 10 C.S.R. § 10-6.065(6)(C)1; *see also* 40 C.F.R. § 70.6(a)(1). Such "applicable requirements" are defined to include: "A. Any standard or requirement provided for in the [Missouri SIP]... ; [and] B. Any term or condition of any preconstruction permit *issued* ... ." *See* 10 C.S.R. § 10-6.020(2)(A)27.A, B (emphasis added). Thus, only those BACT operating parameters contained within final, issued, construction permits

- 4 -

constitute an "applicable requirement" for a Title V operating permit.   10 C.S.R. § 10-6.020(2)(A)27.B.[1]

The permit applicant has the initial responsibility of identifying existing applicable requirements.   10 C.S.R. § 10-6.065(6)(B)3, (6)(C)1.   However, a permit applicant is only required to identify information regarding "applicable requirements" of which it is "aware" prior to issuance of the draft Title V operating permit.  *See* 10 CSR § 10-10.6065(6)(B)2; *see also* 40 C.F.R. § 70.5(b); *White Paper #1* at 4.   An applicant is also required to identify "any applicable requirements with which ... [the source] is not in compliance at the time of permit issuance."   10 C.S.R. § 10-6.065(6)(B)3.I.(II)(c); *see also* 42 U.S.C. § 7661b(b).   If the applicant determines that any non-compliance exists, the permit application must contain a "compliance plan" that sets forth a schedule for coming into compliance with any such applicable requirements.  *See id.*

### D.   The Amended Complaint's Title V Claims.

In Counts V and VI, the Amended Complaint alleges that Ameren violated the CAA by undertaking certain "major modifications" (the "Projects") without first obtaining a PSD construction permit.   (Amended Complaint ("AC"), ¶¶ 65-76, 78-79, 83-84, 88, 92, 97, 101.)   Had Ameren done so at the time of the Projects, MDNR allegedly would have undertaken a BACT determination.   (*Id.*)   (EPA, however, does not allege what new operating parameters, if any, such a BACT determination would have required.)   EPA alleges that as a result, Ameren allegedly failed to:

---

[1] While Title V permits can be reopened to address requirements that become applicable after permit issuance, not all such requirements must be immediately included in the Title V permit.  For example, only those Title V permit holders who have more than three years remaining before expiration need to "correct" their permits to include the new "applicable requirements."   *See* 10 C.S.R. § 10-6.065(6)(E)6.A.(III)(a).  (Sources would still need to comply with regulatory requirements, regardless of whether those requirements were part of the permit.)  But there is no basis to reopen a permit now to include any hypothetical BACT operating parameters that do not now and may never exist.

(a)     operate in compliance with the hypothetical operating parameters that might have been required as part of the BACT determination that did not take place (because those parameters were not included in the Title V permit) (AC ¶¶ 88, 90, 92, 97, 99, 101); and

(b)     submit an accurate and complete Title V permit application (because the application did not list: (i) the hypothetical "applicable requirements" that might have been imposed by that same BACT determination, or (ii) a compliance plan for achieving those requirements) (AC ¶¶ 89, 98).

Collectively, these claims allege that Ameren's Title V permit applications and issued permits are inadequate because they allegedly omit the BACT operating parameters.  For simplicity, we will refer to them herein as the "Omitted BACT Claims."[2]

CAA provides for source liability under Title V in only two circumstances: (1) violating "any requirement of a permit issued," or (2) operating without "a permit issued by a permitting authority under this subchapter." 42 U.S.C. § 7661a(a).  The Omitted BACT Claims do not allege a violation of any requirement imposed by Ameren's issued Title V permits.  Nor do they allege that Ameren was not operating with Title V permits issued in accordance with the procedures in the Missouri regulations, and approved by EPA.

## III.    LEGAL STANDARDS

Article III of the Constitution limits courts to deciding actual cases and controversies, and courts may not issue opinions advising "what the law would be upon a hypothetical state of facts."  *Pub. Water Supply Dist. No. 8 v. City of Kearney*, 401 F.3d 930, 932 (8th Cir. 2005) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)) (internal citation and quotation omitted). EPA, as the party invoking federal jurisdiction, bears the burden on a challenge to subject matter jurisdiction.  *Jones v. Gale*, 470 F.3d 1261, 1265 (8th Cir. 2006).

In deciding whether an issue is ripe, a court must "evaluate both the fitness of the issues

---

[2] The Amended Complaint alleges other violations of Title V that are not addressed by this Motion, but are the subject of Ameren's Rule 12(b)(6) Motion to Dismiss the Amended Complaint.

for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967).

