# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 4:11-cv-00077-RWS |
| ) | |
| AMEREN MISSOURI, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## UNITED STATES' MEMORANDUM IN OPPOSITION TO AMEREN MISSOURI'S MOTION TO DISMISS UNDER FED. R. CIV. P.  RULE 12(b)(6)

## INTRODUCTION

After the Court denied Ameren's first motion to dismiss as moot in light of the Amended Complaint (ECF Nos. 35, 36), Ameren has now filed another motion to dismiss the United States' amended claims under Fed. R. Civ. P. Rule 12(b)(6).  Ameren again argues that the Amended Complaint lacks the detail it claims is required under Fed. R. Civ. P. 8(a)(2).  Ameren also renews its argument, almost verbatim, that the United States' civil penalty claims arising from the 2001 and 2003 modifications should be dismissed, asserting that the United States has failed to allege any ongoing violations that continue into the five-year statute of limitations period set forth in 28 U.S.C. § 2462.

Ameren's motion should be denied.  Ameren either distorts or brushes aside factual allegations in the Amended Complaint that clearly meet Rule 8's notice pleading standard, and then misapplies that standard by attempting to convert the pleadings stage into an evidentiary hearing under Fed. R. Evid. 702.  Such a level of specificity is not contemplated by Rule 8(a)(2), and has not been applied by the Supreme Court, the Eighth Circuit, or this Court.  Second, Ameren continues to misread Missouri's federally enforceable regulations and its own Title V permits, which specifically prohibit the ongoing operation of a modified source without first obtaining the required construction permit that includes applicable emission limitations.  If the United States prevails on this State Implementation Plan ("SIP") claim, it will be entitled to injunctive relief and civil penalties for each day of such illegal operation within the applicable five-year statute of limitations.

## REGULATORY FRAMEWORK

The United States has previously described the CAA provisions applicable to this case in its Opposition to Ameren's first Rule 12(b)(6) Motion to Dismiss and its Memorandum in

1

Support of its Motion for Leave to Amend the Complaint.  (ECF Nos. 18, 34).  In brief, the CAA's Prevention of Significant Deterioration ("PSD") provisions prohibit the construction or modification of a "major emitting facility" unless a permit has been issued and the facility is subject to emissions limitations imposed by the Best Available Control Technology ("BACT") for each pollutant emitted from the facility.  42 U.S.C. § 7475.  Subject to EPA's oversight, Missouri implements its own PSD program as part of the EPA-approved, federally-enforceable Missouri State Implementation Plan ("SIP").  (Amended Complaint or "AC" ¶ 29).  The Missouri SIP requires PSD permits for a "major modification," which is defined as "[a]ny physical change or change in the method of operation . . . that would result in a significant net emissions increase of any pollutant."  *See* Mo. Code Regs. Ann. tit. 10 C.S.R. 10-6.060(8)1; 10 C.S.R. 10-6.020(2)(M)2.  A "significant" net emission increase is a net increase equal to or exceeding certain *de minimis* levels under the Missouri SIP, which for $SO_2$ is 40 tons per year. 10 C.S.R. 10-6.020(3)(A).[1]

The calculation of whether a physical change would result in a significant net emissions increase requires a comparison of "the actual annual emissions of a pollutant" to "the actual average for the two prior years."  *Envt'l Def. v. Duke Energy Corp.*, 549 U.S. 561, 569 (2007) ("*Duke Energy III*"); *see also United States v. Duke Energy Corp.*, No. 1:00-cv-01262, 2010 WL 3023517, at *5 (M.D.N.C. July 28, 2010) ("*Duke Energy IV*").  Actual emissions are measured "in a manner that looks to the number of hours the unit is or probably will be actually running" after the project.  *Duke Energy III*, 549 U.S. at 578; *see also United States v. Cinergy Corp.*, 458 F.3d. 705, 709 (7th Cir. 2006) ("[A]ging [of equipment at coal-fired power plants] produces

---

[1]    All citations to the Missouri Code of Regulations are to the regulations as they existed on October 30, 2008.  A copy of the regulations is attached as Exhibit A to this brief.  Although there have been revisions to the regulations between 1999 and the present, those revisions have not substantively changed the regulatory provisions relevant to this brief.

more frequent breakdowns and so reduces a plant's hours of operation and hence its output."). Increases in operating hours "*enabled by a physical change* . . . must be included in the pre-project calculus." *Duke Energy IV*, 2010 WL 3023517, at *5 (emphasis added).  If the calculation shows a significant net emissions increase, then Missouri's SIP expressly prohibits an existing facility from operating after it has been modified unless it has first obtained a permit under Missouri's PSD program.[2] 10 C.S.R. 10-6.060(1)(C).

