# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

_____
                                              )
**UNITED STATES OF AMERICA,**                 )
                                              )
      **Plaintiff,**                      )
                                              )
        **v.**                     )     **Civil Action No. 4:11-cv-00077-RWS**
                                              )
**AMEREN MISSOURI,**                          )
                                              )
      **Defendant.**                      )
_____)


## UNITED STATES' MEMORANDUM IN OPPOSITION TO AMEREN MISSOURI'S MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1)

Plaintiff, the United States of America, opposes defendant Ameren Missouri's ("Ameren's") Rule 12(b)(1) motion to dismiss (ECF No. 41), and respectfully requests that the Court deny the Motion because the Clean Air Act provides federal jurisdiction to hear this case.

## INTRODUCTION

Ameren has again filed a Rule 12(b)(1) motion to dismiss the United States' Amended Complaint for a purported lack of subject matter jurisdiction after the Court denied its previous motion as moot. (ECF No. 34). Ameren's renewed motion again misconstrues the Clean Air Act ("CAA" or "the Act") and its implementing regulations.

In fact, the Act and its implementing regulations are straightforward and support the United States' Title V claims. CAA Section 113 specifically authorizes the United States to bring an action for injunctive relief and civil penalties for any Title V violation, and provides this Court with broad jurisdiction over this case. *See* 42 U.S.C. § 7413; *see also* 28 U.S.C. §§ 1331, 1345, 1355. CAA Title V required Ameren to secure a permit that includes "enforceable emission limitations and standards, a schedule of compliance, . . . and such other conditions *as are necessary to assure compliance with applicable requirement of this chapter, including the requirements of the applicable implementation plan*." 42 U.S.C. § 7661c(a) (emphasis added). In turn, Prevention of Significant Deterioration ("PSD") is a requirement of Missouri's federally-approved State Implementation Plan ("SIP"). As alleged in the Amended Complaint (ECF No. 36), Ameren does not dispute that it operates the Rush Island Plant under a Title V permit that does not include PSD "applicable requirements" stemming from the plant modifications at issue.

Ameren's motion ignores these statutory provisions, as well as the numerous cases confirming that the United States may bring enforcement actions for CAA Title V violations like those alleged here. Instead, Ameren makes a brazen argument that runs counter to basic

1

principles of jurisprudence:  that even if it did violate the PSD requirements, and is thus also

currently operating without a Title V permit that incorporates such requirements, it should be

immune from penalties for its illegal operation of the Rush Island Plant due to its *own failure* to

ask the permitting authority to make a "Best Available Control Technology" ("BACT")

determination under PSD.  This Court should reject Ameren's invitation to reward the company

for its violations.  Ameren's years of illegal operation in violation of Title V, which continue to

this day, cannot simply be wiped away.  Under the plain text of the statute and regulations,

EPA's long-standing construction of both, and the clear weight of the case law, this Court should

deny Ameren's Rule 12(b)(1) motion to dismiss the challenged Title V claims.

## STATUTORY AND REGULATORY FRAMEWORK

### A.  The Clean Air Act Title V Permitting Program.

Added by the CAA Amendments of 1990, Title V established a comprehensive operating

permit program to enable permitting authorities to better ensure that major sources of air

pollution comply with the various substantive requirements imposed by the Act, including the

PSD requirements contained in CAA Title I.  *See* 42 U.S.C. §§ 7661-7661f (CAA Title V); 40

C.F.R. Part 70 (EPA Title V regulations).  Title V ensures that all "applicable requirements" are

collected in one place.  *See Sierra Club v. Otter Tail Power Co. ("Otter Tail")*, 615 F.3d 1008,

1012 (8th Cir. 2010).  While Title V generally does not impose new substantive requirements,

Title V permits may impose additional monitoring, recordkeeping and reporting requirements.

*See, e.g.,* 42 U.S.C. § 7661c(a); Mo. Code Regs. Ann. tit. ("C.S.R.") 10 §§ 10-6.065(6)(C)1.C

(monitoring, recordkeeping and reporting), 10-6.065(6)(C)9.A & B (requiring contemporaneous

notice of changes to the facility's operations).[1]

---

[1]   All citations to the Missouri Code of State Regulations are to the regulations as they existed on October 31, 2008.  These regulations are attached as Exhibit A to the United States Opposition to Ameren's Rule 12(b)(6)

The Act requires EPA to promulgate regulations establishing the minimum required elements of state Title V permitting programs, including the requirement that state programs may allow certain changes to a permitted facility without the need to revise the Title V permit, but only "if the changes are not modifications under any provision of subchapter I of this chapter." 42 U.S.C. § 7661a(b)(10).  Thus, Congress made it clear that a PSD modification—which is one form of Title I modification—must be included in the terms of the Title V permit.

