**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| | ) **No 4:11-CV-77 RWS** |
| **AMEREN MISSOURI,** | ) |
| | ) |
| **Defendant.** | ) |

**MOTION HEARING**
**BEFORE THE HONORABLE RODNEY W. SIPPEL**
**UNITED STATES DISTRICT JUDGE**
**DECEMBER 19, 2012**

APPEARANCES:

For Plaintiff:           Andrew C. Hanson, Esq.
                         U.S. DEPARTMENT OF JUSTICE
                         ENVIRONMENT & NATURAL RESOURCES DIV.
                         P.O. Box 7611
                         Ben Franklin Station
                         Washington, DC  20044

                         Nigel B. Cooney, Esq.
                         U.S. DEPARTMENT OF JUSTICE
                         ENVIRONMENTAL DEFENSE SECTION
                         601 D. Street, N.W., Suite 8000
                         Washington, DC  20004

                         Andy Lay, Esq.
                         OFFICE OF U.S. ATTORNEY
                         111 S. 10th Street, 20th Floor
                         St. Louis, MO  63102

Appearances Continued on Page 2

Reported by:             SHANNON L. WHITE, RMR, CRR, CSR, CCR
                         Official Court Reporter
                         United States District Court
                         111 South Tenth Street, Third Floor
                         St. Louis, MO  63102
                         (314) 244-7966

PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

APPEARANCES CONTINUED:

Also Present:         Alex Chen
                      Environmental Protection Agency


For Defendant:        Ronald S. Safer, Esq.
                      Matthew B. Mock, Esq.
                      SCHIFF AND HARDIN
                      233 S. Wacker Drive, 6600 Sears Tower
                      Chicago, IL  60606

                      David Harlan, Esq.
                      ARMSTRONG TEASDALE, LLP
                      7700 Forsyth Blvd., Suite 1800
                      Clayton, MO  63105

1       **(PROCEEDINGS BEGAN AT 2:05 PM )**

2               THE COURT:  Good afternoon.  We are here today in the

3       case styled United States of America against Ameren Missouri,

4       Cause No. 4:11-CV-77.  Would counsel make their appearances,

5       please?

6               MR. LAY:  Your Honor, Andrew Lay for the United

7       States.  With me at counsel table is Alex Chen from the EPA,

8       and Michael Cooney and Andrew Hanson from the U.S. Department

9       of Justice in DC.

10              MR. HARLAN:  David Harlan for Ameren.  Ron Safer and

11      Matt Mock from Schiff Hardin for Ameren.

12              THE COURT:  Very good.  We are here today on Ameren's

13      motions to compel.  Are there any announcements before we

14      begin?  In other words, have any of the issues been narrowed?

15              MR. SAFER:  No, Your Honor.

16              THE COURT:  All right.

17              MR. SAFER:  Afternoon, Your Honor.

18              THE COURT:  Afternoon.

19              MR. SAFER:  I will be discussing the emissions motion

20      to compel.  In that regard, we seek two categories of

21      information.  The first is the emissions calculations that the

22      government performed as the basis for its allegations that

23      these projects caused an emissions increase, so those existing

24      actual emissions calculations.  And the second is the

25      methodology that they intend to use in this case to arrive at

1  the emissions calculation that they are going to urge upon the

2  Court and the jury.

3      Whether Ameren should have anticipated an emissions

4  increase after these projects is identified in this complaint

5  as the key issue in this case.  The government contends that

6  before each of these projects -- so, that is, before 2001,

7  before 2003, before 2007, and before 2010 -- Ameren should

8  have performed an emissions calculation for each project and

9  that that emissions calculation would have shown Ameren that

10 there would be an increase in emissions from these projects.

11      The methodology to those calculations are found

12 nowhere in any statute, any rule, any regulation, any guidance

13 by the government whatsoever.  The government has made such a

14 calculation for each project before bringing this lawsuit, and

15 the government has admitted that those calculations were the

16 foundation for the allegations in the complaint, indeed for

17 the filing of the complaint.

18      During the hearing on the FOIA issue when the court

19 was discussing the lack of any guidance in the regulations as

20 to how these calculations should be made, Judge Fleissig asked

21 the government, quote, "Why shouldn't Ameren be able to learn

22 why you have decided that it is the subject to a notice of

23 violation?"

24      Mr. Lay responded for the Government, quote, "From

25 the Government's perspective, Ameren is learning that through

1      the Clean Air Act litigation."

2              So it's not in a regulation.  It's not in a statute.

3              THE COURT:  Aren't you trying to prove too much here?

4      I mean, there is, you're absolutely correct, no formula in the

5      regulations, no precise requirement, but it was an obligation

6      of the defendant to make a reasonable estimate, right?

7              MR. SAFER:  Not a numeric calculation, no, Your

8      Honor.

9              THE COURT:  No.  I mean, I know there is no formula

10     anywhere, there's no magic formula this is what you have to

11     do, but you have to take a measure of what you're about to do

12     and if it's going to have a significant impact, right?

13             MR. SAFER:  You have to evaluate that, yes.  Whether

14     it is quantitative or qualitative is not spelled out.

15             THE COURT:  Just has to be reasonable.

16             MR. SAFER:  Right.

17             THE COURT:  You have to make a reasonable effort to

18     make a determination.

19             MR. SAFER:  Yes.

20             THE COURT:  There is no -- we probably wouldn't be

21     here if there was a magic formula somewhere because I suspect

22     your client knows what is happening at that plant today, what

23     was happening at that plant two years ago, four years ago, six

24     years ago, and eight years ago.  You know.  They know what's

25     going on.

1          MR. SAFER:  Yes, Your Honor.

2          THE COURT:  Right?

3          MR. SAFER:  Yes.  But they don't know -- this is not

4   a "what is happening" kind of calculation.

5          THE COURT:  Understood.  It's a reasonable effort to

6   project what's going to happen as a result of the changes

7   being made.

8          MR. SAFER:  And there are also -- there is a lot of

9   dispute about what you look at as the baseline for the

10   comparison for the future.  So you use two out of five years

11   before.  And what two years did the government use?  What heat

12   rate did they use?

13          THE COURT:  What two years did you use?

14          MR. SAFER:  Well, we didn't do that type of

15   calculation for this, for the three projects.  It was never

16   required by the regulations.  For none of the projects was

17   there a federally approved state implementation plan that

18   required any calculation.

19          THE COURT:  Why isn't this just more -- let's take it

20   a little bit broader.  The contention interrogatory issue, the

21   issue you're talking about, why isn't this more just a subject

22   of the expert discovery?  Maybe we should accelerate the

23   expert discovery and see where we are.

24          Instead of trying to pin the experts in before they

25   give their opinion, why isn't this just part of the expert

1  discovery?  You know, what analysis do they have?  What are

2  the experts saying?  Why are they saying it?  And then see

3  where we are.

4        MR. SAFER:  And, Your Honor, if we did that today,

5  you know, that would be okay.

6        THE COURT:  We're five months away from it.  As hard

7  as it is to believe, their experts are due the first week of

8  June.

9        MR. SAFER:  Right.  But we are going to have -- that

10  only leaves us a short period of fact discovery left when --

11  here is the reason why we need that in order to conduct fact

12  discovery.  There are a bunch of factual determinations, you

13  know, as I say, what is the baseline?

14        THE COURT:  Right.  What baseline did they use and

15  why?

16        MR. SAFER:  What heat rate?  What did they look at

17  for outages?  To what did they attribute outages?  And in a

18  more broad view, we are entitled to ask, for instance, all of

19  the MDNR witnesses:  Have you ever seen anything like this

20  before?  You know, did anybody suggest to you in the 2000s

21  that this kind of a calculation should be done?  Did you

22  suggest this to Ameren?  Fact determinations.

23        Because, Your Honor, they are going to say to you

24  that this is not just a normal expert testimony where the

25  expert says, I believe that this is "a" way to do it, and

1  we'll say, well, we have an expert that will do it, and let

2  the jury decide.

3        They will ask you to afford deference to their

4  calculation because it is the agency's calculation.  And we --

5  and that entails a whole bunch of questions.

6        THE COURT:  That begs the question, I think, about

7  which calculation they're going to use.

8        MR. SAFER:  Right.

9        THE COURT:  I mean, you want to get into -- when I

10  read the papers, okay, one of the things that struck me was,

11  in a way they're in a tough spot.  They don't know what you've

12  done.  They don't know everything about -- they may know more

13  than I think they know, but they can't just file this lawsuit

14  without a good-faith basis.  And I don't think there's a

15  discussion that this isn't done in good faith, but you want to

16  know why they thought they ought to bring the lawsuit.

17        I mean, do you really -- if they come in with experts

18  and say, here's what happened, here's what we know, and here's

19  what the projections, we think the projections should have

20  shown if they had done them -- I mean, you're telling me you

21  didn't do any; is that right?

22        MR. SAFER:  Yes.  For three of the projects.

23        THE COURT:  2001, '3, and '7?

24        MR. SAFER:  We did no quantitative analysis of this

25  sort.

