UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 4:11-CV-00077-RWS |
| ) | |
| **AMEREN MISSOURI,** ) | Judge Rodney W. Sippel |
| ) | |
| **Defendant.** ) | |
| ) | |

**AMEREN MISSOURI'S MEMORANDUM IN SUPPORT
OF ITS MOTION FOR ATTORNEYS' FEES AND COSTS**

## TABLE OF AUTHORITIES

Page

**CASES**

*Barton v. U.S.*,
  988 F.2d 58 (8th Cir. 1993) ................................................................................................ 12

*Freeman v. Bechtel Const. Co.*,
  87 F.3d 1029 (8th Cir. 1996) .............................................................................................. 13

*Friends of Boundary Waters Wilderness v. Thomas*,
  53 F.3d 881 (8th Cir. 1995) ........................................................................................... 11, 12

*In re Medtronic, Inc. Sprint Fidelis Leads Products Liab. Litig.*,
  08-1905 (RHK/JSM), 2009 WL 294353 (D. Minn. Feb. 5, 2009) ........................................... 13

*Kenagy v. United States*,
  942 F.2d 459 (8th Cir. 1991) .............................................................................................. 13

*Lauer v. Barnhart*,
  321 F.3d 762 (8th Cir. 2003) ........................................................................................ 11, 12

*Loudermilk v. Best Pallet Co. LLC*, 636 F.3d 312 (7th Cir. 2011) ................................................. 8

*S.E.C. v. Zahareas*,
  374 F.3d 624 (8th Cir. 2004) ........................................................................................ 11, 13

*Szabo Food Serv., Inc. v. Canteen Corp.*,
  823 F.2d 1073 (7th Cir. 1987) ............................................................................................ 13

*Thomas v. Peterson*, 841 F.2d 332 (9th Cir.1988) ........................................................................ 11

*United States v. 1,378.65 Acres of Land, More or Less, Situate in Vernon Cty., State of Mo.*,
  794 F.2d 1313 (8th Cir. 1986) ............................................................................................ 11

*United States v. Rose*,
  563 F. Supp. 283 (S.D.N.Y. 1983) ...................................................................................... 12

*United States v. Trident Seafoods Corp.*,
  92 F.3d 855, 861 (9th Cir. 1996) ........................................................................................ 11

**STATUTES**

42 U.S.C. § 7413(b) ..................................................................................................................... 11

**RULES**

10 C.S.R. 10-6.020 ............................................................................................................................ 6

57 Fed. Reg. 32314 ......................................................................................................................... 8

The two projects that EPA recently dismissed made the plants more efficient. That is, they enabled the plants to produce the same amount of electricity while burning less coal. EPA's allegations concerning these projects defied common sense. Why would anyone expect emissions to be increased by a project that reduced the amount of coal necessary to produce a certain amount of energy? It also defied experience. Emissions, of course, decreased after these projects. EPA had full knowledge that these were efficiency projects and that actual emissions decreased after the projects.

Nevertheless, EPA chose to pursue the 2001 and 2003 projects in its complaint, alleging not facts, but a theory, and one that is at best counterintuitive: that Ameren should have expected an increase in emissions because Rush Island's improved "cost-effectiveness" *might* prompt the units to run more frequently. Ameren moved to dismiss under *Twombly* and *Iqbal*, arguing that a case based on such a counterintuitive theory, one the parties knew was counter-factual, should not proceed given the expansive discovery it would require. Relying on EPA's representations that it had a good faith basis for its claims, as well as the lenient standards applicable to notice pleading, the Court denied Ameren's motion. The Court, however, warned that "if they [EPA] allege this and there's no basis in fact for it, the good news for you is, you've got . . . a plaintiff who can pay sanctions for not being able to back it up." (Ex. A at 50:25-51:3.)

