**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 4:11-CV-00077-RWS |
| ) | |
| **AMEREN MISSOURI,** ) | Judge Rodney W. Sippel |
| ) | |
| **Defendant.** ) | |
| ) | |

**AMEREN MISSOURI'S REPLY MEMORANDUM IN SUPPORT
OF ITS MOTION FOR ATTORNEYS' FEES AND COSTS**

# **TABLE OF AUTHORITIES**

## **CASES**

*Air Trans. Ass'n of Canada v. F.A.A.*,
  156 F.3d 1329 (D.C. Cir. 1998) ............................................................................... 11

*Baskin v. Hawley*,
  810 F.2d 370 (2d Cir. 1987) ...................................................................................... 8

*Bradley v. School Bd. of City of Richmond*,
  416 U.S. 696 (1974) ................................................................................................... 8

*Brouwers v. Bowen*,
  823 F.2d 273 (8th Cir. 1987) ..................................................................................... 6

*Cinciarelli v. Reagan,*
  729 F.2d 801 (D.C. Cir. 1984) ................................................................................ 10

*Commissioner, INS v. Jean*,
  496 U.S. 154 (1990) ....................................................................................... 9, 10, 11

*E.E.O.C. v. Memphis Health Ctr., Inc.*,
  526 F. App'x 607 (6th Cir. 2013) ........................................................................... 11

*Freeman v. Bechtel Const. Co.*,
  87 F.3d 1029 (8th Cir. 1996) ..................................................................................... 3

*Friends of Boundary Waters Wilderness v. Thomas*,
  53 F.3d 881 (8th Cir. 1995) ....................................................................................... 6

*Gatimi v. Holder*,
  606 F.3d 344 (7th Cir. 2010) .............................................................................. 10, 11

*Geissal ex rel. Estate of Geissal v. Moore Medical Corp.*,
  338 F.3d 926 (8th Cir. 2003) ..................................................................................... 9

*Gutierrez v. Barnhart*,
  274 F.3d 1255 (9th Cir.2001) .................................................................................. 11

*Hanover Potato Prods., Inc. v. Shalala*,
  989 F.2d 123 (3d Cir. 1993) .................................................................................... 11

*Hanrahan v. Hampton*,
  446 U.S. 754 (1980) ................................................................................................... 9

*Kenagy v.United States*,
  942 F.2d 459 (8th Cir. 1991) ..................................................................................... 3

*Lauer v. Barnhart*,
   321 F.3d 762 (8th Cir. 2003) ............................................................................................... 5

*Roanoke River Basin Assoc. v. Hudson*,
   991 F.2d 132 (4th Cir. 1993) ............................................................................................. 11

*S.E.C. v. Zahareas*,
   374 F.3d 624 (8th Cir. 2004) ............................................................................................... 8

*Stanfield v. Apfel*,
   985 F.Supp. 927 (E.D. Mo. 1997) ..................................................................................... 10

*Szabo Food Serv., Inc. v. Canteen Corp.*,
   823 F.2d 1073 (7th Cir. 1987) ............................................................................................. 3

*Texas State Teachers Ass'n v. Garland Indep. School Dist.*,
   489 U.S. 782 (1989) ............................................................................................................ 9

*Tripoli Rocketry Ass'n, Inc. v. ATF*,
   698 F. Supp. 2d 168 (D.D.C. 2010) ................................................................................... 10

*United States v. Hurt*,
   676 F.3d 649 (8th Cir. 2012) ............................................................................................. 11

*United States v. Jones*,
   125 F.3d 1418 (11th Cir. 1997) ..................................................................................... 9, 10

## **OTHER AUTHORITIES**

6 J. Moore, Federal Practice 54.70(5) (1974 ed.) ........................................................................ 8

## **RULES**

10 C.S.R. 10-6.020 ...................................................................................................................... 6

61 Fed. Reg. 39,857 .................................................................................................................... 7

61 Fed. Reg. 39,860 .................................................................................................................... 7

EPA brought the 2001 and 2003 claims – Counts 1 and 2 – based on a theory that defied logic.  It asserted that greater efficiency, that is, the same amount of energy produced by burning less coal, would cause emissions to increase.   During discovery, EPA stonewalled Ameren's efforts to learn the factual basis for that remarkable hypothesis.  EPA asserted in its Complaint that Ameren should have anticipated that emissions would increase, but EPA steadfastly refused Ameren's request for the methodology EPA used to support that claim.  It promised over and over that expert discovery is "when Ameren will find out" the basis for these claims.

