**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No. 4:11-CV-00077-RWS** |
| **v.** ) | |
| ) | **Judge Rodney W. Sippel** |
| **AMEREN MISSOURI,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**AMEREN MISSOURI'S MEMORANDUM IN SUPPORT OF ITS**
**MOTION FOR A PROTECTIVE ORDER NARROWING CERTAIN RULE 30(B)(6)**
**DEPOSITION TOPICS REQUESTED BY EPA**

**I.      INTRODUCTION**

This case is about whether the New Source Review regulations required Ameren to seek a preconstruction permit before replacing certain boiler components with like-kind components at the Rush Island power plant.  Answering that question involves determining whether those like-kind component replacements constituted "routine maintenance, repair, and replacement," and whether Ameren should have expected those replacements to cause significant increases in emissions of sulfur dioxide, excluding emissions resulting from other causes such as growth in the demand for electricity.  EPA has obtained extensive discovery on these issues — demanding a pre-suit production by Ameren of a quarter-million documents, serving comprehensive discovery requests requiring production of hundreds of thousands of additional documents and 90 gigabytes of electronic data, and noticing 25 depositions, including numerous days of Rule 30(b)(6) deposition testimony.  This has cost Ameren millions of dollars and imposed an immense burden.

Ameren recognizes that the scope of discovery can be broad, but it is not limitless.  As the discovery cutoff approaches, EPA's latest requests for even more discovery either stray too far beyond the issues in the case or seek to duplicate what Ameren already has provided.  EPA recently served two more Rule 30(b)(6) deposition notices — on "Unit Performance Measures" and "Rate Cases" — seeking additional testimony on 20 topics.  Although Ameren will prepare and produce witnesses to testify regarding many of these topics, it objected to the following topics:

- The specific bonuses paid out every year, for a decade, to over 20 Ameren employees (Unit Performance Measures Topics 4 & 6; Rate Cases Topic 8);

- The identification of any document and every individual referencing or related to a "critical assumptions" effort that neither was completed nor resulted in an official company document, as Ameren already has explained in an interrogatory response and deposition testimony (Unit Performance Measures Topic 2);

- Testimony on every instance in the last 14 years where Ameren performed a calculation of Rush Island's "commercial availability" — a metric that is not used to project emissions (*Id.* Topic 5);

- Duplicative testimony on inputs and calculations pertaining to "equivalent availability" and "equivalent unplanned outage rates," even though this information already was provided by a 30(b)(6) deponent (*Id.* Topics 7 & 8);

- Testimony on every rate case that Ameren has filed with the Missouri Public Service Commission over the last eight years (Rate Cases Topic 4); and

- Duplicative testimony on the expenditures related to the like-kind boiler component replacement projects at issue in the case (Rate Cases Topic 10).

Ameren proposed good-faith compromises attempting reasonably to narrow these topics, but EPA refused, requiring Ameren to file this motion.  Ameren respectfully requests a protective order narrowing these topics as set forth below.

## II.    LEGAL STANDARD

Even under Rule 26(b)(1)'s liberal scope, discovery must be "reasonably calculated to lead to the discovery of admissible evidence" and "[a]ll discovery is subject to the limitations

imposed by Rule 26(b)(2)(C)."  Rule 26(b)(2)(C), in turn, states:

> (2) *Limitations on Frequency and Extent*. . . .
>
> (C) *When Required*.  On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:
>
>> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>>
>> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>>
>> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

This Court has broad discretion to enter a protective order limiting or precluding discovery in order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," and prohibiting discovery where "the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(c)(1)(A); (b)(2)(C)(i), (iii); *see also Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984); *Roberts v. Shawnee Mission Ford, Inc.*, 352 F.3d 358, 362 (8th Cir. 2003).

