**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

_____

|                                         |     |                                          |
|-----------------------------------------|-----|------------------------------------------|
| UNITED STATES OF AMERICA,               | )   |                                          |
|                                         | )   |                                          |
| Plaintiff,                              | )   |                                          |
|                                         | )   |                                          |
| v.                                      | )   | Civil Action No. 4:11-cv-00077-RWS       |
|                                         | )   |                                          |
| AMEREN MISSOURI,                        | )   | Honorable Rodney W. Sippel               |
|                                         | )   |                                          |
| Defendant.                              | )   |                                          |

_____

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION**
**TO COMPEL PRODUCTION OF COMMUNICATIONS BETWEEN AMEREN AND**
**THIRD PARTY UTILITY INDUSTRY ASSOCIATIONS**

# EXHIBIT C

**DAIRYLAND Power COOPERATIVE** • 2615 EAST AVE. SO. • P.O. BOX 817 • LA CROSSE, WISCONSIN 54602-0817

(608) 788-4000

May 17, 1989

TO:       MAPP Environmental Committee
          MAPP Air Quality Subcommittee

FROM:     Eric Hennen, Chairman
          MAPP Air Quality Subcommittee

SUBJECT:  Update On EPA Policy - Life Extension

This memo is intended to update you with regard to recent events which
have occurred in the WEPCO Life Extension saga.  This activity was greatly
facilitated by my attendance at a UARG meeting on March 22, regarding this
issue.

Brief History

In approximately the mid 1980's, Wisconsin Electric Power Company
(WEPCO) was embroiled in an acid deposition discussion within the state of
Wisconsin along with the rest of the Wisconsin utilities.  At that time,
clean coal research was in its infancy, and Wisconsin Electric was seeking to
get co-funding for a clean coal demonstration at their Port Washington
facility.  This plant is composed of five units, all of which were operating
at various reduced capacity levels, due to cracks in the steam drum.
Wisconsin Electric determined that rather than renovate these units to their
original condition, they would instead convert them to a pressurized,
fluidized bed system and thus qualify, not only for clean coal funds, but
reduce $SO_2$ in cooperation with the state acid deposition requirements as
well.  Since this project would involve major capital expenditure and
modification to the existing facilities, it would likely be subject to NSPS
regulation.  This was not particularly troublesome, since the Innovative
Technology exemption could be utilized.

Unfortunately, clean coal funds did not become available for this
project and WEPCO subsequently determined to repair the units to their
original condition siting the "routine maintenance" exemption sections of
NSPS and PSD.  They therefore sought to avoid NSPS and PSD review.  Since the
issue had already been raised, EPA took a close look at whether the
modifications which WEPCO was proposing were in fact, routine maintenance or
whether the modifications which involved a substantial capital expenditure
could be non-routine, which would still trip NSPS and PSD review.  In late
1988, a series of letters between Wisconsin Electric management and EPA

MAP 01246

MAPP Environmental Committee
MAPP Air Quality Subcommittee
Page 2
May 17, 1989

headquarters followed, and ultimately a final decision by EPA was rendered in the form of a letter signed by Donald Clay, Assistant Air Administrator, a copy of which is attached.

The Clay letter makes clear EPA's present policy for interpretation of the PSD and NSPS regulations regarding physical or operational changes which are made at power plants which involve a capital expenditure, a pollutant increase, or maintenance. Since the Clay letter is attached to this memo, I will not go into the details of it other than to state that EPA determined that what WEPCO was calling "routine maintenance" was not routine. Further, the modifications which Wisconsin Electric was seeking to accomplish would in fact subject all five units to NSPS or PSD review. Wisconsin Electric responded by filing a suit in the United States Court of Appeals for the Seventh Circuit, challenging EPA's decision. Briefing is ongoing at this point with a final decision by the court expected either in June at the earliest, or if that is not forthcoming, the court will recess and the earliest a decision could be expected would be in the fall of 1989. Wisconsin Electric has retained Hunton and Williams, the attorneys that also represent UARG. UARG also filed an amicus brief, in support of WEPCO, but since they did not formally intervene as parties in the case, UARG would not be bound (and would not bind the rest of the utility industry) if the decision goes against WEPCO.

Because the UARG attorneys feel that this issue is of such concern to the utility industry as a whole, they held a meeting of the Plant Renovation task force on March 22, 1989 to field questions regarding the impact of this policy shift at EPA. Note: This task force used to be called the Life Extension Task Force, however, Life Extension is an unpopular term in the wake of WEPCO.

Meeting Discussion

* NOTE:   It must be clearly understood that in the following discussion, what I am about to state is my own interpretation and opinion drawn from the meeting discussion. PSD and NSPS regulations exist on the books. The meeting discussion centered on present EPA policy regarding interpretation of those regulations. As I detail my observations and other discussions at this meeting, it is recommended that legal advice be sought regarding specific issues in question.

