**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:11-cv-00077-RWS |
| | ) | |
| AMEREN MISSOURI, | ) | Honorable Rodney W. Sippel |
| | ) | |
| Defendant. | ) | |

_____

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION**
**TO COMPEL PRODUCTION OF COMMUNICATIONS BETWEEN AMEREN AND**
**THIRD PARTY UTILITY INDUSTRY ASSOCIATIONS**

# EXHIBIT E

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) |
| AMEREN MISSOURI, | ) |
| Defendant. | ) |

Civil Action No. 4:11-cv-00077-RWS

## PLAINTIFF UNITED STATES' SECOND SET OF REQUESTS FOR PRODUCTION

Plaintiff United States of America, acting by authority of the Attorney General and at the request of the Administrator of the United States Environmental Protection Agency ("EPA" or "Plaintiff") pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, requests that Defendant Ameren Missouri ("Ameren" or Defendant") produce the documents described below within 30 days after receipt at the United States Department of Justice, Environment and Natural Resources Division, Environmental Enforcement Section, 601 D Street, N.W., Washington, D.C. 20004.

### GENERAL INSTRUCTIONS

1. Scope of Discovery (Location and Custody of Documents and Information).

These production requests are directed to the above-named Defendant and cover all information in Defendant's possession, custody and control, including information in the possession, custody or control of its divisions, employees, agents, servants, representatives, attorneys, both past and present, or other persons directly or indirectly employed or retained by it, or anyone else acting

on its behalf or otherwise subject to its control, and any predecessors, successors, parents, subsidiaries, divisions, or affiliates.

2.    <u>Supplemental Responses</u>. These requests are continuing; supplemental production and responses must be provided pursuant to and in accordance with Fed. R. Civ. P. 26(e), if Defendant obtains additional documents between the date of production and the termination of any trial on matters alleged in the Amended Complaint.

3.    <u>Documents Previously Provided</u>.  Defendant need not reproduce any document that it previously produced pursuant to previous EPA requests for information under Section 114 of the Clean Air Act, 42 U.S.C. § 7414.

4.    <u>Vague or Burdensome</u>.  It is anticipated that Defendant may object to a particular request as vague or burdensome.  Plaintiff cannot always determine in advance which requests might truly be burdensome to Defendant.  It is anticipated that Defendant will respond to all requests to the best of Defendant's ability and in good faith, preserving any bona fide objections if necessary.  It is further anticipated that Defendant will attempt to obtain clarification or delimiting of Plaintiff's requests from the undersigned (who stands ready and willing to do so) if the facts of the particular situation so require.

5.    <u>Production of Original and Unique Copies</u>.  Each request shall be deemed to call for the production of a legible copy of all of the original document or documents responsive to the request.  If the original is not available, then copies of the available documents shall be produced.  In addition, any copy of a document shall be produced if it differs in any respect from the original (*i.e.*, by reason of handwritten notes, comments, marginalia or any addition or deletion to the copy which does not appear in the original).

2

6.     <u>Electronically Stored Information</u>.  Unless otherwise agreed in writing by the parties, the United States requests that all electronically stored information ("ESI") be produced in a reasonably accessible or usable and searchable form, either consistent with the Agreement Regarding Preservation and Production of Electronically Stored Information and Documents ("ESI Agreement"), or in a format mutually agreed upon after discussion between counsel for Defendant and counsel for the United States.  These requests, including the directions and instructions, are to be construed consistent with the parties' ESI Agreement.

7.     <u>Sources of Documents.</u>  In responding to each Request, every source of documents to which Defendant has access should be consulted, regardless of whether the source is within Defendant's immediate possession or control.  All documents in the possession of experts or consultants must be consulted.

8.     <u>Inability to Respond.</u>  Whenever Defendant is unable to produce documents in response to a Request, state the steps taken to locate responsive documents.

9.     <u>Document No Longer In Possession</u>.  If any document requested is no longer in the possession, custody, or control of Defendants, describe the substance of the document and state:

    a.   what was done with the document;

    b.   when such document was made;

    c.   the identity and address of the current custodian of the document;

    d.   the person who made the decision to transfer or dispose of the document;

    e.   when the document was transferred or disposed of, if reasonably known; and

    f.   the reasons for the transfer or disposition.

10.     <u>Deletions from Documents</u>. Where anything has been deleted from a document produced in response to a production request:

    a.   specify the nature of the material deleted;

    b.   specify the reason for the deletion;

    c.   when the deletion was made; and

    d.   identify the person responsible for the deletion.

11.     <u>Retention of Documents</u>.  Defendants are to retain in their possession, custody or control, and to refrain from destroying, any document requested herein or provided in response hereto that is in Defendants' possession, custody or control as of the date of service of these requests.

12.     <u>Lost Documents</u>.  If any document responsive to these requests has been lost or mislaid, identify the document, the date of its loss or mislaying, and each reason for its loss or mislaying.

