UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.  ) | Case No. 4:11-CV-00077-RWS |
| ) | |
| AMEREN MISSOURI, ) | Judge Rodney W. Sippel |
| ) | |
| Defendant. ) | |
| ) | |

### AMEREN MISSOURI'S RESPONSE IN OPPOSITION TO EPA'S MOTION FOR PROTECTIVE ORDER / MOTION TO QUASH DEFENDANT'S SUBPOENA TO THE ELECTRIC POWER RESEARCH INSTITUTE

Under the 2002 NSR Reform Rule that governs EPA's claims in this case, EPA must prove, among other things, that Ameren should have expected that a significant net increase in emissions of sulfur dioxide would occur as a direct result of replacing certain boiler components and not some other cause, such as growth in the demand for electricity.  Since the beginning of discovery, Ameren has attempted to learn how, why, and on what bases EPA contends, and will attempt to prove, that Ameren should have had such an expectation.  EPA delayed revealing this until serving its expert reports at the end of 2013, and slowly released additional support for its contentions all the way up to the very end of discovery.  In fact, on September 11, 2014 — just one week before the discovery cut-off — EPA served a 243-page document substantially revising and adding to its answers to Ameren's interrogatories.  Among the last-minute changes, EPA tripled the length of its answer to Ameren's Interrogatory No. 3(b), which had asked EPA to identify all instances when its emissions methodology had been used outside of enforcement litigation.  EPA's additions to that answer included identifying a 1985 study by the Electric

Power Research Institute ("EPRI") as responsive to Interrogatory No. 3(b). Faced with EPA's new contention that this 1985 EPRI study, which addresses "Economic Evaluation of Plant-upgrading Investments," somehow applies or reflects EPA's *emissions* methodology, Ameren immediately issued a deposition subpoena to EPRI in order to rebut EPA's new contention.

EPA has taken 29 fact depositions (to Ameren's 24) and will take another on October 15; it served supplemental expert reports on October 3; it scheduled for October 22 but just recently postponed what it calls a "Rule 34 Site Inspection" of the Rush Island power plant; and after the September 19 discovery cut-off, on September 23, EPA told the Court that "adjustments . . . to the schedule in this case" will be needed for expert discovery (ECF #364). Although EPA would allow itself all of this post-September 19 discovery, it vehemently objects to Ameren having subpoenaed non-party EPRI on September 19 for a deposition to be taken on October 28 or another mutually agreeable and convenient date. EPA should not be able to have it both ways, especially after having created the need for the September 19 subpoena through its September 11 "supplemental" answer to Interrogatory No. 3(b).

EPA's Motion to Quash should be denied. As a threshold matter, EPA lacks standing even to bring this motion. In any event, good cause exists for Ameren to depose EPRI after the discovery cut-off and EPA will suffer no prejudice.

**I.      BACKGROUND**

One of the first questions Ameren asked EPA in discovery was to explain its methodology for determining whether Ameren should have expected a significant net emissions increase as a result of the projects at issue. Ameren asked in its Interrogatory No. 2(b)(2):

> b.      If you contend that any Project constituted a major modification because, in whole or in part, the Project should have been expected to cause a significant net emissions increase of SO2, describe with specificity all facts that support your contention, including: . . .

2

>   2.  the method(s) you used for projecting or determining that post-project emissions should be expected to increase, including the means you claim should be used to predict future emissions, the pre-project or baseline time period(s) used in the method(s) and the post-project time period(s) used in the method(s); . . . .

(Ex. 1, EPA's Answer to Ameren's Interrogatory No. 2(b) (Sept. 17, 2014).)[1]

EPA ultimately answered by incorporating its expert reports: "Plaintiff has provided expert testimony to explain why the Projects at issue should have been expected to increase emissions of $SO_2$." (*Id.*)  It's experts' methodology essentially boils down to (1) counting the hours in the past when the unit was out of service due to the failure of one of the components at issue, (2) assuming that replacing those components would eliminate similar failures in the future, (3) further assuming that the unit would therefore regain in the future those past outage hours (ignoring all other internal and external factors that affect the unit, such as other parts failing), and (4) then further assuming that the unit would generate electricity and emit sulfur dioxide at a set rate for those regained hours.

