UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:11 CV 77 RWS |
| | ) | |
| AMEREN MISSOURI, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Plaintiff the United States of America, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), filed this suit against defendant Ameren Missouri ("Ameren") on January 12, 2011. In its complaint, EPA alleges that Ameren committed various violations of the Clean Air Act, 42 U.S.C. § 7401 *et seq.* ("CAA"), the Missouri State Implementation Plan ("SIP"), and Ameren's Rush Island Plant Title V Permit, when it allegedly undertook major modifications at the Rush Island Plant in Festus, Missouri without obtaining the requisite permits.

The parties have filed ten separate motions for summary judgment and partial summary judgment. In this memorandum and order, I will address the only motion for full summary judgment, Ameren's Motion for Summary Judgment No. 1: On the Missouri SIP's Construction Permitting Rule. In this motion, Ameren asks me to find that, in addition to proving that Ameren undertook "major modifications" as defined by the federal regulations, EPA must also prove that Ameren undertook "modifications" as defined by the Missouri SIP. Despite their semantic similarity, "modification" and "major modification" appear to have different meanings. According to Ameren, to be a "modification" under the Missouri SIP, the project must cause an

increase in potential emissions; to be a "major modification" the project must cause an increase in actual emissions.

I heard oral argument on this motion and have carefully considered the arguments and authorities provided in the parties' briefs. For the reasons stated below, I will deny Ameren's motion for summary judgment.

I.  **Background**

   A. **Factual Allegations**

EPA filed this lawsuit against Ameren asserting various violations of the Clean Air Act's Prevention of Significant Deterioration program, Title V of the CAA, the Missouri SIP, and Ameren's Title V permit for its Rush Island Plant. EPA seeks equitable and injunctive relief.

EPA makes the following factual allegations in its Third Amended Complaint.

Coal-fired electric units utilize boilers that burn coal to generate heat that converts water into steam. The steam in turn spins a generator to produce electricity. Major components of a coal-fired boiler include the superheater, economizer, reheater, lower slope tubes, and air preheater. When a major component breaks down, it causes the unit to be taken out of service for repairs (known as a "forced outage"). Forced outages prevent the unit from generating electricity. Replacing worn-out major components that cause forced outages improve the unit's availability to operate for more hours, increase capacity and/or efficiency, and cost-effectiveness of operations. As a result, when worn-out major components are replaced, increased amounts of coal might be burned and more annual pollution is emitted from the unit's smokestack.

Units 1 and 2 of the Rush Island Plant are coal-fired electric generating units that operate nearly continuously when available. EPA alleges that Ameren performed major modifications on Unit 1 from approximately February 2007 to May 2007 ("2007 Project") when it replaced the

2

Unit's economizer, reheater, lower slope tubes, and air preheater. EPA also alleges that Ameren performed major modifications on Unit 2 from approximately January 2010 to April 2010 ("2010 Project") when it replaced the Unit's economizer, reheater, and air preheater.

EPA asserts violations of PSD requirements for both of the projects. EPA alleges that each major modification enabled and caused the affected unit to burn more coal and release greater amounts of sulfur dioxide (SO2) by increasing the capacity of the unit to burn more coal per hour of operation, increasing the availability of the unit to operate for more hours, and/or increasing the efficiency of the unit to operate more cost-effectively and for more hours of operation and/or at higher levels of operation. EPA alleges, for each project, that Ameren violated the PSD requirements in the CAA and the Missouri SIP because it (1) did not obtain a PSD permit for construction and operation of the modified unit; (2) did not undergo a BACT determination; (3) did not install BACT for control of SO2 emissions; (4) failed to operate BACT for control of SO2 emissions; (5) failed to operate in compliance with BACT emissions limitations; and (6) operated the units after undergoing an unpermitted major modification.

EPA also alleges that Ameren violated Title V of the CAA because Ameren failed to submit an accurate and complete Title V permit application and by commencing major modifications at Units 1 and 2 without obtaining a PSD permit.

