**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>SIERRA CLUB, )<br><br>Plaintiff-Intervenor, )<br><br>v. )<br><br>AMEREN MISSOURI, )<br><br>Defendant. ) | Civil Action No. 4:11-cv-00077-RWS |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT THAT AMEREN MUST COMPLY WITH NEW SOURCE
REVIEW REQUIREMENTS**

**FILED UNDER SEAL**

# Table of Contents

**INTRODUCTION AND SUMMARY**................................................................................1

**STATUTORY BACKGROUND** ...................................................................................... 2

**LEGAL STANDARD** ...................................................................................................... 4

**ARGUMENT** .................................................................................................................... 4

    **I.**    **Ameren must obtain NSR permits and apply BACT to come into compliance with the Clean Air Act.** ................................................................................................................... 5

        *A.*    *The Clean Air Act requires all modified sources to obtain NSR permits and apply BACT.* ......... 5

        *B.*    *Because Rush Island Units 1 and 2 are modified sources, they must obtain NSR permits and apply BACT.* .......................................................................................................................... 6

        *i.*    *Congress already determined how modified sources must comply with the law.* ......................... 8

        *ii.*    *All of the traditional equitable factors support requiring compliance.* ..................................... 9

    **II.**    **NSR compliance at Rush Island requires controls designed to meet an emission rate at least** ███████████████████████████████████. ................. 12

        *A.*    *There is no dispute that FGDs are the best available $SO_2$ controls for Rush Island.* ................ 12

        *B.*    ███████████████████████████████████████████████ ██ *consistent with the technology-forcing purpose of BACT and avoids rewarding Ameren for its own failure to comply with the law.* ................................................................................................. 13

    **CONCLUSION** ............................................................................................................ 15

# TABLE OF AUTHORITIES

*Cases*

*Alaska Dept. of Envtl. Conservation v. EPA,*
   540 U.S. 461 (2004) ........................................................................................... 3

*American Farm Bureau Fed'n v. EPA.,*
   559 F.3d 512 (D.C. Cir. 2009) ........................................................................ 10

*Amoco Prod. Co. v. Gambell,*
   480 U.S. 531 (1987) ......................................................................................... 10

*Burlington N. R.R. v. Bair,*
   957 F.2d 599 (8th Cir. 1992) ............................................................................ 8

*Chipperfield v. Mo. Air Conservation Comm'n,*
   229 S.W.3d 226 (Mo. Ct. App. 2007) ........................................................ 4, 12

*Citizens for Clean Air v. EPA,*
   959 F.2d 839 (9th Cir. 1992) ........................................................................ 3, 12

*Communities for a Better Env't v. Cenco Ref. Co.,*
   179 F.Supp.2d 1128 (C.D. Cal. 2001) ........................................................... 10

*Duke Energy Corp.,*
   549 U.S. 561 (2007) ........................................................................................... 2

*Ebay v. MercExchange, L.L.C.,*
   547 U.S. 388 (2006) ........................................................................................... 9

*Envtl. Def. Fund v. Lamphier,*
   714 F.2d 331 (4th Cir. 1983) ............................................................................ 8

*Grand Canyon Trust v. Tucson Elec. Power Co.,*
   391 F.3d 979 (9th Cir. 2004) ............................................................................ 3

*Harris v. SWAN, Inc.,*
   459 F.Supp.2d 857 (E.D. Mo. 2005) ............................................................... 4

*Hawaiian Elec. Co. v. EPA,*
   723 F.2d 1440 (9th Cir. 1984) ...................................................................... 3, 9

*In re Gen. Motors, Inc.*,
  10 E.A.D. 360 (E.A.B. 2002) ............................................................................ 3

*In re W. Suburban Recycling and Energy Ctr.*,
  No. 97-12, 1999 WL 133041 (U.S. Envtl. Prot. Agency Mar. 10, 1999) ................................ 14

*Louisiana Generating, LLC v. Illinois Union Ins. Co.*,
  831 F.3d 618 (5th Cir. 2016) ............................................................................ 2

*Lynn v. Deaconess Med. Ctr.*,
  160 F.3d 484 (8th Cir. 1998) ............................................................................ 4

*New York v. EPA*,
  413 F.3d 3 (D.C. Cir. 2005) .......................................................................... 2, 5

*New York v. Niagara Mohawk Power Corp.*,
  263 F. Supp. 2d 650 (W.D.N.Y. 2003) ............................................................. 7, 15

