# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> SIERRA CLUB, ) <br> ) <br> Plaintiff-Intervenor, ) <br> ) <br> v. ) <br> ) <br> AMEREN MISSOURI, ) <br> ) <br> Defendant. ) | Civil Action No. 4:11-cv-00077-RWS <br><br> Judge Rodney W. Sippel |

## AMEREN MISSOURI'S REMEDY PHASE TRIAL BRIEF

Matthew B. Mock (admitted *pro hac vice*)
SCHIFF HARDIN LLP
One Market, Spear Street Tower Suite 3100
San Francisco, California 94105
Tel:  (415) 901-8700

Renee Cipriano
David C. Scott
Mir Y. Ali
Molly L. Wiltshire
Daniel J. Schufreider
(All admitted *pro hac vice*)
SCHIFF HARDIN LLP
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606
Tel:  (312) 258-5500

Ronald S. Safer (admitted *pro hac vice*)
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison, Suite 2900
Chicago, Illinois 60602
Tel:  (312) 471-8700

John F. Cowling
ARMSTRONG TEASDALE LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri  63105
Tel:  (314) 621-5070

*Counsel for Defendant Ameren Missouri*

Dated:  March 27, 2019

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................ 1

I.  There Is No Harm Because Air Quality Is Excellent and Rush Island SO2 Emissions Contribution to PM2.5 Is Miniscule ................................................................ 3

II. As to PSD Compliance at Rush Island, It Would Be Inequitable to Force Ameren to Forfeit Minor Permitting ........................................................................................ 6

III. DSI Strikes an Equitable Balance Under the *eBay* Test ................................................. 11

IV. Under Eighth Circuit Law, There Is No Basis for Mitigation of "Excess" Emissions ............ 12

# INTRODUCTION

Air quality in the St. Louis area is better than it has ever been, and continues to improve. The levels of the pollutant at issue in the remedy phase—fine particulate matter or PM2.5—are at all-time lows. EPA's most important duty under the Clean Air Act is to determine, for each pollutant, the National Ambient Air Quality Standard (NAAQS), setting it at a level that protects the health of even the most sensitive groups. The NAAQS for PM2.5 is 12 micrograms per cubic meter ($\mu g/m^3$), meaning air concentration levels at or below 12 are safe. In 2017, in Jefferson County where Rush Island is located, the level of PM2.5 was 8.2 $\mu g/m^3$, well below 12. Provisional 2018 data shows even lower levels: just 7.4 $\mu g/m^3$.[1] Indeed, air quality satisfies the NAAQS throughout Missouri and its neighboring states. (Ex. A.)

Where do Rush Island's emissions fit into this? We already know that Rush Island's emissions have not pushed the air quality anywhere close to the level where EPA's safety concerns begin. Moreover, Rush Island's annual SO2 emissions are, and since 2012 have been, about 10,000 tons per year below the pre-project baseline levels.

Considering that concentration levels are well within what EPA has found to be safe, and that Rush Island's emissions are already far lower, what remedy is appropriate and equitable under the goals of the Prevention of Significant Deterioration ("PSD") program? As its name states, PSD is intended to prevent *deterioration* of air quality. Since the projects, air quality has improved, not deteriorated; and it continues to improve. The PSD program does not require emissions reductions; it actually allows emissions increases. EPA's 30(b)(6) witness admitted that PSD allows for economic growth, whereas it is the NAAQS that protect public health.

---

[1] EPA Air Quality Statistics by County, 2017, https://www.epa.gov/air-trends/air-quality-cities-and-counties (last visited 3/26/2019); EPA Outdoor Air Quality Data, Monitor Values Report, 2018, https://www.epa.gov/outdoor-air-quality-data/monitor-values-report (last visited 3/26/2019).