IV.   **ARGUMENT**

    A.   **The Omitted BACT Claims Are Contingent on Events That May Never Occur and Facts That Cannot Yet be Determined.**

The Amended Complaint alleges that *if* Ameren had gotten a PSD permit before construction began, the PSD permit would have imposed hypothetical BACT operating parameters.  (AC ¶¶ 88, 97.)  Those parameters, it alleges, would have been required to be included in Ameren's Title V permits, and their omission is allegedly a continuing violation.  (*Id.* ¶¶ 89, 98.)  But the Amended Complaint never says what the parameters would have been, instead vaguely referring to them as "such requirements" and "such limitations."  (AC ¶¶ 88, 89, 97, 98.)

There is no dispute that the BACT operational parameters that allegedly "would have been determined," if Ameren had sought a PSD permit at the time of the Projects, do not exist. The Eighth Circuit has specifically characterized them as "hypothetical": "[W]hile Otter Tail may have violated [the PSD program] by failing to apply for PSD permits in the first place, it does not continue to do so by failing to comply with a *hypothetical set of operational parameters* that would have been developed through the permitting process."  *Otter Tail*, 615 F.2d at 1016 (emphasis added); *Midwest Generation*, 2011 WL 1003916 at *12 ("In the absence of [a PSD] permit, they [BACT parameters] do not exist.").  Indeed, EPA has already conceded that the BACT parameters do not exist.  (ECF No. 25 at 11, 12.)

Thus, faced with the Eighth Circuit's decision in *Otter Tail*, Plaintiff strains in an effort to expand its penalty claims by several hundred million dollars, and in so doing, impermissibly crosses the line into speculation.  *Pub. Water Supply Dist. No. 8*, 401 F.3d at 932 ("disputes

based on hypothetical facts" improperly call for the rendering of advisory opinions); *Yankton Sioux Tribe v. Podhradsky*, 606 F.3d 994, 1014-15 (8th Cir. 2010) (vacating judgment because claims were factually undeveloped, and thus, unripe).   Another court considering similar allegations made by EPA in another NSR case found them to be improper attempts to "slip their PSD claims through the back door by recharacterizing them as Title V claims."   *Midwest Generation*, 2011 WL 1003916. at *12.  In dismissing those Title V claims, the same court had earlier stated:

> Tellingly, the Plaintiffs' brief states that "[i]f a PSD permit *had* been issued for each of the alleged modifications, each permit would have set forth [best available control technology] requirements."  This underscores the fact that the ongoing requirements cited by Plaintiffs are tied to the application of the permit and that it is the original failure to obtain that permit which violates these PSD provisions.  There is no obligation to apply "best available control technology" in the abstract.

*Midwest Generation*, 694 F. Supp. 2d at 1007 (emphasis in original) (internal citation omitted).

Here, the Omitted BACT Claims are unripe because they necessarily depend on the occurrence of at least three events that have not occurred and may never occur:

First, there must be a finding that Ameren violated the PSD pre-construction permitting program.  As shown above, under the Amended Complaint's theory, if there is no PSD liability, there can be no Title V liability.

Second, even assuming such a finding occurs, a fact-intensive BACT determination would have to be made in the future, and would have to require operating parameters that are different from those then in place.  Until such an inquiry is made, it cannot be determined if any new operating parameters will be required, because one cannot predict: (a) when such a determination might occur; (b) what the determination will be; or (c) the circumstances at Rush Island at the time the determination is made.

- 8 -

Third, even then, there would be no violation of Title V unless Ameren failed to include the new parameters in its Title V permits; or, having included them, failed to abide by them. *See* disc. *supra* at 5-6. "Under these circumstances, where 'we have no idea whether or when such [a sanction] will be ordered,' the issue is not fit for adjudication." *Texas v. United States*, 523 U.S. 296, 300 (1998) (brackets in original); *Missouri v. Cuffley*, 112 F.3d 1332, 1337 (8th Cir. 1997) ("The basic rationale of the ripeness doctrine is to prevent the courts . . . from entangling themselves in abstract disagreements . . . until an administrative decision has been formalized and its effects felt in a concrete way. . . .").

For all these reasons, the Omitted BACT Claims have not been established and may never exist. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Minnesota Pub. Util. Comm'n v. FCC.*, 483 F.3d 570, 582 (8th Cir. 2007) (holding that challenge to FCC order was unripe because the order stated that FCC "would" take certain actions "if faced with the precise issue" – but had not yet faced the issue) (quotation omitted); *Efron v. United States*, 1 F. Supp. 2d 1468, 1470-71 (S.D. Fla. 1998) (where claim was predicated on several contingent events that had not yet occurred, it was unripe).