## ARGUMENT

### I.   THE COMPLAINT MEETS THE NOTICE PLEADING STANDARD OF RULE 8.

### A.  Standard of Review

A motion to dismiss may test the sufficiency of the pleadings under Rule 8, which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  In order to meet this standard, a complaint need not include "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (Rule 8 does not require "detailed factual allegations").  A claim is plausible on its face where the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable." *Iqbal*, 129 S. Ct. at 1949 (*citing Twombly*, 550 U.S. at 556).  Additionally, under Rule 12(b)(6), the Court must liberally construe the complaint in favor of the plaintiff and "must accept as true all of the factual allegations contained

---

[2]        In the "Factual and Legal Background" section of its brief, Ameren incorrectly asserts that "if the operator does not expect a planned modification to increase net emissions above a significance level . . .  it does not need a permit." (ECF No. 40 at 4).  On the contrary, a source may not unilaterally exempt itself from PSD by deciding that a change would not cause a significant net emissions increase.  The PSD regulations make clear that a source is subject to enforcement if it incorrectly determines that PSD does not apply.  The Utility Air Regulatory Group, an industry lobbying organization that represents the operators of the largest coal-fired power plants in the country, has agreed, telling the D.C. Circuit Court of Appeals that "[i]f the source's determination [that PSD does not apply] ultimately turns out to be incorrect *in the view of EPA or a state agency,* the source may be subject to enforcement for violating NSR." Joint Brief of Industry Intervenors, *New York v. EPA*, No. 02-1387, 2004 WL 5846442, at *18-*19 (Oct. 26, 2004) (emphasis added).

in the Complaint." *Twombly*, 550 U.S. at 572 (citations omitted).  Rule 12(b)(6) "does not

impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a

reasonable expectation that discovery will reveal evidence" sufficient to prove a claim.

*Twombly*, 550 U.S. at 556.  This plausibility analysis is a "context-specific task that requires the

reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 129 S. Ct. at 1950.

### B.  The Amended Complaint Pleads Facts Showing That the United States is Entitled to Relief.

The facts contained in the Amended Complaint easily satisfy Rule 8's liberal pleading

standard.  Indeed, while the United States does not concede that Rule 8 requires the additional

facts included in the Amended Complaint, they directly respond to Ameren's chief argument:

that the complaint does not describe "why [the projects] would have been predicted, before

beginning construction, to cause an emissions increase[.]"  (ECF No. 13 at 1; *see also id*. at 6).

In the Amended Complaint the United States describes how Rush Island Units 1 and 2 burn coal

to generate electricity.  (AC ¶ 13).  The major modifications undertaken by Ameren were multi-

million dollar replacements of massive components that are essential to the operation of a coal-

fired generating unit.  (*Id.* at ¶¶ 2, 13, 67, 73, 78, 83).  The United States alleges that by replacing

old, deteriorated components that were causing excessive outages and lost generation, these large

capital improvement projects should have been expected to enable and cause increased

generation at Rush Island Units 1 and 2 by increasing their availability, capacity, and/or cost-

effectiveness to operate.  This in turn increases coal consumption at those units.  (*Id.* at ¶¶ 13, 14,

67, 73, 78, 83).  Combustion of coal inside the boiler releases sulfur that, without pollution

control, combines with oxygen in the atmosphere to form $SO_2$, a harmful pollutant that

contributes to premature mortality, asthma attacks, acid rain and other adverse effects in

downwind communities and natural areas.  (*Id.* at ¶ 3).  Ameren did not notify EPA before

undertaking these projects, did not apply for PSD permits before undertaking these projects, did not install and operate BACT for $SO_2$, and did not act in compliance with Missouri's Title V regulations or Ameren's Title V permits.  (AC ¶¶ 68, 74, 79, 84, 89-93, 99-102).

Taken as true, *see Cole v. Homier Distrib. Co.*, 599 F.3d 856, 861 (8th Cir. 2010), these allegations plausibly allege that Ameren's multi-million dollar modifications should have been expected to result in a significant net emissions increases of $SO_2$.  As a result, the Amended Complaint allows the Court to draw the reasonable inference that Ameren is in violation of PSD and Title V requirements.  *See Twombly*, 550 U.S. at 570; *Iqbal*, 129 S. Ct. at 1949.