States that develop Title V programs containing all required elements may implement the program after securing EPA approval.  57 Fed. Reg. 32,250 (July 21, 1992).  EPA approved Missouri's Title V program, which is codified at 10 C.S.R. § 10-6.065.  62 Fed. Reg. 26,405 (May 14, 1997).[2]  Consistent with the CAA and federal regulations at 40 C.F.R. Part 70, Missouri's Title V program places the burden squarely on the permit applicant to secure a permit containing "all applicable requirements." 10 C.S.R. § 10-6.065(6)(C)1.A; 42 U.S.C. §§ 7661 - 7661c(a).  The applicant's burden also includes the obligation to submit a detailed application containing "all information needed to determine applicable requirements."  10 C.S.R. § 10-6.065(6)(B)3.  The Missouri SIP defines the term "applicable requirement" to include: "A. Any standard or requirement provided for in the implementation plan approved or promulgated by EPA through rulemaking under Title I of the Act that implements the relevant requirements . . . [and] B. Any term or condition of any pre-construction permit issued pursuant to regulations approved or promulgated through rulemaking under Title I, including part C [PSD] or D [Nonattainment New Source Review] of the Act."  10 C.S.R. § 10-6.020(2)(A)23; *see also* 40 C.F.R. § 70.2 (containing almost identical EPA definition).  A "responsible official" must certify

---

Motion to Dismiss.  Although there have been revisions to the regulations between 1999 and the present, those revisions have not substantively changed the regulatory provisions relevant to this brief.

[2]       With limited exceptions not applicable here, Missouri's Title V regulations are also part of the federally-approved Missouri SIP.  *See* 66 Fed. Reg. 16,137, 16,139 (March 23, 2001).

that after a "reasonable inquiry" the applicant has submitted a complete application identifying all such applicable requirements.  10 C.S.R. § 10-6.065(6)(B)4.  Also, an "applicant who fails to submit any relevant facts, or who has submitted incorrect information in a permit application, upon becoming aware of this failure or incorrect submittal, shall promptly submit supplementary facts or corrected information."  10 C.S.R. § 10-6.065(6)(B)2.

The CAA provides EPA with broad authority under Section 113 to commence a civil action for injunctive relief and civil penalties for violation of "any . . . requirement or prohibition" of Title V.  42 U.S.C. §§ 7413(a)(3), (b)(2); *see also id.* § 7413(a)(1).  The only limited exception to this broad authority is where a Title V permit contains a "permit shield" providing that compliance with the permit constitutes compliance with the requirements at issue.[3]  Ameren does not argue, however, that a permit shield protects it from the United States' claims in this action.

## B.  The Title V Claims.

The United States alleges that Ameren is operating Rush Island Units 1 and 2 in violation of the express terms of 42 U.S.C. § 7661a.  (Amended Complaint ("AC") ¶¶ 87 – 104).  The United States specifically alleges in the Amended Complaint that Ameren has operated and continues to operate Rush Island Units 1 and 2 without a Title V permit that incorporates all applicable requirements.  (AC ¶¶ 90, 99).  These Title V claims also assert that Ameren failed to comply with the procedural permitting requirements by, *inter alia*, failing to submit an accurate and complete Title V permit application, failing to accurately certify compliance, and failing to provide a compliance plan that would provide a pathway for the application of BACT (*i.e.*

---

[3]        Such a "permit shield" provides that compliance with the permit protects the operator from enforcement, but only for those requirements that are included in the permit or where the permit expressly states that a particular requirement is inapplicable to the source and the permit "includes the determination or a concise summary thereof." 42 U.S.C. §7661c(f); *see also* 10 C.S.R. § 10-6.065(6)(C)6.

stringent emissions limitations based on modern pollution control technology).  (AC ¶¶ 89, 98).