1          THE COURT:  And they're saying you should have.

2          MR. SAFER:  Yes, they are.

3          THE COURT:  And you want to know why?

4          MR. SAFER:  And we want to know why, and we want to

5  know what it was.  And, Your Honor, again --

6          THE COURT:  My point is to get -- and I know I'm

7  mixing and matching, and maybe you don't want me to go there,

8  but they had -- the lawyers had to sit down and take a look at

9  this and see if there was anything here for them really to

10  justify filing a complaint.

11          MR. SAFER:  Right.  After three years of discovery,

12  they sat around and they said -- so they had three years to

13  get data, and then they said, should we file a complaint?  You

14  know, the Rule 114 was -- I believe it started in March of

15  2008, and so they had two years, ten months of discovery.

16  It's not again like the normal situation.  So they know all of

17  that.  It's not asking them to reveal something before it's

18  time.  They know it.

19          THE COURT:  So if I grant your request today, I'm

20  going to tell them to do what?  In plain English.

21          MR. SAFER:  To first just turn over the numbers, the

22  forecasts that they made that they have identified that

23  were -- they refer to as the screening forecasts.

24          Second, give us the emissions calculation that they

25  intend to put forward in this case and the methodology.

1      THE COURT:  That really tells me that's the expert

2    side.  You know, what the methodology is and what the

3    emissions calculation, isn't that really what the experts are

4    going to tell us?

5      MR. SAFER:  It could be what the experts -- these are

6    their EPA engineers have made this, if that's their case,

7    Judge.

8      THE COURT:  Right.

9      MR. SAFER:  If that is the case.  I mean, they are,

10   they are -- I don't think they can have it both ways.  So if

11   that is the case, Your Honor, that, look, this is just

12   litigation and their expert's going to say what their expert's

13   going to say.

14     THE COURT:  Here's the methodology, here's the

15   calculation, and here's what we believe, in our opinion, this

16   is what the forecast should have been had they made one.

17     MR. SAFER:  As an expert in this litigation, fine.

18   Don't then claim, EPA, that this is entitled to deference.

19   This is a litigation position, not something that has been

20   consistently applied as the Supreme Court requires of

21   something that is of deference, not something that is just a

22   litigation position, but something that has been consistently

23   applied.

24     If they don't have something that has been

25   consistently applied, then that's fine.  If they want to say

1    that this is an expert's opinion in this litigation that is

2    not entitled to deference, then I accept the Court's solution

3    that we could expedite that discovery, and that would solve

4    the problem.

5         If they are saying that this is entitled to deference

6    because it is something that is consistently applied, it is

7    not just, as the Supreme Court said, says, a, you know, that

8    deference is unwarranted when it appears that the

9    interpretation's no more than a litigating position.

10        THE COURT:  Slow down so we make sure we got it

11   right.

12        MR. SAFER:  Oh, I'm sorry.  Thank you, Your Honor.

13   That the interpretation is nothing more than a convenient

14   litigating position, then, you know, then we can get it in the

15   normal course.  I suspect that that's not the case, Your

16   Honor.  In other cases they have asked the court to instruct

17   the jury that their way is the only way; that to instruct the

18   jury that the way you calculate this emissions is our way.

19   It's a beyond deference.

20        So if they're going to ask that, ask for deference,

21   then we should be entitled to see what has been consistently

22   applied.  It has to exist.  They said that we should have done

23   it in 2001; so it has to exist.  It's not something that is

24   premature.  And that, Your Honor, applies to this, to half of

25   the projects in this case, you know.  They describe the

12

1  methodology, this regained hours theory, which I think is

2  bizarre, but that's for another day.

3       THE COURT:  That's why we're here.  If it wasn't

4  bizarre, if it wasn't different, if it wasn't unusual, you all

5  would have figured all this out.

6       MR. SAFER:  I think that's probably right, Your

7  Honor.  But that applies to these maintenance types of

8  projects where there is some, you know, replacement repair of

9  parts.  That has no application to the efficiency projects.

10  That is, when the turbines were replaced, the turbines weren't

11  replaced because the turbine was going to wear out.  It was

12  replaced with a more efficient turbine.  And there is no

13  reason for anyone to believe that an efficiency project would

14  increase emissions, and the purpose of the project is so that

15  you produce --

16       THE COURT:  Well, that's where we get into their

17  reclaimed hours issue, right?

18       MR. SAFER:  No, Your Honor.  The reclaimed hours is

19  for, I've got these boiler tubes, and if I don't repair -- I

20  have them regularly scheduled to repair them.  If I don't

21  repair them, they are going to break down eventually and the

22  system will grind to a halt and stop, and there will be an

23  outage.  Since you repaired them, you're not going to have the

24  outage, and so you've regained those hours.  That applies to

25  that.

1          It doesn't apply to the efficiency project.  The

2     efficiency project just produces for the same amount of energy

3     is produced with less coal, or if you look at the other way,

4     this --

5          THE COURT:  But if you run more hours --

6          MR. SAFER:  But it's not regained -- that's right.

7     It's not regained from this outage theory.  It's I don't know

8     what.  Yes, so if you run more hours.  But where is -- that's

9     not the regained hours.  Where is that methodology?  We don't

10    know what that is.  We have no idea what that methodology is.

11         Again, it doesn't make sense.  Intuitively you would

12    say a project of the same amount of coal produces more

13    electricity, would not increase emissions.  It would decrease

14    emissions.  And I don't think anybody, even the EPA, ever

15    viewed those efficiency projects in the past as major

16    modifications before this litigation campaign.  So we don't

17    have the first clue as to what the formula is for that.

18         With regard to the privilege issue, Your Honor, it

19    has been waived in this case because they have put the

20    emissions calculations at issue.  So the Eighth Circuit has

21    said that attorney-client and attorney work product privilege

22    is waived by placing a matter at issue.  And there can be no

23    doubt that EPA has placed their emissions calculations at

24    issue.

25         Again at the FOIA hearing on page 49, the government

1   said -- the government said -- "EPA, by filing a Clean Air Act

2   suit, has put emissions calculations at issue, and there is a

3   methodology in place in Judge Sippel's case for how those

4   disclosures will be made.  To the extent EPA made a mistake in

5   Judge Sippel's case, they would have a remedy to get an

6   appropriate amount of discovery."  You know, the mistake being

7   waiver by putting that at issue.

8            And there is no question that they have waived the

9   privilege.  We are entitled to those calculations that have

10  been done.  We are entitled to know what we are defending

11  against.  Otherwise, we cannot really conduct fact discovery

12  in this case.

13           THE COURT:  All right.  Response?

14           MR. HANSON:  Thank you, Your Honor.  Andrew Hanson

15  for the United States.  I think I can clear up a few things

16  here and respond to a few points that Mr. Safer had made.  I

17  think it's important to remember what this case is actually

18  about.  It's about what a reasonable power plant owner would

19  have expected to result from the multimillion dollar projects.

20           THE COURT:  You've got to admit that it's

21  intellectually attractive that if I make my facility more

22  efficient and I use less coal or produce the same amount of

23  energy, that I'm not necessarily thinking I'm going to

24  increase emissions.  I'm hoping, in fact, to decrease

25  emissions, right?

1        MR. HANSON:  Well, that's what's called the Detroit

2   Edison applicability determination, where EPA said, a year

3   before this project, it was going to --

4        THE COURT:  When you say "this project" --

5        MR. HANSON:  I mean the 2001 project.

6        THE COURT:  All right.

7        MR. HANSON:  That Ameren claims produced an

8   efficiency improvement.

9        THE COURT:  Right.

10       MR. HANSON:  EPA had said in guidance a year before

11  the 2001 project that even if you make your plant more

12  efficient, if that results in you running it more hours

13  annually, that can still trigger new source review.  Even an

14  efficiency improvement can still trigger new source review.

15  It's not, per se, exempt from new source review.  If you end

16  up running it more, then that's what will happen.

17       And we're learning in discovery from documents that

18  Ameren is producing how much Ameren expected to run that Rush

19  Island Unit 1 more after that efficiency improvement.  So it's

20  not as though -- it's not as though just an efficiency

21  improvement by itself is exempt from the Clean Air Act.

22       A couple of points that Mr. Safer had made.  The

23  Court had pointed out that Ameren is required or a reasonable

24  power plant owner is required to make a reasonable estimate.

25  Now, there is a methodology.  It's spelled out in the

1    regulation.  You compare emissions before a project to

2    emissions after a project and determine what portion of that

3    emissions increase resulted from the project.  There isn't a

4    precise formula.  There isn't a precise magic formula, as the

5    Court had put it, but it just requires a reasonable estimate.

6        And in fact, EPA's regulations do require a numeric

7    estimate, some numeric result that the power plant operator

8    has to make before the fact, and in fact, it looks as though

9    Ameren prepared some sort of numeric estimate for the most

10   recent project, the 2010 project.