That is exactly what transpired. There was never any factual basis for this theory. In discovery, Ameren asked EPA to provide the factual basis for its claims. As detailed below, EPA failed to produce any competent evidence. It produced almost no facts, and the facts it did produce lacked any support and were contradicted by contemporaneous documents. EPA applied a legal test contrary to that required by the Missouri State Implementation Plan ("SIP") so that it could assert, incorrectly, that emissions had increased when they had actually

1

decreased.  EPA ignored the evidence that did exist, which showed that Ameren expected to burn less fuel because of these projects.  Even its legal theory was a mere hypothesis – an idea that had never actually been applied by EPA (or anyone else) in the real world.  EPA repeatedly promised that "all would be revealed" in its expert disclosures – its methodology and the facts supporting it.  In fact, the extensive, exhausting and expensive discovery EPA sought from Ameren about these projects in this case merely confirmed what EPA knew from its multi-year pre-suit investigation: There were never any facts to support its theory.  Now, with its expert disclosure deadline looming, EPA chose to drop its claims.  That is as it should be.  One thing remains: EPA must pay Ameren's costs and fees for the discovery about these claims.

The claims EPA recently dismissed allowed EPA to expand in dramatic fashion the scope of this case and discovery.  These were the oldest projects in the case by six and three years.  Because EPA maintained that it needed discovery dating back to five years before the earliest project, EPA demanded documents going all the way back to 1996, saddling Ameren with the burden of collecting and producing documents from up to *17 years ago*.  The Court has become very familiar with the size, scope, and cost of that undertaking.  As shown below, EPA's pursuit of the 2001 and 2003 projects more than doubled Ameren's discovery burden.  Even though none of the facts relating to the 2001 and 2003 projects have changed, EPA waited until after Ameren's production was complete before deciding to dismiss.

The Clean Air Act contains a fee-shifting provision, which allows for defendants to recover their attorneys' fees where EPA's claims were "unreasonable."  EPA's claims defied the facts and logic.  They were the definition of unreasonable.  The Court should grant this motion and award Ameren its reasonable attorneys' fees and costs.

2

I.      **RELEVANT BACKGROUND**

   A.   **EPA Knew that the 2001 and 2003 Efficiency Projects Were Expected To, and Did, Reduce Emissions.**

Both EPA's original and amended complaints asserted claims pertaining to Ameren's replacements of certain turbine and boiler tube components at Rush Island unit 1 (in 2001) and unit 2 (in 2003). Specifically, Ameren replaced the high-pressure and intermediate-pressure turbines with improved turbines, and replaced boiler tubes in the superheater portion of the boiler with longer, expanded tube assemblies. Ameren expected both replacements to increase the units' efficiency. Indeed, Ameren's engineers calculated that the superheater projects would save nearly $1 million in coal costs every year due to efficiency gains. (Ex. B at AM-00081635 and AM-00081634 ("The benefits of performing this project are reduced fuel costs."); *compare* Ex. B at AM-00081642, *with* AM-00081646 ("reduced fuel costs"); Ex. C at AM-00499713 ("The justification analysis for this project is based on fuel savings alone.").) Ameren gave EPA those documents in 2008, long before EPA filed this lawsuit.

EPA also knew before filing suit that actual emissions at both Rush Island units *decreased* following these projects. The pre-project and post-project actual emissions for each unit were as follows:

| Outage | Actual Annual Emissions Rate Before the Project (Average annual emissions during the two-year period selected by EPA, *see* ECF # 53) | Actual Annual Emissions Rate After the Project (Average annual emissions during the 24-month period following the project) | Actual Annual Decrease in $SO_2$ Emissions |
|---|---|---|---|
| Unit 1 – 2001 | 14,130 | 12,376 | (1,754) ton decrease |
| Unit 2 – 2003 | 13,957 | 13,384 | (573) tons decrease |

(Ex. D at ¶¶ 5-9.)

3

### B. Numerous Regulators Had Determined that Similar Turbine Replacement Projects Did Not Require a PSD Permit.

Before filing suit, EPA knew (or should have known, based on information readily available to it) that numerous regulators, including EPA and Missouri DNR, determined that projects similar to Ameren's 2001 and 2003 projects did not require a PSD permit. These include:

- In 2008, Missouri DNR determined that City Utilities of Springfield did not need a PSD permit for a turbine upgrade at its Southwest Power Station. (Ex. E at AM-00433086-MDNR.)