At the same time, EPA launched massive discovery requests to Ameren seeking documents and information spanning a 17-year period from 1996 to 2013.  Ameren expended enormous human and monetary capital to comply with those requests.  Then, just two months before its expert disclosures were due, and just weeks after Ameren finished producing hundreds of thousands of pages of information related to the 2001 and 2003 projects, EPA simply abandoned its claims relating to those projects.

Ameren's opening brief showed that EPA's allegations about these projects were without support and that the few "facts" to which EPA pointed were either false or proved nothing. EPA's response brief abandons most of these "facts" and attempts to recite new ones.  Those new "facts" are as bankrupt as the now abandoned ones to which EPA originally cited.  There is, and never was, any reasonable basis for the claims relating to the 2001 and 2003 projects.

Ameren has been unfairly prejudiced by EPA's tactics.  Section 113(b) of the Clean Air Act and the Equal Access to Justice Act were written to deter the type of overreaching exhibited by EPA in this case.  The Court should find that the 2001 and 2003 claims were unreasonable within the meaning of Section 113(b) and should award Ameren its reasonable fees and costs.

I.      ARGUMENT

   A.     **EPA Lacks a Factual Basis for the 2001 and 2003 Claims.**

In discovery, EPA offered three "facts" to support the 2001 and 2003 claims. The first fact was the Alstom engineering study. Ameren demonstrated in its initial brief that EPA's reliance on the Alstom study was misplaced. (ECF # 167 at 21-22.) Ameren documented that EPA compared two different projections, both of which were *post*-project. (*Id.*) When the relevant post-project projection was compared to the baseline *pre-project* conditions, the Alstom study confirmed Ameren's expectations that the turbine and boiler tube replacements would increase efficiency and reduce coal consumption. (*Id.*; ECF # 167 at Ex. N comparing Run No. 1 (baseline) to Run No. 6 (depicting expected post-project conditions).) In its response brief, EPA ignores its initial misstatement and commits another one.

EPA tacitly accepts that the relevant comparison is to the pre-project "baseline" run (Run No. 1) that Ameren identified in its opening brief. Unfortunately, EPA cites a projection – Model Run No. 22 – that contains a condition both parties acknowledge would not occur after the project: 2% more steam flow. Thus its assertion, that Model Run No. 22 showed "significantly more coal burned at Rush Island Unit 1" than in the baseline run (ECF # 177 at 6-7) is, at best, misleading. EPA knows that Ameren planned to operate the unit, and would gain all the efficiency benefits of the project, *without* running the boiler at greater capacity and without increasing steam flow.[1] At most, Run No. 22 demonstrates the unremarkable proposition that if the boiler was run "harder" than before the project – something both parties acknowledge was not anticipated – emissions would increase. That provides no support for

---

[1] Indeed, EPA knows that any alleged increase in "capacity" is associated with the turbines, not the boiler. The "increased capacity" expected to result from these projects refers to an increased capacity to generate electricity (due to the improved efficiency), *not* an increased capacity to burn coal.