A protective order should be granted whenever the moving party demonstrates good cause for the issuance of the order.  *Miscellaneous Docket Matter No. 1 v. Miscellaneous Docket Matter No. 2*, 197 F.3d 922, 926 (8th Cir. 1999).  Good cause exists when specific prejudice or harm will result if no protective order is granted.  *See Frideres v. Schiltz*, 150 F.R.D. 153, 156 (S.D. Iowa 1993).  The prejudice or harm protected by Rule 26(c) includes "annoyance, embarrassment, oppression, or undue burden or expense."  *See* Fed. R. Civ. P. 26(c); *Crawford–El v. Britton*, 523 U.S. 574, 599 (1998).  "Such determination must also include a consideration of the relative hardship to the non-moving party should the protective order be granted."

*General Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1212 (8th Cir. 1973) (citing *United States v. Kordel*, 397 U.S. 1, 4–5 (1970)).

III.   <u>**ARGUMENT**</u>

Certain topics in EPA's latest Rule 30(b)(6) deposition notices are not "reasonably calculated to lead to the discovery of admissible evidence" or are "unreasonably cumulative or duplicative." Fed. R. Civ. P. 26(b)(1) & (2)(C)(i). EPA "has had ample opportunity to obtain the information by discovery in th[is] action" and "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2)(C)(ii) & (iii). Absent a protective order narrowing them, Ameren will suffer annoyance, undue burden, and expense if it is required to prepare and present witnesses on those topics, as discussed below.

A.   <u>**The "Unit Performance Measures" Rule 30(b)(6) Notice**</u>

While the entire notice on so-called "unit performance measures" is duplicative, and unduly burdensome in light of its lack of relevance, Ameren seeks a protective order regarding deposition topics 2, 4, 5, 6, 7 and 8. Ameren addresses each of these topics below.

**1.   Employee Compensation Bonuses (Topics 4 & 6)**

Topics 4 and 6 of the Unit Performance Measures notice seek over eight years' worth of Ameren employees' personal compensation information, including the amounts and calculations of their bonus compensation, and the factual basis supporting the bonus award. Specifically, EPA seeks the following:

> 4. Incentive-based compensation programs for Ameren employees (including but not limited to Key Performance Indicators) relating to the equivalent availability, commercial availability, or heat rate of Rush Island Units 1 and 2. This topic includes the categories of Ameren employees eligible for incentive-based compensation; the identity of each employee on Ameren's Supplemental Rule 26(a) Disclosures who received incentive-based compensation; the level and amount of compensation awarded to each such employee for each such category from 2006 through the present; and the factual basis on which such compensation was awarded.

      6.  The calculation or development of each annual KPI or other incentive-based compensation threshold or target for each year between 2004 and 2012 for the Rush Island Plant (including units 1 and 2) that are related to Equivalent Availability, Commercial Availability, or Heat Rate.  This topic specifically includes but is not limited to how You calculated or developed each input identified in response to Interrogatory No. 67.  (Ex. A, EPA's Rule 30(b)(6) Notice – Unit Performance Measures.)[1]

Employee bonus information is not relevant to the issues in this case, such as determining whether those like-kind component replacements constituted "routine maintenance, repair, and replacement," and whether Ameren should have expected those replacements to cause significant increases in emissions of sulfur dioxide, excluding emissions resulting from other causes such as growth in the demand for electricity.  Moreover, any production of employee bonus information unnecessarily intrudes upon the personal finances and job performance of Ameren's engineers and plant managers.  EPA's argument for relevance is that the bonuses of some Ameren employees are based in part on attaining target (*i.e.*, aspirational) goals for a given power plant's availability to operate, which it claims is relevant to EPA's theory regarding increased availability of the Rush Island units.  But any such connection is too attenuated to warrant this discovery in light of the extensive discovery EPA already has obtained on availability issues.

EPA already has obtained all of the actual pre-project and post-project availability information for each Rush Island unit for every year at issue.  Likewise, EPA already has taken exhaustive discovery regarding Ameren's assumptions about the future availability of the Rush

---

[1] Topic 8 of the "Rate Cases" notices also seeks this same type of information:

      8.  A description of any case before the MPSC in which Ameren requested that the costs associated with its KPI incentive-based compensation bonus program be included within its rate base or otherwise accounted for in electricity rates.  For each year between 2004 to the present, describe the total amount of KPI bonuses paid to Ameren employees that have been included within Ameren's rate base for electricity service and the portion of those bonuses related to Equivalent Availability or Commercial Availability.  (Ex. B, EPA's Rule 30(b)(6) Notice – Rate Cases.)