The PSD and NSPS regulations state that if a pollutant increase occurs from a particular facility which is coupled with a physical or operational change, then the facility would be subject to PSD and NSPS review. When we discuss PSD, we typically are talking about a tons of a pollutant increase per year. When we talk about NSPS, we are referring to a pollutant increase

MAP 01247

MAPP Environmental Committee
MAPP Air Quality Subcommittee
Page 3
May 17, 1989

over a much shorter time frame such as pounds of pollutant per day. EPA claims that in order to determine whether a pollutant increase will occur, you compare projected potential emissions on a 365 day a year basis at full load against past actual emissions. Since most of us do not operate our power plants at full load for 365 days a year, you will note that under this interpretation, a pollutant increase will always happen, even if no modifications were made. Since the regulations specifically allow that an emissions increase will not have occurred if it is due only to an increase in the hours of operation, it would seem that EPA's present policy differs with their existing regulations. Nevertheless, it appears that present EPA policy has thrown out the capacity factor exemption. This is a point of litigation between WEPCO and EPA. Since WEPCO had been operating its five units at a much reduced level due to safety concerns, under the past actual versus future projected emissions calculation, they would be dealt with quite harshly. WEPCO therefore asked to be able to retest their boilers to demonstrate a higher baseline level. EPA agreed but the testing was necessarily stringent and they were subsequently still unable to show full load capacity at all units. The inference here is clear: if for any reason, one of your facilities breaks down, do not operate for any length of time in a deteriorated state or you may set a new baseline. Document any operation at a reduced level as being temporary and due strictly to factors beyond your control.

UARG and industry have made the point that all industry follows economic cycles and, in periods of high economic output, much of industry will defer maintenance, instead accomplishing the maintenance years later during the time when plant capacities may be reduced due to a downturn in the business cycle. Under EPA's present policy, this definitely presents a problem. General Electric may also be a party to the suit because orders for a turbine refurbishment are down and they are concerned about a loss of business due to an adverse ruling in WEPCO.

There is a rumor within EPA that a so-called "30/30 rule" may come about. EPA is interested in learning about utility plans for refurbishment on any plant 30 years old or greater with historical capacity factors of 30% or less. EPA is interested in whether the utilities plan on increasing capacity factors of these older units.

A second issue of concern in the WEPCO case is a definition of "routine maintenance". PSD and NSPS regulations state that if a physical or operational change occurs, but it is routine maintenance, then these modifications are exempt from PSD and NSPS review. WEPCO has argued that repairs made to the steam drum and air heater basket replacements are routine maintenance. The Clay letter makes clear that EPA has disallowed these items and further, has stated that routine maintenance must be very routine in

MAP 01248

MAPP Environmental Committee
MAPP Air Quality Subcommittee
Page 4
May 17, 1989

order to avoid scrutiny. According to UARG, EPA equates "routine" with "frequent"; whereas, UARG states that routine actually means "in accordance with established practice". UARG believes that maintenance practices are evolving in the utility industry. That, as new standards of safety, environmental, and performance increase, they are forcing higher levels and standards and more maintenance activities to be accomplished.

UARG believes that under the present EPA policy, in order to qualify for the routine maintenance exemption, the activity would have to be:

* frequent
* inexpensive
* able to be accomplished at a scheduled outage
* will not extend the normal economic life of the unit
* be of standard industry design

UARG suggests that if a catastrophic failure occurs, start maintenance immediately. You should also have established your baseline or representative levels of operation prior to these failures. Performance testing is highly recommended to determine maximum capacity levels of your units.

Another issue which was discussed is what constitutes a "capital expenditure". According to the regulations, if this physical or operational change, which results in a pollutant increase, is coupled with a capital expenditure, then you could subject yourself to PSD and NSPS review. According to UARG, if you capitalize the investment, then there is no question - you have decided that it was a capital expenditure. On the other hand, if in fact you choose to expense the project as a maintenance expense in one year, EPA states that you're only able to allow up to 5% of the original cost or nominal dollar basis of the unit in one year. If your maintenance expenses exceed 5% of this basis of the unit, then EPA determines that a capital expenditure has still occurred, even if you expense it. EPA states in the Clay letter that while they recognize this determination would be harsh in the case of old units which were built with non-inflated dollars, they state that nevertheless, this was what Congress intended anyway.

## WEPCO Versus EPA Arguments

WEPCO is arguing that the enforcement of NSPS and PSD in the Port Washington case was arbitrary and capricious and is inconsistent with the regulations. Specifically they are arguing in four areas:

MAP 01249

MAPP Environmental Committee
MAPP Air Quality Subcommittee
Page 5
May 17, 1989

1.   EPA needs to engage in proper rulemaking regarding their present policy interpretations of their NSPS and PSD rules. Letters from EPA cannot be used as the force of law.