13.     <u>Relation to Particular Requests</u>.  For each document produced, indicate the numbered paragraph to which it responds.

14.     <u>Entire Documents</u>.  If a portion of any document is responsive to any request, produce the entire document, including all appendices, tables and attachments.

15.     <u>Production of Documents</u>.  All documents that are physically attached to each other or segregated or separated from other documents, whether by inclusion in binders, files, subfiles, or by use of dividers, tabs, or any other method, shall be left so attached, segregated, or separated.  Documents shall be produced in the order in which they are maintained in the file where filed.

16.    Privilege.  If an objection is made to producing any document, or any portion thereof, or to disclosing any information contained therein, in response to any production request on the basis of any claim of a legally cognizable privilege, Defendant shall specify in writing the nature of such documents, and the nature of the privilege claimed, so that the Court may rule on the propriety of the objection. In the case of documents, Defendant should state:

    a.  the title of the document;

    b.  the nature of the document (e.g., interoffice memorandum, correspondence, report);

    c.  the author or sender;

    d.  the addressee;

    e.  the date of the document;

    f.  the name of each person to whom the original or a copy was sent, shown or circulated;

    g.  the names appearing on any circulation list relating to the document;

    h.  the basis on which privilege is claimed; and

    i.  a summary statement of the subject matter of the document in sufficient detail to permit the Court to rule on the propriety of the objection.

17.    Singular/Plural. Words used in the plural shall also be taken to mean and include the singular. Words used in the singular shall also be taken to mean and include the plural.

18.    And/Or. The words "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

19.    Verbs.  All verbs shall be construed to include all tenses.

## DEFINITIONS

1.    "All" or "any" shall mean "any and all" and shall be all inclusive.

2.      "Applicability determination" means any formal or informal determination, whether made by the Missouri DNR, EPA, or Illinois EPA relating to whether NSR requirements and/or the Missouri SIP may apply to a proposed construction activity undertaken by or on behalf of Defendant at any Ameren coal fired generating unit.

3.      "Baseline Actual Emissions" shall have the meaning prescribed in 40 C.F.R. § 52.21(b)(48)(i) (2007).

4.      "Boiler" or "boiler unit" means any of the boiler systems utilized at the Rush Island Plant to generate steam that is provided to a turbine-generator for the production of electricity and any component of those systems such as the pulverizers, burners, fans, air heaters, boiler feed pumps, economizer, feedwater heaters, superheaters, reheaters, condensers, and waterwalls.

5.      "Capacity Factor" (CF) shall refer to the ratio of unit generation (in megawatt hours, Mwh) to the unit's maximum generating capability (in Mwh) during the period of time which CF is evaluated.

6.      "Capital expenditures" means expenditures by Defendant for construction projects from its capital budget.

7.      "Communication" means any oral, written, mechanical, electronic, or other transmission of words, symbols, numbers or depictions to a person, entity, file or repository as data or information, including (but not limited to) correspondence, memoranda, or telephone conversations, or notes, recordings, transcriptions of meetings, or of telephone conversations, or any other document that recorded or reflected any such communication.

8.      "Component" means a defined portion of the Boiler, turbine, generator, or EGU. For instance, "Boiler Components" would include, but not be limited to, the following:

6

waterwalls, primary or secondary reheater, primary or secondary superheater, economizer, or air heater.

9.     "Computer Modeling Program" shall mean any program or other automated method of analysis used to project or estimate the anticipated future generation and loading of, or demand on, Defendant's generating system, including but not limited to PROSYM, ENPRO, GENESIS, TRAX, PROMOD, PROSCREEN, PMOs, NUPLEX, FOPLEX, PROVIEW, IEES, POWERPRO, EVA, WASP, EGEAS, HYDRO LIFE CYCLE, PREPS, PEEM, CESMS, FUEL WORKS, or OVER/UNDER.

10.     "Consultant" means any person who has advised Defendant or who has acted as agent on behalf of Defendant, whether or not for consideration.

11.     "Contractor" or "subcontractor" means any person who advised Defendant, or who acts or acted as agent for or on behalf of Defendant, whether or not for consideration.

12.     "Defendant" unless otherwise stated herein, means Ameren Missouri and includes, without limitation, its past and present officers, employees, agents, servants, representatives, counsel, consultants, contractors, subcontractors or other persons directly or indirectly employed by Defendant or anyone else, past or present, acting on behalf of or otherwise subject to Defendant's control.  Without limiting the generality of the foregoing, Defendant for purposes of these requests includes Ameren Corporation, Ameren Missouri, Ameren Illinois, Ameren Services Company, and Ameren Fuel Supply Services and any of their corporate predecessors.

13.     "Defenses" shall refer to the Affirmative Defenses asserted by the Defendant against the United States in this action.