EPA's experts' emissions methodology was created for EPA's use in power plant litigation and is designed always to show a projected emissions increase when a utility replaces any component that experienced any problems in the past, no matter how common such problems are in the utility industry.  The methodology is purely additive — it will never project a decrease in generation or emissions — and, therefore, presupposes an emissions increase.  Unsurprisingly, EPA has admitted that it does not use this methodology in PSD permitting analyses and that EPA has never used it other than in the power plant lawsuits.

---

[1] After its September 11 supplementation, EPA further supplemented its interrogatory answers on September 17 — Exhibit 1 contains EPA's most recent answers as of September 17.

3

One of the next questions Ameren asked in discovery was for EPA to identify any instances other than in litigation when this "regained hours" emissions methodology has been used. Ameren asked in its Interrogatory No. 3(b):

> With respect to the emissions calculation method(s) you identified in response to Interrogatory Nos. 2(b)(2): . . .
>
> (b) Identify and describe with specificity all instances, <u>other than in litigation</u>, in which you, a state regulatory agency (including MDNR) or an owner or operator of an EGU has used those method(s) to determine whether or not a given activity constitutes a major modification, or taken the position that those method(s) should be used or would be appropriate to use for that purpose.

(Ex. 1 (underlining in original).)

Throughout three years of discovery up until the very end, including the Rule 30(b)(6) deposition Ameren took on this very issue last January (*see* Ex. 2, Jan. 21, 2014 Rule 30(b)(6) Deposition Notice, Topic No. 4), EPA's answer to this question made no mention of the 1985 EPRI study titled "Economic Evaluation of Plant-upgrading Investments." However, on September 11, 2014 — with only one week left before the discovery cut-off — EPA served 243 pages of "supplemental" interrogatory answers, including substantial additions to its answer to Interrogatory No. 3(b), which for the first time identified the 1985 EPRI study as an instance when EPA contends its emissions methodology somehow had been used. (Ex. 3, redline showing changes made by EPA in Sept. 11 supplemental answer to Interrogatory No. 3(b).)

EPA's last-minute supplementation is particularly suspect because over the final months of discovery, EPA had already comprehensively supplemented its interrogatory responses. On July 3, EPA served 178 pages of supplemental answers to all then-pending interrogatories. But in this supplementation, EPA failed to mention the 1985 EPRI study as being responsive to Interrogatory 3(b). EPA waited until September 11 to add that.

4

Of course, EPA's new contention makes no sense because the 1985 EPRI study, apart from being almost 30 years old, has nothing to do with emissions or how to project emissions, and the study certainly does not endorse or support the approach designed by EPA for its power plant lawsuits; instead, the 1985 EPRI study presents a conceptual economic framework for assessing potential investments. But setting aside the merits of EPA's last-minute contention, Ameren has a right to develop discovery rebutting it. Accordingly, after receiving EPA's September 11 supplemental interrogatory answers, Ameren immediately served a deposition subpoena on EPRI seeking testimony regarding the 1985 study. (*See* ECF #377-3 (Sept. 19, 2014 Subpoena).) Because EPA waited until the end of discovery to add this contention to its answer to Interrogatory No. 3(b), Ameren had no choice but to schedule the EPRI deposition for a date after the discovery cut-off. The deposition is currently set for October 28 in San Francisco near EPRI's headquarters, but Ameren has made very clear that it will take the deposition on a date and at a location that are mutually agreeable and convenient to all parties involved. (*Id.*)[2]