### B. Statutory and Regulatory Background

#### 1. The Prevention of Significant Deterioration Program

The factual allegations underlying this lawsuit arise out of the CAA's Prevention of Significant Deterioration ("PSD") program and the related regulations. The United States Court of Appeals for the Eighth Circuit has exhaustively examined the applicable statutory and regulatory framework.

> Congress enacted the Clean Air Act Amendments of 1970 seeking to guarantee the prompt attainment and maintenance of specified air quality standards. To that end, it directed EPA to devise National Ambient Air Quality Standards (NAAQS) limiting various pollutants, which the States were obliged to implement and enforce.
>
> A central part of the CAA's regulatory scheme was the New Source Performance Standards (NSPS) program, which required EPA to develop "technology-based performance standards" designed to limit emissions from major new sources of pollution. "New sources" include both newly constructed facilities and those that have been modified such that their emissions increase. It is unlawful for any owner or operator of any new source to operate such source in violation of applicable performance standards.
>
> The Supreme Court has pointed out that the NSPS program did too little to achieve the ambitious goals of the 1970 amendments. Merely setting emissions limits failed to improve air quality in those areas that had already attained the minimum standards of the NAAQS because polluters had no incentive to diminish emissions below the established limits. Congress therefore amended the CAA again in 1977 to add the "Prevention of Significant Deterioration" (PSD) program, which seeks to ensure that the "air quality floor" established by the NAAQS does not in effect become a ceiling.
>
> Under the PSD program, no major emitting facility . . . may be constructed or modified unless it meets certain preconditions. Among the preconditions relevant here are that the facility must obtain a permit setting forth applicable emission limitations, and that it must be subject to "best available control technology" (BACT). BACT, despite what the term implies, is not a particular type of technology. Rather, it is an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for the facility in question.

*Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1011-12 (8th Cir. 2010) (internal citations and quotations omitted).

The PSD program's central provision as stated in the CAA is worth re-emphasizing. It provides that "[n]o major emitting facility . . . may be constructed in any area to which [the PSD provisions] appl[y] unless" various requirements are met. 42 U.S.C. § 7475(a). Under this provision, "[t]he term 'construction' … *includes the modification (as defined in Section 7411(a)*

4

*of this title)* of any source or facility." 42 U.S.C. § 7479(2)(C) (emphasis added). Section 7411(a) defines the crucial term "modification" as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." 42 U.S.C. § 7411(a)(4).

EPA promulgated regulations to implement the CAA's PSD program in 1978 and significantly revised them in 1980, 1992, and 2002. Each of these revisions focused, in part, on the difference between measuring emissions increases based on potential emissions, versus measuring actual emissions increases. The difference between using a test focused on potential emissions and a test focused on actual emissions has important practical consequences. Potential emissions, or in other words, a unit's maximum design capacity, are measured by the amount of emissions that a unit could emit if it were running at full design capacity all day every day.[1] However, sources of pollution, and utilities in particular, do not usually run at full capacity all day every day. This occurs for many reasons, most commonly because of unit age or breakdowns. Under an actual emissions analysis, if a plant that is not running at full capacity pre-project undergoes repairs that enable it to operate at closer to full capacity and/or for more hours post-project, and therefore emit significantly more pollution, the project would be subject to the PSD rules. That is so even though the unit's maximum capacity might not have increased. Under this same scenario, however, if the test focused on potential emissions, a source would not be required to obtain a PSD permit.

In *Alabama Power Co. v. Costle*, 636 F.2d 323, 399-400 (D.C. Cir. 1979),[2] the United

---

[1] For example, if a unit is designed with a capacity to emit 10 tons of sulfur dioxide, and undergoes modifications to increase its capacity to be able to emit 20 tons of sulfur dioxide, its potential emissions would increase.
[2] Section 307(b) of the Clean Air Act grants the D.C. Circuit exclusive jurisdiction to decide challenges to EPA rules with nationwide applicability. 42 U.S.C. 7607(b); *see* 67 Fed. Reg. at 80,244 (Dec. 31, 2002).