*Oregon Envtl. Council v. Oregon Dep't of Envtl. Quality*,
  No. CIV. 91-13-FR, 1992 WL 252123 (D. Or. Sept. 24, 1992) ................................... 5, 7

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*,
  826 F.3d 1030 (8th Cir. 2016) .......................................................................... 10

*Sierra Club v. Franklin County Power of Ill.*,
  546 F.3d 918 (7th Cir. 2008) .................................................................... passim

*Sierra Club v. Otter Tail Power Co.*,
  615 F.3d 1008 (8th Cir. 2010) .............................................................. 2, 3, 5, 9

*Sierra Club v. Thomas*,
  828 F.2d 783 (D.C. Cir. 1987) .......................................................................... 3

*Torgerson v. City of Rochester*,
  643 F.3d 1031 (8th Cir. 2011) .......................................................................... 4

*TVA v. Hill*,
  437 U.S. 153 (1978) ...................................................................................... 9

*United States v. Ameren Missouri*,
  229 F. Supp. 3d 906 (E.D. Mo. 2017) ......................................................... 1, 6, 10

*United States v. Cinergy Corp.*,
    618 F.Supp.2d 942 (S.D. Ind. 2009) ................................................................ passim

*United States v. City of Painesville*,
    644 F.2d 1186 (6th Cir. 1981) ....................................................................... 6

*United States v. Duke Energy Corp.*,
    278 F. Supp. 2d 619 (M.D.N.C. 2003) ........................................................ 15

*United States v. Duke Energy Corp.,*
    No. 1:00CV1262, 2010 WL 3023517 (M.D.N.C. July 28, 2010).......................... 15

*United States v. Louisiana-Pacific Corp.*,
    682 F. Supp. 1141 (D. Colo. 1988) ............................................................. 7

*United States v. Midwest Generation*,
    720 F.3d 644 (7th Cir. 2013)....................................................................... 7

*United States v. Oakland Cannabis Buyers' Coop.*,
    532 U.S. 483 (2001) ................................................................................... 8

*United States v. Ohio Edison Co.*,
    276 F. Supp. 2d 829 (S.D. Ohio 2003) ....................................................... 5

*United States v. Oliver,*
    *No. 3:06-CV-196 JWS, 2009 WL 10671371 (D. Alaska June 25, 2009)* ................ 11

*United States v. Production Plated Plastics*,
    762 F. Supp. 722 (W.D. Mich. 1991)........................................................... 6

*United States v. Westvaco,*
    No. 00-2602, 2015 WL 10323214 (D. Md. Feb. 26, 2015) ............................ 6, 10, 11

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ................................................................................... 6, 8

*Wisconsin Elec. Power Co. v. Reilly*,
    893 F.2d 901 (7th Cir. 1990)....................................................................... 2, 11

*Statutes*

42 U.S.C. 7470 ......................................................................................................................... 2
42 U.S.C. § 7401(b)(1) ......................................................................................................... 11
42 U.S.C. § 7475(a)(4) .......................................................................................................... 14
42 U.S.C. §§ 7413(b) .............................................................................................................. 8
42 U.S.C. §§ 7475(a) .............................................................................................................. 5
42 U.S.C. §§ 7475(a), 7479(2)(C) ......................................................................................... 5

*Rules*

Fed R. Civ. P. 56(c) ............................................................................................................... 4

*Regulations*

40 C.F.R. § 52.21(j)(3).................................................................................................... 5, 14
40 C.F.R. § 52.21(r)(2) ......................................................................................................... 14

## INTRODUCTION AND SUMMARY

This Court has already determined that Ameren violated the law when it modified Rush Island Units 1 and 2 "without obtaining the required permits [and] installing best-available pollution control technology."  *United States v. Ameren Missouri*, 229 F. Supp. 3d 906, 914 (E.D. Mo. 2017).  The only question remaining is what to do about those violations.  In broad terms, Plaintiffs seek a two-part remedy.  First, Ameren must come into compliance with the Clean Air Act.  Second, Ameren must redress the harm caused by its excess pollution.