Fashioning an equitable remedy also requires other considerations of fairness.  Ameren submits that chief among these is lawfully available minor permitting and related fair notice and penalty issues.  Had Ameren known that the projects would trigger PSD, then, like any reasonable operator, it would have taken other actions—like capping emissions, or installing dry sorbent injection technology ("DSI")—to avoid an emissions increase.  EPA has repeatedly deemed those compliance approaches lawful, and it is far and away the norm, not the exception.  Across the country, in the 40 years of the PSD program, there have been only 2 instances where an existing power plant obtained a PSD permit for SO2.

Ameren determined that the projects would not cause an increase, and the Court ruled that Ameren was incorrect; but there was no clear regulatory direction from EPA.  EPA's liability trial evidence turned on the judgment of its experts, interpreting the only guiding standard:  consider "all relevant information."  That phrase provides no guidance at all, let alone fair notice, of what is required.  Indeed, another regulation's ambiguous use of the word "relevant" prompted the Supreme Court to review administrative deference in *Kisor v. Wilkie* (No. 18-15), which, coincidentally, was argued earlier today.  If the standard had been clearer, or if the regulation had actually required Dr. Sahu's approach, then Ameren could have lawfully obtained a minor permit or implemented operating restrictions at the time of the projects.

Injunctive relief must be narrowly tailored to effect the purpose of the law at issue.  The PSD program is intended to "preserve air quality" with only a "minimum of economic hardship," *Alabama Power Co. v. Costle*, 636 F.2d 323, 378 (D.C. Cir. 1979)—precisely why minor permits allowing emissions *increases* are lawful compliance approaches.  PSD compliance does not mandate installing scrubbers.  Plaintiffs' request for injunctions costing over $2.5 billion must be viewed in this context.  Overbroad injunctions are subject to reversal and remand, as shown by

2

*Kennedy Bldg. Assocs. v. CBS Corp.*, 375 F.3d 731, 746-48 (8th Cir. 2004), an environmental contamination case in which the 8th Circuit remanded an injunction that was not tailored to the violation and exceeded the relief "authorized by" the statute.

Given the excellent air quality, Rush Island's far lower emissions, the narrow purposes of the PSD program, the potential burdens on ratepayers, and the other equitable considerations like fair notice and penalty issues, Ameren proposes that an equitable remedy would be:

1. Installing DSI at both Rush Island units, which reduces emissions by 50%, and obtaining from MDNR a minor permit making enforceable a corresponding annual emission limit. DSI can be installed and begin reducing emissions years earlier than FGD, at just 5% of the capital cost of FGD.

2. No mitigation relief. The Eighth Circuit's decision in *Otter Tail* forecloses such relief here. There are no "excess" emissions because operating without a PSD permit is not unlawful, and it is black letter law that no mitigation is required for a lawful act. Indeed, it is impossible to square the holding of *Otter Tail*—that the failure to get a permit is a one-time, non-continuing violation—with the notion that operations occurring *after* that one-time violation must be remediated. Plaintiffs have provided absolutely no reason why *Otter Tail* does not control.

3. But if the Court disagrees and requires mitigation, which Ameren submits would constitute error, then retiring an appropriate number of Ameren's emissions allowances under the Cross-State Air Pollution Program would constitute full mitigation. EPA has confirmed that retirement of these allowances is "equivalent to pollution controls" and "would reduce ambient air pollution and thereby mitigate the harm" from any excess emissions the Court finds. Such relief is far more tailored than would be the years-long construction of over $1.6 billion in controls at the Labadie plant, which would constitute a penalty under *Kokesh v. S.E.C.,* 137 S. Ct. 1635 (2017).

We preview the trial evidence on these points below.

**I.     There Is No Harm Because Air Quality Is Excellent and Rush Island SO2 Emissions Contribution to PM2.5 Is Miniscule.**

Setting the NAAQS is EPA's most important duty under the Clean Air Act: the NAAQS is "the engine that drives nearly all of Title I of the CAA." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). EPA sets the NAAQS based on a review and assessment of the available science, advice from an independent panel of highly-regarded scientists selected by EPA, and

3

thousands of comments from the public.  Importantly, the cost to the country of meeting this standard plays no role in setting the NAAQS.  The only question EPA asks is:  What level of air quality is safe for even the most vulnerable populations?