In *Wilderness Society v. Alcock*, 83 F.3d 386 (11th Cir. 1996), the Wilderness Society challenged the U.S. Forest Service's land management plan for the Cherokee National Forest, drafted pursuant to the National Forest Management Act. The Forest Service argued that the suit was not ripe, because the plan had to go through "another level of decisionmaking that determines precisely what site-specific action will be taken pursuant to the Plan." *Id.* at 390. The Eleventh Circuit affirmed the district court's dismissal of the suit as unripe, because there was no "site-specific" action that had yet been proposed by the Forest Service. *Id.* at 390-91.

- 9 -

Here, too, before the Omitted BACT Claims can ripen, there must be a finding by this Court that PSD was triggered, followed by another level of "decisionmaking" that is site-specific to the Rush Island units at issue – the fact-intensive BACT inquiry – and even then, additional events must occur before a Title V claim accrues.  *See, e.g., Yankton Sioux Tribe v. U.S. Army Corps of Engineers*, 194 F. Supp. 2d 977, 991 (D.S.D. 2002) (claim was deemed unripe where the factual record was not yet established).

For these reasons, and those set forth below, the Omitted BACT Claims are not "fit for judicial decision."  *See Abbott Labs.*, 387 U.S. at 149.  EPA will not suffer any hardship if the Court withholds consideration of these claims.  The Omitted BACT Claims are predicated on the Amended Complaint's central claims for alleged PSD violations, and EPA is able to pursue its PSD claims to the extent they seek injunctive relief.  Moreover, if the Omitted BACT Claims ever ripen, EPA can pursue them at that time.

**B.      Hypothetical BACT Operating Parameters Are Not "Applicable Requirements."**

Title V permits require compliance with ***existing*** "applicable requirements."  *See disc. supra* 4-5.  The Omitted BACT Claims do not allege that Ameren violated any existing applicable requirements or failed to include any existing applicable requirements in its Title V permit applications.  As explained above, because there was no BACT determination at the time of the Projects, there are, and were, no BACT operating parameters to include in a Title V permit or application.  "In the absence of [a PSD] permit, they do not exist."  *Midwest Generation*, 2011 WL 1003916 at *12.[3]

---

[3] For the same reasons, the Amended Complaint's allegations that a compliance schedule is "missing" from the Title V permit are unripe as well.  (AC ¶¶ 90, 99.)  Compliance plans are only necessary for "applicable requirements" for which a source was "not in compliance *at the time of permit issuance*."  10 C.S.R. § 10-6.065(6)(B)3.I.(II)(c) (emphasis added).

C.     **EPA and MDNR Have Confirmed That Hypothetical BACT Parameters
Need Not Be Included in a Title V Permit Application.**

EPA alleges that "BACT" is an applicable requirement that should have been included in

the Rush Island Title V permit – even though it admits the BACT parameters do not and may

never exist, and does not identify any specific BACT parameters that were omitted.  What EPA

is really alleging is that the law required Ameren to identify in its permit application not just

those requirements that *existed* at the time of the permit application, but also any non-existent

requirements that might be identified *only in the future*.  That position is simply incorrect as a

matter of law (and common sense).  As shown below, EPA's own prior interpretation of

"applicable requirement" refutes its current argument.

In addition to Rush Island, Ameren also operates the Sioux power plant in St. Charles

County.  In 2010, Ameren's Title V permit for the Sioux plant was in the process of being

renewed.  As part of that process, the public, including the Sierra Club, had the opportunity to

comment on MDNR's draft final Title V permit for Sioux.  MDNR received comments from, in

addition to Ameren, the Sierra Club; and both MDNR and EPA responded in writing to those

comments.  A true and correct copy of the comments, with MDNR and EPA's written responses,

is attached hereto as Exhibit A.

At the time of these comments, EPA had already issued a Notice of Violation ("NOV") to

Ameren, and that NOV included a claim, like that EPA makes with respect to Rush Island here,

that certain Sioux projects were "major modifications" that violated the PSD permitting rules and

regulations.  In its first comment, the Sierra Club quoted from the NOV in arguing that the Sioux

Title V permit should not be issued, because, just as EPA alleges here,

> AmerenUE has failed to submit an accurate and complete Title V permit
> application for the . . . Sioux Plant with information pertaining to the
> modifications . . . and with information concerning all applicable requirements,

- 11 -

including, but not limited to, the requirement to apply, install, and operate BACT
. . . for the control of $SO_2$ . . . at the plant.