Ameren incorrectly asserts that the United States only alleges the "possibility" of a violation at the Rush Island Plant.  (ECF No. 40 at 5, 7).  In doing so, Ameren largely ignores the specific substantive allegations of the Amended Complaint and instead focuses almost exclusively on background factual allegations that describe how coal-fired power plants burn coal to generate electricity and emissions, and how massive capital improvement projects like those undertaken by Ameren should be expected to result in significant net emissions increases under the PSD regulations.  (ECF No. 40 at 4-6 (*citing* AC ¶¶ 13, 14)).  Not until several pages into its brief does Ameren finally acknowledge that the Amended Complaint specifically pleads that Ameren's capital projects, like those described in Paragraphs 13 and 14, actually enabled and caused the Units to operate more hours, burn more coal and generate more emissions than before the projects.  (ECF No. 40 at 7; AC ¶¶ 67, 73, 78, 83).

While Ameren acknowledges the specific factual allegations in Paragraphs 67, 73, 78, and 83, it attempts to brush them off as "mere conclusions."  (ECF No. 40 at 7).  At the same time, Ameren contradictorily contends that the Amended Complaint "does not allege that the Projects actually **did** increase emissions, **did** improve unit availability or **did** increase

capacity[.]"  (ECF No. 40 at 6 (emphases in original)).  Ameren's contention ignores the words of the Amended Complaint, in which the United States directly alleges that the projects resulted in significant net emissions increases by "enabling and causing Rush Island Unit 1 [and 2] to burn more coal and release greater amounts of $SO_2$ . . . by increasing the **capacity**. . . **availability**. . .  and **cost-effectiveness** of Rush Island Unit 1 [and 2] to operate more hours, burn more coal, and **emit greater amounts of $SO_2$**[.]"  (AC ¶¶ 67, 73; *see also* ¶¶78, 83 (emphases added)).[3]  Moreover, Rush Island Units 1 and 2 are both baseload coal-fired generating units that operate nearly continuously when available to supply the electricity needed to meet minimum levels of customer demand.  (AC ¶13).  Repairing and improving these units to enable them to operate more hours will cause them to burn more coal and produce more emissions.  (*Id.*)  Ameren's claim that the Amended Complaint is missing key facts required under Rule 8 is simply wrong.  The Amended Complaint explains how Ameren's projects *can* increase emissions, and proceeds to specifically allege that Ameren should have expected these projects to result in significant net increases in $SO_2$ emissions.[4]

Ameren invokes *Twombly* and *Iqbal* to argue that the facts alleged in Paragraphs 13, 14, 67, 73, 78 and 83 are equally consistent with either lawful or unlawful conduct (ECF No. 40 at 7-8), ignoring that those paragraphs allege that the projects resulted in increased hours of operation, coal burned, and annual emissions of $SO_2$ at the units sufficient to require a PSD

---

[3]  Although Ameren appears to take issue with the allegation that its modifications at the Rush Island plant had "one or more" effects on generation and emissions, Fed. R. Civ. P. Rule 8(d)(2) permits pleading facts in the alternative.

[4]  As with the Complaint, the Amended Complaint uses the words "result in" when alleging that Ameren's Rush Island projects should have been expected to cause significant net emissions increases.  This is consistent with the plain language of the Act and PSD regulations, which use the same "result in" words and establish that PSD is a preconstruction program that relies on a forward-looking projection of emissions.  *See* 42 U.S.C. § 7411(a)(4) (defining "modification"); 40 C.F.R. § 52.21(b)(2) (defining "major  modification"); *New York v. EPA*, 413 F.3d 3, 16 (D.C. Cir. 2005) (*citing* 57 Fed. Reg. at 32,323–26) (Under the "[the PSD regulations], utilities would determine whether they had post-change increases in emissions—and thus whether they needed NSR permits—by comparing actual emissions before the change to their projections of actual post-change emissions.").

permit.  As explained by the Supreme Court, this is the crux of proving a significant net emissions increase under the PSD regulations.  *Duke Energy III*, 549 U.S. at 578 (Actual emissions are measured "in a manner that looks to the number of hours the unit is or probably will be actually running" after the project.); *see also Duke Energy IV*, 2010 WL 3023517, at *5 (Increases in operating hours "*enabled by a physical change* . . . must be included in the pre-project calculus.") (emphasis added).  Undertaking a physical or operational change to increase a Unit's operating hours and consequently its annual emissions beyond the significance threshold for $SO_2$ of 40 tons per year without first obtaining the required permit is incontrovertibly *unlawful* conduct under the Missouri SIP.  The Supreme Court's analysis in *Iqbal* and *Twombly* is no bar to the Amended Complaint's allegations of unlawful conduct.