Thus, Ameren failed to "obtain a proper or adequate Title V operating permit . . . that contains

one or more emissions limitations for $SO_2$ that meet BACT."  (AC ¶¶ 90, 99).  It is undisputed

that Ameren has not identified the PSD "applicable requirements" stemming from its plant

modifications in its Title V permit applications, and that its Title V permit includes neither

BACT emissions limits nor a schedule of compliance to establish BACT.  (ECF No. 40 at 6

("[N]o BACT determination has ever been made.")).[4]

## STANDARD

Because Ameren's Rule 12(b)(1) motion does not make a factual attack on the Amended

Complaint, the "the non-moving party receives the same protections as it would defending

against a motion brought under Rule 12(b)(6)."  *Osborn v. United State*s, 918 F.2d 724, 729 n.6

(8th Cir. 1990);[5] *see also Arnold v. Hoelscher*, No. 1:10-cv-187-SNLJ, 2011 WL 1226901, at *1

(E.D. Mo. Mar. 30, 2011) (finding that the "same standard governs motions to dismiss under

both Rules 12(b)(1) and 12(b)(6)").  In ruling upon a motion to dismiss under Rule 12(b)(6), the

Court is to "accept as true all factual allegations in the complaint and view them in the light most

favorable to the Plaintiff."  *Zumwalt v. City of Wentzville*, 4:10-CV-561-RWS, 2010 WL

2710496, at *2 (E.D. Mo. July 7, 2010).

Familiar standards of deference to EPA are to govern this Court's construction of the

statutory and regulatory provisions at issue.  In construing the Clean Air Act, this Court "is

obliged to accept the agency's position if Congress has not previously spoken to the point at

issue and the agency's interpretation is reasonable."  *United States v. Mead Corp.*, 533 U.S. 218,

---

[4]     ECF page cites in this brief cite to the page numbers assigned by the ECF system at the top of the page.

[5]     If Ameren believed that there was a factual dispute over whether this Court has jurisdiction, then "the
proper course is to request an evidentiary hearing on the issue."  *Osborn*, 918 F.2d 730 (citation omitted).  But
Ameren has not identified any factual issues that such an evidentiary hearing would resolve.

229 (2001).  To the extent the applicable regulations are ambiguous, this Court is to defer to

EPA's construction unless "plainly erroneous or inconsistent with the regulation."  *Auer v.*

*Robbins*, 519 U.S. 452, 461 (1997); *Navistar Int'l Transp. Corp. v. EPA*, 858 F.2d 282, 286-88

(6th Cir. 1988) (deferring to EPA's construction of the Ohio SIP).

## ARGUMENT

Ameren's jurisdictional challenge to the United States' Title V claims is entirely

predicated on its misreading of the statute and regulations to require that certain "contingent

future events" must occur before these claims can proceed.  (*See* ECF No. 42 at 5-6).  But

Ameren's ripeness argument fails for the simple reason that, under a correct reading of the law,

the events that form the basis of these claims have already occurred.  In short, once Ameren's

misreading of the law is dispelled, its ripeness argument collapses.

CAA Title V requires source operators to identify and incorporate all "applicable

requirements" into Title V permits, including any relevant PSD obligations.  This statutory

construct requires the source, which has the greatest access to information about its operations, to

fully report the details of those operations to ensure that the permit is accurate and complete.

The United States alleges that Ameren failed to do so, (AC ¶¶ 89, 98), and that Ameren's Title V

permit for the Rush Island Plant does not contain PSD requirements stemming from the

modifications of Units 1 and 2 at issue here (AC ¶¶ 90, 99).  CAA Section 113, 42 U.S.C. §

7413, in turn, conveys broad authority on EPA to enforce these Title V violations.

In an attempt to avoid liability for years of illegal operation of Rush Island Units 1 and 2,

Ameren argues that BACT emissions limits "do not exist" for Rush Island Units 1 and 2, and

therefore that the challenged Title V claims are purely "hypothetical" and unripe.  (ECF No. 42

at 11).  Ameren's cavalier argument should be rejected.  Whether BACT has yet been established

for these units is irrelevant to the United States' claim that PSD is an applicable requirement that should have been included in the Rush Island Title V permit after the major modifications at Units 1 and 2. Indeed, the only reason that BACT is not yet "in effect" is that *Ameren failed to comply with PSD and Title V*. Thus, Ameren advances a reading of Title V of the Act that would actually reward violators.[6]