11       But getting back to the privilege issue, the

12   privilege issue has largely been decided by Judge Fleissig in

13   the FOIA case.  And Judge Fleissig was right.  The same

14   documents that are at issue in this case were at issue in the

15   FOIA case, and Judge Fleissig found that they were

16   attorney-client privilege communications and that they were

17   attorney work product.  And in fact, Judge Fleissig found that

18   they would also fall under the deliberate process privilege, a

19   privilege that EPA didn't actually claim in the FOIA case.

20       And Judge Fleissig was right for a couple of reasons.

21   The declaration of Mark Smith provides the factual basis for

22   how these calculations were prepared.  They were prepared at

23   the request of counsel.  They reflect counsel's mental

24   impressions.  It's the stuff that EPA used to determine

25   whether or not the matter should be referred to the Department

1  of Justice for prosecution, and as a result, they reflect some

2  back and forth between DOJ attorneys and technical staff

3  between EPA attorneys and technical staff.

4         So there isn't much left to decide there on that

5  particular issue. And just by way of background the way these

6  calculations come up --

7         THE COURT: Obviously, all that information can

8  easily be segregated. When I asked him what he would get if I

9  granted his motion today, he said the forecast made for 1, 3,

10  7, and 10 and the screening forecasts. He wasn't talking

11  about correspondence internally between EPA and DOJ. He just

12  wanted to know what the basis was for the EPA to conclude that

13  there was a problem here.

14         MR. HANSON: Right. And those forecasts themselves

15  do, in fact, reflect attorney-client communications. It's the

16  lawyers saying, well, what if you adjusted this variable, or

17  what if you adjusted this factor in the analysis, and the

18  technical staff going back and doing that and saying, well,

19  that's what the result that this would yield, or the attorney

20  saying, well, we just learned this new thing about the

21  projects at issue. How would that affect your analysis? How

22  does that technically play in? Those are still

23  attorney-client communications.

24         THE COURT: At some point to prevail, though, here

25  you have to establish that, in fact, a reasonable utility had

18

1    a belief that it had a problem; that there were going to be

2    increased emissions and it should do a calculation, right?

3              MR. HANSON:  That's correct, Your Honor.  We will

4    have to prove that.  And we'll do that through expert

5    discovery through the calculations that we'll actually rely on

6    in the case in chief in this case.

7              THE COURT:  You're not going to -- whatever these

8    discussions were, they're never going to come up?

9              MR. HANSON:  We are not going to be relying on EPA's

10   screening analyses and calculations, the documents that Ameren

11   basically wants.  We're just not going to rely on those.

12   They're not going to be part of the Government's case in

13   chief, and so there isn't any particular reason why Ameren

14   should need them even if they could make a substantial need or

15   even if they attempted to make the substantial need argument

16   under the attorney work product doctrine.

17              In fact, we've given Ameren all of the data that goes

18   into the calculations.  Ameren can prepare its own

19   calculations, and in fact, it has prepared its own

20   calculations, and it refuses to disclose those calculations on

21   a basis of privilege.  We've got a privilege log that's

22   attached to our record where Ameren has identified its own

23   calculations that it prepared after the fact.

24              THE COURT:  I want to get you guys together.  Why

25   don't you come back up.  Let's sort through this.  As I read

1  your papers, what I was hearing was, you needed to understand

2  what the potentialities were here; so you took a look to these

3  forecasts to make a decision before you brought a complaint,

4  right?

5        MR. HANSON:  That's right.

6        THE COURT:  But these forecasts that you relied on in

7  making a determination to proceed are no way going to be used

8  by you in prosecuting the case.

9        MR. HANSON:  That's right, because they predate the

10  discovery in this case.  They predate our ability to get civil

11  discovery in the enforcement action from Ameren where we get

12  to gather additional information, take depositions, pose

13  interrogatories, and then let our experts take that

14  information along with the Clean Air Act.

15        THE COURT:  The more certain.  I mean, I gathered

16  that you didn't know all the possible things that had happened

17  or had gone on, right?

18        MR. HANSON:  That's right, because Ameren didn't tell

19  us when they performed the projects.  Ameren didn't tell EPA,

20  hey, we're going to be doing this project and we project no

21  emissions increase.  They didn't tell EPA ahead of the fact.

22  We had to find out after the fact through EPA's investigation.

23        THE COURT:  Is he right that they have given you all

24  the raw data they looked at in making this decision?

25        MR. SAFER:  The raw data is supplied by Ameren.

1          THE COURT:  Right.

2          MR. SAFER:  So there's a -- that's like saying that

3    we know all of the numbers in the world.  How come you

4    can't --

5          THE COURT:  Well, it's not an infinite universe.

6          MR. SAFER:  But it's pretty close.  It's an enormous

7    amount of data.  What did you use?  You know, again, what

8    baseline period did you use?  What heat rate did you use?

9    What emission rate did you use?  To what did you attribute

10   certain outages?  That is the heart of this, and it is

11   revealed by these calculations.

12         They might not use these calculations.  We would like

13   to use these calculations.  They are not attorney-client

14   communications.  They're numbers.  There are calculations.

15         THE COURT:  Well, there's a difference between

16   numbers and then what the attorney does when he looks at the

17   numbers to determine how to proceed.

18         MR. SAFER:  And that's fine.

19         THE COURT:  What he's suggesting to me is, he's given

20   you all the numbers they looked at.  He just hasn't given you

21   their internal analysis and thought process of making a

22   decision about what the numbers tell them.

23         MR. SAFER:  Well, again, they haven't said which

24   numbers they used for those calculations.

25         THE COURT:  I'm left with -- help me out with this

1   deference issue because I really am left with, I mean -- look,

2   at the end of the day, the last thing I want to do is put my

3   hand on the scale.  We just come in.  And it seems to me the

4   sooner we get to these experts reports and you take these

5   depositions, the sooner this case comes into focus.

6           And then if we need to back up, much to my horror

7   because it's the last thing I want to do, and go, wait a

8   minute, I didn't know you looked at that, or this wasn't a

9   factor I ever thought you would have considered, I need more

10  information about that data now, we can fix that.  I mean, I

11  understand you've kind of got your back to the wall.  The

12  judge said, here's the expert schedule, and then I'm kind of

13  stuck with it, but it seems to me when you think about the

14  order of discovery, this is a case that cries out for you

15  getting a look at their expert.  And then if there's some fact

16  that they're relying on or some series of data points that

17  they're relying upon and you had no idea that's where they

18  were coming from, we can back up and open up fact discovery

19  for three months on those issues for you to respond to it so

20  that you don't have one hand tied behind your back when you're

21  trying to figure out what the theory of the case is.

22          MR. SAFER:  And I think, Your Honor --

23          THE COURT:  Does that make sense?

24          MR. SAFER:  It makes perfect sense.

25          THE COURT:  But I know the schedule now doesn't

1  contemplate that, so that's probably partly why we're here.

2       MR. SAFER:  If as long as they don't claim that this

3  is something entitled to deference, I think that makes perfect

4  sense.

5       MR. HANSON:  To be clear, Your Honor, we are not

6  claiming --

7       THE COURT:  Are we talking Greek, or are we talking

8  the same thing?  Because if we're talking Greek, I'm the one

9  talking Greek.  You're talking whatever you guys talk and I'm

10  talking normal everyday stuff, okay?

11       MR. HANSON:  What we would propose, Your Honor, is to

12  actually accelerate the case management schedule.  If they

13  want expert discovery to happen sooner and move up the trial

14  date in this case, we would be perfectly fine with that.

15       THE COURT:  Let's do one thing at a time.  Let's get

16  our arms around the expert, because this is a case about

17  experts at this point in some ways, what a reasonable utility

18  should have known about what it was doing and whether it

19  reasonably should have made a calculation about increased

20  emissions or not, right?  And that's not a layman's

21  determination.

22       MR. SAFER:  That's part of what the case is about.  I

23  mean, part of it is going and asking the real people who were

24  responsible for enforcing this, for instance, did you ever

25  think about this?  Is this --

1          THE COURT:  Your people or their people?

2          MR. HANSON:  Both, Your Honor.

3          MR. SAFER:  Missouri.  Yeah, both of them.

4          THE COURT:  On both sides.  Your folks, why didn't

5   you do it?

6          MR. SAFER:  And the Missouri people, you know, the

7   Missouri Department of Natural Resources.  Did you ever hear

8   about this?  Did you ever think about this?  Did you ever talk

9   to anybody about this?  And we need to know what this is.

10          THE COURT:  The deference issue causes him heartache.

11   What do you think about that?

12          MR. HANSON:  Yeah.  To be clear, Your Honor, we're

13   not seeking deference on emissions calculations.

14          THE COURT:  That's the way he wanted to hear you say

15   out loud, you know that.

16          MR. HANSON:  Yeah.  We're not seeking deference on

17   the emissions calculations.  Rule 702 will govern the

18   admissibility of expert testimony in this case.

19          THE COURT:  So a traditional litigation analysis.

20          MR. HANSON:  It's not a matter of deference.  The

21   method is spelled out in the regulations in case law on how to

22   conduct a reasonable estimate of the emissions impact on a

23   multimillion dollar project like this one.