- In 2000, the Texas Natural Resource Conservation Commission determined that nine turbine upgrades performed by TXU Business Services at four different power plants did not need a PSD permit. **The Chief of EPA Region 6's NSR Permitting was copied on this determination.** (Ex. F at EPA6ENF0002947-948.)

- In 2000, the Washington Department of Ecology determined that the installation of more efficient turbine rotors at the Centralia Power Plant did not affect emissions from the facility and thus did not need a PSD permit. **EPA Region 10 reviewed this determination and approved it.** (Ex. G at EPAHQ_AME312464-466).

### C. Ameren's Rule 12(b)(6) Motion to Dismiss

Ameren moved to dismiss EPA's Amended Complaint because EPA failed to allege facts showing that Ameren's projects should have been expected to cause emissions to increase. Citing *Twombly* and *Iqbal*, Ameren argued that EPA simply alleged conclusions without the facts to support them. Indeed, EPA's allegations largely consisted of statements that the projects at issue "can" (*i.e.*, "might") lead to increased emissions. But EPA never alleged any facts showing that the projects actually did or would be expected to increase emissions. (ECF # 40 at 1-9.) At oral argument, EPA's counsel represented that EPA had a factual basis for its allegations regarding the 2001 and 2003 projects:

> THE COURT: Increasing the availability is a little more subjective. That requires somebody to have made a determination that this plant

4

|  |  |
|---|---|
|  | should run longer than some other plant. I assume that you have a basis to allege that that's what's happened. |
| MR. HANSON: | We do, Your Honor. EPA has conducted investigation and has looked at the operating hours that were regained as a result of replacing these major components. |
| THE COURT: | Okay. |

\*   \*   \*

|  |  |
|---|---|
| MR. HANSON: | Any one of these three things is the cause. One or more in combination is the cause of the emissions increase. For example, in this instance [the 2001 project] the unit was made more available. Its capacity also went up. Efficiency also improved. Now, discovery may reveal potentially that the unit wasn't made more efficiently somehow as a result of the project,[1] but we have a good faith basis to allege that because of the nature of these projects at issue. |

(Ex. A at 25:18-26:1, 26:6-14.)

EPA opposed Ameren's motion to dismiss by asserting facts that it chose not to allege in its Complaint: that emissions actually increased at Rush Island following the 2001 and 2003 projects. (ECF # 53 at 3; *see also* Ex. A at 28:2-7, 28:22-24.)  But to make that assertion, EPA used an improper legal test.  Rather than comparing pre-project actual (or "baseline") emissions to the actual emissions that occurred during a 24-month period following the project, EPA compared the baseline emissions to those in a 12-month post-project period (out of the five years after the project) with the highest emissions.  (ECF # 53 at 3 (denoting a one-year post-project period of "Feb-05 to Jan-06" for the 2001 project and "Oct-04 to Sep-05" for the 2003 project reflecting the "highest year of actual SO$_2$ emissions in the 5 years following the project").)  But EPA's use of a one-year post-project period was improper under the Missouri SIP.  The SIP's plain language requires that actual emissions be calculated by taking two years of emissions data

---

[1] Discovery has confirmed that the units were made more efficient, so that cannot be the reason for EPA's recent dismissal.

5

and averaging them. (*See* Ex. H, 10 C.S.R. 10-6.020(2)(A)(4) (1999) ("actual emissions" are determined by calculating the "average rate, in tons per year" over a two-year period).) EPA ignored this regulation. As shown above, when the Missouri SIP is followed, actual emissions decreased. *See supra* at 3. At oral argument, EPA's counsel characterized the selection of the post-project period as a "factual dispute":

> MR. HANSON: Now, Ameren obviously tries to create a factual issue about whether the projects in 2001 and 2003 actually caused emissions to go up. And they claim that emissions went down. Again, <u>that's a factual dispute at this point.</u> But one thing we will say is that <u>emissions did actually go up</u> after each of the projects. … <u>So putting aside that factual issue, however, emissions actually did go up, and this supports the plausibility of the United States' claims.</u>

(Ex. A at 28:2-7, 28:22-24 (emphasis added).) EPA's statement that emissions "actually did go up" was flatly incorrect. (*Id.*) EPA could make that argument only by applying an improper test, one contrary to the plain language of the Missouri SIP.