1

EPA's allegation that Ameren should have expected emissions to increase *as a result of the project*. The project justification EPA cites explicitly rejects EPA's assumption: it states that the 2001 and 2003 projects would "add about 23 MWs [megawatts] of capacity without additional steam flow…." (Ex. A at Interrog. No. 1 (emphasis added).)[2]

EPA's use of the second set of projections is no less misleading. Ameren's fuel-purchase projections forecasted an increase in electrical generation at Rush Island in the years after the projects. (ECF # 177 at 7-8.) That is no evidence, of course, that *the project caused* an increase in generation, or that Ameren anticipated it would. Indeed, it is unremarkable that, in a growing economy, Ameren anticipated demand would warrant increased use of the unit. EPA's *post hoc ergo propter hoc* fallacy alone renders these projections inadequate to support EPA's allegations. But EPA's lack of any explanation of *why* these efficiency projects would result in an increase in emissions, combined with the illogic of that conclusion, demonstrate that these projections provide absolutely no support for EPA's allegations. Any vestige of value those projections might have had is destroyed by the other evidence EPA knew before bringing this suit and does not dispute: that actual emissions decreased substantially after these projects; that generation regularly fluctuates from year to year; and that before performing these projects Ameren's engineers expected them to cause less coal to be burned.[3]

---

[2] EPA's claim that Run No. 22 is "*identical*" to Run No. 6. (ECF # 177 at 6 (italics are EPA's)) is similarly misleading. Run No. 22 is not identical: it employs the "2% greater steam flow" assumption, whereas Run No. 6 did not. This is plainly stated in the Alstom study: "This run [No. 22] is the same as run #6 **but** with the reheater and superheater steam flow increased 2.0%." (ECF # 167 at Ex. N at AM-00081739 (emphasis added); *id.* at AM-00081773.) EPA's representation that the runs are "identical" is simply false.

[3] Moreover, EPA continues to play games with the evidence. EPA argues that the question of whether Ameren needed to get a PSD permit must be answered by the facts available to Ameren before the project. (ECF # 177 at 7.) Yet, regarding the 2001 project, EPA cites a projection ("FB 02-06") that was not created until *after* the 2001 project was complete. When the facts work in EPA's favor, it says the relevant standard must be forward-looking only. When the facts are not in its favor, then EPA uses post-

2

EPA cannot claim ignorance. It states multiple times in its response brief that it was "without the benefit of full discovery."[4] (ECF # 177 at 5, 9.) But EPA cannot make allegations without having supporting facts and then *hope* to find a factual basis through discovery. "It is not permissible to file suit and use discovery as the sole means of finding out whether you have a case." *Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1083 (7th Cir. 1987). That is not a reasonable basis for a claim; in fact, the Eighth Circuit has called it an "abuse of the liberal federal pleading rules." *Freeman v. Bechtel Const. Co.*, 87 F.3d 1029, 1032 (8th Cir. 1996) (rejecting the plaintiff's request to take more discovery in an effort to establish a factual basis on which to amend its complaint). EPA must have a reasonable factual basis – as it alleged and claimed to have – that the increased activity was due to the project. EPA's argument that perhaps, with more discovery, it would have found a factual basis is a tacit admission that it never had one in the first place.

The third "fact" that EPA cited in discovery was its assertion that the superheater projects were performed to "reduce failures in the primary superheater." Ameren showed in its opening brief that EPA had no facts to support that assertion. (ECF # 167 at 7.) In its response, EPA offers new information, information it improperly withheld during discovery. (*See id.* at Ex. I at Interrog. No. 4.) But that new information still provides no support.

EPA now claims that "Ameren's own data … show that the primary superheaters … each caused several days of outage time in the five years before each Project, resulting in lost

---

project facts that Ameren could only know in hindsight. And if post-project facts are relevant, then how can EPA ignore the most probative post-project fact – that emissions actually decreased?

[4] This assertion itself is puzzling. EPA took discovery for years before it filed this action and for years after. Filing suit after an investigation fails to turn up facts further demonstrates a lack of reasonableness. *Kenagy v.United States*, 942 F.2d 459, 464 (8th Cir. 1991) ("The government's position may not be reasonable if it failed to adequately investigate its case ….")