Island units — in other words, availability in the years following the like-kind boiler component replacement projects at issue. Because EPA's availability argument is based on what it claims Ameren should have expected in terms of future availability, EPA already has the discovery relevant to its theory.[2]

Even to the extent that employee bonus information has an "availability" component, it is several steps removed from EPA's theory. Initially, the awarding of bonuses to management employees is contingent upon Ameren Corporation achieving earnings targets as approved by the Board of Directors. So in a year where earnings targets are not met, unless the Board modifies earnings criteria, performance bonuses would not be awarded regarding availability or anything else. If earnings targets are met, then bonuses are awarded depending on a variety of metrics including plant availability, corporate safety record, and fiscal discipline. None of the bonus information has anything to do with projecting emissions from the Rush Island units. Accordingly, EPA's requests are overbroad and any relevance or benefit gained from exploring these areas is far outweighed by Ameren' burden and expense of preparing witnesses for testimony and the employees' privacy interests.

Additionally, over Ameren's objections, EPA has already taken discovery related to incentive-based compensation (which Ameren maintains is irrelevant),[3] and thus will suffer no

---

[2] Ameren disagrees with EPA's contentions and with its "methodology" for assessing emissions, but that disagreement, while fundamental to this case, is not part of this motion.

[3] Through the deposition testimony of at least six Ameren employees, EPA has gained insight into the general purpose and structuring of Ameren's incentive-based compensation program (known as Key Performance Indicators or "KPI"); the specific KPI metrics, thresholds and targets tracked; the individuals who set the targets and how the targets were developed; the type of employees eligible for bonus compensation; and how bonuses are generally calculated. (*See, e.g.*, Ex. C, Dep. Tr. of Robert Meiners at 101, 107, 111-12, 133-34, 196.) In all, this totals over 100 pages of testimony. In addition, Ameren also produced over 1,298 documents related to the KPI program, some of which EPA used during those depositions.

hardship if this motion is granted.[4]   Accordingly, Ameren seeks a protective order precluding further discovery into Ameren's incentive-based compensation programs.

## 2. "Critical Assumptions" Information (Topic 2)

Topic 2 of the Unit Performance Measures notice seeks discovery on a set of documents that relate to short-lived project centered on "critical assumptions" information.  This effort began in or about August of 2006 as an Excel spreadsheet containing data related to "critical assumptions."  The project, which was never finalized nor made official, was originally intended to ensure uniformity in use of underlying assumptions for cross-group and cross-plant planning. As of December 2006, the document had not been finalized, was "still in a developmental stage," still had "bugs," and was not an "official document."  (Ex. D, at AM-02502964.)  The critical assumptions project is an incomplete effort by the company, having ended on or about January 1, 2007, when a departmental reorganization occurred.  This is not unusual and should not be surprising.  Ameren, like many companies, creates thousands of documents every year — many are official documents that are part of a formal and repeated process and get reviewed and approved by many different people at different levels of responsibility; but many are not.

Ameren has already explained all of this to EPA, in its response to Interrogatory No. 71. (*See* Ex. E.)  This response is in addition to the extensive discovery EPA has taken on this issue, including hours of deposition time with over half a dozen witnesses including two Rule 30(b)(6) witnesses, which revealed that the project never got far off the ground.  Indeed, EPA questioned some Ameren witnesses at great length on the critical assumptions spreadsheet — as indicated by

---

[4] Further, based on the questioning at the depositions of Mr. Meiners and Mr. Strubberg it appears that EPA is trying to impugn the character of Ameren employees by implicitly suggesting that they are rigging the incentive-based compensation system to increase bonuses. (*See, e.g.,* Ex. C, at 118-21; 130-32.)   Besides being completely unfounded, that type of accusation clearly has nothing to do with, for example, determining whether Ameren should have expected the projects at issue to cause increases in emissions.

the fact that the document was mentioned nearly 50 times over the course of EPA's deposition of

Ameren employee David Queensen.  Yet EPA still wishes to pursue more about this topic, even

though it knows this is a dead end:

> 2.  The development, authorship, creation, purpose, and use of any Document
> that references "critical plant assumptions" or "critical assumptions," as those
> terms are or have been used by Ameren, including all Communications related
> thereto either to or from any of Defendant's employees, Consultants, and
> Contractors.  This topic includes but is not limited to the development,
> authorship, creation, purpose, and use of "critical plant assumptions" or
> "critical assumptions", and all Communications to or from any of Defendant's
> employees, Consultants, or Contractors related to the subject matter of such
> Documents.  This topic specifically includes the identity of all persons
> involved in the preparation, use, or dissemination of such documents for any
> purpose.  This topic also includes but is not limited to Your Response to
> Interrogatory No. 71.  (Ex. A.)

Given the character of this incomplete effort, EPA's request is overly broad and unduly

burdensome, to the extent that it seeks information and testimony as to "any Document," and "all

Communications" to or from "any" employees, consultants or contractors, and the identity of "all

persons" involved with any use of the documents.  Further, the critical assumptions spreadsheet

and any related documents have nothing to do with projects at issue, have no relation to

engineering analyses used for project planning, and are not used in emissions analyses.  EPA's

request for additional discovery in this area is unduly burdensome given that any further

information gained would be far outside of what is relevant in this case.  Ameren is unclear why

EPA thinks the "critical assumptions" spreadsheet is relevant, other than the fact that EPA's

experts cherry-picked it as supposed support for their opinions.[5]  The reality is that EPA has

reached the bounds of what there is to discover on this issue, and Ameren should not be called

upon to spend hours preparing and presenting a witness on a project and "all documents" that

---

[5] EPA plucked a document out of Ameren's production based on its name – "Critical
Assumptions" – and without more, had its experts rely on it.  (*See* ECF # 272 at 12 (citing Expert
Reports and Depositions of Dr. Ranajit Sahu and Robert H. Koppe).)

never became complete and official.  Any possible benefit EPA would gain from additional discovery is far outweighed by the undue burden and expense to Ameren.

If EPA would like deposition testimony about the purpose and lifespan of the initial "critical assumptions" spreadsheet, Ameren is willing to provide that, but Ameren seeks a protective order precluding further discovery on this topic.

### 3.       Availability (Topics 5, 7 & 8)

Topics 5, 7 and 8 of the Unit Performance Measures notice seek information regarding projected availability and equivalent availability inputs for the Rush Island Units — discovery which Ameren has already provided.  Most important, Ameren has provided documents as well as deposition testimony on the availability inputs that matter to this case — those that were used for any emissions analyses completed by the company.  Given the discovery to date, there is no question about what the inputs to the emissions analysis were.  That ground has been covered.[6]

Additionally, EPA already has Ameren's testimony and discovery on equivalent availability inputs and equivalent unplanned outage rates and forecasts sought by Topics 7 and 8. Ameren's response to Interrogatory No. 68 provides two detailed charts setting forth the requested inputs and source information for the final fuel budgets.  (Ex. E, Resp. to Interrogatory No. 68.)  Moreover, the process for developing the assumptions of equivalent unplanned outage rate used in the annual fuel budgeting process has been the subject of extensive questioning and was described at length by David Boll and Tim Finnell in their Rule 30(b)(6)-Modeling depositions in December and November 2013, respectively, wherein Messrs. Boll and Finnell provided nearly 175 pages of testimony on equivalent availability and equivalent unplanned

---

[6] The individuals who have provided testimony on these inputs include David Queensen, James Bosch, David Boll, Robert Meiners, Tim Finnell, and William Leingang.  *See also e.g.*, Group Ex. F, Dep. Tr. of David Boll, pp. 24-122; Dep. Tr. of Timothy Finnell, pp. 28-103; Ameren's Response to Request for Admission No. 171, 172.

outage rate inputs.  (Ex. F, Dep. Tr. of David Boll at 24-122 and Dep. Tr. of Tim Finnell at 28-103.)  For example, after explaining in detail the source of the availability inputs for developing forecasts, Mr. Boll further describes the company's process:

> Basically, all the inputs in the worksheet were really assumptions based on, you know, some of the factors that I mentioned earlier, that these decisions were made -- the input was made very quickly.  It was not a long, drawn-out process.  There's no formal procedure or checking or anything like that.  It's – it's a very high level, imprecise method of coming up with those – those numbers.  (Ex. F, Tr. of David Boll at 34.)