2.   WEPCO believes that maintenance on units with limited capacity which returns them to original capacity should be exempt from NSPS and PSD review, even if these facilities operated for a time at a reduced capacity level.

3.   EPA cannot ignore the fact that a capacity factor increase is an exemption under the present rules and EPA's policy of comparing past actual versus future potential 100% emissions is wrong.

4.   Whether a fuel switch is allowed to meet NSPS, EPA says the applicable NSPS in the case of power plants is the Da (or scrubber) NSPS.

UARG believes that this case, while not binding on the utility industry, will set a serious precedent if it is adverse. It is also possible that WEPCO, realizing a bad outcome, may negotiate a settlement and leave the litigation. It may in fact, fall to a different utility to further test EPA's present policies. Nevertheless, UARG has sent a letter to administrator Reilly, asking for a reconsideration of EPA's present policy as advocate D.C. circuit action later.

<u>Meeting Conclusions</u>

As a result of this meeting, I believe several points are of importance.

1.   Be certain that you know the basis of your past historical emissions and that they are accurate. Test if necessary.

2.   Clearly identify your maintenance projects and target them toward specific repairs instead of broad brush life extension programs.

3.   Do not use the term "life extension" to describe any project.

4.   Carefully review the original cost basis of all plants in nominal dollars, such that you are aware of whether a capital expenditure may occur with a given project.

5.   Don't <u>ever</u> state that you will be retiring units unless you really mean to do it.

MAP 01250

MAPP Environmental Committee
MAPP Air Quality Subcommittee
Page 6
May 17, 1989

6.  Avoid pessimism on plant ratings.  If a plant is derated for any reason, make sure your reliability council or pool is aware of the reasons for it and the steps that you are taking to return it to its full rating.  Don't operate in a deteriorated state for any length of time.

7.  Keep up with maintenance.

It became quite clear throughout the meeting that intent is all important here.  Document very clearly in your records that your intent in making a physical or operational change at the unit, conducting routine maintenance, or spending capital expenditure dollars on a unit, is being done with good intent and not that you were trying to life extend the unit to circumvent Clean Air Act requirements.

It is also my impression that if you had to trip one rule or the other, that NSPS would be preferable to PSD.  The reason for this is that the NSPS rule requires only that you meet the NSPS Da requirements (which is bad enough, for example an $SO_2$ scrubber).  But the PSD rule and EPA's present policy of "top-down", requires that you install the most stringent best available control technology (BACT), which exists unless you can make a case demonstrating its infeasibility at your particular unit.  But the best that you'll ever be able to do is NSPS.

Examples

UARG reviewed several examples for the audience as a way of illustrating how the WEPCO decision may affect other utilities in the future.  Of interest to note, is that the WEPCO decision is already affecting two specific utilities.

Detroit Edison has a plant which operates on coal at present with a 10% capacity factor.  They wish to switch to natural gas and raise the capacity factor at the unit.  Under EPA's present policy of past actual emissions compared to future potential 100%, they showed an increase in $NO_x$ emissions and find that they are therefore subject to PSD regulation requiring best available control technology.  To my knowledge, Detroit Edison has not pursued this finding by EPA.  However, of interest is that Bush and many members of his staff are from Texas and they are thus very interested in encouraging conversion to natural gas.

Another example is that of Ohio Edison.  Ohio Edison won a clean coal II co-funding grant for the installation of clean coal technology.  Ohio Edison, following the WEPCO policy, asked if the installation of the clean coal equipment for the mandatory two year period would result in their defining a now reduced pollutant baseline level.  If at the end of the two year period.

MAP 01251

MAPP Environmental Committee
MAPP Air Quality Subcommittee
Page 7
May 17, 1989

the clean coal equipment did not work, and Ohio Edison wished to remove it, returning to their previously higher pollutant emission levels, would that trip PSD and NSPS? EPA's response was that in fact, under their present policy, it would trip the regulation. However, EPA went on to say in their letter that, since they are in favor of clean coal demonstrations and since this was in the public interest, they promised that they would not enforce the law. This was contained in a letter called a "No Action Assurance" letter and is attached for your interest. The UARG attorneys point out that while EPA can promise not to prosecute a source, the Justice department is required to enforce the law and would certainly be free to proceed with enforcement action. Also, any citizen under the Clean Air Act can take action against a source. Finally, a letter promising no action assurances by one administrator may not be honored by the next administrator. As of this time, my understanding is that Ohio Edison is cautiously proceeding.

UARG also illustrated several generic type case studies to illustrate how the present EPA policy may work in a given situation. In the next section I will illustrate some of these.