7

14.    "Document" means, consistent with the parties' ESI Agreement, any and all documents as defined in Rule 34(a) of the Federal Rules of Civil Procedure, including but not limited to, all tangible things, including, without limitation, tape or other forms of audio, visual, or audio/visual recordings, written material, drawings, films, graphs, charts, photographs, phone records, and any retrievable data, whether in computer storage, carded, punched, taped, or coded form, or stored electrostatically, electromagnetically, digitally, or otherwise.  Without limiting the generality of the foregoing, "document" specifically includes all contracts, agreements, forms, correspondence, letters, telegraphs, telephone messages (written or audio recordings), checks, cancelled checks, notices, notes, memoranda, records, reports, diaries, minutes, purchase orders, statements, worksheets, summaries, books, papers, manuals, journals, ledgers, audits, maps, diagrams, drafts, newspapers, appointment books, desk calendars, notes or summaries of personal interviews or conversations, messages (including, but not limited to reports of telephone conversations and conferences), acknowledgments, telexes, facsimiles, all other written or printed matter or communications of any kind, and all other data compilation from which information can be obtained and translated, if necessary.  "Document" or "documentation" also refers to texts or treatises referred to or relied upon by Defendant's expert consultants or witnesses.  Every draft or non-identical copy of a document is a separate "document" as that word is used herein, subject to the parties' ESI Agreement.

15.    "Electricity Generating Unit," "EGU", or "Unit" mean each Unit at the Rush Island Plant that relies on coal combustion to generate electricity, including the unit's boiler and its components, fans, turbines, turbine blades, generators, emission control equipment, and other equipment related to the generation of electricity at the Rush Island Plant.

16.    "EPA" means the United States Environmental Protection Agency.

8

17.    "Equivalent Availability Factor" (EAF) is the ratio of how much the unit would generate, in Mwh, if the unit was operated at its maximum generating capability during the hours it was available to operate, divided by the generation that would occur if the unit operated at full capacity during all hours for the time period when EAF was evaluated.

18.    "Generator" shall refer to the device that converts the mechanical energy from the turbine into electrical energy.

19.    "Life Extension Project" or "Life Optimization" means all activities undertaken to optimize and extend the life, or increase the availability of a boiler, boiler component, plant, or Electricity Generating Unit, or any combination of units or portion of a unit.  This definition includes, but is not limited to:  overhauls of boilers, replacement or upgrades of major boiler components; plant availability programs or projects; plant reliability programs or projects; life optimization programs or projects; life assessment evaluations; plant restoration programs or projects; and plant refurbishment programs or projects.

20.    "Life Extension Studies" means all plans, evaluations, reports and memoranda analyzing, discussing or reflecting construction activities which could be or have been undertaken to optimize and extend the life, or increase the availability of a plant, boiler, boiler component, or Electricity Generating Unit.  This definition includes studies or determinations pertaining to overhauls of boiler units, and replacement or upgrades of major boiler components. This definition also includes:  plant availability studies, determinations, or evaluations; plant reliability studies, determinations or evaluations; life optimizations studies, determinations, or evaluations; plant life cycle analysis studies, determinations, or evaluations; plant restoration studies, determinations or evaluations; generating facility evaluations; plant refurbishment studies, determinations or evaluations; fossil heat unit evaluation measures; fossil unit heat rate

9

studies, determinations, or evaluations; and studies analyzing the need for capital expenditures to extend the useful economic life of a coal-fired boiler, unit, or plant.

21.    "Missouri DNR" means the Missouri Department of Natural Resources and all departments and divisions therein.

22.    "Missouri PSC" means the Missouri Public Service Commission.

23.    "Missouri SIP" means Missouri's State Implementation Plan under the Clean Air Act as approved by EPA.

24.    "Net Output Factor" shall mean a unit's net actual generation divided by the product of its service hours and net maximum capacity.

25.    "New Source Review" or "NSR" shall refer to Parts C and D of Title I of the Clean Act, 42 U.S.C. §§ 7470-7515, and the implementing state and federal regulations.

26.    "NSR permit" shall refer to any permit or authorization that is required by Parts C or D of Title I of the Clean Air Act, 42 U.S.C. §§ 7470-7515, and/or the implementing federal and state regulations when a major stationary source under the applicable regulations is constructed or at which major modifications (as defined by the regulations) are to be commenced.

27.    "Nonattainment NSR" or "NNSR" shall refer to any permit or authorization that is required by Part D of Title I of the Clean Air Act, 42 U.S.C. §§ 7501-7515, and/or the implementing federal and state regulations when a major stationary source under the applicable regulations is constructed or at which major modifications (as defined by the regulation) are to be commenced.

28.    "Person" means the plural as well as the singular, and shall include without limitation, individuals, associations, partnerships, and corporations or other form of legal entity.

10

29.     "Pertain to," "pertaining to," "relate to" or "relating to" means discuss, describe, refer to, reflect, contain, analyze, study, report on, comment on, evidence, comprise, constitute, set forth, consider, recommend, concern, depict, describe, or allude to.