## II.  ARGUMENT

### A.  EPA Lacks Standing to Move to Quash Ameren's Subpoena to EPRI.

As a threshold matter, EPA lacks standing to move to quash Ameren's deposition subpoena to EPRI. "A party ordinarily lacks standing to quash a subpoena served on a non-party, even where the motivation is to 'protect' the third party from undue burden or harassment." *National Ben. Programs, Inc. v. Express Scripts, Inc.*, No. 4:10CV00907 AGF,

---

[2] EPA misleadingly states that "Ameren only advised the United States of its intent to seek leave to take the deposition out of time on September 29, 2014, ten days after it issued the subpoena." (ECF #377 at 2.) EPA is not suggesting that it only received or learned of the subpoena then, for EPA was served with the subpoena papers on September 19, the same day EPRI was served. (*See* ECF #377-3.) Rather, EPA is referring to a discussion among counsel regarding EPA's plan to move to quash and whether the issue should be raised through a motion for leave.

2011 WL 6009655, at *3 (E.D. Mo. Dec. 1, 2011) (citing *Coffeyville Res. Ref. & Mkts., LLC v. Liberty Surplus Ins. Corp.*, No. 4:08MC00017JLH, 2008 WL 4853620, at *1 (E.D. Ark. Nov. 6, 2008); *Mawhiney v. Warren Distrib.*, No. 8:05CV4662007 WL 433349, at *1 (D. Neb. Feb. 7, 2007), *aff'd*, No. 07–2753, 283 Fed. App'x 424 (8th Cir. July 10, 2008)). "Generally, "[a] motion to quash or modify a subpoena duces tecum may only be made by the party to whom the subpoena is directed except where the party seeking to challenge the subpoena has a personal right or privilege with respect to the subject matter requested in the subpoena." *National Ben. Programs*, 2011 WL 6009655, at *3 (citing *Streck, Inc. v. Research & Diagnostic Systems, Inc.*, No. 8:06CV458, 2009 WL 1562851, at *3 (D. Neb. June 1, 2009); *Mawhiney*, 2007 WL 433349, at *1; *Johnson v. Gmeinder*, 191 F.R.D. 638, 639 n.2 (D. Kan. 2000)).

EPA does not have — and has not even attempted to demonstrate — "a personal right or privilege with respect to the subject matter requested in" Ameren's deposition subpoena to EPRI. EPA, therefore, lacks standing, and for that reason alone its Motion to Quash should be denied.[3]

### B. Good Cause Exists for Ameren to Depose EPRI After the Discovery Cut-off.

Even if EPA had standing, its Motion to Quash fails on the merits. EPA's sole argument for quashing Ameren's subpoena to EPRI is that the deposition would occur after the September 19 discovery cut-off. EPA concedes, however, that if good cause exists, then Ameren should be permitted to depose EPRI after the discovery cut-off. (ECF #377 at 4.) The "good cause" standard is "liberally construed." *Export-Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd.*, 233 F.R.D. 338, 342 (S.D.N.Y. 2005) (citing 6A Charles A. Wright, Arthur R. Miller &

---

[3] This principle applies even when the third-party discovery would occur after the discovery cut-off. *See Vukadinovich v. Griffith Public Schools*, No. 2:02 cv 472, 2008 WL 5191451, at *3 (N.D. Ind. Dec. 10, 2008) (where third-party subpoenas were served before the discovery cut-off, but discovery would occur after the cut-off, "because here the subpoenas are directed to third-parties, there is no unfair advantage or prejudice to [the objecting party]").

6

Mary K. Kane, Federal Practice and Procedure § 1522.1 (1990)).  "A party seeking discovery meets this standard by demonstrating that it could not reasonably meet its deadline despite diligent efforts."  *Id.*  Moreover, good cause exists when one party learns new information from another party near the end of discovery, justifying follow-up discovery beyond the discovery cut-off.  *Id.* at 342-43; *see also* 6A Wright, Miller & Kane, Federal Practice and Procedure § 1522.2 (3d ed. Sept. 2014) (good cause exists "[w]hen the modification is necessitated by acts of the opposing party," the other party "has not unduly delayed the action," and "the opponent will not be prejudiced by the modification").