5

States Court of Appeals for the D.C. Circuit heard a challenge to the 1978 rules. Under the 1978 rules, to determine whether a "major modification" would occur, operators were required to use a potential-to-potential test to calculate whether a project would increase potential emissions by at least a minimum threshold, was permissible. *Id.* at 399-400. The *Alabama Power* court found that the CAA's statutory definition of "modification," covering "*any* physical change . . . ," indicated that Congress intended that the PSD program have broad applicability. *Id.* at 399-400 (emphasis added). Because of this, the court reasoned, EPA only had "discretion, in administering the statute's 'modification' provision, to exempt from PSD review some emission increases on grounds of de minimis or administrative necessity." *Id.* at 400. By limiting PSD review to modifications that increase potential emissions by at least a minimum threshold, EPA was essentially exempting from review many modifications that increased the source's actual emissions. The *Alabama Power* court found that such a provision unreasonably departed from the CAA's broad provisions, and it struck down EPA's definition of "major modification." *Id.*

In response to the *Alabama Power* decision, EPA revised the PSD rules in 1980 to include a new definition of "major modification." Under the 1980 definition, which remains the standard today, a "major modification" involves two criteria: (1) there must be a physical change or change in method of operation that (2) would result in a significant net emissions increase. 40 C.F.R. § 52.21(b)(2). As EPA explained in promulgating the 1980 revisions, the new definition of "major modification" focuses on actual, rather than potential, emissions. *See* 45 Fed. Reg. 52,680, 52,700 (Aug. 7, 1980).[3] Under this new definition, the test to be employed in

---

[3] As EPA explained when it promulgated the final 1980 rule:
> The Following the lead of the [*Alabama Power*] court, EPA has also shifted the focus of its regulatory definitions from "potential to emit" to "actual emissions." For both PSD and nonattainment purposes, a "major modification" is now any significant "net emissions increase" at a major stationary source that results from certain changes. "Net emissions increase" is, in turn, roughly any net increase in "actual emissions." Not only are those definitions consistent with the court's view of section 111(a)(4), but they also avoid the "paper offset" problem described above, thereby better serving PSD and nonattainment

6

determining whether a major modification would occur was an actual-to-potential test, which compared actual baseline emissions to future potential emissions. 45 Fed Reg. at 52,680; *see also Environmental Defense et al. v. Duke Energy Corp.*, 549 U.S. 561, 577-78 (2007) ("*Duke Energy*").

In 1990, the PSD rules came under scrutiny again, this time by the United States Court of Appeals for the Seventh Circuit in *Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) ("*WEPCO*"). In *WEPCO*, the court held, in part, that an actual-to-potential test was not supported by the regulations for an existing source of emissions because it unrealistically assumed continuous operations post-project. *Id.* at 917-18. In 1992, in response to *WEPCO*, the EPA amended the PSD rules again. Under the 1992 revisions, EPA required the use of an actual-to-projected-actual test. 56 Fed. Reg. 27,630, 27,633 & n.10 (June 14, 1991); *see also* 57 Fed. Reg. at 32,323. The actual-to-projected actual test requires sources to compare actual baseline emissions to projected actual emissions post-project. This is the test that remains the standard today and was the standard at the time of Ameren's alleged violations. 67 Fed. Reg. at 80,186, 80,275 (Dec. 31, 2002).

EPA amended the PSD rules again in 2002, but the 2002 amendments did not change the requirement that operators apply an actual-to-projected actual test as relevant here. 67 Fed. Reg. 80,186, 80,275 (Dec. 31, 2002). Notably, in 2005, the D.C. Circuit reviewed a challenge to EPA's 2002 PSD rule in *New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005). In its opinion, the D.C. Circuit emphasized numerous times that the CAA itself requires emissions increases to be measured using actual emissions. The court reasoned that "the plain language of the CAA indicates that Congress intended to apply NSR to changes that increase actual emissions instead

---

purposes.
45 Fed. Reg. at 52,700.