The first part of the remedy is straightforward and can be resolved now.  To comply with the Clean Air Act, Ameren must obtain New Source Review (NSR) permits for its modified units and meet emission limits for sulfur dioxide ($SO_2$) based on the "best available control technology" (BACT).  That is simply what the law requires for modified sources of air pollution.  Moreover, there is no genuine dispute about what is required to meet BACT at Rush Island.  Flue Gas Desulfurization (FGD) "scrubbers" have for decades been considered the technology needed to meet BACT at coal-fired power plants.  ██████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████  Accordingly, Plaintiffs seek summary judgment that Ameren must obtain NSR permits and meet BACT in order to bring Rush Island into compliance with the law, and that BACT requires emission reductions at least ████████████████████████████ ████████████████████████████████████

Granting this motion will promote judicial economy and streamline the case.  Bringing Rush Island into compliance will eventually halt future excess pollution, but it will not redress

the harm from pollution that never should have been emitted had BACT been met at the time of the modifications.  At the remedy trial, Plaintiffs will seek to redress this harm, which continues each day Rush Island operates without meeting BACT.[1]  But whatever the best way to redress that harm, there is no doubt about what Ameren must do to comply with the law.

## STATUTORY BACKGROUND

In 1970, Congress passed the Clean Air Act "to speed up, expand, and intensify" efforts to address air pollution.  *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990) (*WEPCo*) (quoting H.R. Rep. No. 91-1146, at 1 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5356)). Unsatisfied with the results achieved by the original enactment, in 1977 Congress added the NSR program to "strengthen" the Act by ensuring that additional requirements apply to new and modified major sources of air pollution.  *New York v. EPA*, 413 F.3d 3, 10 (D.C. Cir. 2005); *see Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1011 (8th Cir. 2010).

The Prevention of Significant Deterioration (PSD) component of NSR – which applies to areas with ambient pollution concentrations that meet national ambient air quality standards (NAAQS) (or where attainment is unclassifiable) – was "aimed at giving added protection to air quality" in such areas while fostering economic growth consistent with preservation of clean air. *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 567 (2007); *see* 42 U.S.C. § 7470 (PSD is intended to protect public health from air pollution "notwithstanding attainment and maintenance of all national ambient air quality standards").  The Eighth Circuit explained the difference between the NAAQS program established in the 1970 Act and the more stringent PSD program:

> Merely setting emissions limits failed to improve air quality in those areas that had already attained the minimum standards of the NAAQS because polluters had no

---

[1]     Although the means to redress that harm will be addressed at trial and is not the subject of this motion, offsetting some of the harm can be accomplished by reducing future pollution affecting the same area, in an amount commensurate with Rush Island's excess emissions.  *See Louisiana Generating, LLC v. Illinois Union Ins. Co.*, 831 F.3d 618, 630-31 (5th Cir. 2016).

> incentive to diminish emissions below the established limits. Congress therefore amended the CAA again in 1977 to add the [PSD] program, which seeks to ensure that the 'air quality floor' established by the NAAQS does not 'in effect become a ceiling.'

*Otter Tail*, 615 F.3d at 1011 (quoting *Sierra Club v. Thomas*, 828 F.2d 783 (D.C. Cir. 1987)); *see Hawaiian Elec. Co. v. EPA*, 723 F.2d 1440, 1446-47 (9th Cir. 1984) ("Congress repeatedly emphasized that NAAQS alone were insufficient to protect public health and welfare").

This added protection for areas that already meet the NAAQS is achieved, in part, by requiring all new and modified sources to meet BACT.  *Hawaiian Elec. Co.,* 723 F.2d at 1447 ("Congress found that it was important to reduce pollution levels below those mandated by the [NAAQS] standards and that the best means of doing so was to require the installation of BACT on all sources which would otherwise increase pollution.").  Meeting BACT requires use of "the most current, state-of-the-art pollution controls" available.  *Grand Canyon Trust v. Tucson Elec. Power Co.*, 391 F.3d 979, 983 (9th Cir. 2004). Though characterized as a "technology," BACT is defined as "an 'emission limitation based on the maximum degree of reduction of each pollutant subject to regulation ... which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable' for the facility in question."  *Otter Tail*, 615 F.3d at 1011 (quoting 42 U.S.C. § 7479(3)).

While determined on a case-by-case basis, "the purpose of BACT is to promote the use of the best technologies."  *In re Gen. Motors, Inc.*, 10 E.A.D. 360, 364 (E.A.B. 2002).  To do this, permitting authorities apply a "top down" approach to setting BACT, which requires use of the controls that will achieve the "maximum degree of reduction," unless the source meets its burden to "demonstrate that the technology is technically or economically infeasible."  *Citizens for Clean Air v. EPA*, 959 F.2d 839, 845 (9th Cir. 1992).  Both EPA and the Missouri Department of Natural Resources (MDNR) apply this "top down" approach. *Alaska Dept. of Envtl.*