We already know that the air quality is excellent and has been steadily improving since the projects.  The levels of PM2.5 in the St. Louis area are at all-time lows:  around 8.5 µg/m$^3$, compared to the NAAQS of 12 µg/m$^3$.  The evidence will show that Rush Island's contribution to this number was miniscule, and did not make the air unsafe, or anywhere close to it.  Even Plaintiff's experts' modeling (which Ameren disputes) of Rush Island's highest SO2 emissions year (2011) showed the emissions contributed a mere 0.0022 µg/m$^3$ to the national annual average PM2.5 concentration.  That amount is so small that it cannot be measured by air quality monitors.  EPA prescribes levels of "significance" for emissions impacts, and the significance level for PM2.5 is 0.2 µg/m$^3$—about 100 times greater than Rush Island's purported contribution.  EPA scientists conduct experiments exposing human subjects to PM2.5 concentrations as high as 400 µg/m$^3$ for a 2-hour period, and EPA considers those experiments perfectly safe.

As EPA's 30(b)(6) witness testified, it is the NAAQS, <u>not</u> the PSD program, which improves and protects public health:

> Q. And [PSD] means the prevention of significant deterioration of air quality, correct?
>
> A. That's correct.
>
> Q. And EPA wants to prevent the deterioration of air quality to protect public health, correct?
>
> A: **I'm not sure I understand all those pieces.** The PSD program of course is a permitting program. As part of that, we can't issue any permits that would be above the standards or that would compromise increment. **So I'm not sure that they have a direct health nexus.** …
>
> Q. **All I'm asking is do you agree that preventing the deterioration of air quality is to protect public health?**

4

> A. **I think at a high level, PSD is meant to allow economic growth and not compromise the air quality beyond the NAAQS.**
>
> Q. **In order to protect public health?**
>
> A: **That's what NAAQS do.**

Ex. B, Aug. 8, 2018 30(b)(6) Dep. of EPA (J. Knodel) at 199:13 – 200:17 (objections omitted).

That makes sense, because the PSD regulations do not require emission reductions, and in fact *allow* emissions increases. As EPA's testimony confirms, so long as emissions do not "compromise the air quality beyond the NAAQS," then PSD "is meant to allow economic growth."

Yet Plaintiffs will argue that the Court should ignore the health-protective NAAQS. Through the magic of statistics, their experts will opine that they can extrapolate a line that represents health benefits even far below the NAAQS, so that even tiny differences in air quality warrant injunctions costing over $2.5 billion, to be borne by Ameren and, presumably, Missouri ratepayers.

There is an irreconcilable conflict between the position EPA and its scientists have taken when making determinations for the public health and setting the NAAQS, and the positions Plaintiffs and their hired experts now take in this litigation. EPA must set the NAAQS without regard to how much it might cost the country to comply: "In setting standards that are 'requisite' to protect public health and welfare . . . EPA may not consider the costs of implementing the standards." 78 Fed. Reg. 3086, 3090 (Jan. 15, 2013) (current PM2.5 NAAQS rule). Thus, in setting the NAAQS, there is no balancing test like the one this Court must apply under *eBay*. And even with cost as no object, EPA determined that the health of all populations would be safe when PM2.5 concentrations are 12 $\mu g/m^3$ or lower.

It cannot simultaneously be true that when cost *does not* matter, EPA's scientists find that

5

PM2.5 concentrations of 12 µg/m$^3$ or lower are safe, and that no health benefits will inure from setting the NAAQS any lower; yet when costs *do* matter—under *eBay*—the expenditure of $2.5 billion is justified by a miniscule reduction of PM2.5 from a level that is *already safe* (because it is below the NAAQS) to a level just fractionally lower.