(Ex. A at page 10 of 38 (quoting EPA's January 10, 2010 NOV).)  Sierra Club further argued,
just as EPA alleges and argues here, that the draft Sioux Title V permit was inaccurate because it
lacked "a compliance schedule requiring AmerenUE to . . . comply with . . . BACT."  (*Id.*; AC
¶¶ 89, 98.)  In an extensive response, EPA rejected Sierra Club's argument that BACT was an
applicable requirement that should have been included in the Sioux Title V permit.  EPA
explained that even if Sierra Club had established a PSD violation:

> [A] compliance schedule would be best left out of the Title V process until
> Ameren had entered into a consent decree or been issued a court order including
> compliance requirements with the Act.

(Ex. A at page 12 of 38.)  EPA likewise responded by stating that "*once [emission] limits are
established* in a construction permit, consent decree, or court order, the requirements would ***then***
be included in a Title V permit."  (*Id.* at 11 of 38 (emphasis added).)[4]  MDNR also responded to
the Sierra Club's comment, specifically stating that

> [B]ased on . . . EPA guidance, until a compliance plan and schedule are finalized
> **there are no provisions to be incorporated into the operating permit, thus,
> the draft contains all applicable requirements which are currently effective
> at the time of permit issuance** per the requirements of §70.6(a)(l).

(Ex. A at page 11 of 38 (emphasis added and citation omitted).)  EPA did not disagree with
MDNR's response.  (*Id.*)  Indeed, EPA stated that "[i]n general, [MDNR's] response addressed
issues raised by the commenters very well."  (*Id.* at 1.)

    By now claiming that BACT is an applicable requirement even before it has been
determined, EPA directly contradicts the position it has taken consistently in the Title V

---

[4]  *See also In re United States Steel Corp*, Jan. 31, 2011 Order (Exhibit B hereto) (EPA
Administrator Jackson stating: "Should EPA prevail in [an] enforcement proceeding, or should the source
and EPA propose to settle their difference, *then* the court would enter judgment in the form of an order or
consent decree requiring that the source achieve compliance." (emphasis added).)

- 12 -

permitting context.[5]   Indeed, the passages block-quoted above echo the precise argument Ameren makes here: that without PSD liability being established and an existing BACT determination, "there are no provisions to be incorporated into the operating permit." Or, as Ameren put it more bluntly: "BACT" does not exist. It did not exist when Ameren applied for its Title V permit, does not exist now, and could exist in the future only if EPA first establishes a PSD violation here.

Thus, even though EPA alleged PSD violations and resulting BACT requirements at the Sioux plant, and that plant's draft Title V permit did not include BACT (or a compliance plan to achieve it), EPA and MDNR nonetheless agreed that the draft permit "contain[ed] all applicable requirements." (Ex. A. at page 11 of 38.) And contrary to what EPA now alleges, it interpreted "applicable requirements" to mean those requirements "which are *currently effective at the time of permit issuance* per the requirements of §70.6(a)(l)." (*Id.*)

There is no ripe dispute under Title V for alleged violations of requirements that do not now exist and are not presently in its Title V permit. *See Otter Tail,* 615 F.3d at 1020 (finding impermissible a citizen suit claim that "the [Title V] permit omitted applicable CAA requirements" as compared to the permissible claim that the permittee "is operating in violation of its permit").

**D.**    **Allegations of Non-Compliance Are Not "Applicable Requirements."**

Echoing EPA's statements in the context of the Sioux Title V permit (described above), EPA's own actions and policies demonstrate that mere allegations of non-compliance do not create any "applicable requirements" that must be included in a Title V permit. EPA's long-held policy is that allegations of CAA non-compliance, including PSD violation allegations, are not

---

[5] *See also Sierra Club v. EPA*, 557 F.3d 401, 405-07 (6th Cir. 2009); *Sierra Club v. Johnson*, 541 F.3d 1257, 1266-69 (11th Cir. 2008).

final determinations that require a compliance schedule or BACT parameters to be included in a Title V operating permit (or even in an application for one).  Accordingly, neither this lawsuit nor the Notices of Violation establish any duty to revise or amend the Title V permit to address hypothetical PSD parameters.  Absent such a current duty, there is no ripe claim.  Instead, PSD requirements need only be addressed in Title V permits if the permit holder litigates and loses, or settles.