Ameren further distorts the allegations of the Amended Complaint by claiming that the massive turbine overhauls at Units 1 and 2 in 2001 and 2003 at the units cannot result in emissions increases, but ignores that the Amended Complaint pleads that it was the new, expanded and modified superheaters, *as well as* the associated turbine projects, that caused the significant net emissions increase at Units 1 and 2.  (Compl. ¶¶ 65, 71; AC ¶¶ 67, 73).  In addition, Ameren asks the Court to draw the unsupported inference that a project that improves the efficiency and cost-effectiveness of a unit is *per se* exempt from the requirements of PSD. (ECF No. 40 at 9).  But Ameren is wrong.  Indeed, one year prior to the 2001 Rush Island Unit 1 project, EPA issued guidance explaining that an increase in efficiency at a coal-fired generating unit may lead to an increase in operations that results in significant net emissions increases under PSD.  *See* Letter from Francis Lyons, EPA, to Henry Nickel, Hunton & Williams, May 23, 2000, at 21, available at http://www.epa.gov/ region07/air/nsr/nsrmemos/ detedisn.pdf  (Explaining that "if Detroit Edison decides to run the Monroe plant even 1% more due to improved efficiency, the

resulting increase in emissions would be well above the significance threshold.").  Among other

things, the Amended Complaint alleges that Ameren undertook the superheater and turbine

projects to improve the efficiency of the units—thus making them more cost-effective—and then

operated the units more heavily and during more hours, thereby burning more coal and releasing

more $SO_2$ on an annual basis following the projects than before.  (AC ¶¶ 14, 67, 73).

### C. This Court Should Reject Ameren's Attempt to Convert the Pleadings Stage into an Evidentiary Proceeding under Fed. Evid. R. 702.

Finally, the Court should reject Ameren's invocation of two recent decisions excluding

expert testimony on emissions increases as a transparent attempt to convert the pleadings stage

into a *Daubert* proceeding.  (ECF. 40 at 8, *citing United States v. Cinergy Corp.,* 623 F.3d 455

(7th Cir. 2010); *United States v. Ala. Power Co.*, 2:01-CV-0152-VEH, 2011 WL 1158037 (N.D.

Ala. Mar. 14, 2011)).  Decisions on the admissibility of expert testimony are not applicable at the

pleadings stage.  *Twombly*, 550 U.S. at 556 (Rule 12(b)(6) "does not impose a probability

requirement at the pleading stage . . .").

Even if *Cinergy* had some relevance to this case *at this stage*, the Amended Complaint is

fully consistent with the Seventh Circuit's holding in that case.  There, the court excluded expert

testimony on projected emissions increases at a "low utilization" power plant because the court

believed that the "formula that the two experts proposed to use for their forecast was designed

for use with baseload electric generating plants," which operate "virtually continuously."

*Cinergy*, 623 F.3d at 459-460.[5]  The *Cinergy* court reasoned that "if a baseload plant is modified

---

[5]      Subsequent to *Cinergy*, Judge Virginia Hopkins of the Northern District of Alabama unreasonably narrowed the *Cinergy* court's definition of "baseload" beyond the facts presented in the *Cinergy* case such that, in Judge Hopkin's view, availability improvements can only result in generation increases that not only operate "virtually continuously" but that also operate "virtually continuously' at 'full capacity.'"  *Ala. Power Co.*, No. 2:01-CV-152, 2011 WL 1158037 at *5-6 (N.D. Ala. Mar. 14, 2011).  The *Alabama Power* ruling is currently on appeal to the Eleventh Circuit.  *United States v. Ala. Power Co.*, Case No. 11-12200 (11th Cir.).  In any case, like the *Cinergy* decision, the fact-specific nature of the court's holding renders it inapplicable at the pleadings stage.

to enable it to produce more electricity, there is a *presumption* that it will produce at the higher rate enabled by the modification, because baseload plants are designed to run at or near full capacity." *Id.* (emphasis added).  For a low-utilization plant, the *Cinergy* court reasoned, one cannot simply presume that an operator will actually utilize increased generating ability enabled by a project.  *Id.*  Here, the Amended Complaint alleges that Rush Island Units 1 and 2 are baseload units that operate continuously whenever they are available, such that increasing their availability to operate will increase their generation and emissions.  (AC ¶ 13).  Ameren all but ignores this "baseload" fact,  omitting it from its quotation of Paragraph 13 (ECF No. 40 at 5), and then asserting that it "adds nothing" to the Amended Complaint (*id*. at 7 n.5).  On the contrary, the status of Rush Island Units 1 and 2 as "baseload" units, taken as true, means that the United States and this Court may apply the *Cinergy* presumption that Ameren's capital improvement projects would lead to increases in generation and emissions.  But even if the Rush Island Units were not baseload units, all *Cinergy* stands for is that, for expert witness purposes, more than a mere "presumption" will be required for the United States' to prove an emissions increase.