Ameren's ripeness argument turns on two misconstructions of the Clean Air Act and implementing regulations. First, disregarding CAA Section 113, Ameren asserts that EPA has limited authority to enforce Title V violations through civil judicial enforcement actions, (*see* ECF No. 42 at 10), and implies that if EPA does not correct a deficient Title V permit during its 45 day review period, that it cannot thereafter enforce the alleged Title V violations in court, (*id.* at 15-18). This argument is addressed in Section I below. Ameren also misconstrues the term "applicable requirement," as used in CAA Title V and the Missouri SIP, to just incorporate emission limits included in previously-issued PSD permits, and not to incorporate the over-arching obligation to secure a PSD permit in the first place. (*Id.* at 8-9, 14). This argument is addressed in Section II below. Ameren also misconstrues the Eighth Circuit's *Otter Tail* decision to support its arguments. (*Id.* at 11). The court in *Otter Tail* held that the citizen plaintiffs in that case could only seek to enforce alleged New Source Performance Standards ("NSPS") violations by seeking judicial review of Otter Tail's Title V permit under CAA Section 307, 42 U.S.C. § 7607, and could not commence a citizen suit under CAA Section 304, 42 U.S.C. § 7604. *See Otter Tail*, 615 F.3d at 1023. However, *Otter Tail* does not support

---

[6]      Ameren also wrongly implies that BACT for Rush Island Units 1 and 2 may not involve any pollution reductions. (*See* ECF No. 42 at 7). Indeed, BACT for Rush Island Units 1 and 2 will involve substantial reductions of $SO_2$ of up to 99% of the tens of thousands of tons of $SO_2$ collectively emitted by these units each year. *See United States v. Cinergy Corp.*, 618 F. Supp. 2d 942, 955 (S.D. Ind. 2009) (finding that "BACT would require a scrubber that removed 99% of the $SO_2$") *rev'd on other grounds by* 623 F.3d 455 (7th Cir. 2010); *United States v. Cinergy*, 1:99-cv-1693-LJM-JMS, 2009 WL 94515, at *1 (S.D. Ind. Jan. 7, 2009) (noting that defendant Cinergy conceded that BACT for $SO_2$ would involve a 95% reduction); *see also* Clean Air Markets Division ("CAMD") website, *available at* http://camddataandmaps.epa.gov/gdm/index.cfm .

Ameren's arguments.  As explained further in Section III below, in that case the Eighth Circuit

joined a number of other circuit courts in recognizing EPA's broad enforcement authority,

explaining that "the considerations underlying our decision would not necessarily be present . . .

in EPA enforcement actions[.]"  *Id. citing Citizens Against Ruining the Environment v. EPA*

("*CARE*"), 535 F.3d 670, 678 (7th Cir. 2008) (finding that EPA's broad enforcement authority

"reinforces our belief that Congress did not intend the EPA to fully investigate and resolve all

allegations in the permitting context").

**I.   EPA Has Broad Authority to Bring this Civil Enforcement Action Stemming from Ameren's Illegal Operation of Rush Island Units 1 and 2 Without a Title V Permit That Includes Emissions Limits Based on the Best Available Control Technology.**

Congress delegated broad authority to EPA in CAA Section 113 and Title V to enforce

*any* Title V violation.  *See* 42 U.S.C. §§ 7413, 7661a(a), 7661b, 7661c.  In light of this broad

authority, courts have routinely rejected arguments—similar to those advanced by Ameren

here—that sought to limit EPA's authority to enforce Title V violations through civil judicial

enforcement actions.  For example, in *United States v. East Ky. Power Coop., Inc.("EKPC")*,

498 F. Supp. 2d 1010 (E.D. Ky. 2007), the court affirmed EPA's authority to bring a CAA

Section 113 enforcement action for Title V violations similar to this case:

> The CAA grants very broad enforcement authority to EPA . . . .  The Part 70 rules are similarly broad in terms of the EPA's enforcement authority.  *See* 40 C.F.R. § 70.11.
>
> The EPA's Part 70 regulations provide that if the EPA determines that "the permit contains a material mistake or that inaccurate statements were made in establishing the emissions standards or other terms or conditions of the permit[,]" 40 C.F.R. § 70.7(f)(1)(iii), the "permit shall be reopened and revised . . . ." *Id.* EKPC argues that this is the only remedy available to the EPA for an alleged deficient permit application.  However, the Court does not read the Part 70 rules to limit the EPA's authority in this matter, particularly in light of the very broad authority granted to the EPA in the actual language of the CAA itself.  Further, the permit shield does not help EKPC in these circumstances.

*Id.* at 1018 (brackets and second ellipsis in original).