24          What we're concerned about, Your Honor, is moving up

25   the deadline for expert discovery but then not having an

1    opportunity to also move up the rest of the case because,

2    frankly, this is not complicated.

3         MR. SAFER:  Well, then give it to us.  Give it to us

4    and we'll do it.

5         THE COURT:  Well, let's move up the expert schedule

6    so you can get the information you're looking for.  But if

7    you're ready -- I mean, do you have the facts you need?  The

8    last thing we want to do is you get -- you let me know in

9    March, well, we really should have talked to so-and-so and

10   so-and-so because here's some pieces of the puzzle we're not

11   clear about, and before I want my guy to testify, he needs to

12   know the answers to these questions.

13        MR. HANSON:  Right, Your Honor.  We can be ready

14   after we take depositions and if we have a reasonable amount

15   of time to take the depositions that we need to confirm and

16   learn more information about these projects because we'd like

17   to know how Ameren couldn't have concluded that these projects

18   would result in emissions increases.  Ameren has prepared its

19   own emissions calculations here to determine whether or not

20   these projects should have been expected to result in

21   increases.  We're entitled to know how they concluded that.

22   We're entitled to ask other fact witnesses who were

23   responsible for that, for that job at Ameren, how they

24   couldn't have concluded otherwise.

25        THE COURT:  So are we talking about 90, 120 days to

1    do that?  Otherwise, we're on the schedule we're on now, which

2    is June 3 or whatever.

3         MR. HANSON:  Right.  We can move it up to April.

4    Again, what I'm concerned about --

5         THE COURT:  That's going to give you 90 days to do

6    this discovery because January, February, March and your

7    expert's report is due in April, but the expert isn't going to

8    conjure this thing up the last week of March.  I'm just trying

9    to be reasonable.  June may not be as crazy as it sounds.

10         MR. HANSON:  June is actually reasonable.

11         MR. SAFER:  Maybe the solution is extending fact

12   discovery into that same period of time.  Could I --

13         THE COURT:  I never -- look, who knows what I wrote,

14   because this is an unusual case, we don't do this all the

15   time, but I never bifurcate discovery in the sense that you

16   can't continue to do fact discovery.  Most cases I would

17   always grant 30 or 60 days after the close of experts because

18   there may be some fact issues you need to clean up because of

19   a point of view that you hadn't or your expert hadn't

20   considered.  You need to go ask some more questions just to

21   close the loop.  So I mean, that to me is the way to manage

22   this.

23         MR. SAFER:  Your Honor, could I have just one moment?

24         THE COURT:  Sure.  There's great thinkers on your

25   side of the room that want to share.

1     MR. SAFER:  Right.  Thank you.

2                    **(OFF THE RECORD.)**

3     THE COURT:  All right.

4     MR. SAFER:  Your Honor, I think there are just a

5   couple of issues to share with you in the interest of --

6     THE COURT:  Now is the time.  You know, you don't

7   want to come back next week.

8     MR. SAFER:  Right, right.  Hopefully, we'd find an

9   empty courtroom next week.

10     THE COURT:  Maybe.  The courthouse is always open by

11   statute.

12     MR. SAFER:  First of all, I think that there --

13   unless we accelerate some, the expert disclosure at least on

14   this issue of what is --

15     THE COURT:  Their emissions calculations.

16     MR. SAFER:  Yes, yes.  That then we're going to

17   have -- unless we do that, we'll have really inefficient fact

18   discovery.

19     THE COURT:  Okay.  You pretty much know what your

20   emission calculations are now, right?

21     MR. HANSON:  I wouldn't say that, Your Honor.  There

22   is discovery that we still need to take.

23     THE COURT:  Okay.  What do you need?

24     MR. HANSON:  We need to take depositions, and we're

25   still waiting for, I think, a large number of electronic

1    documents from Ameren in response to our discovery request.

2              THE COURT:  Well, I hate that, because that will

3    take -- just getting it and going through it and --

4              MR. HANSON:  Yeah.  I mean, in one sense the June

5    deadline is perfectly fine.  Their expert disclosures are due

6    in August.  They get two months to look at what our experts

7    have done.  It's only six months away.  There isn't really a

8    reason to accelerate this.

9         And I don't think expert discovery is going to be

10   inefficient given that we've given them all the data.  We've

11   explained how EPA performed its initial emissions

12   calculations.  The parties have multiple depositions that they

13   want to take.  And Ameren has performed its own calculations.

14   In fact, Ameren boasts at how well it projects generation from

15   its units.  It uses a special model.

16             MR. SAFER:  Apples and oranges.

17             THE COURT:  I'm sure they're good at it.  Yeah, I'm

18   not --

19             MR. HANSON:  My point is, Your Honor, I think June is

20   probably fine, but if we did move it up, we'd want to have a

21   mutual exchange of expert reports where we find out how Ameren

22   concluded that their projects wouldn't trigger and we explain

23   why we think the projects would have triggered.  I mean, that

24   is fair.  That provides an opportunity for some mutual fact

25   discovery after the fact so -- you know, that cures the

 1   inefficiency problem that I think Mr. Safer has mentioned.

 2           THE COURT:  In your perfect world, what do we do?

 3           MR. SAFER:  I think we move up -- they give us their

 4   methodology.

 5           THE COURT:  Remember the one thing we don't want to

 6   do is do experts twice.

 7           MR. SAFER:  Exactly.  We don't want to do that, and I

 8   understand that.  I'm trying to wrap my head around the "this

 9   should have been done in 2001, but we can't tell you what it

10   was."

11           THE COURT:  That's an interesting argument, but we're

12   not going to spend our time on that today.

13           MR. SAFER:  Okay.  But that's preventing me from

14   figuring out what they need before --

15           THE COURT:  Well, what they don't know is perhaps all

16   the things that Ameren did or didn't do or what it knew.  You

17   know, they can guess.

18           MR. HANSON:  Ameren won't even explain to us how they

19   calculated the projects.

20           THE COURT:  I understand.  They want to get their

21   arms fully around what was known at Ameren before they go

22   further, because they don't know that.

23           MR. SAFER:  So I'm not sure what we do in a perfect

24   world because what we wouldn't want to do, because it'd just

25   be horribly inefficient, is take a lot of fact discovery

1    without knowing what the central theory of the case is and

2    then -- because it really isn't just all about experts, Your

3    Honor.  These were real people --

4              THE COURT:  Oh, I understand.

5              MR. SAFER:  -- that had to make the determinations,

6    so we'll ask the real regulators and the real engineers that

7    had to do this.  And so to ask them once, take discovery --

8              THE COURT:  See, that's what they want, because when

9    should it have been obvious to Ameren that it needed to make a

10   estimate of emission increases?

11             MR. SAFER:  As soon as the rules and regulations

12   required it, which was never.

13             THE COURT:  That's your argument.

14             MR. HANSON:  And of course we --

15             THE COURT:  Their argument is, there's a point in

16   this process at which it should have become clear to the

17   decision makers that what they were doing was going to

18   increase emissions and they then had a duty to make a

19   calculation and perhaps go to the EPA and seek a permit.

20   That's where the fact question hits the road here.

21             MR. SAFER:  Right.

22             THE COURT:  Whether that's justified or not will

23   depend somewhat on the expert's analysis.

24             MR. SAFER:  Right.  So how they calculate their

25   emissions really, how they do it, what's the formula, that

1   really is nothing to do with any of that, any of what Ameren

2   actually did or didn't do.  Or at least I don't see it.  So

3   I'm missing that part.

4            MR. HANSON:  I think the issue in the case is what

5   Ameren expected.  We need to take depositions.  We need to

6   learn Ameren's documents.  There may be documents out there

7   whether from third parties or from Ameren where somebody said

8   maybe we should have gotten an NSR permit for this project or

9   maybe we should get NSR, an NSR permit for the project, or

10  there may be a deposition witness who says, yeah, we thought

11  about it, and here's what we considered and thought, and we

12  thought that maybe we should have but decided that we

13  wouldn't.

14           MR. SAFER:  And that has nothing to do --

15           MR. HANSON:  That has everything to do with the

16  central issue in this case.

17           MR. SAFER:  Has nothing to do with what their expert

18  is going to say Ameren should have done in 2001.  They say

19  Ameren should have done a calculation in 2001 that would have

20  told it that emissions would increase.  What is that formula?

21  That's the central issue in the case.  How did they reach that

22  conclusion, that has nothing to do with whether an Ameren

23  person said, gee, maybe we should get a permit or not.

24           MR. HANSON:  And, Your Honor, I submit that it has

25  everything to do with what the experts conclude in this case,

1   because if a reasonable power plant owner or operator --

2           THE COURT:  It might be indicia of it.  It's a tough

3   one, because the word "reasonable" means different things to

4   different people, and it depends a lot on what your people

5   knew and when they knew it, what they understood, you know,

6   was going to be the effect of what they were doing.  I mean,

7   you can get into a repair, I suspect, or replacement project

8   and then realize some benefits maybe you fully hadn't

9   anticipated.  Or they might have seen them coming three months

10  earlier or six months earlier.  You know, I'm sure they didn't

11  just flip a switch one day.