Ameren's counsel explained why EPA's conclusory allegations would lead to Ameren wasting resources on unmeritorious claims:

> MR. SAFER: And that's just one example, Your Honor, of how the test determines the answer. So we need to know by what rules the government says this game should be played. And then if they give you – if they allege in the complaint the wrong test, we can bring that to Your Honor now, not a decade from now. . . .
>
> This is not, Judge, a game of making them walk through hoops or jump through hoops. This will affect the course of this litigation. It will affect whether or not we are directed towards a specific goal or whether we take discovery in a vacuum where we don't know until expert discovery what the test is and how they calculate emissions.

(*Id.* at 12:22-13:3, 13:21-14:1; *see also* ECF # 40 at 2-3.) Recognizing this risk to Ameren, the Court noted that if EPA was unable to support its allegations, Ameren could take comfort in

6

EPA's ability to pay the costs of litigation, noting that the federal government is "[p]robably the only plaintiff I can think of where you know they can—if I order them to pay the cost of litigation because there was no good faith base to bring it in the first place, we know they'll be able to write you a check." (Ex. A at 51:5-12.)

### D. EPA Failed to Produce Any Supporting Facts During Discovery.

In discovery, Ameren sought the facts supporting EPA's allegations regarding these efficiency projects. EPA pointed to three things. First, EPA stated that "[t]he increase in air pollution … was related to, and caused by, projected increases in the availability of the unit by reducing failures in the primary superheater." (Ex. I at Interrog. No. 4 (offering same reason for 2003 project).) That is flatly incorrect. EPA did not cite any documents or data to support that assertion. (*See id.*) And it was directly contradicted by the 2001 and 2003 project documents, which discussed how the projects reduced fuel costs and improved the units' heat rate; in other words, how they were efficiency improvements that caused less fuel to be used. Moreover, the documents show that Ameren did not perform the projects to "reduce failures" in the primary superheater, but rather to help the units achieve a design specification (the superheater outlet temperature) that had not been met since the unit began operation. (Ex. B. at AM-00081633-635.) All of this information was presented in documents Ameren produced to EPA long before this suit was filed.

Second, EPA asserted that prior to the projects, Ameren forecasted increases in "heat input," the amount of fuel burned to generate power, for the years following the projects. But EPA knows – and common sense dictates – that, due to normal market fluctuations, the level of power generation varies from year to year. As Jon Knodel from EPA Region 7's Air Permitting and Compliance Branch put it:

7

> An increase in emissions from the boilers from one year to the next is not that unusual. Most utility boilers have wide operating ranges and can adjust those ranges consistent with the economics of the grid. … Based on many factors, some units will have increased electrical output from prior years while others will decrease.

(Ex. J at 2.)  Therefore, a projection of increased generation at some point after a project says nothing about whether the project caused the increase.  "*Post hoc ergo propter hoc* is the name of a logical fallacy, not a means to prove causation." *Loudermilk v. Best Pallet Co. LLC*, 636 F.3d 312, 314 (7th Cir. 2011).  EPA never offered any facts to show that the forecasted heat input increases were *caused by* the projects, as opposed to being caused by normal market fluctuations. (Ex. K at Interrog. No. 11.)  EPA knows that "emissions might increase over baseline levels in the future for reasons unrelated to the physical or operational change in question," and has acknowledged that is a "very real possibility."  (Ex. L, 57 Fed. Reg. 32314 at 32325.)  Finally, regardless of what Ameren's projections were in the early 2000s, when EPA filed suit a decade later, it had the benefit of knowing what actually happened – emissions decreased.