3

generation from those units." (ECF # 177 at 9.) EPA cites and attaches outage event data that it did not identify during discovery. (*Id.* at Exs. 19 and 23.) But *none* of the events EPA cites occurred in the portion of the superheater that was replaced during the project.[5] (Ex. B, Stuckmeyer Decl. at ¶ 7.) As set forth above, EPA cannot look at outages related in some way to the superheater and hope that they involved the part of the superheater that was replaced; it must have proof of it.[6]

Months before EPA filed its response brief, Rush Island's main boiler engineer, Steve Nehrkorn, told EPA that the superheater replacements were not done to address outages, indeed, he testified there were "no problems." The replacements were "strictly" done to achieve the original design temperature:

> The vertical superheater replacement had nothing to do with availability either. It was strictly – we have no problems in the vertical superheater at that time and it was strictly done to get temperature. So it had nothing to do with availability.

(Ex. C, Nehrkorn Dep. 31:15-20 (emphasis added).) Even now, EPA continues to ignore the evidence. These are not issues on which "reasonable minds can differ," as EPA suggests. EPA simply lacks evidence.

EPA's inability to produce any factual basis is sufficient to grant this Motion and award Ameren its fees and expenses. "A position which lacks any evidence in its support is no more

---

[5] The superheater consists of several portions: the superheater division panels, the superheater pendant platens, the final or finishing superheater pendants, which are sometimes referred to as the front pendants, and the low temperature superheater. The component replaced during the projects was the low temperature superheater, which is sometimes referred to as the "vertical" or "primary" superheater. The failures cited by EPA all occurred in different portions of the superheater; portions that were not replaced in the 2001 and 2003 projects and that have nothing to do with EPA's claims. (*See* Ex. B, Stuckmeyer Decl. at ¶ 7.)

[6] The "availability" arguments discussed here are EPA's arguments for why Ameren should have expected emissions increases. This theory is flawed, but that is a battle left for another time. The point salient to this Motion is that EPA lacks competent evidence even under its own litigation theory.

4

well founded in fact than a position that ignores overwhelming adverse evidence." *Lauer v. Barnhart*, 321 F.3d 762, 765 (8th Cir. 2003).

B.   **EPA's Other Arguments Fail to Establish a Reasonable Basis.**

EPA's other attacks on Ameren's arguments highlight its desperation. Ameren pointed the Court to the decrease in actual emissions after the project – a fact known to EPA for many years before it filed this Complaint. (ECF # 167 at 3.) EPA criticizes Ameren for presenting this evidence, calling Ameren's use of an "actual-to-confirmed actual" test "incorrect" and "improper." (ECF # 177 at 13.) Yet this is the very same actual-to-actual comparison EPA offered to the Court when arguing that its claims for the 2001 and 2003 projects should not be dismissed: "Emissions actually did go up, and this supports the plausibility of the United States' claims." (ECF # 62 at 28:23-24 (emphasis added); ECF # 53 at 3 (comparing actual pre-project emissions to confirmed actual post-project emissions).)

The rules according to EPA change depending on the facts EPA is offering at the time. When facts disprove EPA's claims, EPA "interprets" the regulations and concludes that those facts are incorrect, improper, and irrelevant. (ECF # 177 at 13.) But when EPA thought that the same facts favored its position, EPA touted them to the Court – without qualification.[7]

EPA reaches perhaps its lowest point when it asserts that at the oral argument on Ameren's Motion to Dismiss, "Ameren's counsel acknowledged that efficiency improvements lead to increased hours of operation by making the unit less expensive to run." (*Id.* at 12.) The

---

[7] EPA now tries to explain in a footnote, saying that its comparison was proper under the federal "WEPCO Rule." (ECF # 177 at 14 n.5.) Yet EPA admits that the WEPCO Rule was not part of the Missouri SIP at the time of the projects – indeed, it has never been a part of the Missouri SIP. (*Id.*) EPA's penchant for changing the test to fit the facts was foreshadowed in Ameren's Motion to Compel Discovery (ECF # 93; ECF # 94) when Ameren asked the Court to force EPA to plead which test it contended applied to which data.

5

context of the quoted statement could not be clearer that Ameren's counsel was paraphrasing the government's theories to attack them, and was not the "acknowledgement" that EPA now claims:

> With regard to the government's theories of liability, Your Honor, their response to the motions to dismiss would -- asks you to read the statutes and regulations in a way that leads to a conclusion that defies law or common sense.