Robert Meiners and James Bosch provided additional testimony at their individual depositions in April and June 2014, respectively, in nearly 275 pages of testimony.  EPA's displeasure with the answers received on these topics should not be license for boundless discovery.

Yet, even though it has all of the testimony that matters relating to the like-kind boiler component replacement projects at issue, and inputs used for emissions analyses, EPA seeks even more discovery on inputs that were not used in that emissions calculation process:

> 5.  The calculation of "commercial availability" for Rush Island Units 1 and 2 from 2002 to the present, the purpose(s) for which Defendant calculates commercial availability for its coal-fired generating units.  This topic specifically includes Defendant's Response to Interrogatory No. 55.  This topic specifically includes the identity of all persons involved in the preparation, calculation and use of any calculation of commercial availability for any purpose.  (Ex. A.)

Ameren has already provided testimony through Interrogatory responses and testimony that commercial availability is an economic metric, calculated using equivalent availability and profit margin, and is not used to project emissions.  (Ex. G, Dep. Tr. Scott Anderson at 17-26; Ex. H, Resp. to Interrogatory No. 55.)  This topic is not related to emissions projections generally, let alone Ameren's expectation of an alleged emissions increase due to the 2007 and 2010 projects, despite EPA's persistence that any metric or document with the word "availability" is subject to discovery via live testimony.  EPA's request for every calculation of

10

"commercial availability" for both Rush Island Units 1 and 2 for the past twelve years, and "all persons" involved with those calculations is overly broad and unduly burdensome.  It would be impossible for Ameren to prepare and present a witness on all of those inputs.  Ameren seeks a protective order precluding further discovery on this topic.

Topics 7 and 8 suffer the same scope problem, are duplicative, and require narrowing before Ameren should be required to prepare and present a witness to testify.

> 7.  The calculation or development of each Equivalent Availability, Equivalent Unplanned Outage Rate, and Capability input used in the final, official Fuel Budget run for the years 2007 and 2010.  This topic specifically includes but is not limited to how You calculated or developed each input identified in response to Interrogatory Nos. 59, 60 and 68.

> 8.  The calculation or development of each Equivalent Availability and Equivalent Unplanned Outage Rate forecast used in each Business Plan or Strategic Plan for Rush Island for each year between 2005 and 2010.  *See, e.g.,* AM-02625363.  This topic specifically includes but is not limited to how You calculated or developed each forecast identified in response to Interrogatory No. 69.  (Ex. A.)

As noted from the testimony cited above, Ameren already has provided exhaustive testimony on these topics.  For example, Mr. Boll was prepared for and provided testimony on the development of availability inputs and unplanned outage rates:

> Q:     But, generally, you're prepared to testify about the — how the availability inputs were developed —

> A:     Yes.

*       *       *

> Q:     And you're prepared today to testify about how the unplanned outage rates were developed in those forecasts?

> A:     Yes.

(Ex. F, Dep. Tr. of David Boll at 24-25.)  Mr. Boll was then questioned on these topics over the next 100 pages of his deposition, including on 8 exhibits involving fuel availability and forced/unplanned outage worksheets.

Additionally, these matters are not reasonably particular to the extent that they seek live testimony on "each" input and "each forecast" — of which there are thousands — and the calculations of the same for a six-year period.[7]   As noted in Mr. Boll's testimony above, there is no formal procedure or precise method for developing the inputs.  EPA knows this already, so what further benefit could be derived from additional questioning?  In any event, Ameren could not possibly prepare and present a witness to testify on all of this data, and certainly the burden and expense of doing so far outweighs any relevance or benefit.  EPA's practice in this regard has been an issue in prior depositions.  EPA drafts an overly broad topic involving extraordinary amounts of inputs or data points, and then presents the witness with randomly chosen spreadsheets from Ameren's nearly 1 million-page production and asks a surprised witness about select worksheet cells and underlying calculations.  (*See, e.g.*, Ex. I, Dep. Tr. of David Queensen at 114-122.)  The time and resources of both parties are best served if EPA instead provided particularized, narrow topics.