Case 1

A hypothetical power plant has been operating historically at a reduced capacity factor and with no physical change to the unit and only routine maintenance, seeks to increase its capacity factor to meet a new dispatching level. In this particular case, the capacity factor exemption would probably still apply and the unit would not be subject to NSPS or PSD.

Case 2

We take the same unit that has been operating at a reduced capacity factor but now we have made a physical modification to the unit which cannot be classified as routine maintenance (for example, an air heater basket modification or change, a turbine overhaul, installation of new controls, or perhaps burner modifications or fan changes). As a result of these modifications, the capacity factor of the unit is increased and this modification might trip PSD and NSPS.

Case 3

This is again a hypothetical power plant which has had some repairs made which specifically will allow the unit to operate with a slightly better heat rate, slightly higher efficiency; for example, this may have been air heater basket modifications, turbine overhaul, etc. If, in the ensuing case, there was an increase in the efficiency, (i.e. a decrease in the heat rate) and no more coal was burned at the unit, in other

MAP 01252

MAPP Environmental Committee
MAPP Air Quality Subcommittee
Page 8
May 17, 1989

words, dispatching procedures remain the same, then there should be no tripping of PSD and NSPS regulations. If on the other hand, as a result of these repairs (or now called modifications which are perceived to be not routine maintenance) and more coal was burned, probably reflecting an increase in capacity factor of the unit, then PSD and NSPS might be tripped. Therefore, it becomes clear that any modification which is made - repair, maintenance, etc., which results in an increase in emissions could conceivably trip NSPS or PSD regulations.

Case 4

This is a case of a fuel switch on a unit which had been firing oil but wishes to switch to natural gas. Accompanying the switch, perhaps there were burner modifications made, so there are physical changes. The maximum capability in an hour probably would go down, pollutant wise, since gas is inherently cleaner, so NSPS would not be tripped. However, if the unit was previously firing on oil with a very low capacity factor, but determines to have a higher capacity factor on gas, then it's possible that PSD could be tripped. Also, in the event of a fuel switch from a high sulfur coal to a low sulfur coal, modifications to the facility may have to be made in the form of mill changes, coal handling equipment, or perhaps boiler modifications such as extra soot blowers, reheat spray, etc. If the switch to low sulfur coal involves a switch to eastern low sulfur coal (which may be higher $NO_x$ emitting fuel) then a pollutant increase might be determined and NSPS could apply. If on the other hand, this fuel switch occurred to western low sulfur coal (which is a low $NO_x$ coal), but western low sulfur coal is also a low Btu fuel, then more coal would have to be fired to equal the same kilowatt hour output. Since more fuel is fired, there would be more $NO_x$ generated over the period of a year and PSD may apply.

Case 5

This is a situation where a facility is reactivated from a mothball state. If the reactivation occurs over a period of less than two years, then a new baseline could conceivably not have had time to have been set and there would probably be no NSPS or PSD applicability. However, if a physical change occurred at the facility (i.e. a repair while the unit was mothballed) then the reactivation of the unit may in fact be construed as an emissions increase and PSD or NSPS could apply.

Some other examples that UARG illustrated, were if you improve instrumentation at your facility, it would probably not trip NSPS since NSPS can only consider boiler and associated equipment. But PSD considers the

MAP 01253

MAPP Environmental Committee
MAPP Air Quality Subcommittee
Page 9
May 17, 1989

"affected facility" which includes turbine, controls, electronics, switchgear, everything. Improvement of instrumentation may trip PSD. Improvements in the turbine would probably not trip NSPS because it's not the boiler, but could conceivably trip PSD. Air heater basket modifications or replacements where an efficiency improvement results which leads to an increase in the capacity factor of the unit might be subject to NSPS and PSD. Conversion of a boiler from forced draft to balanced draft (i.e. inclusion of induced fans) would probably subject the unit to NSPS and PSD review. Any type of capacity upgrade of a boiler which results in a change (on paper) of the production output of a boiler might subject the unit to NSPS and PSD review.

Final Thoughts

It should be clear by now that the potential of an adverse outcome in the WEPCO case, could be extremely critical to the utility industry. But note: this is not a rule but is EPA policy and interpretation. The suggestion is clear: review the regulations and evaluate your particular case within the present regulations. If you go to EPA and ask under the past actual versus future projected emission calculation, you will have a pollutant increase and you will probably subject yourself to PSD or NSPS review. Therefore, make the evaluation yourself, document it, and get a legal opinion regarding your company's decision. (Apparently the legal opinion is important to protect yourself from criminal action). In any event, while we make the statement that this is not a change in the present rules, there is no doubt that there is greater liability to a utility following this WEPCO suit than before.

Senior Environmental Engineer

EH16:srf

Attachments

cc: Mr. David Lingo
    MAPP Center

MAP 01254