30.     "Potential to emit" means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design.  Any physical or operational limitation on the capacity of a source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable.  Secondary emissions do not count in determining potential to emit.

31.     "Projected Actual Emissions" shall have the meaning prescribed in 40 C.F.R. § 52.21(b)(41) (2010).

32.     "PSD" shall refer to Subchapter I, Part C, Prevention of Significant Deterioration of Air Quality of the Clean Air Act, 42 U.S.C. §§ 7470-7479, and the implementing federal and state regulations.

33.     "PSD Permit" shall refer to any permit or authorization that is required pursuant to Part C, Prevention of Significant Deterioration of Air Quality of the Clean Air Act, 42 U.S.C. §§ 7470-7479, and/or the implementing federal and state regulations when a major stationary source under the applicable regulations is constructed or at which major modifications (as defined by the regulations) are to be commenced.

34.     "Representative Actual Annual Emissions" shall have the meaning prescribed in 57 Fed. Reg. 32,314 (July 21, 1992) codified at 40 C.F.R. § 52.21(b)(33) (1998).

35.     "Rush Island Plant" means the Rush Island Plant located in Festus, Jefferson County, Missouri.

36.    "Rush Island Projects" or "Projects" means:

a.  The replacement of the primary superheater and high pressure/intermediate pressure turbine at Rush Island Unit 1 from September of 2001 to February of 2002;

b.  The replacement of the primary superheater and high pressure/intermediate pressure turbine at Rush Island Unit 2 from November of 2003 to January of 2004;

c.  The replacement of the economizer, reheater, lower slope tubes, and air heaters at Rush Island Unit 1 from February of 2007 to May of 2007; and

d.   The replacement of the economizer, reheater, and air heaters at Rush Island Unit 2 from January of 2010 to April of 2010.

The projects also include, but are not limited to, all other activities related in any way to those listed above at Rush Island Units 1 and 2 during the applicable timeframes.  This includes, but is not limited to, activities conducted for site preparation for the project, such as activities to gain access to the equipment, to alter the facilities, or prepare other components for the project.  This also includes, but is not limited to, follow-up activities such as site cleanup.

37.    "Rush Island Project Document" refers to any document that concerns or mentions a Rush Island Project.  The scope of this definition includes but is not limited to project justifications, work order justifications contracts, Economic Valuation Analyses, cost-benefit analyses, MEAGER studies, Reheat Boiler Performance Program studies, alternative options analyses, solicitations for bids, correspondence, internal memoranda, newsletters, proposals, notes from any source, estimates, equipment specifications, invoices, payments, purchase orders, labor costs, funding requests, work orders, approval document, project completion reports, proposed and executed contracts, progress reports, morning reports, operator logs, performance tests, construction schedules, project completion reports, minutes from meetings with any

12

contractor or consultant, and minutes of any meetings of Defendant's employees and/or corporate board members which relate to the Rush Island Projects. This request also includes documents that describe or relate to differences in the operational characteristics, material, design configuration, type of components, or other types of differences in the design or performance capability between any original and replacement components.

38. "Rush Island Unit 1" means Unit 1 at the Rush Island Plant.

39. "Rush Island Unit 2" means Unit 2 at the Rush Island Plant.

40. "Turbine" shall refer to the device that converts the heat and pressure energy contained in the steam received from the boiler to mechanical energy manifested in the rotation turbine rotor. The term turbine includes "low pressure turbine," "intermediate pressure turbine," and "high pressure turbine."

41. "Utilization Factor" shall mean a unit's Capacity Factor divided by its Equivalent Availability Factor.

42. "You" (and any form thereof, including "your") shall refer to Defendant and any agent or employee of Defendant, including (a) experts whom the Defendant expects to call as witnesses at trial, (b) attorneys retained by Defendant, and (c) persons who have access to the requested information and from Defendant can obtain such information.

## REQUESTS FOR PRODUCTION

24. All training materials, internal policy memoranda, manuals, and guidances related to the NSR requirements of the Clean Air Act and related regulations, including but limited to the Missouri SIP. This request includes but is not limited to all manuals and guidance regarding evaluation of projects, maintenance or modifications to determine applicability of or compliance with such provisions, and the required reporting of "off permit changes" to an emissions source

13

under the Clean Air Act's Title V provisions and regulations, Missouri's Title V regulations, and the Missouri SIP.

25.     All Documents that relate in any way to Defendant's communications with any person, including any of Defendant's employees or consultants, EPA, or any person at the State of Missouri, regarding the following information pertaining to the electrical generating units at the Rush Island Plant:

a.   Whether Defendant may need to obtain, should obtain, or had to obtain, a PSD or nonattainment NSR permit;

b.   Whether Defendant should obtain, or had to obtain a construction permit pursuant to Missouri law or regulation; and

c.   Whether Defendant should register a modification pursuant to those provisions, including whether Defendant should report any Projects at issue as "off permit changes".