As discussed above, here the deposition of EPRI only became necessary after EPA substantially revised and supplemented its answer to Interrogatory No. 3(b) on September 11 — specifically, by identifying for the first time that a 1985 EPRI study somehow applied or reflected EPA's emissions methodology.  EPA makes much of its prior references to the 1985 EPRI study elsewhere in discovery, but it ignores the fact that, up until September 11, it never contended that the 1985 EPRI study constitutes a non-litigation use of EPA's emissions methodology responsive to Ameren's Interrogatory No. 3(b).  It never said so despite comprehensively revising its interrogatory answers multiple times over the final months of discovery.  If, as EPA argues, its position was known to Ameren — and was based on supposedly long-existing information, then why did EPA not include the 1985 EPRI study in its original answer to Interrogatory 3(b) or any of the prior supplementations?  Why did EPA wait until the last possible moment to disclose this contention to Ameren?  The fact that EPA had referred to the 1985 EPRI study elsewhere is beside the point; what matters is what EPA said for

7

the first time in its September 11 supplemental interrogatory answer. Ameren has a right to develop discovery that rebuts EPA's last-minute contention.[4]

Moreover, as discussed above, EPA is readily availing itself of post-September 19 discovery. EPA cannot have it both ways by simultaneously arguing that Ameren should be barred from deposing EPRI post-September 19. EPA will suffer no prejudice as a result of this deposition going forward; in contrast, if it does not, Ameren will be prejudiced and effectively sandbagged by EPA's last-minute additions to its interrogatory answer.

### III. CONCLUSION

For the reasons stated above, Ameren respectfully requests that the Court deny EPA's Motion to Quash.

Dated:  October 10, 2014

Respectfully submitted,

/s/ Matthew B. Mock

Ronald S. Safer (*pro hac vice*)
Patricia Brown Holmes (*pro hac vice*)
Renee Cipriano (*pro hac vice*)
Steven J. Bonebrake (*pro hac vice*)
Matthew B. Mock (*pro hac vice*)
SCHIFF HARDIN LLP
233 South Wacker Drive, Suite 6600
Chicago, Illinois 60606
(312) 258-5500
Fax:  (312) 258-5600

James J. Virtel
ARMSTRONG TEASDALE LLP
7700 Forsyth Boulevard Suite 1800

---

[4] EPA's cited authorities are inapposite (ECF #377 at 5) — none of those cases involved the situation we have here, where one party's last-minute additions to an interrogatory answer necessitated further follow-up discovery related to those additions, and the other party acted immediately to issue a third-party subpoena before the discovery cut-off.

8

St. Louis, Missouri  63105
(314) 621-5070
Fax: (314) 612-2298
jvirtel@armstrongteasdale.com
*Counsel for Defendant Ameren Missouri*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 10, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will cause an electronic copy to be served on counsel of record, who are listed below:

>Andrew C. Hanson
>Bradford T. McLane
>Nigel B. Cooney
>Environmental Enforcement Section
>Environment and Natural Resources Division
>U.S. Department of Justice
>P.O. Box 7611
>Washington, DC  20044-7611
>Telephone:  (202) 305-0544
>Facsimile:  (202) 616-6584
>andrew.hanson2@usdoj.gov
>bradford.mclane@usdoj.gov
>nigel.cooney@usdoj.gov

>Suzanne J. Moore
>Andrew J. Lay
>United States Attorney's Office
>Eastern District of Missouri
>Thomas Eagleton U.S. Courthouse
>111 South 10th Street, 20th Floor
>St. Louis, MO 63102
>Telephone:  (314) 539-2547
>Facsimile:  (314) 539-2309
>suzanne.moore@usdoj.gov
>andrew.lay@usdoj.gov

/s/ Matthew B. Mock___