7

of potential or allowable emissions," that "EPA lacks authority to promulgate [a contrary provision]," and that the CAA "unambiguously defines 'increases' in terms of actual emissions." *Id.* at 39, 40.

The *New York v. EPA* Court also specifically considered industry's argument that individual states should be free to allow sources to use a baseline other than the actual emissions baseline as required by EPA's PSD rules. *Id.* at 21. The court rejected that argument, concluding that "[w]hile states are responsible for writing SIPs, the Act gives EPA responsibility for developing basic rules for the NSR program, a responsibility that clearly includes choosing a methodology for calculating baseline emissions." *Id.* (internal citation omitted).

### 2. Missouri's State Implementation Plan

"The PSD program is primarily implemented by the states through "state implementation plans" ("SIPs"). States have broad discretion in designing their SIPs, but the plans must include certain federal standards and are subject to EPA review and approval." *Sierra Club*, 615 F.3d at 1011-12 (internal citations and quotations omitted).

In 2006, Missouri adopted and incorporated by reference EPA's PSD rules, set forth at 40 C.F.R. § 52.21, directly into the Missouri SIP, which is part of Missouri Rule 10 C.S.R.10-6.060. EPA subsequently approved the Missouri SIP. 47 Fed. Reg. 26,833.

### 3. The Title V Program

In addition to alleging violations of the CAA's PSD program, EPA also alleges that Ameren has violated Title V of the CAA. The Title V program is an operating permit program requiring covered sources of pollution to obtain permits for source operation. 42 U.S.C. §§ 7661 *et seq.*; 40 C.F.R. Part 70. As the Eighth Circuit has described:

> In 1990 Congress again amended the CAA to require each covered facility to obtain a comprehensive operating permit setting forth all CAA standards

> applicable to that facility. These "Title V" permits do not generally impose any new emission limits, but are simply intended to incorporate into a single document all of the CAA requirements governing a facility. Similar to other CAA programs, Title V is implemented primarily by the states under EPA oversight. In states with EPA approved programs, Title V permits are issued by the state permitting authority, but are subject to EPA review and veto.

*Sierra Club*, 615 F.3d at 1012 (internal citations and quotations omitted). Under Title V, major sources are prohibited from operating without a Title V permit and from operating in contravention of any term or condition of a permit. 42 U.S.C. §§ 7661a(a).

Missouri's operating permit program under Title V of the CAA was also approved by the EPA and is codified at 10 C.S.R. 10-6.065 and incorporated into the Missouri SIP.

## II.    Legal Standard

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Lynn v. Deaconess Medical Center*, 160 F.3d 484, 486 (8th Cir. 1998) (citing Fed. R. Civ. P. 56(c)). The party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of the affidavits, pleadings, depositions, answers to interrogatories, and admissions on file which it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When such a motion is made and supported by the movant, the nonmoving party may not rest on his pleadings but must produce sufficient evidence to support the existence of the essential elements of his case on which he bears the burden of proof. *Id.* at 324. In resisting a properly supported motion for summary judgment, the plaintiff has an affirmative burden to designate specific facts creating a triable controversy. *Crossley v. Georgia-Pacific Corp.*, 355 F.3d 1112, 1113 (8th Cir. 2004).

## III. Discussion

Ameren argues that the Missouri SIP requires EPA to prove that the challenged projects were both "major modifications," meaning the projects would cause significant increases in actual emissions, and "modifications," meaning the source's potential emissions would significantly increase. As EPA has never alleged that the projects increased the units' potential emissions, Ameren argues that it is entitled to full summary judgment.[4]

Ameren's argument is based on language it finds in Section (1), Applicability, of the Missouri SIP, which governs all of the state's air quality construction permit programs, of which the PSD program is one subsection. This general Applicability section of the Missouri SIP provides, in relevant part:

> 10 C.S.R. 10-6.060 Construction Permits Required
>
> PURPOSE: This rule defines sources which are required to obtain permits to construct. It establishes requirements to be met prior to construction or modification of any of these sources . . . .
>
> (1) Applicability. . . .
>
> * * *
>
> (C) Construction/Operation Prohibited. No owner or operator shall commence construction or *modification* of any installation subject to this rule, begin operation after that construction or modification, or begin operation of any installation which has been shut down longer than five (5) years without first obtaining a permit from the permitting authority under this rule.