*Conservation v. EPA*, 540 U.S. 461, 475-76 (2004); *Chipperfield v. Mo. Air Conservation Comm'n*, 229 S.W.3d 226, 239 (Mo. Ct. App. 2007).  Although the specific emission rate will depend on case-specific factors, FGDs are considered the best available $SO_2$ controls at coal-fired power plants.  *Chipperfield,* 229 S.W.3d at 240 ("In general, pulverized coal-fired boilers burning low-sulfur coal, such as Powder River Basin ("PRB") coal, may use dry FGD, while boilers burning high-sulfur coals, such as eastern bituminous coal, must use wet FGD."); *United States v. Cinergy Corp.*, 618 F.Supp.2d 942, 955 (S.D. Ind. 2009), *rev'd on other grounds*, 623 F.3d 455 (7th Cir. 2010) ("BACT would require a scrubber that removed 99% of the $SO_2$").

## LEGAL STANDARD

Summary judgment is appropriate if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed R. Civ. P. 56(c); *Lynn v. Deaconess Med. Ctr.,* 160 F.3d 484, 486 (8th Cir. 1998). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).  Granting summary judgment in such circumstances properly "avoids needless and costly litigation and promotes judicial efficiency."  *Harris v. SWAN, Inc.,* 459 F. Supp. 2d 857, 862 (E.D. Mo. 2005).

## ARGUMENT

As a matter of law, modified sources must obtain NSR permits and meet BACT.  Thus, in Section I Plaintiffs seek summary judgment that Ameren must obtain NSR permits and meet BACT limits in order to come into compliance with the Clean Air Act.  In addition, as set forth in Section II, BACT should require pollution controls *at least* ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

4

I.      **Ameren must obtain NSR permits and apply BACT to come into compliance with the Clean Air Act.**

A.  *The Clean Air Act requires all modified sources to obtain NSR permits and apply BACT.*

The law requires every modified source to meet certain requirements, including obtaining a permit that sets forth stringent emission limitations, analyzing air quality impacts, conducting air quality monitoring, and complying with state-of-the-art pollution control requirements.  *See* 42 U.S.C. §§ 7475(a), 7479(2)(C), *Otter Tail*, 615 F.3d at 1011-12; *New York*, 413 F.3d at 12-13. The NSR rules reiterate the mandatory nature of these requirements.  For instance, the PSD rules make clear that any "major modification *shall* apply best available control technology for each pollutant subject to regulation under the Act for which it would result in a significant net emissions increase. . . ."  40 C.F.R. § 52.21(j)(3) (emphasis added); *see also id.* § 52.21(i)(2) ("The [technology review, air quality modeling and analysis, and other] requirements of paragraphs (j) through (r) of this section shall apply to ... any major modification. . . .").

Thus, for a modified facility to comply with the PSD requirements of the Clean Air Act, it must obtain a PSD permit and, *inter alia*, meet BACT limits.  *See United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 850 (S.D. Ohio 2003) (a "modification triggers permitting requirements under the CAA as well as the duty to install pollution controls.").  This conclusion follows from the plain language of the Clean Air Act and NSR rules, which require "without exception" that all major modifications are subject to such requirements.  *Oregon Envtl. Council v. Oregon Dep't of Envtl. Quality*, No. 91-13-FR, 1992 WL 252123, *22-23 (D. Or. Sept. 24, 1992).  As the Seventh Circuit put it, the failure to obtain a valid PSD permit leaves "the company no option but to obtain this permit before it can commence construction."  *Sierra Club v. Franklin County Power of Ill.*, 546 F.3d 918, 936 (7th Cir. 2008).

B. *Because Rush Island Units 1 and 2 are modified sources, they must obtain NSR permits and apply BACT.*

Rush Island Units 1 and 2 are "modified" sources of air pollution.  *Ameren*, 229 F. Supp. 3d at 914.  In order to bring these units into compliance with the Clean Air Act, Ameren must obtain NSR permits and meet BACT. That is simply what the law requires for modified sources and, with liability established, Ameren must now come into compliance.  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982) (Court must order "relief it considers necessary to secure prompt compliance with the Act."); *United States v. City of Painesville*, 644 F.2d 1186, 1194 (6th Cir. 1981) ("Congress did not contemplate that its decision would be thwarted by judicial reluctance to require compliance when enforcement proceedings are brought and liability is proven."); *United States v. Production Plated Plastics*, 762 F. Supp. 722, 731 n.9 (W.D. Mich. 1991) ("Court cannot order the defendants to do less than RCRA minimally requires.").