The years-long public process of setting the NAAQS—"the engine that drives" the Clean Air Act—must have meaning. Plaintiffs' litigation theory pretends it has none.

## II. As to PSD Compliance at Rush Island, It Would Be Inequitable to Force Ameren to Forfeit Minor Permitting.

Plaintiffs argue that Ameren must "come into compliance" with PSD. In the ordinary course, sources who initially determine that a project will trigger PSD have several compliance options available to them. The three primary options are: (1) applying for a PSD permit and installing BACT; (2) taking other options (*e.g.*, changing the project scope) in order to lawfully avoid triggering PSD; and (3) seeking a minor permit that includes an enforceable emissions limit.

EPA has repeatedly recognized that sources may pursue any of these compliance options, including obtaining minor permits.[2] While seeking a minor permit can be difficult for a new power plant (because all of its emissions are new) existing power plants are in a very different position. Existing plants have an emissions history ("baseline emissions") and need only take the actions necessary to avoid significantly increasing emissions above those baseline levels. Taking such action is far and away the norm: In the 40 years that the PSD program has existed,

---

[2] *See, e.g.,* Requirements for Preparation, Adoption, and Submittal of Implementation Plans; Approval and Promulgation of Implementation Plans, 45 Fed. Reg. 52676 (August 7, 1980); U.S. EPA, Office of Air Quality Planning and Standards, Prevention of Significant Deterioration Workshop Manual, EPA-450/2-80-081, at p. I-B-1 (October 1980); Memorandum from J.S. Seitz and R.I. Van Heuvelen of U.S. EPA to U.S. EPA regional air division directors (January 22, 1996); Prevention of Significant Deterioration (PSD) and Nonattainment New Source Review (NSR), 61 Fed. Reg. 38249 (July 23, 1996).

6

only two existing EGUs have sought a PSD permit and installed BACT for SO2, both in very different circumstances than are at issue here. That PSD compliance option through minor permitting should remain available to Ameren here. It should not be forfeited because the Court found Ameren's emissions analysis to be incorrect.

Preventing significant increases was feasible at Rush Island. At the liability trial, Dr. Sahu predicted relatively small increases in emissions—on the order of 3% to 6% over baseline levels. Exhibit C hereto shows the minor permit limit (Baseline +39 tons). Both units' actual emissions exceeded that number only by a small amount; compliance could have been achieved by merely restricting operations or changing fuel. As shown on Exhibit C, Ameren reduced emissions far below the minor permit level after changing to a lower sulfur fuel in 2012.

Plaintiffs argue that once an operator makes an initial determination that a project will cause emissions to increase, the die is cast and there is no turning back: BACT must be installed. That argument is legally incorrect and makes no sense. Just as a project that initially was expected to cause an increase could be cancelled before construction begins, so could it be changed to avoid an increase. Indeed, that is true even during PSD permitting: If Ameren had gone to MDNR, applied for a PSD permit, and MDNR required actions that were not economically viable, Ameren still could have changed the scope of the project or taken other actions that would have avoided PSD permitting altogether. A finding that Ameren has forfeited the minor permitting option would be inequitable for three reasons.

**1.     Applying Different Legal Tests Would Be Inequitable.** In the liability phase, the Court ruled, over Ameren's objection, that the relevant legal test was the "reasonable power plant operator" standard, applied retroactively at the time the projects were commenced. In other words, the trier of fact would go back to 2007 and 2010 and assess the facts as they then stood to

7

determine whether a reasonable operator "would have" expected an emissions increase.  That same standard should apply in the remedy phase:  with an initial determination that a project would cause an increase, what PSD compliance path would a reasonable operator have selected?  It would be manifestly unfair to assess liability by going back in time to second-guess Ameren's past analysis, but then discard that back-in-time, reasonable operator standard in the remedy phase by finding that Ameren has now forfeited the other options it would have had to comply.