As EPA itself has acknowledged, the mere "*concern*[] regarding *potential* non-compliance" is not a final determination that warrants inclusion in a source's Title V operating permit.  *In re Valero Ref. Co.*, 2004 WL 5917581, at 13 (EPA 2004) (final admin. order) (emphasis added); *see also In re BP Prods. North America, Inc.*, 2009 WL 7513856, at 18 (EPA Oct. 14, 2009) (final admin. order) ("It is well-recognized that no binding legal consequences flow from an NOV. . ."); *In re Georgia Power Co.*, at 7 (EPA Jan. 8, 2007) (final admin. order) ("EPA believes that the fact of the issuance of an NOV or the filing of a complaint do not definitively establish the necessity of a compliance schedule for Title V purposes").

### E.      Title V Does Not Require Applicants or Permit Holders to "Look Back."

Finally, the Title V operating permit program does not require that Ameren Missouri reevaluate, either during the application process or after the Title V permit has issued, any prior determination that a particular project did not trigger PSD permitting requirements:

> To make the required compliance certification to accompany the initial [Title V] permit applications, sources are required to review *current* major and minor NSR *permits* and other permits containing Federal requirements, SIPs and other documents, and other Federal requirements in order to determine applicable requirements for emission units.
>
> *Companies are not federally required to reconsider previous applicability determinations as part of their inquiry in preparing [Title V] permit applications.* However, EPA expects companies to rectify past noncompliance as it is discovered.

*See White Paper #1,* at 25-26 (emphasis added).  While U.S. EPA has clarified that an applicant

- 14 -

must identify noncompliance, applicants are only required to identify noncompliance issues of which they are aware. *See Letter from John S. Seitz, Director, Office of Air Quality Planning and Standards, U.S. EPA to Mr. Hodanbosi and Mr. Lagges, STAPPA/ALAPCO,* Enclosure A (May 20, 1999) (only noncompliance of "which companies are *aware* must be reported").  As discussed above, allegations of noncompliance do not create applicable requirements.  Even if a "look back" requirement existed, there is simply nothing to "look back" on.  The Amended Complaint acknowledges that PSD construction permits were not issued for any of the Projects. (AC ¶¶ 88, 97.)  What constitutes BACT is not known until a BACT determination is made.

For the same reasons set out above – *i.e.*, allegations of noncompliance do not create applicable requirements and BACT operating parameters do not exist until a BACT determination has been made – there is no basis to contend that Ameren was required to include in its Title V permit hypothetical operating parameters that do not now and may never exist.

## V.   <u>CONCLUSION</u>

The Amended Complaint's Omitted BACT Claims are unripe and present no justiciable controversy that could provide the Court with subject matter jurisdiction.  The Court should dismiss them pursuant to Federal Rule of Civil Procedure 12(b)(1).

Dated:   July 15, 2011                    Respectfully submitted,

                                          /s/ Patricia Brown Holmes

                                          Ronald S. Safer (*pro hac vice*)
                                          Patricia Brown Holmes (*pro hac vice*)
                                          Renee Cipriano (*pro hac vice*)
                                          Steven J. Bonebrake (*pro hac vice*)
                                          Matthew B. Mock (*pro hac vice*)
                                          SCHIFF HARDIN LLP
                                          233 South Wacker Drive Suite 6600
                                          Chicago, Illinois 60606
                                          (312) 258-5500
                                          Fax:  (312) 258-5600

                                          James J. Virtel
                                          ARMSTRONG TEASDALE LLP
                                          7700 Forsyth Boulevard Suite 1800
                                          St. Louis, Missouri  63105
                                          (314) 621-5070
                                          Fax: (314) 612-2298
                                          jvirtel@armstrongteasdale.com

                                          *Counsel for Defendant Ameren Missouri*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 15, 2011, I electronically filed the foregoing **Ameren Missouri's Memorandum in Support of its Partial Motion to Dismiss Under Fed.R.Civ.P. 12(b)(1)** with the Clerk of Court using the CM/ECF system, which will cause an electronic copy to be served on counsel of record, who are listed below:

> Justin A. Savage
> Andrew C. Hanson
> Bradford T. McLane
> Trial Attorneys
> Environmental Enforcement Section
> Environment and Natural Resources Division
> U.S. Department of Justice
> P.O. Box 7611
> Washington, DC  20044-7611
> Telephone:  (202) 514-5293
> Facsimile:  (202) 514-0097

/s/ Patricia Brown Holmes
Patricia Brown Holmes