In sum, Ameren's claim that the Amended Complaint is missing relevant facts is wrong based on the words of that pleading and the standard in Rule 8.  The Amended Complaint passes Rule 8 muster and this case should proceed to the merits.

## II. THE PSD REQUIREMENTS OF THE MISSOURI SIP AND TITLE V PERMITS IMPOSE ONGOING OPERATIONAL AND REPORTING OBLIGATIONS.

The United States' claims for civil penalties for the major modifications at issue are not barred by the statute of limitations in 28 U.S.C. § 2462 because Ameren has continued to violate the Missouri SIP's prohibition on operating an installation after a modification without first obtaining a construction permit throughout the limitations period.  In applying the statute of

9

limitations, courts typically analyze the relevant SIP provisions to determine whether a source is under an ongoing obligation to obtain a PSD construction permit following a modification to its facility.  *See Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1015-16 (8th Cir. 2010) (finding that the South Dakota PSD SIP does not impose ongoing requirements); *Nat'l Parks Conservation Assoc. v. TVA* (*Nat'l Parks – 6th Cir*), 480 F.3d 410, 413-14 (6th Cir. 2007) (finding the Tennessee SIP to create ongoing PSD requirements); *United States v. Duke Energy Corp.* ("*Duke Energy I*"), 278 F. Supp. 2d 619, 649-52 (M.D.N.C. 2003) (finding the North Carolina and South Carolina SIPs impose ongoing requirements), *rev'd on other grounds sub nom Duke Energy III.*, 549 U.S. 561; *accord Sierra Club v. Portland Gen. Electric*, 663 F. Supp. 2d 983, 992-94 (D. Or. 2009).  While the Eighth Circuit recently held that the South Dakota PSD SIP did not clearly impose ongoing operational requirements,[6] it confirmed that where a SIP does impose such requirements, failure to comply with PSD can subject a source to ongoing liability.  *Otter Tail*, 615 F.3d at 1014, 1017.  Missouri has such a SIP.  As discussed below, the language of the federally-approved Missouri SIP and Ameren's Title V permits prohibits the operation of a major modification without obtaining a PSD permit and imposes an ongoing obligation on Ameren to comply with PSD requirements.

### A. The Missouri SIP and Ameren's Title V Permits Prohibit Operation of a Major Modification Without First Obtaining a PSD Permit.

The Missouri SIP prohibits operation of an installation following a major modification without first obtaining a permit.  10 C.S.R. 10-6.060(1)(C).  The relevant Missouri SIP provision cited in the Amended Complaint prohibits *both* construction and operation without a PSD permit. It is titled "Construction/ Operation Prohibited" and provides:

---

[6]    The United States respectfully disagrees with the Eighth Circuit's holding that the CAA itself does not impose ongoing obligations to comply with PSD requirements.  *See Brief of the United States as Amicus Curiae, Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008 (8th Cir. 2010) (No. 09-2862), 2009 WL 4831919.  However, as discussed below, even under the Eighth Circuit's rationale in *Otter Tail*, Missouri's PSD obligations are ongoing.

> No owner or operator shall commence construction or modification of any installation subject to this rule, _begin operation_ after that construction or modification…without first obtaining a permit from the permitting authority under this rule.

_Id._ (emphasis added).  In addition, Ameren's Title V operating permit for the Rush Island Plant, issued before the projects at issue in this case, provides an independent basis for finding Ameren's alleged violations in this case to be ongoing.  That permit specifically prohibits operation of a major modification without first obtaining a PSD permit under the Missouri SIP. (AC ¶ 50; ECF No. 18-4 at 24; ECF No. 18-5 at 28 ("The permittee shall not . . . begin operation after [a] . . . major modification . . . without first obtaining a permit.")).