8

Likewise, in *New York v. Niagara Mohawk Power Corp.*, No. 02-cv-24S, 2003 WL

23356447 (W.D.N.Y. Dec. 31, 2003), the court specifically allowed plaintiff to bring Title V

claims similar to those alleged here.  The court in that case rejected Niagara Mohawk's argument

that the State of New York could not bring Title V claims based on a failure to comply with

BACT requirements triggered by a prior modification.  In so holding, the court confirmed that

the State's claims for operation without a valid Title V permit would survive even though the

court had previously held that the alleged PSD violations were not ongoing.  *Id.* at *2-3.  Further,

the court held that the question of whether PSD applied to Niagara Mohawks projects, and thus

whether PSD requirements should have been included in the Title V permit, required the

resolution of factual issues not proper for consideration at the pleading stage.  *Id.* at * 3-4.

Other courts have likewise rejected challenges to similar Title V claims.  *See United*

*States v. CEMEX, Inc.*, No. 09-cv-00019-MSK-MEH, 2010 WL 1348769, at *1-2, 3 n.4 (D.

Colo. Mar. 31, 2010) (accepting as true the allegation that defendant was operating without a

valid Title V permit, denying defendant's rule 12(b)(6) motion to dismiss, and noting that

whether the defendant was required to include PSD as an applicable requirement is "particularly

ill-suited to resolution on a non-evidentiary basis via a Rule 12 motion"); *see also Pennsylvania*

*v. Allegheny Energy, Inc.*, No. Civ.A. 05-885, 2006 WL 1509061, at *7-8 (W.D. Pa. Apr. 19,

2006) (rejecting defendant's argument that plaintiffs' Title V claims were barred as a collateral

attack on defendant's Title V permit); *United States v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d

1054, 1095 (W.D. Wis. 2001) (finding EPA's enforcement discretion not limited to

administratively modifying inaccurate permit that does not include all applicable requirements,

particularly where defendant failed to disclose information relevant to issuance of the permit).[7]

---

[7]      Ameren relies on two district court opinions in *United States v. Midwest Generation LLC* that are
inapplicable to this case and, in any event, contrary to the clear weight of the foregoing authorities.  (ECF No. 40 at

Ameren's misreading of the Clean Air Act also finds no support in the cases it cites involving final decisions by EPA to deny administrative petitions asking EPA to object to proposed, state-issued Title V permits for failure to include applicable requirements.  (ECF No. 42 at 16, 17 n.5).  Indeed, the two circuit court cases that Ameren cites in footnote 5 actually *affirm* EPA's broad authority to choose either to enforce Title V violations through enforcement actions under CAA Section 113 or through the Title V permit process.  *See Sierra Club v. Johnson*, 541 F.3d 1257, 1266 (11th Cir. 2008) (noting that "it makes sense Congress did not attempt to impose a one-size-fits-all approach and instead elected to afford the agency some discretion in evaluating the merits of permitting disputes"); *accord Sierra Club v. EPA*, 557 F.3d 401 (6th Cir. 2009).  Moreover, as the Seventh Circuit explained in the *CARE* case relied on by the Eighth Circuit in *Otter Tail*, a judicial action often presents the best forum for EPA to remedy a source's illegal operation under a deficient Title V permit:

> The existence of EPA's broad enforcement authority reinforces our belief that Congress did not intend the EPA to fully investigate and resolve all allegations in the permitting context. . . .  Moreover, Title V itself reserves the EPA's ability to bring an enforcement action for violations of the CAA unless an express "shield" on the face of the permit bars the action.  This provision would hardly be necessary if the EPA was supposed to resolve all alleged violations of the CAA in the permitting process.  In addition, unlike the permitting process, the enforcement process allows for discovery, hearings, cross-examination of witnesses, and expert testimony – mechanisms designed to resolve disputed claims.  It is reasonable to interpret Title V to complement, not to limit, the EPA's enforcement authority.

*CARE*, 535 F.3d at 678-79 (citations omitted).

---

7, 11); 694 F. Supp. 2d 999 (N.D. Ill. 2010); No. 09-cv-5277, 2011 WL 1003916 (N.D. Ill. March 16, 2011).  In the first opinion, the court held that the federal PSD provisions did not impose ongoing obligations; the court did not address, let alone dismiss, EPA's claim that Midwest Generation submitted deficient Title V permit applications. 694 F. Supp. 2d at 1007.  With respect to the second opinion, Ameren's piecemeal quotes omit the court's *actual holding*: Midwest Generation was not a successor liable under Title V for operating a source that was allegedly modified by the prior owner.  2011 WL 1003916, at *12.  Given that the court's first holding did not address Title V and the second holding was limited to successor liability, neither opinion helps Ameren's cause.