12          MR. HANSON:  That's absolutely right.  Ameren could

13  have concluded after the project that the project triggered.

14          THE COURT:  And there would be no harm in that, if

15  they only found out after they did the project, right?

16          MR. HANSON:  They would have been required to go get

17  a permit from the permitting authority, and if they failed to

18  go get a permit from the permitting authority if they

19  concluded after the fact, they can be held liable on that

20  basis too.

21          MR. SAFER:  That isn't what they've alleged.

22          THE COURT:  I know.  That's not this case.

23          MR. SAFER:  Right.  It's not this case.  They've

24  alleged that we should have performed calculations before the

25  project.  They have done these calculations.  They are not --

1  they are concealing them, having put them at issue, and they

2  won't give them to us.  They could hand those over right now.

3  Those are easy.  Those have been put at issue.

4        THE COURT:  But they're saying that these

5  calculations were done with counsel to make a determination

6  about whether or not to pursue the litigation.

7        MR. SAFER:  We need that, Your Honor.  They've put

8  emissions calculations at issue.  They have said they put

9  emissions calculations at issue.  We are entitled to those

10  emissions calculations.  If they want to explain them away for

11  any host of reasons, they are free to do that.

12        EPA's emissions calculations that form the basis of

13  their allegations in this complaint, not a theoretical

14  calculation, that formed the basis of their allegation in this

15  complaint that we should have known that this was going to

16  cause increased emissions have been put at issue.  They've

17  waived any privilege with regard to those.  Those are easy.

18        MR. HANSON:  Two responses to that, Your Honor.

19  Emissions calculations are at issue in this case but not these

20  emissions calculations.  The other point is that Ameren

21  performed emissions calculations that it is refusing to

22  produce.

23        MR. SAFER:  That's totally different.  They are the

24  regulator, Your Honor.  They are the regulator in the case.

25  They did these, they said, for the purpose of determining and

1 | to their regulations whether this violated the regulations.
2 | We can do them for a million different reasons.  To exposure,
3 | what is the company's exposure?  What is our securities
4 | disclosure going to have to be?  Those are real privilege
5 | issues.  These are done by a regulator for the purpose of
6 | seeing whether or not the regulations according to them were
7 | violated.  Those are as far apart as you can possibly get.
8 |         MR. HANSON:  Now it's the concern that we have here
9 | is that Ameren wants to play by its own set of rules where our
10 | emissions calculations are not privileged but theirs are.
11 | They've pled affirmative defenses in this case where they
12 | allege that their project should not have been expected to
13 | result in emissions increases or all of the emissions
14 | increases that actually occurred are due to demand.  If we've
15 | waived the privilege, so have they by pleading affirmative
16 | defenses, but I don't think that's Ameren's position.  It
17 | doesn't make any sense.  That can't be the law that by
18 | bringing an enforcement action EPA waives the attorney-client
19 | privilege and attorney work product over its emissions
20 | analyses when expert discovery will provide the date by which
21 | those are actually produced in the case.
22 |         And I'm sure Ameren will have experts where they will
23 | produce their final expert testimony that support the basis of
24 | their affirmative defenses.  That date is June for the United
25 | States, and it's August for Ameren.  That's only six months

1    away.

2          MR. SAFER:  The difference is, they have provided

3    affidavits which say that the basis for this lawsuit, the

4    basis for these allegations, were these tests.  And you know,

5    we are not playing by our own rules.  We are just trying to

6    find out what the rules are.  And they said you'll find out

7    what the rules are during litigation.  Okay.  Well, here we

8    are.

9          MR. HANSON:  We have produced dozens of pages of

10   interrogatory responses that explain what the regulations are.

11   The regulations themselves represent hundreds of pages of

12   documents that explain themselves in terms of federal register

13   notices and guidance.

14         Expert discovery is coming in June.  That's when

15   Ameren will find out the basis for the government or the

16   emissions calculations that the government will use for its

17   case in chief.  The government shouldn't have to turn over its

18   attorney work product or attorney-client communications, nor

19   should necessarily Ameren, unless it's willing to make a

20   waiver.

21         THE COURT:  How many pages of documents are we

22   talking about?

23         MR. HANSON:  That Ameren seeks in this particular

24   motion?

25         THE COURT:  Right.  If I were to grant their motion,

1   what are we talking about?

2          MR. HANSON:  I believe Ameren seeks 31 documents, 31

3   emissions analyses off of the government's privilege log.  And

4   Ameren's spreadsheets will comprise -- I think there are three

5   separate spreadsheets that comprise their emissions

6   calculations on their privilege log.

7          THE COURT:  I mean, I'm inclined to deny the motion

8   to compel because counsel is entitled to make an evaluation of

9   the case and how to pursue the case and to look at, as he

10  described, well, what if this, what if that, and they haven't

11  waived the privileges as to that.

12         But I think out of an abundance of caution I need to

13  look at them in camera to make sure that that's what they are.

14         MR. SAFER:  Thank you, Your Honor.  That's fine, Your

15  Honor.

16         THE COURT:  I may be borrowing trouble.

17         MR. SAFER:  That's fine, Your Honor.  And if anything

18  in there says, you know, please look at this for purposes

19  of --

20         THE COURT:  Right.  I need to just satisfy myself

21  that it stays within the -- I'm not doubting counsel, don't

22  get me wrong.  I just want to have the assurance that that's

23  what we're talking about.

24         MR. HANSON:  Understood, Your Honor.

25         THE COURT:  And it isn't inadvertently broader than

```
1    that.

2            MR. SAFER:  And if they're just numbers --

3            THE COURT:  That goes to you too.

4            MR. SAFER:  That's fine.

5            MR. HANSON:  So Your Honor is seeking Ameren's

6    emissions analyses as well as the government's to review in

7    camera?

8            THE COURT:  Right.  Well, you don't have a motion to

9    compel, so I really, really, really don't borrow trouble, you

10   know.  I'm not going to pick a fight that hasn't been picked

11   for me, if you understand.

12           MR. HANSON:  I do understand.

13           THE COURT:  So I wouldn't go there probably if I were

14   you because that just -- but you'll know what happens if I

15   ultimately rule against you.  I'm sure the next day I will see

16   a motion, right?  You'll probably work that out.

17           MR. SAFER:  I would assume, Your Honor.

18           THE COURT:  You'll work that out.

19           MR. SAFER:  We've worked out -- we've tried to work

20   out lots of stuff.

21           THE COURT:  But I do think that you're going to have

22   what you want by the time the experts are done.  I'm thinking

23   August may be too soon for your response is what I'm thinking.

24           MR. SAFER:  I think that's right, Your Honor.

25           THE COURT:  Given the scope of what you're going to
```

1   depose the experts about, that the next thing we're going to

2   do is push your expert deadline a month or two to allow you to

3   do some follow-up to be ready, to have your expert report

4   ready.  I know we haven't written that down and you count on

5   it, but I won't be surprised if that's the next motion I get

6   for this to go without duplicating effort unnecessarily.

7          All right.  What else do we need to talk about today?

8          MR. HANSON:  Nothing with respect to those motions,

9   Your Honor.  There is a second motion, I believe.

10          THE COURT:  All right.

11          MR. HANSON:  Thank you.

12          THE COURT:  You're the contention interrogatories

13   man.

14          MR. MOCK:  Well, no, Your Honor.  That was Mr. Safer.

15          THE COURT:  Because the contention interrogatories

16   aren't going to be answered until the expert reports are due.

17          MR. HANSON:  That's correct, Your Honor.

18          THE COURT:  They come together.

19          MR. MOCK:  Understood.

20          THE COURT:  All right.

21          MR. MOCK:  Your Honor, I am the discovery of the EPA

22   regional documents guy.

23          THE COURT:  Oh.

24          MR. MOCK:  Yes.  So, Your Honor, through our motion

25   to compel we seek two categories of documents.  The first are

1   these regional documents, all paper that are at issue in this

2   motion from the regions other than Region 7 and headquarters.

3        THE COURT:  Region 7 and main EPA.  If they're right,

4   they have produced materials from, we would call it, main

5   justice but from headquarters and Region 7.

6        MR. MOCK:  That's right, Your Honor.  The reason we

7   seek these is -- well, there are a number, and I will give you

8   three, and I can talk about them in more detail.  First of

9   all, it again goes to this deference issue, Your Honor.  We

10  need to be --

11       THE COURT:  He says he's not asking for deference.

12       MR. MOCK:  Well, I think maybe perhaps --

13       THE COURT:  Are you using the word in a different

14  way?

15       MR. MOCK:  On a different issue, Judge.

16       THE COURT:  All right.

17       MR. MOCK:  So they may not be seeking deference on

18  emissions, but as we understand it, they will be seeking

19  deference on a whole host of other interpretation of these NSR

20  regulations.  And that's on issues like routine, what is

21  routine in the industry, whether certain projects should be

22  considered together.  That's something called aggregation.