Third, EPA cited two documents that depicted models of boiler performance, asserting they showed "increase[d] coal consumption." (Ex. M at Interrog. No. 22.)  But in citing this "fact," EPA again ignored the evidence that showed its assertion to be baseless – a different page in the *same document*. EPA's citation was to several boiler performance models, all of which modeled the conditions that could exist *after* the replacements at issue.  (*Id.* citing AUE-00009475-476 and AM-00081773.)  But as is obvious, a comparison of potential future conditions tells one nothing about the effect of the project; to do that, one would compare the existing conditions to what is forecasted in the future.  The same document cited by EPA, contained a model that showed existing conditions. (Ex. N at AM-00081752 ("Baseline Test").)

8

Comparing the baseline to the future showed that the project was expected to improve boiler efficiency (from 84.76% to 85.14%) and that the boiler would burn less coal during every hour of operation. (*Compare* Model Run No. 1, *Id.* at AM-00081752 ("Baseline Test"), *with* Run No. 6 at AM-00081757 ("Predicted Conditions with New LTSH" (low temperature superheater).) The document EPA cited showed fuel burn was likely to decrease, but again, EPA ignored the existing evidence.

Because EPA failed to produce any competent facts supporting its allegations, Ameren moved to compel EPA's emissions contentions and calculations. At oral argument, EPA merely reiterated its hypothesis, but noted that discovery was producing information about "how much" more Ameren expected to run the units:

> THE COURT: You've got to admit that it's intellectually attractive that if I make my facility more efficient and I use less coal or produce the same amount of energy, that I'm not necessarily thinking I'm going to increase emissions. I'm hoping, in fact, to decrease emissions, right?
>
> MR. HANSON: Even an efficiency improvement <u>can</u> still trigger new source review. It's not, per se, exempt from new source review. <u>If you end up running it more, then that's what will happen. And we're learning in discovery from documents that Ameren is producing how much Ameren expected to run that Rush Island Unit 1 more after that efficiency improvement.</u>

(Ex. O at 14:20-25, 15:14-19 (emphasis added).) EPA represented that its expert disclosures would provide the basis for its claims: "Expert discovery is coming in June. That's when Ameren will find out the basis for the government or the emissions calculations that the government will use for its case in chief." (*Id.* at 35:14-17.)

The Court denied Ameren's motion. (ECF # 118.) EPA never supplemented its interrogatory responses; it never identified the information it claimed to have learned regarding "how much" more Ameren expected from the Rush Island units. (Ex. I at Interrog. 4; Ex. K at

9

Interrog. 11; Ex. M at Interrog. No. 22.)

Later in discovery, Ameren asked EPA to at least provide the methodology (*i.e.*, the "formula") upon which it based its hypothesis that an improvement in cost-effectiveness would lead to increased emissions.[2] EPA regulations, guidance, and other publicly-available information do not state how such a projection could be performed. Indeed, Ameren was unable to find any instance where EPA or anyone else had performed such a projection or even suggested how to do so. So Ameren asked EPA to identify its methodology and where that methodology had been used. (Ex. P at 2.) EPA again declined to do so. (Ex. Q at 2.) EPA never subsequently identified any responsive facts. (Ex. M at Interrog. No. 22.)[3]

EPA moved to dismiss the claims regarding the 2001 and 2003 projects on October 1, 2013. (ECF # 157.) At the time, EPA's expert disclosures were due to be made on December 1, 2013. (ECF # 149.)

## II. ARGUMENT

### A. Ameren Is Entitled to Its Attorneys' Fees and Costs Under the Clean Air Act.

The CAA provides the statutory basis for Ameren to recover its attorneys' fees and costs:

> In the case of any action brought by the Administrator under this subsection, the court may award costs of litigation (including reasonable attorney and expert witness fees) to the party or parties against whom such action was brought if the court finds that such action was unreasonable.