(ECF # 62 at 4:24-5:3.)  Counsel then recited the government's theories – in part as quoted by EPA's response brief – that defied law and common sense.  To argue, as EPA does, that this is an endorsement of its theory is beneath the dignity of a government representative.  There is no more powerful statement that EPA's allegation lacks support than that EPA feels it must attempt to mislead this Court by distorting the record and taking quotes out of context.

### C. EPA's Legal Arguments Lack a Reasonable Basis.

In its opening brief, Ameren demonstrated that EPA failed to establish a reasonable legal basis for its claims.  If EPA's case is not "well founded in law," it is not substantially justified. *Brouwers v. Bowen*, 823 F.2d 273, 275 (8th Cir. 1987).  EPA's claims lacked the necessary legal foundation for two reasons.  First, EPA ignored the Missouri SIP when presenting the Court with certain post-project emissions data, to assert (incorrectly) that "emissions actually did go up" following the projects.  The SIP requires that a two-year average be used, but EPA used a one-year period.  10 C.S.R. 10-6.020(2)(A)(4); (ECF # 167 at 5-6.)   EPA does not dispute Ameren's reading of the SIP, does not dispute that it used a one-year period, and does not dispute that when the correct two-year period is applied, actual emissions decreased after the project.  EPA's failure to apply the correct law is strong support for a finding that its claims lacked a reasonable basis.  *Friends of Boundary Waters Wilderness v. Thomas*, 53 F.3d 881, 885 (8th Cir. 1995).

Second, Ameren demonstrated that there was no legal basis for EPA's hypothesis that Ameren should have concluded that the increased efficiency would cause a significant emissions

6

increase.  (ECF # 167 at 7-10.)   "Significant" means more than 40 additional tons of $SO_2$, so to arrive at a conclusion that the increase was above that number, EPA's allegation implied that Ameren should have used a specific method or formula.  Ameren asked EPA: what is the method?  EPA refused to identify it.  Ameren pointed out that neither EPA nor any state agency has ever identified such a method.  (ECF # 167 at 10.)   EPA did not counter with any evidence.  (ECF # 177 at *passim*.)  Even now, EPA still offers nothing on point.  As Ameren predicted, EPA cites the Michigan letter (regarding Detroit Edison), but that letter provides no guidance as to the test to be applied, and EPA does not contend that it does.  (ECF # 177 at Ex. 5.)  Neither does the other determination EPA cites.   (*Id.* at Ex. 7 (Otter Tail).)   Moreover, EPA fails to mention that in both determinations, *no PSD permit was required*.

  EPA does not cite a single instance where it, or any state regulatory agency, has <u>ever</u> required a PSD permit for projects like those at issue here.  Ameren's own regulator, Missouri DNR, as well as the states of Texas and Washington, and EPA Region 10 all determined in separate instances that similar turbine projects required no permit.  (ECF # 167 at 4.)  EPA says it is "not bound" by those determinations (ECF # 177 at 11 n.4), but that misses the point.  Why would Ameren would come to a different conclusion than those agencies about the projects' lack of an emissions impact? And what method would Ameren use to reach that conclusion?  The determinations do not discuss one.  EPA has no answer.  Its claims lack a reasonable legal basis.

  EPA's reference to various statements from the Federal Register (*Id.* at 10-11) is inapposite.  For example, EPA quotes the Federal Register to the effect that "non-routine physical or operational changes … <u>might</u> trigger NSR… [because they] <u>may</u> improve [the units'] market position…" 61 Fed. Reg. 39,857, 39,860 (emphasis added).  These statements, which are not part of the Missouri SIP, do nothing to provide EPA a reasonable basis for its allegations.