Accordingly, regarding Topic 7, Ameren should not be required to provide duplicative testimony on equivalent availability and equivalent unplanned outage rate inputs.  Ameren is, however, willing to produce one or more witnesses to provide testimony on how the capability inputs contained in the 2007 and 2010 final, official fuel budget runs were created.  Ameren seeks a protective order limiting testimony to this subject.  Regarding Topic 8, Ameren should not be called upon to prepare a witness on hundreds of figures over a six-year time frame when the scope of relevant data is much narrower.  Ameren asks that the Court grant a protective order precluding further discovery on this topic.

---

[7] This topic is also overbroad because the only time periods that matter are years 2007 and 2010 (when Ameren completed the projects at issue).

### B.      The "Rate Cases" Rule 30(b)(6) Notice

Similar to its Unit Performance Measures notice, most of EPA's Rate Cases notice seeks testimony on topics that have no relevance to this case.  As an initial matter, EPA's Rate Cases notice fails to identify the specific rate cases that EPA believes relate to the projects at issue.  In an effort to reach a compromise, Ameren is willing to provide limited testimony on rate cases ER-2007-0002, ER-2008-0318, and ER-2011-0028, which are the only rate cases that cover expenses related to the 2007 and 2010 major outages during which Ameren performed the like-kind boiler component replacement projects at issue.[8]  EPA has been unable to point to any document that suggests additional rate cases seek reimbursement for expenses related to the projects at issue, but EPA has refused to narrow its notice to ER-2007-0002, ER-2008-0318, and ER-2011-0028.    Accordingly,  Ameren  requests  that  the  Court  limit  EPA's  deposition questioning to those three rate cases.

Although Ameren will prepare and present a witness on many of the topics in the Rate Cases notice, Topics 4 and 10[9] are extremely broad, have little to no relevance to this case, and the burden on Ameren outweighs any limited relevance.  These topics ask Ameren to prepare and present testimony on every case Ameren filed with the Missouri Public Service Commission ("MPSC") over an eight to nine year period.  Specifically, EPA seeks the following:

> 4.  The facts related to each rate case between 2006 and the present in which Ameren included Capital Expenditures, O&M expenses or other costs incurred  or  to  be  incurred  that  relate  to  the  2007  and  2010  Overhauls. Included  within  this  Matter  are  the  specific  amounts  of  the  overall  rate

---

[8] Unlike ER-2008-0318 and ER-2011-0028, ER-2007-02 was filed in July of 2006 and does not cover the time period when the projects at issue were performed in 2007 and 2010.  But, because ER-2007-02 includes expenses Ameren incurred in preparation for the Rush Island Unit 1 Reheater and Air Preheater projects, Ameren is willing to prepare a witness to provide limited testimony on ER-2007-02.

[9] Rate Case Topic 8, on bonus information, is addressed above.

increase requests that relate to the 2007 and 2010 Overhauls in general and the Projects in particular. Also included within this Matter are the identities (name, job title, employment duties) of each witness that testified for or on behalf of Ameren in such rate cases and the identity of each person involved in preparing or assisting in the preparation of such testimony.

10. The facts relating to any MPSC case, between 2007 and the present, that relates to the 2008 FAC – such as MPSC Case ER-2008-0318 and any adjustments, true-ups, and prudence reviews – and the testimony, exhibits, or other documents filed by Ameren with MPSC that relate to actual or projected fuel or purchased-power costs for the Rush Island Plant and the prudence of such costs.

(Ex. B, EPA's Rule 30(b)(6) Notice – Rate Cases.)