26.     All Documents discussing, describing or relating in any way to Defendant's understanding of the meaning of the following terms in federal regulations and the Missouri SIP: "major modification"; "physical change or change in the method of operation"; "routine maintenance, repair, and replacement"; "an increase in the hours of operation or in the production rate"; "emission unit"; "actual emissions" or "projected actual emissions"; "representative actual annual emissions"; "net emissions increase"; "baseline actual emissions"; "reasonable possibility"; "best available control technology"; "potential to emit"; "emissions unit"; and "installation"; "aggregation"; "demand growth exclusion"; and "capable of accommodating".

14

27.     All Documents relating to assessing whether the construction or modification of an electricity generating unit, or the replacement or upgrading of components at an electricity generating unit may constitute a "modification," "major modification," "change in the method of operation," or "routine maintenance, repair or replacement," or may increase emissions within the meaning of the Clean Air Act, NSR regulations, or Missouri SIP.

28.     All Documents in your possession relating to or discussing the federal court decision in *Wisconsin Electric Power Company v. Reilly*, 893 F.2d 901 (7th Cir. 1990) ("WEPCO") and its applicability to, impact on, or implementation by Defendant.  Included in this request are all Documents pertaining to the implications of the *WEPCO* decision and related administrative determinations, and deliberations and plans for responding to the decision.

29.     All Documents in your possession relating to or discussing the administrative applicability determination contained in the May 23, 2000 letter from Francis Lyons, EPA to Henry Nickel, Hunton & Williams ("Detroit Edison letter"), available at http://www.epa.gov/region07/air/nsr/nsrmemos/detedisn.pdf, and its applicability to, impact on, or implementation by Defendant.  Included in this request are all documents pertaining to the implications of the Detroit Edison letter and related administrative determinations, and deliberations and plans for responding to the Detroit Edison letter.

30.     All Documents in your possession relating to or discussing the administrative applicability determination contained in the June 17, 1993 Memorandum from John Rasnic, EPA, to George Czerniak, EPA, concerning Applicability of New Source Review Circumvention Guidance to 3M-Maplewood, Minnesota, ("3M-Maplewood Memorandum") available at www.epa.gov/region07/air/nsrmemos/maplwood.pdf, and its applicability to, impact on, or implementation by Defendant.  Included in this request are all documents pertaining to the

15

implications of the 3M-Maplewood Memorandum and related administrative determinations, and deliberations and plans for responding to the 3M-Maplewood Memorandum.

31.   All Documents relating to any communication, oral or written, between Defendant and the Edison Electric Institute, Utility Air Regulatory Group, Electric Power Research Institute, and any other utility industry trade associations (including the agents and attorneys thereof), and all information provided to Defendant by any such institutes, groups, or associations, pertaining to:

a.   the meaning, interpretation, or application of the routine maintenance, repair or replacement provisions in federal and state regulations implementing the NSR requirements of the Clean Air Act, including but not limited to interpretations by EPA, states, and utilities;

b.   the method by which emissions calculations must be performed under NSR regulations for determining whether there has been a "net emissions increase," "significant emissions increase" or "significant net emissions increase" associated with a construction project;

c.   the definition of "major modification" under the NSR regulations; *Wisconsin Electric Power Company v. Reilly*, 893 F.2d 901 (7th Cir. 1990) and the administrative determinations that were the subject of that case;

d.   obtaining determinations from EPA or a state concerning whether a maintenance, repair, or replacement activity is a "major modification" under federal or state regulations implementing the NSR provisions of the Clean Air Act; or

e.   the provisions of 40 C.F.R. § 52.21(r)(6), incorporated by reference in the Missouri SIP at 10 C.S.R. 10-6.060(8)(A).

16

32.    All annual reports to Your stockholders and Securities and Exchange Commission 10-K reports.

33.    All Documents relied upon in responding to the Plaintiff's First Set of Interrogatories.

34.    All Documents describing the maximum gross and net megawatt ratings of each Unit at the Rush Island Plant from 1996 to the present, and all documents which state or describe actual operation at or above any designed, permitted, or described megawatt ratings for those units and/or boilers during any time of their operation since 1990.  This request includes but is not limited to:

    a.    All long term and short term ratings (all deratings lasting more than 30 days), seasonal ratings, vendor ratings, reported regulatory ratings, permitted ratings, ratings described in permits, maximum ratings due to a restriction from another component (e.g. bottleneck at the turbine) or on a component in isolation, and any other maximum megawatt ratings;

    b.    All Documents which relate to, state, describe, or otherwise denote a change in any of those megawatt ratings, their definitions, or the design guarantees of the megawatt ratings;

    c.    All Documents related in any way to a change in the maximum designed, permitted or described megawatt ratings, including any attempt to change how such ratings are included, conditioned, or described in any state operating permit, permit issued under Title V of the Clean Air Act, or any other permit; and

17

d.  All engineering notes and calculations relating to any documents responsive to this request, including all underlying calculations used to generate any data in such Documents.