10 C.S.R. 10-6.060(1)(C) (emphasis added).

The general Definitions section of the Missouri SIP defines the key term "modification" as "[a]ny physical change, or change in method of operation of, a source operation or attendant air pollution control equipment which would cause an increase in potential emissions of any air

---

[4] It is undisputed that the projects were not expected to and did not increase the units' potential emissions.

10

pollutant emitted by the source operation."[5] 10 C.S.R. 10-6.020(2)(M)(10) (2005) (emphasis added). "Potential emissions," (defined in the definition section by "potential to emit") means the unit's ability to emit at full design capacity "assuming continuous year-round operation." *Id.* at 10-6.020(2)(P)(19).

EPA disputes Ameren's interpretation of the SIP and the implications that such an interpretation would have, and urges me to find that the SIP does not limit PSD applicability to only those projects that are both "major modifications" and "modifications," as defined by Ameren.

For the reasons that follow, I agree with EPA that the SIP does *not* limit PSD applicability to only those projects that increase both actual and potential emissions. In other words, a project need not qualify as a "modification" as interpreted by Ameren to trigger PSD review.

First, the PSD rules impose their own independent, stand-alone applicability provisions in Section (8) of the Missouri SIP (incorporating EPA's PSD rules set out at 40 C.F.R. 52.21). As "it is a commonplace of statutory construction that the specific governs the general," the PSD-specific applicability language should trump the general applicability language in Section (1) of the SIP. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071, 182 L. Ed. 2d 967 (2012) (internal quotation omitted). Here, it is clear that the specific PSD applicability language provides, in relevant part, that applicability turns only on whether a project is a "major modification":

> (a)(2) Applicability procedures.
>
> (ii) the requirements of paragraphs (j) through (r) of this section apply to the construction of any new major stationary source or the *major modification* of any existing major stationary source . . .

---

[5] It is undisputed that the projects at issue were not "construction" as defined by the Missouri SIP or the PSD rules.

11

> (iii) No new major stationary source or *major modification* to which the requirements of [] this section apply shall begin actual construction without a permit . . . . (1) . . . any owner or operator of a source or modification subject to this section who commences construction . . . without applying for and receiving approval hereunder, shall be subject to appropriate enforcement action.

10 C.S.R. § 10-6.060(8) (incorporating 40 C.F.R. 52.21) (emphasis added).

EPA's approval of the SIP illustrates why the specific PSD rules control. In the final rule, which contains EPA's approval of the Missouri SIP, EPA expressly stated that it was approving the SIP "because the revisions incorporate, by reference, the Federal New Source Review reforms." 71 Fed. Reg. 36,486 (June 27, 2006). As discussed above, the regulatory and statutory history of the PSD rules is well-established and there can be no doubt that the federal PSD rules are focused on "major modifications" which are based on actual emissions determinations. Moreover, and perhaps most persuasively, EPA's approval of the SIP provided that the CAA and the program requirements as set out in 40 C.F.R. 52.21 would supersede any conflicting provisions in the state SIP: "This revision incorporates by reference the other provisions of 40 C.F.R. 52.21 as in effect on July 1, 2003, *which supersedes any conflicting provisions in the Missouri rule*." 71 Fed. Reg. 36,489 (June 27, 2006) (emphasis added).[6]

In addition, Ameren's interpretation would render a portion of the PSD rules superfluous. The United States Supreme Court has rejected an argument similar to Ameren's in *Duke Energy*. 549 U.S. at 581 (2007). There, the defendant power company argued that "before a project can become a 'major modification' under the PSD regulations . . . it must meet the definition of 'modification' under [other New Source Performance Standards] regulations." *Id.* at 581, n.8. As the Supreme Court explained:

---

[6] *See also* 71 Fed. Reg. at 36,487 (June 27, 2006) ("As we explained in the proposed rulemaking, to the extent that these provisions *or similar provisions* are addressed by § 52.21, the provisions of § 52.21 supersede the state provisions for purposes of the PSD program.") (emphasis added).