Despite these clear requirements for modified sources, Ameren has taken the position that it may avoid obtaining NSR permits and meeting BACT altogether.  One of Ameren's experts even suggested that compliance should be based on what it hypothetically could have done at the time to *avoid* triggering NSR, rather than what is actually required by NSR now that the Court has determined Rush Island Units 1 and 2 to be "modified" sources.  *See* Dep. of Colin Campbell (Ex. 12 to accompanying Statement of Facts), at 12:2-13:5.[2]  But the fact is Ameren *did* modify its units.  The time for obtaining a permit to avoid NSR was before commencement of construction.  Now, NSR has been triggered, and the path to compliance is to obtain the required

---

[2]     Similarly, Ameren was required to address how it "will achieve compliance" with requirements triggered by this Court's liability decision as part of a recent renewal of its Title V permit. May 21, 2018 Part 70 Permit, at RPC-5 (PDF Page 125/127 of Ex. 36 to Statement of Facts).  Ameren took the position that it "has not been 'ordered' to do anything" to comply with this Court's decision, and that it is "premature to speculate what, *if any*, relief the district court may impose upon Rush Island…".  *Id.* at RPC-4 (PDF Page 124/127) (emphasis added).

permits and meet BACT.  Ameren must live with the consequences of its noncompliance even if they "might have been avoided had it taken a different course of action."  *United States v. Westvaco*, No. 00-2602, 2015 WL 10323214, *8 (D. Md. Feb. 26, 2015); *see New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 663 (W.D.N.Y. 2003) ("initial failure to comply with the requirements of the Clean Air Act cannot now inure to [defendant's] benefit").  As the *Oregon Envtl. Council* court explained in the context of the parallel nonattainment NSR program, NSR requirements apply to *all* modified sources, including those illegally constructed:

> The SIP does not exempt a source of pollutants from the new source review requirements simply because the 'major modification' was constructed prior to the issuance of a requisite permit.  Moreover, if such an exemption were allowed, a windfall would be created for those major new or modified sources that disregarded the SIP-mandated requirements.

1992 WL 252123, at *23; *see United States v. Midwest Generation*, 720 F.3d 644, 646 (7th Cir. 2013) (modifying plant without a permit is a "risky strategy" because if challenged the plant may need "to undertake a further round of modifications to get the permit"); *Cinergy*, 618 F. Supp. 2d at 961-62, 965 (rejecting post-hoc NSR avoidance theory, and holding that the only compliance alternative "was to apply for the necessary permits or shut down the units"); *United States v. Louisiana-Pacific Corp.*, 682 F. Supp. 1141, 1166 (D. Colo. 1988) ("requirements of the [PSD] program have been met only upon *receipt* of PSD permits") (emphasis in original).

Ameren also may argue the Court should wait to weigh the equities before ruling on any compliance issues.  But there is no reason to delay holding that Ameren must obtain permits and meet BACT in order to comply with the Clean Air Act.  Congress already determined how modified facilities are to be treated, and the Court can and should order compliance on that basis.  Moreover, even applying the traditional factors that guide a court's exercise of discretion, the equities all weigh in favor of requiring Ameren to obtain permits and meet BACT.

     *i.*     *Congress already determined how modified sources must comply with the law.*

 This is not an ordinary injunctive relief case.  Rather, this case involves a sovereign acting in the public interest to remedy an established violation of a public health law.  In that law, Congress determined that modified sources must obtain permits and meet BACT, and provided for injunctive relief to restrain violations at such sources.  42 U.S.C. §§ 7413(b), 7475, 7477.  Thus, Congress already balanced the equities by determining what modified sources must do to comply, leaving the court to enforce compliance.  *Burlington N. R.R. v. Bair*, 957 F.2d 599, 601-02 (8th Cir. 1992); *Envtl. Def. Fund v. Lamphier*, 714 F.2d 331, 337-38 (4th Cir. 1983).

Although a court need not mechanistically issue an injunction in all cases, it cannot "override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited."  *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001).  Where a violation has been established, the law must be enforced:

> Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is ... for the courts to enforce them when enforcement is sought. Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute. Their choice (unless there is statutory language to the contrary) is simply whether a particular means of enforcing the statute should be chosen over another permissible means; their choice is not whether enforcement is preferable to no enforcement at all. … To the extent the district court considers the public interest and the conveniences of the parties, the court is limited to evaluating how such interest and conveniences are affected by the selection of an injunction over other enforcement mechanisms.