If the reasonable power plant operator standard is applied in this remedy phase, minor permitting would be the result.  No reasonable operator would have forged ahead with the Rush Island projects litigated in the liability phase, which cost tens of millions of dollars, if doing so also required installing $1 billion in SO2 controls.  Like any rational economic actor, the operator would change course.  The proof is in the history of the PSD program.  In four decades of its existence, all across the country, only two PSD permits for SO2 have been issued for existing power plants.

**2.      Fair Notice.**  The PSD program is set up as a self-administered program; that is, the source makes its own emissions analysis and is not required to ask MDNR or EPA for prior approval or confirmation.  Ameren made its own analysis before undertaking the projects and concluded that they would not cause a significant emissions increase.  The Court has found that Ameren's conclusions were incorrect and that it should have expected an increase.  It is significant, however, that the Court's decision was only reached after years of discovery, numerous motions on fundamental legal issues related to what the regulations mean, and a full merits trial.  (Of course, that was not the Court's choice:  that path was chosen by EPA.)  Consider the path necessary for the Court to reach its conclusion:

EPA's investigation began in 2008, and continued until it filed suit in 2011.  EPA then

took several years of discovery. To make its liability case, EPA took years to investigate and take discovery, and had half a dozen experts spend over 1,000 hours before they could they reach their conclusions. Halfway through discovery, EPA dismissed the first two counts, regarding large projects undertaken at Rush Island in 2001 and 2003. The ultimate conclusion, that the remaining projects triggered PSD, was anything but obvious.

The PSD regulations contain no notice that economizer or reheater replacements, for example, are major modifications. If they did, it would have been impossible for a trial court to find such component replacements to be lawful, as did the courts in *Nat'l Parks Conservation Ass'n. v. TVA* and in *Pennsylvania v. Allegheny Energy, Inc.*, or for a jury to find them to be lawful, as did the jury in the *U.S. v. Cinergy* case.[3] Indeed, the Court will recall from the liability trial that MDNR regulators were on-site at Rush Island when these projects were taking place. Knodel Liability-Phase Test., Tr. Vol. 1-B, at 42:22-42:25. If it had been clear that the projects would cause emissions to increase, EPA or MDNR would have moved for immediate relief. They did not. Ameren repeatedly sought from EPA its emissions calculations, the very basis for liability: before discovery, during discovery, and through a FOIA suit. EPA refused every time. If EPA's very basis for liability cannot be ascertained by a knowable, public method, and instead requires numerous experts and years of analysis, how can the regulated public have fair notice?

As EPA's experts freely admitted at trial, their opinions were based on their judgment. The regulatory hook for their exercise of judgment was the phrase in the PSD regulations requiring the consideration, when projecting emissions, of "all relevant information." The

---

[3] *Nat'l Parks Conservation Ass'n. v. TVA*, No. 3:01-CV-71, 2010 WL 1291335 (E.D. Tenn. Mar. 31, 2010); *Pennsylvania v. Allegheny Energy, Inc.*, No. 05-885, 2014 WL 494574 (W.D. Pa. Feb. 6, 2014); *U.S. v. Cinergy Corp.*, 623 F.3d 455, 457 (7th Cir. 2010) (noting that the jury found that most of the modification projects at issue there were lawful).

9

vagueness of that phrase provides no notice, much less fair notice, to the regulated public. Indeed, it is the same ambiguity in the word "relevant" that is currently before the Supreme Court in the administrative deference case, *Kisor v. Wilkie*.[4] Posted speed limits provide no notice when there are no speedometers, and instead compliance is determined by applying subjective judgment under a vague directive to consider "all relevant information."

The lack of fair notice regarding what constitutes a major modification is a strong equitable consideration in determining a fair remedy. The lack of fair notice would be particularly exacerbated by imposition of a different and harsher legal test in the remedy phase, one that takes away a lawful compliance option—minor permitting—that would have been available to Ameren if it had known the projects would be deemed major modifications. It would have been easy for EPA to provide fair notice. If Dr. Sahu's emissions method was the one EPA required operators to use, or if other methods (like Ameren's) were improper, all EPA had to do was say so. Ameren would have had fair notice of what the law required, and could have obtained a minor permit.[5]

Finally, Ameren reasserts its fair notice argument regarding the interpretation of the Missouri SIP's construction permit provisions. *See* ECF No.'s 539-542, 643. EPA may approve or disapprove a proposed SIP; but it may not fundamentally alter the SIP by offering comments in the approval notice, particularly when those comments were specifically rejected by Missouri.