Ameren argues that the words "begin operation" in the Missouri SIP mean that the requirement to obtain a PSD permit begins at construction and ends upon operation of an illegally modified source.  (ECF No. 40 at 11-12).  Ameren's argument is inconsistent with the regulation's plain language:  Ameren "shall . . . [not] begin operation after that construction or modification" without first obtaining a PSD permit.  10 C.S.R. 10-6.060(1)(C).  "Beginning" operation is part of the act of operating, and such operation is prohibited under the Missouri SIP without first obtaining a PSD permit.[7]  WEBSTER'S THIRD NEW INT'L DICTIONARY, at 198 ("begin" means "to perform or execute the first part of an action, activity, or procedure.").

---

[7]     Ameren again mistakenly relies on a state statute, Mo. Rev. Stat. § 643.055(1), to assert that the Missouri SIP cannot legally prohibit operation of a modified source without a construction permit.  (ECF No. 40 at 14). However, Section 643.055(1) is not part of the federally-approved Missouri SIP, does not change its plain language, and does not limit EPA's authority to approve any provision of the SIP.  _See_ 40 C.F.R. § 52.1320; 66 Fed. Reg. 27,028 (May 16, 2001).  At most, Section 643.055(1) "is a limitation on the state's ability to promulgate rules," 66 Fed. Reg. 27,028, 27,030 (May 16, 2001), and this Court is the wrong forum for Ameren to attack Missouri's regulations.  Even if this were the proper forum, Ameren misreads Section 643.055(1).  That statute prohibits Missouri from enacting "standards or guidelines" "stricter" than the CAA but does not prohibit regulations that are _broader in scope_ than the federal CAA.  _See e.g., Friends of Agric. v. Zimmerman_, 51 S.W.3d 64, 77-82 (Mo. Ct. App. 2001) (upholding odor control regulations and operating permit program under Section 643.055(1) as broader in scope than the CAA); _Mo. Hosp. Ass'n v. Air Conservation Comm'n_, 874 S.W.2d. 380, 397 (Mo. Ct. App. 1994) ("The Commission continues to have rulemaking authority to regulate Missouri air quality in all ways, and in all areas, not covered by the federal Clean Air Act.").  According to the Eighth Circuit, the CAA's PSD program does not prohibit operation of a modified source without a construction permit.  _Otter Tail_, 615 F.3d 1014-15.  Thus Missouri's operating prohibition is permissibly broader in scope than the federal PSD program.

Other SIP provisions cited by Ameren do not negate the plain language of 10 C.S.R. 10-6.060(1)(C); they simply demonstrate the clear requirement that a source first obtain a PSD permit that meets the requirements of the SIP before operating.  (*See* ECF No. 40 at 12, *citing* 10 C.S.R. 10-6.060(8)(B)2 & 3, 10-6.060(8)(C)1.A).

Even if the Court finds the Missouri SIP to be ambiguous, which it is not, the Court should defer to EPA's reasonable interpretation of the federally approved Missouri SIP.  *Am. Cyanamid Co. v. EPA*, 810 F.2d 493, 498 (5th Cir. 1987) (deferring to EPA interpretation of Louisiana SIP); *Navistar Int'l Transp. Corp. v. EPA*, 858 F.2d 282, 286-88 (6th Cir. 1988) (deferring to EPA interpretation of Ohio SIP).  Further, this Court should construe EPA's broad authority to enforce SIP violations in light of the "rule that statutes of limitations are construed narrowly against the government" and that "the sovereign is given the benefit of the doubt if the scope of the statute [of limitations] is ambiguous."  *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 95-96 (2006); s*ee also Badaracco v. C.I.R.*, 464 U.S. 386, 391 (1984) *citing E. I. Du Pont De Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924); *Mullikin v. United States*, 952 F.2d 920, 926 (6th Cir. 1991).

### B.  The Missouri SIP and Ameren's Title V Permits Impose an Ongoing Obligation on Ameren to Comply with PSD Requirements Even After a Modification.

In addition to prohibiting operation of a major modification without a PSD permit, the Missouri SIP and Ameren's Title V permits prohibit Ameren from making a change to the Rush Island Plant without a permit revision if that change is a major modification, also known as a Title I modification.  10 C.S.R. 10-6.020(2)(M)2; 10 C.S.R. 10-6.020(2)(T)2.  Critically, if the source *does* make a change to the permitted installation, then the regulations provide:

> The permittee must provide contemporaneous written notice of the change to the permitting authority and to [EPA]. . . .  This written notice shall describe each

change, including the date, any change in emissions, pollutants emitted and any applicable requirement that would apply as a result of the change.