EPA's decision not to object to the Sioux Title V Permit for failing to include PSD as an applicable requirement is entirely consistent with the case law describe above.  As with the Rush Island Title V permit, the Sioux Title V permit does not shield Ameren from enforcement for failing to include PSD as an applicable requirement.[8]  Instead, to prevent duplicative proceedings that may produce conflicting results, EPA reserved its right to later pursue Ameren through an enforcement action for those violations, as it has done here with respect to the Rush Island Plant. In EPA's comments on the Draft Title V permit for the Sioux Plant (attached as Exhibit A to Ameren's brief), EPA explains why it makes sense to avoid duplicative administrative and civil judicial enforcement proceedings:  "In cases where EPA has initiated an enforcement action at the same time as the permitting authority is taking action on a Title V permit application, the source and EPA could find themselves in two separate actions, litigating essentially the same issues . . . with the risk of potentially different and conflicting results."  (ECF No. 42-1 at 13). Moreover, resolution of PSD and Title V violations through civil judicial enforcement actions make sense in light of the fact-intensive nature of these cases and the time it takes to adjudicate them, points which Ameren acknowledges.  (*See* ECF No. 40 at 12).

In summary, Clean Air Act Section 113 delegates broad authority to EPA to bring these Title V claims and grants this Court with jurisdiction to hear them.

## II.  Where an Operator Violates PSD and Fails to Secure a Pre-Construction Permit, PSD Is Still an "Applicable Requirement" That Must Be Included in Its Title V Permit.

Ameren also advances an untenable construction of the term "applicable requirement," as used in CAA Title V and the Missouri SIP, to encompass previously-issued PSD permits, but not the underlying obligation to secure a permit.  (ECF No. 42 at 10, 14).  Ameren's argument "conveniently ignores the fact that the permitting authority never had the opportunity to

---

[8]       *See* 2011 Sioux Title V Permit, at 46, *available at* www.dnr.mo.gov/env/apcp/permits/ameren-sioux2011op.pdf.

11

determine BACT for the [Rush Island Plant] because [Ameren] failed to follow the proper preconstruction procedures" in the Act.  *Niagara Mohawk*, 263 F. Supp. 2d at 663.[9]  Thus, Ameren's construction of Title V "would ignore, or worse reward, [Ameren's] own failure to comply with" PSD.  *Id.*  That failure should not now work in Ameren's favor by allowing it to avoid liability for its Title V violations.  *Id.*  Indeed, the statute makes clear that PSD is an applicable requirement under Title V.  *See* 42 U.S.C. § 7661a(b)(10).  Missouri's regulatory definition of the term "applicable requirement" also plainly encompasses the obligation to secure a PSD permit by referencing:  "*Any standard or requirement provided for in the implementation plan* approved or promulgated by EPA through rulemaking under Title I of the Act that implements the relevant requirements."  10 C.S.R. § 10-6.020(2)(A)23.A (emphasis added). Moreover, even if the definition of "applicable requirement" were ambiguous (which it is not), EPA's construction of the term would still be entitled to deference.[10]

Ameren further asserts that its obligation to secure Title V coverage of "all applicable requirements" only extends to requirements of which it is "aware."  (ECF No. 42 at 9.)  But Ameren must conduct a "reasonable inquiry" to identify all obligations, 10 C.S.R. § 10-6.065(6)(B)4, and Ameren is also obligated to supplement or correct its permit application if it becomes aware of omissions or errors, *see* 10 C.S.R. § 10.6.065(6)(B)2. Even if Ameren could

---

[9]    Although the court in *Niagara Mohawk* addressed whether the plaintiff could bring a citizen suit under CAA Section 304 for defendant's failure to comply with BACT, the defendant in that case makes essentially the same argument that Ameren makes here:  that BACT is not in effect because it has not yet been determined.  *See* 263 F. Supp. 2d at 663. That court's reasons for rejecting the defendant's argument concerning the purportedly "hypothetical" nature of BACT in that case apply with equally persuasive force here.

[10]    EPA's long-standing construction of the term "applicable requirement" to encompass the obligation to secure a New Source Review permit (including PSD permits) is reflected in the guidance documents cited by Ameren and discussed below.  In addition, in the *In re Valero Ref. Co.* decision cited by Ameren, the EPA Acting Administrator explained that all sources subject to Title V "must have a permit to operate that assures compliance by the source with all applicable requirements.  *Such applicable requirements include the requirement to obtain NSR permits that comply with applicable NSR requirements* under the Act, EPA regulations, and state implementation plans."  2004 WL 5917581 (EPA 2004) (emphasis added) (citations omitted).