23  How the rules discuss whether a plant or unit can accommodate

24  a certain level of emissions, and that's a provision that goes

25  to causation, in other words whether the project caused any

1    actual increase or whether it could have been accommodated

2    beforehand.  And the demand growth provision.

3          There are a number of these different issues.  The

4    reason why this is such a focus of our discovery efforts, Your

5    Honor, is that EPA over the years has been extremely vague in

6    its regulations.  They either have not promulgated any rules

7    at all or they have promulgated rules that are very vague and

8    unspecific.  You know, the emissions is a good example of

9    that.  They don't say how to calculate it.  And as Your Honor

10   said, if they had, we probably wouldn't be here fighting over

11   it.

12         So we want to take discovery on EPA's interpretations

13   and how they've changed over time and how they have been

14   interpreted differently by different EPA regions or different

15   EPA personnel.

16         THE COURT:  Is there any evidence that Region 7 is

17   treated any differently and their interpretations changed over

18   time?

19         MR. MOCK:  So, for example, we have Jon Knodel, an

20   email from Jon Knodel, who is, as I understand it, the head of

21   EPA's -- he's the PSD coordinator in Region 7, and we have a

22   1998 or 1999 email from him saying:  Boiler tubes or

23   replacement of boiler tubes are routine.  The agency

24   considered them to be routine.

25         Turbines.  In the same email he says no problem with

 1   turbine projects.  That, of course, is 180 degrees different

 2   from the litigation position that EPA is taking in this case

 3   and is consistent, by the way, Your Honor, with how MDNR

 4   interpreted these regulations.  MDNR has seen these boiler

 5   tube projects, which is the bulk of what we're dealing with

 6   here, as being routine.  Routine parts replacement.  So that's

 7   a very key issue in this case.

 8           But separate and apart from that, why we are seeking

 9   the discovery from the other regions is that these different

10   regions may -- and that's why we need discovery, may be

11   viewing these rules and applying them and interpreting them

12   differently.  One of the themes that the jury will hear at

13   trial, Judge, is that how EPA went at these rules changed

14   markedly when it began this litigation campaign in the late

15   1990s.

16           And we cited and quoted a letter from a Virginia head

17   of DNR, head of the air program, who said:  This is a seismic

18   shift from the 25 years of how this has been interpreted prior

19   to this litigation campaign.  So that's the first and foremost

20   reason why we need this discovery from the other regions.

21           Now, to highlight that, EPA is itself offering

22   interpretations from those other regions.  So EPA, even though

23   it says in its papers this is a case about a Missouri plant,

24   this is a case about Rush Island and about MDNR's

25   interpretation of these regs, EPA is itself offering

1    interpretations from Region 5, 1, 3, 9.  Mr. Hanson himself

2    referred to the Detroit Edison interpretation about turbines.

3    That's from Region 5.  That's not from Region 7.  And that is

4    the only basis for their take on this turbine emissions

5    projection argument.

6              So we want to see did other regions view that

7    differently?  Because it is a very intuitive proposition that

8    if you have an energy efficiency project, you're not going to

9    see an emissions increase from that.  So that's why we want to

10   take discovery on that.

11             The other issue, Judge, is fair notice.  So we want

12   to be able to demonstrate through discovery of these documents

13   that Ameren did not have fair notice of EPA's new

14   interpretations of these rules after it started this

15   litigation campaign.

16             And again, that Virginia document that I referenced a

17   moment ago is a way of showing that, and we expect to find

18   more like that one.  In other words, EPA is changing the way

19   it has viewed these for the last several decades.

20             And then, finally, we need these documents to prepare

21   for deposition discovery.  We asked EPA:  Identify the people,

22   the current EPA employees, who have responsibility for

23   interpreting and applying and enforcing these regulations.

24   They gave us a list of 600 people.

25             We asked them for work groups that are used at EPA to

42

1    handle all these various issues, NSR issues, power plant

2    issues, and they gave us several other pages of -- you know, I

3    believe the NSR work group was four single-spaced pages.  And

4    these people are from every region across the country.

5         And so we need to figure out who we want to take the

6    deposition of, and the way we can do that is, of course, to

7    see who's really dealing with these issues and what they're

8    saying about them.

9         THE COURT:  The way to do that is through a 30(b)(6)

10   deposition.  Tell them what you want to know and they bring

11   the person who has the most knowledge.

12        MR. MOCK:  Certainly that's one way to do it, but we

13   might not always want the person with the most knowledge or

14   the person who's going to espouse EPA's, you know, their

15   current litigation policy.  We want the guy who, eight years

16   ago, told a coal-fired power plant in New Jersey that, you

17   know, when you do these boiler tube projects, that's okay,

18   that's routine, you don't need a permit for that.

19        We want a situation where in Alabama or in North

20   Carolina the state writes the EPA and says:  One of our

21   sources is going to do a turbine project.  Does that pose any

22   NSR problems, any PSD problems?  And EPA either doesn't say

23   anything or says, yeah, as Knodel did in 1997, that's not an

24   issue.

25        Those are the sorts of documents that we want to get,

1   and so we want to go and talk to those people, those

2   witnesses, and not a 30(b)(6) witness.

3           THE COURT:  I'm kind of hard put to conjure up a

4   world in which your client doesn't talk to other utilities

5   around the United States to find out who got a pass and who

6   didn't.

7           MR. MOCK:  Well, I don't think that that's how it

8   works, Judge.  There are a lot of -- first of all, there are a

9   lot of --

10          THE COURT:  Ameren doesn't talk to anybody else.  You

11  just got sued because we didn't get a permit.  What happened

12  to you when you did that plant?

13          MR. MOCK:  Well, these are competitors, so these are

14  competitors who are selling into the same markets, and I don't

15  think it is commonplace for power plants around the country to

16  coordinate on, you know, what have you done on this and what

17  have you done on that.  I don't think that's the case.  And

18  there's certainly no indication of that.

19          THE COURT:  All right.

20          MR. MOCK:  All right.  And so, Judge, just as a

21  matter of fundamental fairness, if they are going to offer

22  these interpretations from other regions, as they have told us

23  that they will and as they have in other cases, then we should

24  be entitled to take discovery from those other regions to see

25  what is out there to what undermines or refutes what they're

1    offering.

2         THE COURT:  Okay.

3         MR. MOCK:  A lot of time has been spent in the

4    briefs, Judge, on the burden at issue here.  And I think that

5    is something -- we filed -- the United States filed a sur

6    reply.  We filed a response.  We've got a little bit more

7    intelligence in terms of the real burden at issue here, and it

8    is not a burdensome process.

9         We recently completed the Region 7 review in place.

10   The result of that is that 2,200 documents were produced that

11   Ameren selected.  It's not a big number, especially in the

12   scheme of this case.

13        THE COURT:  How many pages was that?

14        MR. MOCK:  I believe it's somewhere just south of

15   50,000 pages.  Now, Ameren for its part right now, we've

16   already produced half a million pages and we are in the

17   process of gathering tens of gigabytes of electronic

18   information, and I think a gigabyte is about a hundred

19   thousand pages.  So don't know exactly what we'll produce, but

20   it's going to be far, far, far in excess of 2,200 documents.

21        I don't know how much time Your Honor wants me to

22   spend on what EPA said about its burden, but they have thrown

23   out a number of estimates:  Seven to nine months, 12,000

24   hours, and miles of paper.  And I think the EPA Region 7

25   review puts those estimates to rest.  It's just not going to

1    take that long.  In fact, these other regions will have fewer

2    sources than Region 7 does, and so we think that it will take

3    even less time per region.

4            Now, I should say, too, just to clear up something in

5    the papers, we are willing to ease their burden by doing this

6    in-place review, but we are certainly not seeking to compel

7    that.  One of the other things that we learned from the Region

8    7 review is that we think with some cooperation with EPA, just

9    sitting down and talking, and not for much time, and reviewing

10   some document indices, that they've given us some and we think

11   they can generate others that are more -- sorted a different

12   way or give us a little more information.

13           And talking with the people on the ground in these

14   regions we can really cut down the time, which is not great to

15   begin with, but we can really cut it down and get right to

16   what we want, perhaps even just selecting from a document

17   index the specific files or folders that we're looking for.

18   So we think that that can be greatly streamlined.

19           We've been talking about this all summer, Judge, and

20   we had almost arrived at an agreement on this.  And back when

21   we were talking about it, EPA estimated that we can do this

22   whole thing in about two and a half months, and so it's not

23   terribly burdensome.

24           THE COURT:  All right.  Where do we end up?

25           MR. MOCK:  Your Honor, there is the -- there is one

1    of the part of this motion is the documents from the

2    Department of Energy and FERC.  I don't know if you would like

3    me to address that now.

4            THE COURT:  You can throw it in there.

5            MR. MOCK:  All right.  So this is a very targeted

6    request, Judge.  Six categories of documents.  Three of those

7    categories are with respect to specific reports that were

8    generated by EPA.  So very narrow, you know, we identified the

9    report and said, please give us the documents that go along

10   with or were used to generate this specific report.