---

[2] While EPA has provided Ameren with a general description of its (created-for-litigation) method for projecting emissions in instances where failing components were replaced, that method, by definition, cannot apply to EPA's hypothesis that the 2001 and 2003 projects yielded improved cost-effectiveness.

[3] EPA has repeatedly cited a 2001 EPA applicability determination from Michigan (the "Detroit Edison letter") in support of the notion that improved cost-effectiveness might lead to increased emissions. But again, the Detroit Edison letter simply posits the hypothesis. It does not suggest, let alone identify, a methodology to assess the impact of improved cost-effectiveness.

10

42 U.S.C. § 7413(b). Case law interpreting this provision is sparse, but at least one Circuit Court of Appeals has equated the CAA's "unreasonable" standard to the "not substantially justified" standard for fees applicable under the Equal Access to Justice Act. *United States v. Trident Seafoods Corp.*, 92 F.3d 855, 861 (9th Cir. 1996) (affirming use of "substantially justified" test to determine whether action was unreasonable under 42 U.S.C. § 7413(b)). Likewise, under the Equal Access to Justice Act and similar fee-shifting statutes, the Eighth Circuit has repeatedly applied the "substantially justified" test in determining fee awards for failed claims brought by the Government. Under that standard, the Eighth Circuit has required that the Government "must show not merely that its position was marginally reasonable; its position must be clearly reasonable, well founded in law and fact, solid though not necessarily correct." *United States v. 1,378.65 Acres of Land, More or Less, Situate in Vernon Cty., State of Mo.*, 794 F.2d 1313, 1317-18 (8th Cir. 1986) (further stating "one of the purposes of the test was to ensure that only sound, well-prepared cases be initiated by the Government"); *Lauer v. Barnhart*, 321 F.3d 762, 765 (8th Cir. 2003) (reversing district court's denial of fees where it failed to first determine whether Government's claim was "well founded in fact").[4]

The burden is on EPA to show its claims were reasonable. *Friends of Boundary Waters Wilderness v. Thomas*, 53 F.3d 881, 885 (8th Cir. 1995); *S.E.C. v. Zahareas*, 374 F.3d 624, 627 (8th Cir. 2004).

---

[4] "Substantially justified" is a sufficiently high standard that the Eighth Circuit has repeatedly held that even where an Eighth Circuit Judge has found (*i.e.*, in a dissenting opinion) that a claim is well founded, that Judge's opinion is insufficient to establish that the claim is "substantially justified." *Lauer*, 321 F.3d at 765; *Friends of Boundary Waters Wilderness*, 53 F.3d at 885; *see also Thomas v. Peterson*, 841 F.2d 332, 336 (9th Cir.1988) (concluding that there was no substantial justification despite divergent views of the district court and the court of appeals).

### B.    EPA's Claims Were Unreasonable, Not Substantially Justified, and Imposed an Enormous Burden on Ameren.

EPA's claims regarding the 2001 and 2003 efficiency projects were not well founded in either the facts or the law.  In bringing these claims, and in opposing their dismissal and resisting discovery directed to them, EPA ignored the evidence that existed, ignored the plain language of the Missouri SIP, asserted conclusions and "facts" with no support, and cited meaningless facts:

- When it did these efficiency projects, Ameren expected them to cause Rush Island to burn less coal, thus reducing emissions.  As EPA has stated time and time again, the central question is what Ameren's expectations were at the time of the projects.  The contemporaneous documents showed what Ameren expected.  Yet EPA ignored this evidence.  That was unreasonable by itself; but it was even more unreasonable considering EPA lacked any contravening competent evidence.

- EPA never produced any competent evidence in support of its allegations.  "A position which lacks any evidence in its support is no more well founded in fact than a position that ignores overwhelming adverse evidence."  *Lauer*, 321 F.3d at 765 (8th Cir. 2003).  Here, EPA asserted that the project "addressed failures" in the primary superheater, but that assertion was incorrect and unsupported.