7

EPA has no evidence to link these general statements to its claims – no evidence, for example, that the projects *did* improve the Rush Island units' market position. As Ameren has already shown, these are the same hypotheses that EPA alleged in its Complaint and repeated again at oral argument on Ameren's motion to dismiss. (ECF # 167 at 4-5.) A hypothesis without any facts, however, is not a reasonable basis for a claim. *S.E.C. v. Zahareas*, 374 F.3d 624, 630 (8th Cir. 2004) (finding SEC's case was not substantially justified where it was "based on an ungrounded and unsubstantiated legal theory and [was] without sufficient factual support").

EPA bears the burden to do more than repeat its allegations. It must produce facts to back up its hypotheses. It offers none.

### D. Ameren's Motion Is Ripe For Resolution Now.

EPA agrees that if the 2001 and 2003 claims were not "substantially justified" and lacked a reasonable basis in both fact and law, then Ameren is entitled to recover its attorneys' fees and costs. (ECF # 177 at 4.) EPA also does not dispute that it bears the burden to show that its claims were reasonable (*i.e.*, substantially justified). (*Id.* at 5.) EPA thus spends the majority of its opposition attempting to justify its claims. (*Id.* at 5-15.) At the end of its brief, however, EPA offers a handful of out-of-context quotes to argue that this Court is barred from even inquiring into the justification for EPA's claims until the entire case has concluded. (*Id.* at 15-16.) It is understandable that EPA would seek to postpone the Court's review of its conduct. But EPA's argument is incorrect. Ameren's motion is ripe and the Court should consider it now.

First, "interim" or "interlocutory" fee and cost awards are permitted. "A district court must have discretion to award fees and costs incident to the final disposition of interim matters." *Bradley v. School Bd. of City of Richmond*, 416 U.S. 696, 723 (1974) (citing 6 J. Moore, Federal Practice 54.70(5) (1974 ed.)); *Baskin v. Hawley*, 810 F.2d 370, 371-72 (2d Cir. 1987) (noting that "an interim award of attorneys' fees to a plaintiff as a prevailing party on some claims,

8

where other claims remain pending, is not immediately appealable"). "The Supreme Court has expressly recognized that a fee award may be appropriate when a party 'ha[s] established the liability of the opposing party, although final remedial orders ha[ve] not been entered.' To be sure, such an interlocutory order must create a 'material alteration of the legal relationship of the parties' to confer prevailing party status." *Geissal ex rel. Estate of Geissal v. Moore Medical Corp.*, 338 F.3d 926, 935 (8th Cir. 2003) (quoting *Hanrahan v. Hampton*, 446 U.S. 754, 757 (1980), and *Texas State Teachers Ass'n v. Garland Indep. School Dist.*, 489 U.S. 782, 792-93 (1989)).

Second, contrary to EPA's argument, this Court may evaluate the justification for EPA's recently dismissed 2001 and 2003 claims separately from the 2007 and 2010 claims, which are still being litigated. EPA relies primarily on a quote from *Commissioner, INS v. Jean*, 496 U.S. 154 (1990), to the effect that a case "should be treated as an inclusive whole, rather than as atomized line items." But *Jean* does not stand for the proposition EPA claims. *Jean* was a "fees on fees" case. The question presented, which the Supreme Court called "so narrow," was whether a district court, having decided to award fees because the government's position was not substantially justified, is then required to make a *second* determination of the justification for the government's position in the fee dispute phase of the case. *Jean*, 496 U.S. at 155-57 (emphasis added). The Court held that a second determination was not required, and it was in that quite different context that the Court said that the case should be treated as an "inclusive whole."

Thus, the "line items" at issue in *Jean* were not individual claims, as EPA implies, but rather different *phases* of the litigation. *See, e.g., United States v. Jones*, 125 F.3d 1418, 1428-31 (11th Cir. 1997) (discussing *Jean* at length). *Jean* does not preclude courts from assessing substantial justification on a claim-by-claim basis or allocating fees accordingly: "[i]t is perilous

9

to take judicial language out of context. *Commissioner v. Jean* does not address the question whether allocation [of fees to individual claims] is permissible under the Equal Access to Justice Act…" *Gatimi v. Holder*, 606 F.3d 344, 349-50 (7th Cir. 2010).