These topics seek facts "relating to" 21 cases (6 rate cases and 15 Fuel Adjustment Clause "FAC" cases).  Every rate case since 2008 deals with the FAC, so Topic 10 seeks testimony on every fact relevant to every rate case filed since then.  Likewise, Topic 4 is not limited to the like-kind boiler component replacement projects at issue in this case (EPA uses the term "overhauls").  This Topic seeks all facts related to any rate case that pertained to those projects — a much broader universe.  Rate cases are massive undertakings — they are trials unto themselves.  Each rate case takes approximately 11 months and involves testimony of upwards of 20 witnesses.  During a rate case, the MPSC and other parties issue literally hundreds of data requests to Ameren, and Ameren's responses cover hundreds of thousands of pages.  Preparing a witness to testify regarding all the facts and people related to 21 such cases is extremely burdensome and unnecessary.

"All facts" relating to these rate cases are not relevant.  A rate case is a regulatory proceeding by which Ameren recovers its expenses and a reasonable rate of return on certain of those expenses.  Fundamentally, it is an accounting and reconciliation exercise.  Certainly, there is a small subset of facts that are at issue in particular rate cases that may be relevant to this case, and Ameren has agreed to produce witnesses regarding those facts.  (*See, e.g.* Ex. J, Ameren's

Response to Matter Nos. 3 and 6.)

Accordingly, Ameren should not be called upon to provide testimony regarding rate cases that seek reimbursement for costs unrelated to the projects at issue, or to provide testimony on Topics 4 and 10.   Ameren is, however, willing to prepare and present a witness to testify generally on the FAC, how Ameren seeks reimbursement through a rate case, and the specific amounts of reimbursement Ameren requested and received for rate cases ER-2007-0002, ER-2008-0318, and ER-2011-0028.   Ameren requests that the Court (1) limit EPA's deposition questioning to rate cases ER-2007-0002, ER-2008-0318, and ER-2011-0028, and (2) grant a protective order precluding further discovery related to Topics 4 and 10.

## CONCLUSION

For the reasons stated above, good cause exists for, and Ameren respectfully requests entry of, a protective order that:

- precludes further discovery on Ameren's incentive-based compensation programs (Unit Performance Measures Topics 4 & 6; Rate Cases Topic 8);

- limits further discovery on the "critical assumptions" effort to the purpose and lifespan of the initial "critical assumptions" spreadsheet (Unit Performance Measures Topic 2);

- precludes further discovery on inputs and calculations pertaining to Rush Island's "commercial availability," "equivalent availability," and "equivalent unplanned outage rates" (Unit Performance Measures Topics 5, 7 & 8);

- limits further discovery on rate cases to the FAC, how Ameren seeks reimbursement through a rate case, and the specific amounts of reimbursement Ameren requested and received for rate cases ER-2007-0002, ER-2008-0318, and ER-2011-0028, and precludes further discovery on rate cases, including rate cases ER-2007-0002, ER-2008-0318, and ER-2011-0028 (Rate Cases Topics 4 & 10).


Dated:   July 17, 2014                             Respectfully submitted,

                                                    /s/ Matthew B. Mock

                                                    Ronald S. Safer (pro hac vice)
                                                    Patricia Brown Holmes (pro hac vice)

15

Renee Cipriano (pro hac vice)
Steven J. Bonebrake (pro hac vice)
Matthew B. Mock (pro hac vice)
Joshua R. More (pro hac vice)
Schiff Hardin LLP
233 South Wacker Drive Suite 6600
Chicago, Illinois 60606
Phone: (312) 258-5500
Fax: (312) 258-5600

James J. Virtel
Armstrong Teasdale LLP
7700 Forsyth Boulevard Suite 1800
St. Louis, Missouri  63105
Phone: (314) 621-5070
Fax: (314) 612-2298
jvirtel@armstrongteasdale.com

*Counsel for Defendant Ameren Missouri*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 17, 2014, I electronically filed the foregoing document with

the Clerk of Court using the CM/ECF system, which will cause an electronic copy to be served

on counsel of record, who are listed below:

>Andrew C. Hanson
>Bradford T. McLane
>James Beers
>Elias Quinn
>U.S. Department of Justice
>Environment and Natural Resources Division
>P.O. Box 7611, Ben Franklin Station
>Washington, DC 20044-7611
>Telephone: (202) 514-5293

/s/ Matthew B. Mock