35.   All Documents describing the maximum steam production capacity (pounds per hour) of each Boiler at the Rush Island Plant, and all Documents which state or describe actual operation at or above any maximum designed, permitted, or described steam production capacity for each Boiler during any time from 1996 to the present (including any change in outlet steam temperature, pressure or both from the superheater, reheater or both).  This request includes but is not limited to:

a.  All long term and short term maximum capacities lasting more than 30 days, seasonal capacities, vendor design capacities, reported regulatory capacities, permitted capacities, capacities described in permits, and any other maximum steam production capacity not included in this list;

b.  All Documents which relate to, state, describe, or otherwise denote a change in the maximum steam production capacity;

c.  All Documents related to any attempt to change the maximum designed, permitted, actual achievable, or described steam production capacity, including any attempt to change how such capacity is included, conditioned, or described in any state operating permit, permit issued under Title V of the Clean Air Act, or any other permit; and

d.  All engineering notes and calculations used to determine steam production capacity and all notes and calculations relating to or used to generate any Documents responsive to this request.

18

36.    All Documents describing the maximum heat input rate (million British thermal units per hour (mmBtus/hr) for each Unit, and all Documents which relate to operation at or above any such maximum design heat rate, permitted heat input rate, or heat input rate used to describe Rush Island Unit 1 and Rush Island Unit 2 in any permit.  This request includes but is not limited to:

   a. All long term and short term rates lasting more than 30 days, seasonal rates, vendor design rates, reported regulatory rates, permitted rates, rates described in permits, and any other maximum designed, permitted, or described heat input rate not included in this list;

   b. All Documents which relate to, state, describe, or otherwise denote a change in the maximum designed, permitted, or described heat input rate;

   c. All Documents related to any attempt to change the maximum designed, permitted, actual achievable, or described heat input rate, including any attempt to change how such a rate is included, conditioned, or described in any state operating permit, permit issued under Title V of the Clean Air Act, or any other permit; and

   d. All engineering notes and calculations used to determine the maximum heat input rate or used to generate any Documents responsive to this request.

37.    All Documents describing the instantaneous capacity (ACFM) of all fans, including primary and secondary fans (forced draft) and induced draft fans, at the Rush Island Plant, and all documents which state or describe actual operation at or above any maximum designed, permitted, or described fan capacity at the Rush Island Plant during any time from 1996 to the present.  This request includes but is not limited to:

19

a. All long term and short term capacities lasting more than 30 days, seasonal capacities, vendor design capacities, reported regulatory capacities, permitted capacities, capacities described in permits, and any other designed, permitted, or described air flow capacities not included in this list;

b. All Documents which relate to, state, describe, or otherwise denote a change in the instantaneous capacity;

c. All Documents related to any attempt to change the designed, permitted, or described instantaneous capacity, including any attempt to change how such capacity is included, conditioned, or described in any state operating permit, permit issued under Title V of the Clean Air Act, or any other permit; and

d. All engineering notes and calculations used to determine instantaneous capacity and all notes and calculations relating to or used to generate any Documents responsive to this request.

38.     All Documents describing the maximum feedwater pump capacity and/or combined heating capacity of the feedwater heaters at the Rush Island Plant, and all documents which state or describe actual operation at or above any such maximum designed, permitted, or described feedwater pump capacity at the Rush Island Plant from 1996 to the present. This request includes but is not limited to:

a. All long term and short term capacities lasting more than 30 days, seasonal capacities, vendor design capacities, reported regulatory capacities, permitted capacities, capacities described in permits, and any other designed, permitted, or described feedwater pump capacities not included in this list;

20

b.  All Documents which relate to, state, describe, or otherwise denote a change in such capacity;

c.  All Documents related to any attempt to change the designed, permitted, or described feedwater pump capacity, including any attempt to change how such capacity is included, conditioned, or described in any state operating permit, permit issued under Title V of the Clean Air Act, or any other permit; and

d.  All engineering notes and calculations used to determine feedwater pump capacity and all notes and calculations relating to or used to generate any Documents responsive to this request.

39.      All Documents describing the maximum coal feeder feed rate and/or coal mill coal pulverization rate at the Rush Island Plant, and all Documents which relate to operation at or above any such maximum designed, permitted, or described rate at the Rush Island Plant from 1996 to the present.  This request includes but is not limited to:

a.  All long term and short term rates lasting more than 30 days, seasonal rates, vendor design rates, reported regulatory rates, permitted rates, rates described in permits, and any other designed, permitted, or described rate not included in this list;

b.  All Documents which relate to, state, describe, or otherwise denote a change in the maximum designed, permitted, or described coal feeder feed rate, coal mill flow rates, and coal pulverizer flow rates;

c.  All Documents related to any attempt to change the maximum designed, permitted, or described coal feeder feed rate, coal mill flow rates, and coal pulverizer flow rates, including any attempt to change how such capacity is included, conditioned, or

21

described in any state operating permit, permit issued under Title V of the Clean Air

Act, or any other permit; and

    d.   All engineering notes and calculations used to determine maximum coal feeder feed

        rate, coal mill flow rates, and coal pulverizer flow rates and all notes and calculations

        relating to or used to generate any Documents responsive to this request.