12

That sounds right, but the language of the regulations does not support it. For example, it would be superfluous for PSD regulations to require a "major modification" to be a physical change in or change in the method of operation . . . if they presupposed that the NSPS definition of 'modification,' which contains the same prerequisite . . . had already been satisfied.

*Id.*

The same is true here. If the SIP first requires, as Ameren argues, that a threshold determination be made that a project is a "modification," meaning "[a]ny physical change, or change in method of operation of, a source operation or attendant air pollution control equipment which would cause an increase in potential emissions of any air pollutant emitted by the source operation," 10 C.S.R. 10-6.020(2)(M)(10), then that makes the first half of the PSD rules' definition of "major modification" superfluous, which starts with the exact same language: "[a]ny physical change or change in the method of operation at an installation or in the attendant air pollution control equipment . . ." 40 C.F.R. § 52.21(b)(2); *see also United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2330, 180 L. Ed. 2d 187 (2011).

For all of these reasons, I find that, consistent with principles of statutory and regulatory interpretation, the specific PSD rules trump the general SIP rules. That is especially true where, as here, the final SIP rule expressly provides that the specific PSD rules set out in 40 C.F.R. 52.21 should do just that, and the alternate interpretation would render a portion of the PSD rules' definition of "major modification" superfluous. *See* 71 Fed. Reg. 36,489 (June 27, 2006).

Moreover, such a finding is consistent with EPA's own interpretation of the Missouri SIP. To the extent that the general Applicability language in Section (1) means what Ameren contends, it at best inserts ambiguity into the meaning of the PSD rules. Under the standards of *Chevron* and *Auer*, EPA's interpretation of the SIP, which I find is based on a permissible

13

construction of both the CAA and the PSD rules, is entitled to deference.[7] *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (deference to an agency's interpretation of its own regulations is "controlling unless 'plainly erroneous or inconsistent with the regulation.'") (internal citations omitted); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–843 (1984); *see also United States v. Duke Energy Corp.*, 981 F. Supp. 2d 435, 454-55 (M.D.N.C. 2013) ("EPA's interpretation of SIP regulations controls when it conflicts with [the state agency's] interpretation, particularly when, as here, the state SIP adopts the relevant federal regulation without additional explanation, modification, or change.").

Ameren relies heavily on *United States v. Cinergy*, 623 F.3d 455 (7th Cir. 2010), for support. *Cinergy* involved an EPA enforcement action against several coal-fired power plants in which EPA alleged, as it does here, that the plants undertook projects that were major modifications and required a PSD permit. Cinergy argued that no permit was required because the projects did not increase the units' potential emissions. Under the plain language of the Indiana SIP in place at the time of the projects, applicability turned on increases in potential, not actual emissions, similar to what Ameren alleges is the case here.

Following a jury trial, the Seventh Circuit reversed the verdict against the utility and entered judgment as a matter of law for Cinergy. It rejected EPA's arguments that the Indiana SIP's provisions were contrary to the CAA itself, case law, EPA's long-standing interpretations of the Act, and the then-existing federal regulations, calling that argument "untenable." The court held that "[t]he Clean Air Act does not authorize the imposition of sanctions for conduct

---

[7] For the reasons outline above, *see supra*, Section I.B. Statutory and Regulatory Background, EPA's interpretation of the SIP as requiring PSD review for major modifications, without further limitation, is reasonable because it conforms to the requirements of the CAA's broad language as interpreted by D.C. Circuit in, e.g., *Alabama Power*, 636 F.2d at 379, 399-400 (D.C. Cir. 1979); *New York v. EPA*, 413 F.3d 3, 39-40 (D.C. Cir. 2005). In contrast, Ameren's reading of the SIP as limiting PSD applicability to projects that are both "major modifications" and "modifications" essentially exempts from PSD review any major modification that does not also increase a source's potential to emit, or maximum capacity – which would likely exempt from review a large portion of major modifications.