*Id*. at 497-98 (internal citations and quotations omitted); *see Romero*, 456 U.S. at 315 (approving of an order to require the Navy to obtain a permit, on grounds it "temporarily, not permanently, allowed the Navy to continue its activities without a permit").[3]

---

[3]    In *Romero*, which involved no actual pollution from any discharge, the Court held the Clean Water Act did not compel an immediate prohibitory injunction because compliance could be ensured through "compliance with the permit requirements."  *Id.*  Thus, even in the absence of pollution, the Court confirmed a permit was required. *See id.* at 320 ("Should it become clear

Moreover, Congress' enactment of the Clean Air Act demonstrated the high priority placed on air quality, and its passage of the PSD program in particular demonstrated the high priority placed on the use of BACT at modified facilities, even in areas that already meet NAAQS.  *Otter Tail*, 615 F.3d at 1011; *Hawaiian Elec.*, 723 F.2d at 1447.  In light of these priorities, Ameren may not simply avoid the application of PSD at its modified units.  *See TVA v. Hill*, 437 U.S. 153, 194 (1978) ("it is … the exclusive province of the Congress not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation"); *see Franklin County Power,* 546 F.3d at 936 ("decision [on liability] leaves the Company no option but to obtain this permit before it can commence construction.").[4]  Any other result would upend the balance Congress struck when it grandfathered existing sources but required all modifications to obtain permits and meet BACT.

    *ii.*    *All of the traditional equitable factors support requiring compliance.*

Even weighing the factors that ordinarily guide a court's discretion, Ameren must come into compliance with the NSR requirements it violated.  Those factors require a plaintiff to show:

> (1) that it has suffered irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for the injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  Each of these factors weighs in favor of requiring Ameren to come into compliance with the Clean Air Act.

---

that no permit will be issued and that compliance with the [Act] will not be forthcoming, the statutory scheme and purpose would require the court to reconsider the balance it has struck").

[4]    The court noted that equitable balancing would likely be required before shutting down a facility for allegedly operating in excess of permit limits.  *See id.*  Here, on summary judgment, Plaintiffs are not seeking an interim shutdown.  Rather, Plaintiffs seek summary judgment that to comply with the Clean Air Act, Ameren must obtain NSR permits and meet BACT limits.

First, there is irreparable harm. This case involves environmental harm, a type of harm that "by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 545 (1987); *see Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1037 (8th Cir. 2016) (environmental harm presumed even from failure to follow procedural requirements of National Environmental Policy Act). In the specific context of an NSR violation, courts have found irreparable harm from the mere fact that an NSR permit would somewhat reduce a source's emissions of air pollution. *See Franklin County Power*, 546 F.3d at 936; *Communities for a Better Env't v. Cenco Ref. Co.*, 179 F. Supp. 2d 1128, 1148 (C.D. Cal. 2001). For instance, in *Franklin County Power*, the court found irreparable harm simply because a BACT determination had become stale, and thus reflected a less stringent limit than would have been required by a more current BACT determination. *See* 546 F.3d at 936. By contrast, this case involves excess emissions from Ameren's failure to comply with BACT *at all*.[5]

Second, the type of harm here has no adequate remedy at law. Ameren cannot pay money to avoid compliance; Congress created no such provision when it enacted the PSD

---

[5]      Well beyond the evidence in *Franklin County Power*, the record shows Rush Island's $SO_2$ emissions would have been reduced by well more than 10,000 tons *per year* had it achieved reductions comparable to other plants that use scrubbers. *See Ameren*, 229 F. Supp. 3d at 917. Such $SO_2$ is harmful in its own right, and mixes with other pollutants to form fine particulate matter, known as $PM_{2.5}$, which causes some of the most serious harm from air pollution, including early death and increased incidence of heart attacks. *American Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 515 (D.C. Cir. 2009); *Westvaco*, 2015 WL 10323214, *8-9 ("The majority scientific consensus, accepted by the Court, is that the harm from exposure to $PM_{2.5}$ is linear, and there is no known threshold below which $PM_{2.5}$ is not harmful to human health"); *Cinergy*, 618 F. Supp. 2d at 949-50, 963 (discussing scientific consensus and finding that because the relationship between $PM_{2.5}$ and mortality is linear at relevant ambient concentrations, "any reduction in $PM_{2.5}$ concentration would have a corresponding reduction in mortality rate").

program.  Thus, an "economic award would not sufficiently compensate" for injuries resulting from failure to obtain a PSD permit.  *Franklin County Power*, 546 F.3d at 936; *see Westvaco*, 2015 WL 10323214, at *9; *Cinergy*, 618 F. Supp. 2d at 961.  In addition, the law must apply equally to all companies, and there is harm to the regulatory program when it is violated, which can only be addressed by bringing the violator into compliance.