---

[4] *See Kisor v. Shulkin,* 869 F.3d 1360 (Fed. Cir. 2017), *cert. granted in part sub nom. Kisor v. Wilkie,* 139 S. Ct. 657, 202 L. Ed. 2d 491 (2018).

[5] It is no answer for Plaintiffs to argue that Dr. Sahu's method was "known in the industry" at the time. General knowledge cannot provide fair notice. Fair notice must come from the regulator itself. *See, e.g..,  Nat. Res. Def. Council v. Illinois Power Res., LLC*, 202 F. Supp. 3d 859, 881 (C.D. Ill. 2016).

3.     **Forfeiture of Minor Permitting Would be a Penalty.**  To avoid having to present its case to a jury of Missouri citizens, EPA waived all claims to penal relief.  That is an odd choice for a public regulator to make when it is asserting its duty to protect the health and welfare of those very same citizens.  But it made that choice, and while Plaintiffs want it to mean that they only waived civil penalties, the Supreme Court has left no doubt that penal relief is broader than that.  *See Kokesh v. S.E.C.,* 137 S. Ct. 1635 (2017) (finding penal relief includes disgorgement).  This is the first time, out of all of the NSR cases, in which a plaintiff has waived its claim for penal relief.   Thus, in all of the other cases that Plaintiffs routinely cite (*e.g.*, *Cinergy*, *Westvaco*, etc.) penalties were still in play, and those plaintiffs were free to seek any remedy, no matter how punitive.  That is not true here.  Taking away the minor permitting option would constitute a penalty because it eliminates a lawful compliance option that was available to, and would have been exercised by, a reasonable operator at the time of the projects.

### III.    DSI Strikes an Equitable Balance Under the *eBay* Test.

Under the Court's liability ruling, Ameren believes that a fair and equitable remedy would be to order Ameren to install DSI on both Rush Island units.  DSI consists of spraying a powdered reagent into the gas stream that binds with sulfur, which then can be removed through existing means.  It is a mature and well-proven technology, one that EPA has accepted in a number of settlements as a feasible and effective means of controlling SO2.  Emissions reductions will begin sooner, because DSI can be installed in 18 months or less, compared to 5 years for FGD.  DSI would remove 50% of SO2 emissions, and would accordingly reduce recent average annual emissions to approximately one-third of baseline levels:

|  | Baseline Actual Emissions (Pre-Project) | 2013-2018 Average Emissions | **Approximate Emissions with DSI** |
| --- | --- | --- | --- |
| Unit 1 | 14,874 | 9,371 | **4,685** |
| Unit 2 | 14,288 | 9,515 | **4,758** |
| **Total** | 29,162 | 18,886 | **9,443** |

Despite reducing emissions by 50%, DSI has a capital cost of only about 5% of FGD ($43 million vs. $1 billion), reducing the burden on ratepayers.  DSI is a particularly equitable remedy in light of the fact that Missouri air quality is excellent, and continues to improve.

The regulatory goal of the PSD program is to prevent significant deterioration with a "minimum of economic hardship."  *Alabama Power*, 636 F.2d at 378.  DSI is appropriately tailored to achieve that goal.

**IV.   Under Eighth Circuit Law, There Is No Basis for Mitigation of "Excess" Emissions.**

The mitigation Plaintiffs seek is both legally unavailable and unwarranted, for three reasons:  (1) *Otter Tail* forecloses it; (2) no mitigation is necessary because air quality has actually improved, and substantially, since the projects; and (3) mitigation at Labadie, an innocent plant, would be unprecedented, excessive, and thus an improper penalty.  If, contrary to *Otter Tail*, the Court believes mitigation is required, there is a remedy that would provide full mitigation:  retirement of unused CSAPR allowances for SO2.