10 C.S.R. 10-6.065(6)(C)9.B.[8]  The Title V permit for the Rush Island Plant similarly requires that Ameren provide post-construction notice of any change to the Rush Island Plant "no later than the next annual emissions report."  (ECF No. 18-4 at 32, *citing* 10-6.065(6)(C)9; ECF No. 18-5 at 40 (same)).  If EPA determines that PSD is an applicable requirement based on this notice, then Ameren's Title V permit may be re-opened, modified, and re-issued to reflect that requirement.  (ECF No. 18-4 at 28, "General Requirements" (10 C.S.R. 10-6.065(6)(C)1.G); ECF No. 18-5 at 35 (same); ECF No. 18-5 at 40, "Reopening-Permit for Cause" (10 C.S.R. 10-6.065(6)(E)6)).

This requirement of the Missouri SIP and Ameren's Title V permits is analogous to the Tennessee SIP that the Sixth Circuit held to impose an ongoing obligation to comply with PSD *even after* the modification.  *Nat'l Parks– 6th Cir.*, 480 F.3d at 419.  The Sixth Circuit case was similar to this one and applied the following Tennessee SIP provision:

> In the case where a source or modification was constructed without first obtaining a construction permit, a construction permit may be issued to the source or modification to establish as conditions of the permit, the necessary emission limits and requirements to assure that these regulatory requirements are met.

*Id*. (*quoting* Tenn. Comp. R. & Regs. 1200-3-9-.01(1)(e)).  Based in part on this provision, the defendant could be held liable for civil penalties for each day it operated the major modification without obtaining a PSD permit.  *Id.*  The Eighth Circuit in *Otter Tail* agreed that such a result "made sense"; these provisions "allow[] for the issuance of a PSD permit even after construction had been completed."  *Otter Tail*, 615 F.3d at 1017.  That result makes sense here, too.  Like the Tennessee SIP, the Missouri SIP and the Rush Island Title V permits provide a mechanism for

---

[8]      The Missouri regulations define "administrator" as "The regional administrator for Region VII, United States Environmental Protection Agency (EPA)."  10 C.S.R. 10-6.020(2)(A)5.

EPA to learn of the Rush Island major modifications and to require Ameren to comply with PSD

requirements *even after* they were completed.   Thus, Ameren has been under an ongoing

obligation to comply with PSD since it undertook the major modifications.

### C. The Eighth Circuit's Ruling in *Otter Tail* Supports the United States' Position Here, not Ameren's.

The Eighth Circuit's reasoning in *Sierra Club v. Otter Tail Power* supports the

conclusion that the Missouri SIP prohibits the ongoing operation of a modified facility without

the required construction permit.[9]  (ECF No. 40 at 13).  In that case, the Eighth Circuit analyzed

the South Dakota SIP, *not* the Missouri SIP.  The Court found that the South Dakota SIP did not

clearly impose such ongoing requirements and did not prohibit operation without a PSD

construction permit.  *Otter Tail*, 615 F.3d at 1015 (*quoting* S.D. Admin. R. 74:36:05:02).

According to the Court, "the [South Dakota] rule simply says that a facility must have the permit

'applicable' to the activity it seeks to undertake – whether construction or operation – but it does

not indicate which permit is applicable to which activity."  *Id. at* 1015-16.  Unlike the South

Dakota SIP, however, the Missouri SIP identifies precisely the kind of permit that is required

before operation will be allowed:  a construction permit.  10 C.S.R. 10-6.060(1)(C).  Thus, the

Missouri SIP clearly prohibits operation without first obtaining a construction permit.

### D. Ameren's Repeated Failure to Accurately Certify Compliance Under its Title V Permits with All Applicable Requirements is Not a "One-time Violation."

The Amended Complaint alleges that Ameren failed to accurately certify compliance

with all of the federally enforceable terms and conditions contained in its Title V permit,

---

[9]        In a footnote, Ameren again cites to a number of other cases that are generally in accord with the Eighth Circuit's decision in *Otter Tail*, but fails to mention that the case law applying the statute of limitations is roughly equally split and, other than the Sixth Circuit's decision in *Nat'l Parks - 6th Cir.*, did not cite to any cases that have reached different results.  *See Sierra Club v. Dairyland Power Coop.*, No. 10-CV-303-bbc, 2010 WL 4294622 (W.D. Wis. Oct. 22, 2010); *United States v. Ohio Edison Co*, No. 2:99-cv-1181, 2003 WL 23415140, at *5-6 (S.D. Ohio Jan. 17, 2003); *United States v. Am. Electric Power Serv. Corp.*, 137 F. Supp. 2d 1060, 1066 (S.D. Ohio 2001); and, *United States v. Marine Shale Processors*, 81 F.3d 1329, 1357 (5th Cir. 1996).

including the PSD requirements of the Missouri SIP, as required by its Title V permit and the

Title V regulations.  (AC ¶¶ 51,  91, 100); (ECF No. 18-4 at 30; ECF No. 18-5 at 38); *see also* 10

C.S.R. 10-6.065(6)(C)3.