12

show that it met these requirements, which depends on facts not appropriate for resolution at the pleading stage, the Act imposes strict liability for Ameren's operation with an invalid Title V permit that does not incorporate all applicable requirements.[11]

Finally, Ameren argues that there is no "look-back" requirement under Title V, such that Ameren may disregard past violations for purposes of Title V. (ECF No. 42 at 18-19).  Again Ameren is wrong:  Ameren is still subject to enforcement for operating in violation of Title V.  Ameren's past and current Title V permits require it to report changes to the plant's permitted operations to EPA even after they have occurred.  *See* Rush Island Title V 2000 Permit (ECF No. 18-4, at 34); Rush Island Title V 2010 Permit (ECF No. 18-5 at 41) (requiring that notice is to be provided "no later than the next annual emissions report").  The Title V permits require Ameren to "describe each change, including the date, any change in emissions, pollutants emitted, and any applicable requirement that would apply as a result of the change."  *Id*.  If upon receiving notice EPA determines that PSD applies, then the permit may be re-opened and modified to include PSD requirements after the change occurred.  (*See* ECF No. 18-5 at 41-42).  Ameren did not notify EPA of changes at the Rush Island Plant, and thereafter it continually certified that it was in compliance with the PSD requirements.  (AC ¶¶ 64, 91, 100).

Ameren's selective quotations from EPA guidance documents in support of this argument are also unavailing. (ECF No. 42 at 18-19).  For example, in quoting an EPA 1999 White Paper, Ameren omitted the following EPA explanation:

> Companies remain subject to enforcement actions for any past noncompliance with requirements to obtain a permit or meet air pollution control obligations.  In

---

[11]     *See Families for Asbestos Compliance, Testing and Safety v. City of St. Louis,* No. 4:05-cv-719, 2008 WL 4279569, at *20, 27 (E.D. Mo. Sept. 15, 2008) (strict liability under the CAA for improper asbestos removal); *Sierra Club v. Morgan,* No. 07-C-251-S, 2007 WL 3287850, at *8 (W.D. Wis. Nov. 7, 2007) ("[T]he CAA imposes strict liability when applied,…'regardless of how minimal the [party's] responsibilities or knowledge [concerning the violation] may actually have been.'") (quotation omitted); *United States v. Anthony Dell'Aquilla, Enterprises and Subsidiaries,* 150 F.3d 329, 332 (3d Cir. 1998) ("The CAA imposes strict liability upon owners and operators who violate the Act"); *United States v. B&W Inv. Properties,* 38 F.3d 362, 367 (7th Cir. 1994) (same).

addition, the part 70 permit shield is not available for noncompliance with applicable requirements that occurred prior to or continues after submission of the application.

U.S. EPA *White Paper for Streamlined Development of Part 70 Permit Applications*, July 10, 1995 (ECF No. 25-2 at 30-31).  The other 1999 guidance document quoted by Ameren further explains that "[a]ll sources subject to Title V must have a permit to operate that 'assures compliance by the source with all applicable requirements'" including "the requirement to obtain preconstruction permits[.]"   Letter from John S. Seitz, Director, Office of Air Quality Planning and Standards, U.S. EPA, to Robert Hodanbosi and Charles  Lagges, May 20, 1999 (ECF No. 25-3 at 6).

In summary, CAA Title V and its implementing regulations, as well as EPA's long-standing construction of both, make clear that the obligation to comply with New Source Review (including PSD) is an applicable requirement under Title V.

### III.  The Eighth Circuit's Decision in *Otter Tail* Does Not Support Ameren's Challenge to The United States' Title V Claims.