11           So the six categories of documents we're seeking from

12   the Department of Energy and FERC fall into basically two

13   categories.  One are these energy efficiency projects, again

14   this turbine project.  It's raising a lot of issues as to

15   what -- and this again goes to Ameren's expectations.  If the

16   Department of Energy or FERC or other players were saying this

17   is a good thing, you know, energy efficiency projects are

18   something that we should encourage as a matter of policy, or

19   we're anticipating that they would not increase emissions,

20   well, that is all evidence that of course supports the

21   reasonableness of Ameren's view that these would not affect

22   emissions in a negative way at all.

23           The other category is the changing nature of the

24   energy markets since deregulation.  So deregulation happened

25   in the late '90s, and that fundamentally changed how

1   electricity is bought and sold.

2          And as we've talked about a little bit earlier today,

3   there is the demand growth provision in the NSR rules, and

4   again that says if the increase in emissions is attributable

5   to a change in demand growth and electricity demand, then that

6   is not -- that does not give rise to the need for a permit.

7          So that's a big part of our defense.  And one issue

8   that we have to develop around that defense is how these

9   markets have changed, and they have changed fundamentally

10  since the '90s.

11         And I will stop there, Judge.

12         THE COURT:  All right.

13         MR. MOCK:  Thank you.

14         THE COURT:  So how about it?  You're prepared to give

15  them documents from Regions 5, 1, 3, and 9, but at the end of

16  the day you just couldn't do it.  So what happened?

17         MR. COONEY:  I'll get to that, Your Honor.  I want to

18  start, I think, with the document requests themselves, and I

19  have those here in case Your Honor doesn't have them handy.

20  This was Exhibit E that Ameren attached to their motion.

21         And these are the first three sets of documents

22  requests that Ameren served, Document Requests 1 through 72.

23  They're up to 80 RFPs currently.  But I think it's helpful to

24  just start by looking at what these requests are, and I will

25  point out a few of them.  Something like Document Request 14

1   on page 9:  All documents, including plant inspections, permit

2   applications of any kind, investigations, communications of

3   any kind from state or federal agencies, or studies or

4   consultations concerning industry practices for the periods

5   since the enactment of the Clean Air Act to the present that

6   identify any and all activity -- you know, from there relating

7   to coal-fired EGUs.

8          Request 17 is similar.  All public statements,

9   guidance documents, and other publicly available information.

10  If it's publicly available, we're not sure why we -- Ameren

11  needs it from us and the idea that we have to go region to

12  region and gather anything that's ever been said publicly

13  about cost effectiveness or efficiency at EGUs.

14         Some of the other, I'll also point to 31 and 32 on

15  page 12.  Thirty-one is all documents referring or related to

16  any speeches or public pronouncements.  The scope of this

17  isn't something that we can -- that isn't manageable.  When

18  Ameren's talking about every region, a speech is anything

19  given, you know, to an elementary school about clean air by an

20  engineer at EPA.

21         Document Request 32 is all documents -- well, yes.

22  You see my point here.  We think the motion as it stands is

23  unripe, it's unclear, and it's unnecessary.

24         THE COURT:  Why is it unripe?  That means we're not

25  there yet.

```
 1              MR. COONEY:  It's unripe because the United States

 2     has already produced in this action about 900,000 documents

 3     that total 5.8 million pages.  These documents came from

 4     Region 7, yes, and headquarters.  Many of them, though, the

 5     documents off the Legacy hard drive that we refer to in our

 6     motion, that's a nationwide production.  Those come from every

 7     region.  Documents from headquarters reflect activity at every

 8     region.

 9              So Ameren already has a nationwide sense of how EPA

10     has implemented NSR, but then when you take those documents

11     together with the electronic documents that we're producing,

12     thus far we've gathered about 1.1 million electronic documents

13     and emails.  We gathered those from 85 individual EPA

14     employees across headquarters and seven separate regions.

15     Those 85 people were people Ameren picked from a list.  We

16     worked together and Ameren got to say who they wanted

17     documents from, and they got to choose the search terms that

18     would be used to search those.

19              Those documents are still being collected, there's

20     well over a million of them, and we think at a minimum Ameren

21     needs to take what's on its plate first and see -- look at the

22     5.8 million documents we've produced and then narrow this

23     request in some way that's manageable.

24              THE COURT:  Well, actually, why don't you come up.

25     Federal Rule of Civil Procedure No. 1, did you read it lately?
```

1       MR. MOCK:  Probably not.

2       THE COURT:  Probably not.  It's one of those that

3  gets by all of us.  And it goes then with inherent power the

4  court has that doesn't necessarily vest in lawyers to kind of

5  manage discovery so that we kind of stay inside Rule No. 1.

6       These rules govern the procedure in all civil actions

7  and proceedings in the United States District Courts.  They

8  should be construed and administered to secure the just,

9  speedy -- and here's the tricky word -- and "inexpensive"

10 determination of every action.

11      So I doubt -- I think we're already past inexpensive

12 if we're dealing with millions of documents.  But you're

13 entitled to get the documents about whether boiler projects

14 are routine or not from the headquarters of the EPA that they

15 have and in Region 7.

16      Now, after you look at all of them and you've got

17 documentation produced from the headquarters that suggests

18 there's been a discussion in Region 1 or Region 9 or Region 3

19 about whether boilers or other tubes are routine, then come

20 back with a narrowly tailored request, because you now have

21 some suggestion in another region that there's been a

22 discussion about it, but we're going to look at headquarters

23 or we're going to look at Region 7.

24      Once you get done looking at that, you've got some

25 suggestion that these discussions have taken place in other

1   regions, then we'll open the door to go there, but we're not

2   going to start there.  Do you follow me?

3              MR. MOCK:  If I can respond briefly --

4              THE COURT:  Yeah.

5              MR. MOCK:  -- with an issue that I see with that.

6   Each of these regions has the ability to day in, day out,

7   operate independently.  They couldn't possibly run everything

8   by HQ, and so they are working day in, day out and dealing

9   with issues and never contact HQ.

10             THE COURT:  Yeah, but we can ask for every document

11  ever generated by any region of the EPA on any topic that has

12  to do with the Clean Air Act, sure, we can do that, but that's

13  not what's going on here.  And you already told me that

14  Ameren's not talking to anybody else.  They don't have any

15  suggestion that any other utility in any other region is being

16  treated differently, because they don't share information.  I

17  find it hard to believe, but it's possible.  And so you're

18  dealing with the administrator in Region 7 and how the

19  regulations are applied to you.

20             And you're right.  I mean, if there's been an

21  experience your client has had that this turbine project has

22  always been treated as routine, that's pretty important, or

23  that boiler project's always been treated as routine and now

24  all of a sudden they're changing the rules on you and you

25  didn't have fair notice that you had a problem, hey, we got a

1    problem.

2          But if you didn't know that in Region 3 Timbuktu

3    company was being treated differently, I mean --

4          MR. MOCK:  That certainly is true, Judge, as to the

5    fair notice issue.

6          THE COURT:  Right.

7          MR. MOCK:  The deference issue, however, is

8    different, and I don't think it turns in any way on what

9    Ameren actually knew or didn't know.  It turns on how EPA

10   interpreted.

11         THE COURT:  So if you find anything at the

12   headquarters of the EPA in discussions about these topics and

13   all these documents you either have gotten or are about to

14   get, you come back and show it to me and we will open the door

15   in those regions to pursue it, but we are not going to start

16   there.  It's the only way I can manage this before this

17   becomes just a mountain.

18         MR. MOCK:  Your Honor, how are we then able to attack

19   the interpretations from the other regions that EPA is

20   offering?

21         THE COURT:  Well, if they -- then you're going to

22   come back with and you're going to give me a specific document

23   request.  You're going to cite that, cite the statement, cite

24   the employee, or cite the document that they are relying on,

25   and then ask for all the documents from that region about that

1    project or that event, and I will grant that.

2              MR. MOCK:  Understood, Your Honor.

3              THE COURT:  We're not going to burn our way to

4    Atlanta to see what's in Atlanta.  You're going to get to go

5    to Atlanta.  If you find there's a path out of there, I'll let

6    you explore it.

7              MR. MOCK:  Very good.

8              THE COURT:  That's the only way to manage this so you

9    don't spend the rest of your life reading documents or some

10   associate that you may not have even met yet will spend the

11   next year of their life reading in a room somewhere that has

12   no light in it.

13             MR. MOCK:  May I raise one other issue, Your Honor.

14             THE COURT:  Sure.  I can manage this for you, okay?

15   Without getting everything, let's get what we need.  That's my

16   point.

17             MR. MOCK:  And I hear what you're saying, Judge,

18   absolutely.  We have an agreement on the ESI, so what we've

19   been talking about is the paper of the other regions.  We have

20   an agreement on the electronic discovery.  We reached that

21   agreement a couple months ago with EPA that they're going to

22   use those search terms that --

23             THE COURT:  You have agreed on the search terms.

24   You've agreed on whose records should be searched.

25             MR. MOCK:  And they would search the electronic files

1    of the regions and then produce that to us pursuant to what we

2    agreed on.