- EPA offered no facts showing that the projected increase in heat input and generation following the project was *caused by* the project.  Because EPA knows that generation fluctuates from year to year, this fact was meaningless and was not probative of causation or liability.

- EPA's factual assertions were contradicted by the evidence it had when it filed suit.  This too is unreasonable.  *United States v. Rose*, 563 F. Supp. 283, 284 (S.D.N.Y. 1983) (granting motion for attorneys' fees and finding the government was not substantially justified in bringing an action that it dismissed after defendant's deposition, when defendant had told the government everything he said in his deposition prior to the institution of the action).

- It was unreasonable for EPA to use an improper emission test.  As described above, EPA used a one-year period that was contrary to the plain language of the Missouri SIP.  That allowed EPA to argue to the Court, incorrectly, that its claims were "plausible" because "emissions actually did go up" after the 2001 and 2003 projects.  *See Friends of Boundary Waters Wilderness*, 53 F.3d at 885 (reversing denial of fees award and finding government claims were unjustified where the government advanced a construction of a statute that was "contrary to the proper definition" and "contrary to existing law").

- Numerous regulators had determined that similar efficiency projects did not require a PSD permit.  EPA Region 10 even concurred in one such determination, and EPA Region 6 was aware of another.  *Barton v. U.S.*, 988 F.2d 58 (8th Cir. 1993) (reversing denial of

12

fees award and finding that "[a]s the case law makes clear," the Government could not reasonably rely on the specific evidence on which it relied to make out its claim).

- No one – not EPA, not MDNR, nor anyone else – had ever described a methodology to determine whether an increase in emissions was caused by improved cost-effectiveness. EPA's claims alleged Ameren was liable for failing to project an emissions increase, when there was no such projection methodology in the first place. That is unreasonable. *See Zahareas*, 374 F.3d at 630 (finding SEC's case was not substantially justified where it was "based on an ungrounded and unsubstantiated legal theory and [was] without sufficient factual support").

It is now apparent that EPA lacked factual support even after completing its multi-year investigation: if it cannot produce any competent facts even after discovery, then it certainly had no competent facts when it filed suit. That is further evidence of unreasonableness. *Kenagy v. United States*, 942 F.2d 459, 464 (8th Cir. 1991) ("The government's position may not be reasonable if it failed to adequately investigate its case …."). It is apparent now that EPA's case never consisted of anything more than its hypothesis that "if" a unit is made more cost effective, it "may" run more often, and generate more emissions. But litigation – especially an enforcement action brought by the government – is not a vehicle to test hypotheses. Plaintiffs, including the government, cannot bring lawsuits based simply on a theory, where that theory lacks supporting facts, and where the extant evidence disproves the claim. It is well-settled that plaintiffs may not use discovery as a tool to try to find facts to support a claim. "Discovery is not to be used to find a cause of action." *In re Medtronic, Inc. Sprint Fidelis Leads Products Liab. Litig.*, 08-1905 (RHK/JSM), 2009 WL 294353 at *2 (D. Minn. Feb. 5, 2009) (internal quotes omitted), *aff'd sub nom. In re Medtronic, Inc., Sprint Fidelis Leads Products Liab. Litig.*, 623 F.3d 1200 (8th Cir. 2010); *see also Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1083 (7th Cir. 1987) ("It is not permissible to file suit and use discovery as the sole means of finding out whether you have a case"); *Freeman v. Bechtel Const. Co.,* 87 F.3d 1029, 1032 (8th Cir. 1996).

13

While EPA's decision to pursue the 2001 and 2003 projects cost EPA nothing, the cost to Ameren has been enormous. These two projects were approximately half of EPA's case, and in pursuing them, EPA at least doubled Ameren's discovery burden. Discovery has taken far longer and has been far more expensive than it would have been had the claims been limited to the 2007 and 2010 outages. Ameren's costs of document preservation, collection, review, and production drastically increased. This is demonstrated by:

- The search terms applied to Ameren's documents, which were drafted with considerable participation from EPA, returned a disproportionate number of documents related to the turbine projects. Those search terms were applied broadly to project engineers and plant personnel.