In *Jones*, the Eleventh Circuit considered a fee request in a case where one claim was found to be substantially justified, but the other was not. The court rejected the same "line item" argument EPA makes here, finding that "*Jean* has no application to the question presented in this case." 125 F.3d at 1430. The court in *Jones* applied *Hensley v. Eckerhart*, 461 U.S. 424 (1983) – upon which the Supreme Court also relied on *Jean* – and held that "the United States cannot escape responsibility for paying EAJA fees unless *all its claims* were substantially justified. . . . The United States may be required to pay EAJA fees to a prevailing party for the work on *any claim* that was not substantially justified." *Jones*, 125 F.3d at 1427 (emphasis added). At least one court in this District has followed *Jones*. *Stanfield v. Apfel*, 985 F.Supp. 927, 930 (E.D. Mo. 1997) (citing both *Jean* and *Jones*, awarding fees, and stating that "[t]he fact that defendant's position on [one] claim was substantially justified does not provide a defense to the EAJA claim of plaintiff.")

The D.C. Circuit has likewise concluded that the "substantial justification" analysis should be performed on a claim-by-claim basis. *See Tripoli Rocketry Ass'n, Inc. v. ATF*, 698 F. Supp. 2d 168, 175 (D.D.C. 2010) (relying on *Cinciarelli v. Reagan,* 729 F.2d 801, 810 (D.C. Cir. 1984)). The D.C. Circuit has explained:

> [I]t cannot be the case that Congress intended that a party who prevails on an essential ground of a petition to set aside government action cannot recover the congressionally contemplated fees because the government's action was substantially unjustified on only one of several possible bases. Virtually any government action is either grouped with other actions or is a component of some greater action. Presumably the government is usually substantially justified on most of its actions. If a litigant who has successfully challenged a government action as substantially unjustified and achieved a complete victory in terms of the

10

> relief prayed cannot recover EAJA fees because of this well-nigh universal grouping, then Congress's enactment of the EAJA becomes a virtual nullity.

*Air Trans. Ass'n of Canada v. F.A.A.*, 156 F.3d 1329, 1332 (D.C. Cir. 1998). Other circuits have taken differing views, however, and there is a circuit split.[8] The Eighth Circuit does not appear to have squarely addressed the issue, but one case touches on it.[9]

Here, a claim-by-claim analysis is appropriate. This is not a case, like the Eighth Circuit's decision in *Hurt*, where a single claim is at issue. Nor is it a case where multiple claims or theories arise out of a common nucleus of operative facts, and discovery on those multiple claims overlaps. Rather, EPA's claims based on the dismissed projects are wholly distinct from its claims based on the remaining projects. Each project rises or falls independently, both factually and legally. Indeed, the recently dismissed 2001 and 2003 claims pertained to entirely different components than the remaining 2007 and 2010 claims. Neither of the latter claims includes turbine projects. EPA has pleaded and pursued these claims as entirely separate occurrences, one count per project. The dismissed claims were predicated on a different theory related to improved cost-effectiveness that is not at issue with the remaining projects. Indeed,

---

[8] The Third Circuit has taken a hybrid approach, requiring a claim-by-claim evaluation in the context of the Government's position as a whole. *Hanover Potato Prods., Inc. v. Shalala*, 989 F.2d 123, 131 (3d Cir. 1993). The Fourth, Sixth and Ninth Circuits examine the case as a whole. *See Roanoke River Basin Assoc. v. Hudson*, 991 F.2d 132, 138–39 (4th Cir. 1993); *Gutierrez v. Barnhart*, 274 F.3d 1255, 1261 (9th Cir.2001); *E.E.O.C. v. Memphis Health Ctr., Inc.*, 526 F. App'x 607, 614 (6th Cir. 2013) (not precedential) (describing split and collecting cases). Other circuits have not decided. *See, e.g.*, *Gatimi*, 606 F.3d at 350 (7th Cir. 2010) ("This is not the case in which to try to resolve the issue.")