      40.     All Documents, including but not limited to electronically stored information,

related to Ameren's Project Justification Guiding Principles.

      41.     All Documents, including but not limited to electronically stored information,

used to prepare each Project Justification Data Table produced in response to Request No. 1,

including but not limited to Documents used to prepare the data contained in tables titled, or

similarly titled, "Annual Value of a 1% Efficiency Improvement", "Forced Outage Cost - $/day

of Forced Outage" and "Load Reduction Costs, $/mwh of Outage."

      42.     All Documents, from 1996 to the present, containing, summarizing, or pertaining

to the annual emission inventory reports submitted by Defendant to Missouri DNR or Missouri

PSC for the Rush Island Plant.  Included in this request are all documents indicating how such

emissions calculations were made in the annual emission inventory reports.

      43.     All Documents related to the installation, start up, operation and non-operation of

any permanent or temporary/experimental air pollution control equipment to reduce $SO_2$

emissions at the Rush Island Plant, including but not limited to dry sorbent injection, and

including Documents sufficient to indicate the dates of installation, start up, and continued

operation of such equipment.

      44.     All air emissions testing reports, for the Rush Island Plant, including but not

limited to reports for tests conducted using EPA Reference Methods, as well as all related

correspondence and memoranda for the Rush Island Plant. This request includes all such tests, regardless of whether they were completed or used for any purpose.

45.    All hourly and quarterly flue gas emissions data tabulated from continuous emission monitoring instrumentation submitted to the Missouri DNR in relation to the Rush Island Plant from 1996 to the present, including electronically stored information to the extent that it contains information that is not included in hard copy documents provided in the response.

46.    Any and all Documents reflecting communications regarding any of the Rush Island Projects:

   a.    between Defendant and any person employed by EPA at the time of the communication;

   b.    between Defendant and any person employed by the Missouri PSC at the time of the communication; and

   c.    between Defendant and any person employed by the State of Missouri at the time of the communication.

47.    All Documents relating to every PSD permit, NNSR permit, PSD permit application, and NNSR permit application prepared, sought or obtained by Defendant from the State of Missouri.

48.    For the Rush Island Plant, the original and most recent version of the manufacturer's maintenance manuals, Defendant's maintenance manuals, employee training manuals and maintenance newsletters for the following components:

   a.    economizer;

   b.    all superheaters;

   c.    all reheaters;

23

d. feedwater heater;

e. air preheaters;

f. burners;

g. furnace floors;

h. condenser;

i. waterwall tubing (furnace walls);

j. all fans;

k. turbine;

l. bottom ash hopper;

m. coal bunkers;

n. pulverizers

o. coal feeders

p. boiler control systems

q. soot blowers

r. steam drum

s. electro-static precipitators, low $NO_x$ burners, baghouses, and other boiler emission

control equipment or related systems, e.g., ammonia injection systems;

t. boiler feed pumps;

u. coal mills; and

v. any of the other components replaced in the course of the Rush Island Projects.

49. All local, state, and federal judicial or administrative testimony filed by

Defendant or any of its officers, agents, or employees and related opinions, orders, decisions, and

stipulations discussing, analyzing, or relating to any of Defendant's Life Extension Projects, Life

24

Extension Studies, or any Rush Island Project. This request includes all Documents relating to any proceedings before the Missouri PSC and/or Missouri DNR, including all memoranda, work papers, studies, accounting data, spreadsheets, testimony and correspondence between Defendant and the Missouri PSC and/or Missouri DNR, between Defendant and its consultants, and internal memoranda of Defendant.

50.    All Documents pertaining to Life Extension Studies and Life Extension Projects considered or implemented at the Rush Island Plant.

51.    All Documents, including electronically stored information, that describe or specify the expected useful economic life, depreciation period, and the planned or projected retirement date for the boiler, turbine, and generator of each electricity generating unit at the Rush Island Plant. Included in this request are all financial and engineering analyses pertaining to the anticipated retirement of a boiler or electricity generating unit at the Plant, and all Documents discussing accounting practices related to the expected lifetime of the Rush Island Plant or any of its generating units or boilers for depreciation purposes.

52.    All Documents which indicate or describe when a given activity is to be expensed or capitalized in Defendant's accounting records. This request includes, but is not limited to Defendant's internal capitalization and expense policies, including all changes and modifications thereto, as well as all internal company documents, manuals, policies and procedures describing the capital budget and maintenance expense budget processes that pertain to, or have been in use at or for the Rush Island Plant. This request also includes a copy of the procedures for the approval of projects involving capital expenditures at the Rush Island Plant, and, if different, a copy of such approval procedures applicable when the Rush Island Projects were approved.