that complies with a State Implementation Plan that the EPA has approved." *Id.* (citing 42 U.S.C. § 7413(a)(1)). While recognizing that the imposition of a potential-to-potential standard on top of an actual emissions standard was likely a "blunder," the court reasoned that EPA's approval of the SIP language was binding, stating:

> [W]hat was Cinergy "on notice" of? It was on notice that a straightforward reading of section 43 permitted the company without fear of sanctions to make modifications without a permit as long as they would not increase a plant's potential generating capacity, even if they would increase its annual output by enabling it to be operated for more hours without having to be shut down for repairs and component replacements. … What Cinergy was not on notice of was that the EPA would treat approval of section 43 as rejection of it.
>
> The agency's frustration is understandable. It embraced the actual-emissions standard … before section 43 was presented for its approval. [EPA] should have disapproved it; it didn't; but it can't impose the good standard on a plant that implemented the bad when the bad one was authorized by a state implementation plan that the EPA had approved. The blunder was unfortunate but the agency must live with it.

*Cinergy*, 623 F.3d at 458-59.

Ameren argues that here, as in *Cinergy*, when EPA approved the Missouri SIP, it said nothing about the SIP's general Applicability provision, even though it commented on many other SIP provisions. Likewise, EPA does not directly challenge Ameren's "straightforward reading" of the SIP language – it only argues that the SIP cannot mean what it says. Following the *Cinergy* defendants' footsteps, Ameren argues that it was not on notice that EPA would treat its approval of Sections 10-6.060(1)(C) (Applicability) and 10-6.020(2)(M)(10) (definition of "modification") as a rejection of them, and allowing EPA to impose liability when it is undisputed no modification has occurred would violate basic principles of due process and fair notice.

Although many of the same considerations that the Seventh Circuit relied on are present here, this case is distinguishable in three ways. First, unlike here, the Indiana SIP did not adopt

15

and incorporate by reference EPA's PSD rules, nor does it appear that the PSD section of the Indiana SIP contained independent applicability language. 47 Fed. Reg. 6621-01 (Feb. 16, 1982). Second, unlike here, EPA's approval of the Indiana SIP did not expressly provide that the PSD rules as set out in the Code of Federal Regulations supersede any conflicting provisions in the state SIP. *Id.* Third, it is not clear that Ameren had actual notice of the SIP provision, whereas in *Cinergy* there is no doubt that there was actual notice. In fact, as outlined in EPA's brief, there is evidence here showing that Ameren had actual notice that the controlling standard is that of a "major modification." The express terms of Ameren's Title V Permit provide that "[t]he permittee shall not commence construction, modification, or major modification of any installation subject to this rule . . . without first obtaining a permit . . . ." *See also, e.g.*, Joint Brief of Industry Petitioners, *New York v. EPA*, No. 02-1387, 2004 WL 5846387, at *28-29 (D.C. Cir. Oct. 26, 2004). Finally, to the extent that this case is indistinguishable from *Cinergy* in these or any other aspects, for the reasons stated above, I disagree with the Seventh Circuit's holding.

Accordingly, I find that Ameren has not established as a matter of law that PSD applicability is limited to only those circumstances where there is a both a "modification" and a "major modification." The same reasons for my conclusion that there is no additional "modification" requirement under the PSD rules apply to Ameren's Title V argument. As a result, Ameren's motion for summary judgment will be denied in its entirety.

Accordingly,

**IT IS HEREBY ORDERED that** Ameren's Motion for Summary Judgment No. 1: On the Missouri SIP's Construction Permitting Rule #[539] is **DENIED.**

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 21st day of January, 2016.