Third, the balance of harms weighs in favor of compliance because it addresses irreparable harm to the public "while simply requiring the Company to … obtain[] a permit that complies with the Clean Air Act."  *Franklin County Power*, 546 F.3d at 936. Compliance simply means Ameren will be required to do what it should have done more than a decade ago, consistent with the balance Congress struck when it grandfathered existing facilities but imposed control requirements on them when modified.  *See WEPCo*, 893 F.2d at 909.  Thus, "any hardship that [Defendant] may suffer from an injunction is the consequence of their longstanding non-compliance with the law." *United States v. Oliver*, No. 06-cv-196, 2009 WL 10671371, *13 (D. Alaska June 25, 2009).  Moreover, any hardship from simply complying with applicable law pales before the harm to the public from unpermitted pollution.

Finally, requiring Ameren to comply with the law will further the public interest.  A primary purpose of the Clean Air Act is to "protect and enhance" the Nation's air quality, 42 U.S.C. § 7401(b)(1), and requiring Ameren to obtain a permit and meet BACT would "result in decreased emissions and improved public health, which would further a stated goal of the Clean Air Act."  *Franklin County Power*, 546 F.3d at 936-37.  Similarly, Congress has already prioritized the application of PSD to modified sources, and the public will benefit from "ensuring that the policies of federal law are enforced and upheld."  *Westvaco*, 2015 WL 10323214, at *9.

11

## II.     NSR compliance at Rush Island requires controls designed to meet an emission rate at least ████████████████████

### A.  There is no dispute that FGDs are the best available $SO_2$ controls for Rush Island.

As described above, the top-down approach to BACT requires use of the "technology that will produce the maximum degree of reduction," unless the source can meet its burden to "demonstrate that the technology is technically or economically infeasible."  *Citizens for Clean Air*, 959 F.2d at 845.  With discovery now complete, there is no genuine dispute that FGD scrubbers are the top controls for reducing $SO_2$, are feasible at Rush Island, and would have been selected as BACT had Ameren followed the law.[6]

FGD scrubbers are widely used at coal-fired power plants, and have been considered the top controls for reducing $SO_2$ from coal-fired power plants for decades.  Statement of Facts (SOF) ¶¶ 4-20.  Both EPA and MDNR have previously determined that FGDs are required to meet $SO_2$ BACT limits at other coal-fired power plants.  SOF ¶¶ 9, 12-15, 17-19; *see also Chipperfield*, 229 S.W.3d at 240; *Cinergy*, 618 F. Supp. 2d at 955.  Indeed, permitting reviews compiled by Ameren's own experts in other matters identified scores of BACT determinations at coal-fired power plants, *all* of which required use of FGDs to reduce $SO_2$. SOF ¶¶ 12-14.  There is thus no genuine dispute that FGD represents the top $SO_2$ reduction technology, and is the accepted technology required to meet BACT at coal-fired power plants.

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[6]     Ameren may point to the opinions of one of its expert witnesses, Colin Campbell, to oppose this motion.  As explained in our concurrently filed *Daubert* motion, Mr. Campbell's opinions are fundamentally unsupported, unreliable, and based on his legally irrelevant interpretation of the BACT requirement.

12

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████ Such reductions are consistent with SO$_2$ rates achieved by scrubbers at other coal-fired power plants. SOF ¶¶ 10, 48.  However, Ameren never installed scrubbers at Rush Island.  ███████████████████████

███████████████████████████████████

B.    ████████████ *is consistent with the technology-forcing purpose of BACT and avoids rewarding Ameren for its own failure to comply with the law.*

Far from allowing Ameren to meet its burden to demonstrate that FGDs were infeasible, the facts described above demonstrate that ███████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

████    Thus, there is no genuine dispute that FGDs would have been considered BACT under the top-down approach had Ameren sought permits for its modifications.  ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████    The Court thus should hold that BACT at Rush Island requires FGDs, and is at least as stringent as what Ameren already selected at the time of the modifications.