**1.** *Otter Tail* **Forecloses Such Relief.**  Under the Eighth Circuit's opinion in *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1015-17 (8th Cir. 2010), and as this Court has also found, failure to obtain a PSD permit is a one-time permitting violation that ends when post-construction operation commences.  *U.S. v. Ameren Missouri*, No. 4:11 CV 77 RWS, 2012 WL 262655, at *8 (E.D. Mo. Jan. 27, 2012).  *Otter Tail* forecloses the notion that operation after that one-time violation creates unlawful "excess emissions."  Operating the plant without BACT is simply not a violation.  No mitigation is appropriate, let alone required, for actions that are legal.

12

Plaintiffs have not claimed that operating Rush Island without a permit is a violation, and for good reason: the Eighth Circuit had already foreclosed such a claim. Allowing Plaintiffs to circumvent Eighth Circuit law by dressing up an invalid claim as "mitigation" relief would be error. The unprecedented size of the request (over $1.6 billion) only compounds the problem.

*Otter Tail* is directly on point and controls. Plaintiffs have provided the Court no basis to avoid its holding.

2. **Relief at Labadie Cannot Satisfy *eBay*.** Concentrations of PM2.5 are below the NAAQS, air quality is excellent, and so there are no health effects to mitigate. And the reduction in concentration levels of PM2.5 provided by controls would be miniscule. Plaintiffs have not even estimated this amount for Labadie, but at best their results would be akin to their Rush Island estimates, which are a tiny fraction of the EPA significance threshold. Ordering any mitigation, let alone $1.6 billion in relief, for such an insignificant effect on air quality would be disproportionate and unwarranted. It fails the *eBay* "balance of the harms" test.

3. **Mitigation at Labadie Would Be a Penalty and Unprecedented.** There is no basis on these facts to require mitigation of excess emissions at an innocent plant, and certainly not on the vast scale that Plaintiffs seek. It would cost over $10,000 to "mitigate" each ton of SO2 emissions at Labadie. No Court has ordered such relief; and other courts have specifically rejected litigation requests for this sort of mitigation.[6] Nor has EPA ever sought such relief in the permitting context. This Court would be the first.

4. **Any Mitigation Should Be Limited to Retirement of SO2 Allowances.**

If, contrary to *Otter Tail* and notwithstanding the other equitable considerations detailed

---

[6] *U.S. v. Westvaco Corp.*, No. CV MJG-00-2602, 2015 WL 10323214, at *12 (D. Md. Feb. 26, 2015); *U.S. v. Cinergy*, 618 F. Supp. 2d 942, 967 (S.D. Ind. 2009), *rev'd on other grounds*, 623 F.3d 455 (2010).

13

above, the Court decides to order mitigation, full and complete mitigation can be accomplished through retirement of Ameren's emissions allowances under the Cross-State Air Pollution Rule ("CSAPR").  *See* 76 Fed. Reg. 48272 (Aug. 8, 2011).

EPA issued CSAPR in 2011 to establish annual emissions tonnage caps for SO2 and other pollutants, for each emissions unit, including those in Missouri.  As its name implies, CSAPR is concerned with limiting cross-state air pollution.  Each generating unit is allocated a number of allowances per year, with each allowance equal to one ton of emissions.   Every operator must prevent emissions from exceeding its fleet-wide allowance allotment, or else must purchase additional allowances in a market created by EPA for that purpose.  Allowances that go unused in a given year "roll over" to the next year and can be banked for future use.  Like other sources, Ameren plans to use its banked allowances as part of its CSAPR compliance plan.