The cases that Ameren cites do not support its contention that each of its reporting

violations "is a discrete event that only occurs at the time the report is due."  (ECF No. 13 at 15).

For example, Ameren cites to *Otter Tail*, which does not discuss Title V's recurring obligation to

accurately certify, on an annual basis, compliance with applicable requirements.  Ameren cites

two other cases that address the CAA's New Source Performance Standards' requirement (in a

completely different set of regulations under the CAA) that a source provide a particular *one-

time* report following work performed on the unit.  *United States v. E. Ky. Power*, 498 F. Supp.

2d 970, 976 (E.D. Ky. 2007) and *United States v. Ill. Power Co.*, 245 F. Supp. 2d 951, 958 (S.D.

Ill. 2003).[10]  None of these cases involved the recurring compliance certifications required by

Ameren's Title V permits.  Here, Ameren had a clear obligation to accurately certify compliance

with the PSD requirements each year.  (ECF No. 18-4 at 30, "Compliance Requirements" at IV;

ECF No. 18-5 at 38 (same)).  Each failure to accurately certify compliance that occurred within

the statute of limitations is a violation of the Title V permit.

## CONCLUSION

For the foregoing reasons, Ameren's Motion to Dismiss should be denied.

---

[10]     *Atwell v. KW Plastics Recycling Div.* is also inapposite.  That case involved a Clean Water Act citizen suit
that addressed whether reporting violations were "wholly past" so as to preclude citizen suit jurisdiction under 33
U.S.C. § 1365(a)(1).  173. F. Supp. 2d 1213, 1227-28 (M.D. Ala. 2001).  That case does not relate to the applicable
statute of limitations, let alone the requirement under Title V to accurately certify compliance with applicable
requirements.  *In the Matter of Umetco Minerals Corp.* is likewise inapplicable. That case held that statutory
penalties could apply on a daily basis for failure to submit a required compliance report, noting that "the obligation
to demonstrate compliance… may…reasonably be regarded as continuing until the next annual report is due."  No.
CAA-113-VIII-92-03, 1996 WL 691531, at *4-5 (EPA March 29, 1996).

United States' Opposition to Ameren's Rule 12(b)(6) Motion to Dismiss, *United States v. Ameren Missouri*, 4:11CV00077-RWS (E.D. Mo.)

Dated: July 29, 2011

Respectfully Submitted,

IGNACIA S. MORENO
Assistant Attorney General


s/ Bradford T. McLane
Justin A. Savage
Andrew C. Hanson
Bradford T. McLane
Trial Attorneys
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
Telephone:  (202) 305-0544
Facsimile:  (202) 616-2427
E-mail: Bradford.McLane@usdoj.gov

Suzanne Moore
Assistant United States Attorney
United States Attorney's Office
Eastern District of Missouri
Thomas Eagleton U.S. Courthouse
111 South 10th Street, 20th Floor
St. Louis, Missouri 63102
Telephone:  (314) 539-2547
Facsimile:  (314) 539-2309
E-mail: Suzanne.Moore@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2011, I electronically filed the foregoing United States' Opposition to Ameren's Rule 12(b)(6) Motion to Dismiss with the Clerk of Court using the CM/ECF system, which will cause an electronic copy to be served on counsel of record, who are listed below:

Ronald S. Safer (pro hac vice)
Patricia Brown Holmes (pro hac vice)
Renee Cipriano (pro hac vice)
Steven J. Bonebrake (pro hac vice)
Matthew B. Mock (pro hac vice)
Schiff Hardin LLP
233 South Wacker Drive Suite 6600
Chicago, Illinois 60606
Phone: (312) 258-5500
Fax: (312) 258-5600

James J. Virtel
Armstrong Teasdale LLP
7700 Forsyth Boulevard Suite 1800
St. Louis, Missouri  63105
Phone: (314) 621-5070
Fax: (314) 612-2298
jvirtel@armstrongteasdale.com

*Counsel for Defendant Ameren Missouri*

s/Bradford T. McLane
BRADFORD T. MCLANE