In advancing its jurisdictional challenge to the United States' Title V claims, Ameren relies heavily on the Eighth Circuit's opinion in *Otter Tail*.  (ECF No. 42 at 5, 11, 17).  But *Otter Tail* does not support Ameren's Title V arguments.  That case involved a *citizen suit* brought under CAA Section 304, 42 U.S.C. § 7604.  *Otter Tail*, 615 F.3d at 1013.  There, the court held that, despite the absence of a permit shield in Otter Tail's Title V permit, Sierra Club could not file a citizen suit to pursue for operation under a Title V permit that did not include NSPS emission limits as an applicable requirement.  Instead, the court found, on the facts of that case, that Sierra Club was limited to petitioning EPA to object to Otter Tail's Title V permit, and then seeking judicial review under CAA Section 307 of any decision by EPA not to object.  *Id.* at 1022-23 (*citing* 42 U.S.C. § 7607).  But Ameren neglects to mention that the Eighth Circuit also

14

recognized that EPA has broader enforcement authority than citizen plaintiffs, and expressly limited its holding:  "While we decline to delve into other contexts in which the permit shield may play a role, we note that the considerations underlying our decision would not necessarily be present, for example, in EPA enforcement actions[.]"  *Otter Tail*, 615 F.3d at 1023 (*citing CARE*, 535 F.3d at 678 ("EPA's broad enforcement authority reinforces our belief that Congress did not intend the EPA to fully investigate and resolve all allegations in the permitting context.")).  *Otter Tail* simply had nothing to do with ripeness or EPA's CAA Section 113 enforcement authority and does not foreclose the Title V claims here. *Id*.

Moreover, the United States' Title V claims for Ameren's illegal operations under an invalid Title V permit in no way present a "hypothetical" dispute.  Ameren does not dispute that the United States' PSD claims are ripe, including the failure to apply BACT at the time of Ameren's major modifications.  (AC ¶¶ 67-83).  Ameren also does not dispute that the Rush Island Title V permits do not include PSD requirements (including BACT).  (ECF No. 42 at 14-17).  The appropriate BACT limits that should have applied to Rush Island Units 1 and 2 after the projects, the excess emissions and environmental harm that resulted, and the appropriate civil penalties for Ameren's violations, may all be ascertained through information gathered through discovery.  *See*, *e.g.*, *Cinergy Corp.*, 618 F. Supp. 2d at 942.  Thus, the United States' Title V claims are squarely presented and ripe for adjudication by this Court.

## CONCLUSION

In summary, pursuant to EPA's broad CAA Section 113 enforcement authority, the United States has properly asserted claims that Ameren is in violation of CAA Title V at Rush Island Units 1 and 2.  These claims are ripe, and because the relief the United States seeks will greatly benefit public health and the environment, these claims should proceed without delay.

United States' Opposition to Ameren's Rule 12(b)(1) Motion to Dismiss, *United States v. Ameren Missouri*, 4:11CV00077-RWS (E.D. Mo.)

Dated: July 29, 2011                    Respectfully Submitted,

                                        IGNACIA S. MORENO
                                        Assistant Attorney General


                                        s/ Bradford T. McLane
                                        Justin A. Savage
                                        Andrew C. Hanson
                                        Bradford T. McLane
                                        Trial Attorneys
                                        Environmental Enforcement Section
                                        Environment and Natural Resources Division
                                        U.S. Department of Justice
                                        P.O. Box 7611
                                        Washington, DC  20044-7611
                                        Telephone:  (202) 305-0544
                                        Facsimile:  (202) 616-2427
                                        E-mail: Bradford.McLane@usdoj.gov

                                        Suzanne Moore
                                        Assistant United States Attorney
                                        United States Attorney's Office
                                        Eastern District of Missouri
                                        Thomas Eagleton U.S. Courthouse
                                        111 South 10th Street, 20th Floor
                                        St. Louis, Missouri 63102
                                        Telephone:  (314) 539-2547
                                        Facsimile:  (314) 539-2309
                                        E-mail: Suzanne.Moore@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2011, I electronically filed the foregoing United States' Opposition to Ameren's Rule 12(b)(1) Motion to Dismiss with the Clerk of Court using the CM/ECF system, which will cause an electronic copy to be served on counsel of record, who are listed below:

Ronald S. Safer (pro hac vice)
Patricia Brown Holmes (pro hac vice)
Renee Cipriano (pro hac vice)
Steven J. Bonebrake (pro hac vice)
Matthew B. Mock (pro hac vice)
Schiff Hardin LLP
233 South Wacker Drive Suite 6600
Chicago, Illinois 60606
Phone: (312) 258-5500
Fax: (312) 258-5600

James J. Virtel
Armstrong Teasdale LLP
7700 Forsyth Boulevard Suite 1800
St. Louis, Missouri  63105
Phone: (314) 621-5070
Fax: (314) 612-2298
jvirtel@armstrongteasdale.com

*Counsel for Defendant Ameren Missouri*

s/Bradford T. McLane
BRADFORD T. MCLANE