3             Yesterday I received an email from Mr. Hanson saying

4    they were essentially reneging on that deal and that they are

5    now not going to produce the files that hit those search terms

6    and that they -- because they're claiming it is too

7    burdensome.

8             THE COURT:  Well, you're going to have to tee that up

9    for me.

10            MR. MOCK:  Okay.

11            THE COURT:  I can't do it on the fly.  And I don't

12   mean to make it hard, but document for me what you agreed on

13   and then what happened and --

14            MR. MOCK:  We will do that, Your Honor.

15            THE COURT:  You follow me.

16            MR. MOCK:  I do.

17            MR. COONEY:  Your Honor, can I speak to the deal

18   we -- in FERC documents?

19            THE COURT:  Yeah.  We haven't gotten there yet.

20            MR. COONEY:  I'm sorry if you're weren't --

21            THE COURT:  No, no, no.  We need to close the loop on

22   that.

23            MR. COONEY:  Okay.

24            THE COURT:  I hadn't ruled on it.

25            MR. COONEY:  Just a few words about DOE and FERC.

1  These are agencies within the executive branch of the

2  government, but they are not agencies that brought this

3  lawsuit or that have any connection to it.

4          Ameren has spoken about two discrete issues, one

5  relating to efficiency and one relating to demand.  We would

6  argue that those issues aren't meaningfully in dispute in a

7  way that justifies discovery from these separate government

8  agencies.  This is why every court that has addressed this

9  issue in every NSR enforcement case the United States has

10 brought has said that discovery outside of EPA is

11 inappropriate.

12         THE COURT:  Was there any interaction with the

13 Department of Energy and FERC on this project about these

14 alterations?

15         MR. MOCK:  On the Ameren projects at issue in the

16 case, Your Honor?

17         THE COURT:  Right.

18         MR. MOCK:  Not that we're aware of.

19         THE COURT:  Nothing that you'd be allowed to pursue

20 that.  If you were interacting with them and they were making

21 suggestions to you or you were --

22         MR. MOCK:  And that is not the basis for --

23         THE COURT:  -- you all sang "Kumbaya" together and

24 the EPA showed up and said "not so fast," I mean, I would let

25 you pursue that.

1        MR. COONEY:  But if in the broader sense what Ameren

2   is seeking here is documents that suggest that the United

3   States government promotes efficiency or that efficiency is

4   good, you know, we don't -- first of all, that's what FERC

5   does.  They regulate utilities and they -- with an eye toward

6   efficient power generation.

7        But secondly, that's not an issue that we need to

8   dispute or we should be spending our time producing scads and

9   scads of documents over.  The types of things that they cite

10  in their motion --

11       THE COURT:  Is "scad" a legal term?

12       MR. COONEY:  I doubt it, Your Honor.

13       THE COURT:  Just checking.  It was a number that I

14  didn't know.

15       MR. COONEY:  And it's large from what I can tell.

16       THE COURT:  Okay.

17       MR. COONEY:  But some of the requests, the six

18  broken-out requests in their motion, two of them relate to EPA

19  reports.  Ameren wants to know, well, what did FERC say, or

20  what did DOE say about a report that EPA generated?

21       Well, if it's relevant at all, EPA has it.  If EPA

22  consulted those agencies, if EPA interacted with them --

23       THE COURT:  Did they ask you for any materials you

24  have from FERC or the Department of Energy in response to

25  those studies?

1          MR. COONEY:  Yes.  That is items --

2          THE COURT:  Did you produce it?

3          MR. COONEY:  We have not produced anything --

4          THE COURT:  But you're going to.

5          MR. COONEY:  I'm sorry.  We need to back up.  Have we

6  produced from EPA?  Is that --

7          THE COURT:  Right, from EPA.

8          MR. COONEY:  Yes.  We will, or we have done or will.

9          THE COURT:  From EPA documents they may have from

10  FERC or the Department of Energy as on those topics.

11          MR. COONEY:  Yes, Your Honor.

12          THE COURT:  And you're not going to claim -- you're

13  going to produce that.

14          MR. COONEY:  If EPA has and if it's relative or

15  responsive, we will produce it regardless of whether it came

16  from FERC or DOE.

17          THE COURT:  All right.

18          MR. COONEY:  But, right, that's two of the requests.

19  A couple of the other requests, as I said, go purely to

20  whether efficiency is good and whether DOE promotes cost

21  effectiveness with utilities.

22          The other two relate to -- one is a withdrawn defense

23  over greenhouse gases; that Ameren withdrew its defense

24  relating to the projects we're complying with the greenhouse

25  gas rules.

1          And then the FERC Order 888, that's Item A, we have

2     made available to Ameren the rule making docket for FERC Order

3     888, EPA participated in that rule making, EPA submitted

4     documents onto that docket, and we have provided that to

5     Ameren.  It's publicly available.

6          To the extent that Ameren thinks that those publicly

7     available documents will inform, you know, more specific

8     requests or more targeted paper, you know, I can't say that

9     FERC has nothing or that there isn't anything there at the

10    FERC and DOE, but you know, the request has to be reasonable

11    and has to be targeted before we can go search an entirely

12    separate agency that didn't even bring this suit.

13          THE COURT:  Any response?

14          MR. MOCK:  Yes, Your Honor.  Very briefly.  This is

15    discovery.  These are very targeted requests.  They are very

16    focused on the NSR issues and the turbine issues.  As we

17    started out the day, the issue on the turbine projects and on

18    all these projects according to the government is, should

19    Ameren have reasonably expected an emissions increase as a

20    result of the project?  For these turbine projects that which

21    are energy efficient projects, we shouldn't have reasonably

22    expected that, and we think that these documents will confirm

23    that reasonableness of that belief.

24          THE COURT:  Does your client have documents from DOE

25    and FERC that suggest that to them?

1          MR. MOCK:  Sitting here now, Judge, I don't know.

2          THE COURT:  I mean, I'd be really -- I mean, that's

3     pretty compelling.

4          MR. MOCK:  But the fact regardless of whether we knew

5     it, the fact that the United States government believed the

6     same thing as Ameren, would be highly compelling evidence of

7     the reasonableness of our belief regardless of whether or

8     not --

9          MR. COONEY:  But it wouldn't go to interpretation and

10    application of NSR.  EPA is the agency that interprets the law

11    at issue or that enforces the law at issue in this case.  It's

12    the court that interprets it.

13         But DOE and FERC aren't a get-out-of-jail-free card

14    that somehow enforce -- or can change how EPA enforces the

15    Clean Air Act.

16         THE COURT:  I'm persuaded by that argument, and I'm

17    going to deny the motion to compel documents from DOE and

18    FERC.  Now, that's without prejudice to you coming back later

19    and showing me that you've developed through EPA and their

20    document production what we would normally call a chain

21    perhaps of correspondence or emails suggesting to the

22    contrary.

23         MR. MOCK:  Thank you, Your Honor.

24         THE COURT:  You don't know me, but my point about

25    that is, is that there are some judges have said, when you

1   come back, say, look, we've already talked about this; don't

2   talk to me anymore about it.  I'm always happy to be convinced

3   I was wrong or you now have document evidence or otherwise to

4   show that that door is now open.  I'm never offended by you

5   rearguing that with new information.

6          MR. MOCK:  We appreciate that.

7          THE COURT:  So I want you to understand that, because

8   you do know there are judges out there who would be pretty

9   upset if you came back and tried it again.

10         MR. MOCK:  I may have come across one or two.

11         THE COURT:  Yeah, they exist.  There may even be a

12  few in this building, for all I know, Mr. Harlan.  And

13  certainly in the old days he can tell you about Judges Harper,

14  Wangelin, Regan, and Meredith, and you would never mention --

15  use the same sentence twice, ever.  Ever.  But that's without

16  prejudice to you finding some line of -- chain of emails or

17  otherwise or documents suggesting to the contrary.  So that

18  motion is denied.

19         Now, let's go off the record.

20         **(AN OFF-THE-RECORD DISCUSSION WAS HELD.)**

21         MR. HANSON:  Mr. Mock had mentioned that we had

22  reneged on a commitment to produce these regional --

23         THE COURT:  You know what the best part about me is?

24  He'll get to prove it up, and you'll get to tell me he's

25  wrong, and I don't take anything from it until I know more.

61

1          MR. HANSON:  Right.  I am just offering that Mr. Mock

2   and I can talk first before any motion gets filed so we can

3   sort it out.

4          MR. MOCK:  Absolutely.

5          THE COURT:  And you can have the courtroom the rest

6   of the day to talk about it.  Thank you, gentlemen.

7          MR. LAY:  One quick question for you.  The documents

8   you wanted in camera, could I have till January 3 to get those

9   to you?

10          THE COURT:  I'm not going to read them next week.

11   Okay.

12              **(PROCEEDINGS CONCLUDED AT 3:35 PM.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

I, Shannon L. White, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 62 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 14th day of January, 2013.


_____
/s/Shannon L. White
Shannon L. White, RMR, CRR, CCR, CSR
Official Court Reporter