- EPA demanded that certain custodians' documents be preserved and searched. Many of those custodians related only to the turbine projects: for example, custodians Morrell, Schaeffer, Sind, Toennies, and Corder. Tens of thousands of electronic records for plant personnel relating to turbine projects and performance were captured, reviewed and if responsive, produced. Had EPA limited its suit to the 2007 and 2010 outages, the vast majority of this effort could have been avoided.

- The relevant time span of discovery was extended by six years more than necessary. Arguing it needed discovery five years before the earliest project, EPA demanded discovery going back to 1996. Collecting and scanning older, non-electronic documents was both time-consuming and expensive in that such materials needed to be manually processed – page by page – and scanned into an electronic format for production. By expanding the time frame by six years, the burden of capturing ESI was significantly expanded. Had EPA focused solely on the 2007 and 2010 outages, documents created prior to 2002 could have been omitted.

- EPA demanded that Ameren preserve and migrate email archives of numerous custodians whose connection to the remaining claims is tangential or nonexistent.

EPA's decision to bring unsupported claims so as to cast a wide discovery net, only to abandon those claims as untenable on the eve of its expert disclosures, should not be condoned. Unlike a private party, EPA enjoys the ability to conduct extensive investigation before filing suit, and did so here for three years. That investigation produced evidence showing that Ameren expected a decrease in emissions, and that emissions actually decreased. But EPA ignored that

14

evidence and forged ahead, pursuing a theory that was unsupported by the facts and had never been used in the real world. EPA knew before it brought this case that its claims regarding the 2001 and 2003 projects lacked factual support, and that actual emissions went down, not up. For all these reasons, EPA's claims were unreasonable, and an award of fees to Ameren is appropriate.

### III. CONCLUSION

Ameren respectfully requests that the Court award Ameren its reasonable attorneys' fees, expenses, and costs that it was forced to incur defending itself against EPA's claims regarding the 2001 and 2003 projects. If the Court so rules, Ameren will submit a separate fee petition and bill of costs at the Court's direction.

Dated:  November 7, 2013                    Respectfully submitted,

/s/ Ronald S. Safer

Ronald S. Safer
Patricia Brown Holmes
Renee Cipriano
Steven J. Bonebrake
Matthew B. Mock
Joshua R. More
(All admitted *pro hac vice*)
SCHIFF HARDIN LLP
233 South Wacker Drive, Suite 6600
Chicago, Illinois 60606
(312) 258-5500
Fax:  (312) 258-5600

James J. Virtel
ARMSTRONG TEASDALE LLP
7700 Forsyth Boulevard Suite 1800
St. Louis, Missouri  63105
(314) 621-5070
Fax: (314) 612-2298
jvirtel@armstrongteasdale.com
*Counsel for Defendant Ameren Missouri*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 7, 2013, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will cause an electronic copy to be served on counsel of record, who are listed below:

>Andrew C. Hanson
>Bradford T. McLane
>U.S. Department of Justice
>Environment and Natural Resources Division
>P.O. Box 7611
>Ben Franklin Station
>Washington, DC  20044-7611
>Telephone:  (202) 514-5293
>Facsimile:  (202) 616-6584
>andrew.hanson2@usdoj.gov
>bradford.mclane@usdoj.gov
>
>Andrew J. Lay
>Suzanne J. Moore
>Office of the U.S. Attorney
>111 S. Tenth Street, 20th Floor
>St. Louis, MO 63102
>Telephone:  (314) 539-2200
>Facsimile:  (314) 539-2777
>andrew.lay@usdoj.gov
>suzanne.moore@usdoj.gov
>
>Nigel B. Cooney
>U.S. Department of Justice
>Environmental Defense Section
>601 D. Street, N.W., Suite 8000
>Washington, DC 20004
>Telephone:  (202) 514-3145
>Facsimile:  (202) 616-6584
>nigel.cooney@usdoj.gov

>/s/ Ronald S. Safer