[9] In *United States v. Hurt*, 676 F.3d 649, 652 (8th Cir. 2012), the Government brought a single Fair Housing Act claim. After the defendants won at trial, they moved for an award of fees under the EAJA, and the district court granted 40% of the fees requested, because it reasoned that claims regarding six of the ten victims would have been time-barred, had they been brought separately by the individual victims. *Id.* The Eighth Circuit reversed because the case involved "a single pattern or practice claim," brought by the Government as plaintiff, not ten individual claims brought by ten plaintiffs. *Id.* While the court in *Hurt* quoted the "line-item" language from *Jean* for the proposition that the case must be considered as a whole, there was only one claim at issue in *Hurt*, so the court did not have occasion to consider the question of a claim-by-claim "substantial justification" analysis.

even if EPA prevailed in full on the 2007 and 2010 claims, that would do nothing to supply the missing bases for the dismissed 2001 and 2003 claims.

Ameren has been prejudiced by the extensive time and effort it was forced to expend on discovery directed to a pair of claims that had no merit whatsoever. It would frustrate the purpose of fee-shifting statutes like the EAJA and Section 113(b) of the CAA if the law allowed EPA to double the cost of discovery by bringing claims that lack any reasonable basis, voluntarily dismiss half of those claims after obtaining extensive discovery, and then argue – as it does here – that fees cannot even be considered until the conclusion of the entire litigation.[10]

The 2001 and 2003 claims had no reasonable basis and were not substantially justified. EPA should compensate Ameren for its attorneys' fees and expenses related to those baseless claims.

---

[10] EPA also argues that the waiver of sovereign immunity must be "construed narrowly," again offering out-of-context quotes from *Trident* and *Ruckelshaus v. Sierra Club*, 463 U.S. 680 (1983). (ECF # 177 at 15-16; *see also id.* at 5.) But *Trident* itself recognizes that where "the government's unreasonableness was a basis for recovery in actions under the Clean Air Act . . . Congress has left no doubt that it intended to waive the government's immunity to costs awards." *Trident*, 92 F.3d at 864. *Ruckelshaus* was a case where Sierra Club sought fees under a "prevailing party" statute even though it had lost all claims, and the issue was whether the phrase "prevailing party" could be broadly construed to include a situation where the plaintiff lost everything. The Court not surprisingly rejected the plaintiff's broad construction.

**II.    CONCLUSION**

The Court should grant Ameren's Motion and award Ameren its reasonable fees, costs and expenses.  Ameren stands ready to submit an appropriate fee petition should the Court so order.


Dated:  December 10, 2013          Respectfully submitted,

/s/ Ronald S. Safer

Ronald S. Safer
Patricia Brown Holmes
Renee Cipriano
Steven J. Bonebrake
Matthew B. Mock
Joshua R. More
(All admitted *pro hac vice*)
SCHIFF HARDIN LLP
233 South Wacker Drive, Suite 6600
Chicago, Illinois 60606
(312) 258-5500
Fax:  (312) 258-5600

James J. Virtel
ARMSTRONG TEASDALE LLP
7700 Forsyth Boulevard Suite 1800
St. Louis, Missouri  63105
(314) 621-5070
Fax: (314) 612-2298
jvirtel@armstrongteasdale.com
*Counsel for Defendant Ameren Missouri*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 10, 2013, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will cause an electronic copy to be served on counsel of record, who are listed below:

> Andrew C. Hanson
> Bradford T. McLane
> Elias Quinn
> James Beers
> Nigel B. Cooney
> James Lofton
> U.S. Department of Justice
> Environment and Natural Resources Division
> P.O. Box 7611
> Ben Franklin Station
> Washington, DC  20044-7611
> Telephone:  (202) 514-5293
> Facsimile:  (202) 616-6584
> andrew.hanson2@usdoj.gov
> bradford.mclane@usdoj.gov
>
> Andrew J. Lay
> Office of the U.S. Attorney
> 111 S. Tenth Street, 20th Floor
> St. Louis, MO 63102
> Telephone:  (314) 539-2200
> Facsimile:  (314) 539-2777
> andrew.lay@usdoj.gov

/s/ Ronald S. Safer