53.     The complete property record for the Rush Island Plant (including each of the Rush Island units), whether in paper form or in an electronic file, from original placement in service to the present, which You are required to maintain in accordance with FERC General Instruction 12, and FERC Electric Plant Instruction 11 (Work Order and Property System Required) and FERC Definition 8 (Continuing Plant Inventory Record).

54.     All correspondence between You and either FERC or any other regulatory agency concerning the proper accounting and exceptions thereto for retirement units (as that term is used in FERC Electric Plant Instruction 10), minor items of property (as that term is used in FERC Electric Plant Instruction 10), life extension projects, extraordinary items of maintenance expense (as that term is used in FERC General Instruction 7), and plant service lives (as that term is used in FERC Definition 35).

55.     The complete property additions and retirement unit listings pertaining to the Rush Island Plant (as required to be maintained in accordance with FERC Electric Plant Instruction 10), including all narrative and explanatory documents explaining terms and entries within the property unit listing, and all changes and modifications thereto, from the year each generating unit was originally placed in service to the present.

56.     All Documents relating to the document retention policies, procedures or practices of Defendant, including all documents that record, describe, or relate to Documents destroyed or otherwise disposed of pursuant to Defendant's document retention policies or practices or otherwise.

57.     All Form EIA-767 data submitted to the U.S. Department of Energy ("DOE") from 1996 through the present, for all Electricity Generating Units in the Rush Island Plant.

58.     All Documents relating to any communication, oral or written, between Defendant and persons acting on behalf of any firm or business entity that provided insurance to the Rush Island Plant at the time of the Rush Island Projects, including communications relating to any insurance inspections and approvals following the Rush Island Projects.

59.     All load duration curves used by Defendant in the evaluation of any Rush Island Project.

60.     All Documents, including but not limited to electronically stored information, referring or relating to daily unit commitment logs used in Defendant's dispatch control center to establish the commitment order of all Ameren generating units and capacity purchases from January 1, 1996 to the date of this Request.  This Request includes any logs developed on a month-ahead, week-ahead, and/or day-ahead basis and includes all work papers that were created in the development of the unit commitment logs.  Electronic Documents responsive to this request should be produced in native format with all embedded formulas intact.

61.     All Documents, including but not limited to electronically stored information, referring or relating to any heat rate/efficiency curves and corresponding heat rate equations for each Rush Island Unit developed based on heat rate tests that were performed during the period five years before each Rush Island Project and five years after each Rush Island Project.  If no heat rate tests for a Rush Island Unit were performed during the five years before each Rush Island Project and five years after each Rush Island Project, provide all Documents related to the most recent heat rate tests for each Rush Island Unit performed before the five year period prior to each Rush Island Project, and the most recent heat rate tests for a Rush Island Unit performed after the five year period following each Rush Island Project.

**Plaintiff United States' Second Set of Requests for Production,** *United States v. Ameren Missouri,* **4:11-cv-00077-RWS.**

Dated: May 8, 2012

IGNACIA S. MORENO
Assistant Attorney General

Justin A. Savage
Andrew C. Hanson
Bradford T. McLane
Trial Attorneys
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Telephone: (202) 514-9859
Facsimile: (202) 616-6584
Andrew.hanson2@usdoj.gov


Suzanne Moore
Andrew Lay
Assistant United States Attorney
United States Attorney's Office
Eastern District of Missouri
Thomas Eagleton U.S. Courthouse
111 South 10th Street, 20th Floor
St. Louis, Missouri 63102
Telephone: (314) 539-2547
Facsimile: (314) 539-2309
E-mail: Suzanne.Moore@usdoj.gov

28

OF COUNSEL:

SEEMA KAKADE
Attorney-Advisor
U.S. EPA, Air Enforcement Division
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

ALEX CHEN
Senior Counsel
Office of Regional Counsel
U.S. EPA, Region 7
901 North 5th Street
Kansas City, Kansas 66101

29

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2012, I served the foregoing via email on counsel of record, who are listed below:

Ronald S. Safer (pro hac vice)
Patricia Brown Holmes (pro hac vice)
Renee Cipriano (pro hac vice)
Steven J. Bonebrake (pro hac vice)
Matthew B. Mock (pro hac vice)
Schiff Hardin LLP
233 South Wacker Drive Suite 6600
Chicago, Illinois 60606
Phone: (312) 258-5500
Fax: (312) 258-5600

James J. Virtel
Armstrong Teasdale LLP
7700 Forsyth Boulevard Suite 1800
St. Louis, Missouri  63105
Phone: (314) 621-5070
Fax: (314) 612-2298
jvirtel@armstrongteasdale.com

*Counsel for Defendant Ameren Missouri*

Andrew C. Hanson