Two additional factors in this case support holding Ameren to at least this compliance standard.  First, it is consistent with the technology-forcing nature of BACT.  When a source seeks a preconstruction permit, the BACT determination reflects the "best available" controls at the time the permit is issued.  42 U.S.C. § 7475(a)(4); 40 C.F.R. § 52.21(j)(3).  Indeed, a BACT determination will *expire* if construction is not commenced within 18 months, or if construction is discontinued for 18 months or longer or not completed within a reasonable time.  *See* 40 C.F.R. § 52.21(r)(2); *In re W. Suburban Recycling and Energy Ctr.*, 8 E.A.D. 192, CAA Docket No. 97-12, 1999 WL 133041 (U.S. Envtl. Prot. Agency Mar. 10, 1999) (noting that this provision "is one of the means of ensuring that the requirement for [BACT] involves reasonably current pollution controls.").  Thus, because "pollution control technology tends to improve over time," more recent BACT determinations will impose "tougher emission standards" than prior determinations.  *Franklin County Power*, 546 F.3d at 927.  This trend of more stringent BACT rates over time is also consistent with the findings of Ameren's own expert.  SOF ¶ 10.  To be consistent with this technology-forcing purpose of the BACT requirement, it is only fair that BACT at Rush Island should be *at least* as stringent as the reductions Ameren already determined were feasible for the plant almost a decade ago.

Second, the BACT process should not be used to allow sources to benefit from their failure to comply with the Clean Air Act's PSD provisions.  As the *Niagara Mohawk* court explained:

> Implicit in the requirement that a facility be subject to BACT . . . is an obligation on the part of the person proposing the construction or modification to obtain the appropriate BACT determination. … [Defendant's] initial failure to comply with the requirements of the Clean Air Act cannot now inure to its benefit…. Permitting Niagara Mohawk to rely on its own inaction as a shield would lead to absurd and surely unintended consequences.

263 F. Supp. 2d at 663; *see also United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 652 (M.D.N.C. 2003) (rejecting interpretation of PSD provisions that could make it "more cost-effective to avoid the permit obligations altogether. . . ."), *vacated in other part*, 2010 WL 3023517 (M.D.N.C. 2010).  Allowing Ameren to meet an emission rate higher than ██████ ████████████████████████████ would reward the company for illegally modifying Rush Island Units 1 and 2 without the required permits.  The court should avoid this perverse result, which would incentivize companies to construct unpermitted modifications without BACT in the hope that, even if later caught, they could be allowed to install less stringent technology.

## CONCLUSION

While a trial will further define the appropriate relief necessary to redress the past and ongoing harm from Ameren's excess emissions, there is no reason to delay ruling on Ameren's compliance obligations.  The Court should hold that (1) Ameren must obtain NSR permits and meet BACT in order to bring Rush Island into compliance with the law, and (2) BACT here means an emission limitation at least as stringent as ████████████████████████████ ████████████████████████████████████.  Such a holding would finally compel Ameren to begin the long-overdue process of bringing Rush Island into compliance with the law.

Dated: September 28, 2018

OF COUNSEL:

Alex Chen
Sara Hertz Wu
Senior Counsel
Office of Regional Counsel
U.S. EPA, REGION 7
11201 Renner Boulevard
Lenexa Kansas  66219

Sabrina Argentieri
Attorney-Advisor
U.S. EPA, OECA

Respectfully Submitted,

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

/s/ *Jason A. Dunn*

James W. Beers, Jr.
Jason A. Dunn, VA No. 42730
Elias L. Quinn, CO No. 42159
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. DEPARTMENT OF JUSTICE
P.O. Box 7611
Washington, DC  20044-7611
Telephone:  (202) 514-1111
Facsimile:  (202) 616-6584
E-mail:  Jason.Dunn@usdoj.gov

ANDREW J. LAY #39937MO
Assistant United States Attorney
United States Attorney's Office
Eastern District of Missouri
Thomas Eagleton U.S. Courthouse
111 South 10th Street, 20th Floor
St. Louis, Missouri 63102
Telephone:  (314) 539-2200
Facsimile:  (314) 539-2309
E-mail: Andrew.Lay@usdoj.gov

*Attorneys for Plaintiff United States*

16

/s/ *Benjamin Blustein*
Benjamin Blustein (*pro hac vice*)
David Baltmanis (*pro hac vice*)
MINER, BARNHILL & GALLAND, P.C.
325 N. LaSalle, Suite 350
Chicago, IL  60654
Tel: (312) 751-1170
Fax: (312) 751-0438
bblustein@lawmbg.com
dbaltmanis@lawmbg.com

Sunil Bector (*pro hac vice*)
SIERRA CLUB
2101 Webster, Suite 1300
Oakland CA 94612
Tel: (415) 977-5759
Fax: (510) 208-3140
sunil.bector@sierraclub.org

*Attorneys for Plaintiff-Intervenor Sierra Club*

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2018, I filed the foregoing with the Clerk of Court using the CM/ECF system.  In addition, I will serve electronic copies of the foregoing on counsel of record.


/s/ *Jason A. Dunn*

JASON A. DUNN