As EPA told the Seventh Circuit, retiring unused allowances "**would provide benefits similar to the benefits the company would generate by installing pollution controls itself. Both actions would reduce ambient air pollution and thereby mitigate the harm caused by** over two million tons of **past illegal emissions**."  Opening Brief of the U.S. at 41, *U.S. v. Midwest Generation, LLC*, 720 F.3d 644 (7th Cir. 2013) (No. 12-1026), 2012 WL 2371123 (emphasis added).  Indeed, EPA stated that "**pollution controls and emissions allowances are equivalent**" because buying allowances accomplishes the same result as installing controls—improving air quality in the same amount.  *Id.* at 40 (emphasis added).  For that reason, the court in *Cinergy* found retirement of allowances to provide "an elegant nexus" between violation and mitigation.  *U.S. v. Cinergy*, 618 F. Supp. 2d at 968.  Plaintiffs have repeatedly sought such allowance retirements in other similar NSR litigation.  *See id.* at 960; Brief for Resps. at 63-64, *EME Homer City Generation, L.P. v. E.P.A.,* 795 F.3d 118 (D.C. Cir. 2015) (No. 11-1302), 2012

14

WL 4754616.

Retirement of unused allowances thus provides the Court with a remedy that is just as effective as pollution controls, but that could be appropriately tailored.  Broader relief would be inappropriate.  "Injunctive relief must be tailored to remedy the specific harm alleged, and an overbroad preliminary injunction is an abuse of discretion."  *Nat. Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007) (vacating overbroad injunction).  In *Lytle v. U.S. Dep't of Health & Human Servs.*, 612 F. App'x 861, 863 (8th Cir. 2015) a civil enforcement action brought under the Federal Food, Drug, and Cosmetic Act, the 8th Circuit remanded, instructing the district court to reconsider its broad ban on the sale of laser medical devices that had not been approved by the FDA, with instructions to consider "whether a more narrowly-tailored injunction might be sufficient."

Requiring controls at Labadie would be particularly overbroad, both because of the availability of narrower relief that is just as effective, and because installation of controls would be extremely burdensome.  It would involve tremendous resources beyond just the $1.6 billion in expense to Ameren and its ratepayers:  *years* of engineering, procurement, permitting, construction, and mobilization.  Despite all of that effort, no emissions reductions would occur for at least five years.  And, of course, there would be a significant impact on electricity rates.

In contrast, retiring emissions allowances could occur almost immediately and would cost far less, require almost no resources, and achieve the same result.  If the goal of mitigation is not to punish, but rather to reduce emissions and improve air quality, all that is needed is retirement of allowances.  *See Lytle, supra.*  Requiring more would violate equity.

Dated:  March 27, 2019         /s/ *Matthew B. Mock*

        Matthew B. Mock (admitted *pro hac vice*)
        SCHIFF HARDIN LLP
        One Market, Spear Street Tower Suite 3100
        San Francisco, California 94105
        Tel:  (415) 901-8700
        Fax:  (415) 901-8701
        mmock@schiffhardin.com

        Renee Cipriano
        David C. Scott
        Mir Y. Ali
        Molly L. Wiltshire
        Daniel J. Schufreider
        (All admitted *pro hac vice*)
        SCHIFF HARDIN LLP
        233 South Wacker Drive, Suite 7100
        Chicago, Illinois 60606
        Tel:  (312) 258-5500
        Fax:  (312) 258-5600

        Ronald S. Safer (*pro hac vice*)
        RILEY SAFER HOLMES & CANCILA LLP
        70 W. Madison, Suite 2900
        Chicago, Illinois 60602
        Tel:  (312) 471-8700
        Fax:  (312) 471-8701

        John F. Cowling
        ARMSTRONG TEASDALE LLP
        7700 Forsyth Boulevard, Suite 1800
        St. Louis, Missouri  63105
        Tel:  (314) 621-5070
        Fax:  (314) 621-5065

        *Counsel for Defendant Ameren Missouri*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2019, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system, which will cause an electronic copy to be served on all counsel of record.


                                              /s/ *Matthew B. Mock*