**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, and <br><br> SIERRA CLUB, <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> AMEREN MISSOURI, <br><br> Defendant. | Civil Action No. 4:11-cv-00077-RWS |

**UNITED STATES' POST-TRIAL BRIEF**
**AND PROPOSED CONCLUSIONS OF LAW**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ iii

SUMMARY ................................................................................................................... 1

ARGUMENT AND CONCLUSIONS OF LAW .......................................................... 3

I.      THE STRUCTURE AND PURPOSE OF THE CLEAN AIR ACT ................................. 3

II.     THE STANDARDS FOR INJUNCTIVE RELIEF ......................................................... 5

        A.    The Substantive Requirements Of Compliance At Rush Island Are Settled
              By Statute ......................................................................................................... 6

        B.    A Court's Basis To Order Injunctive Relief To Ensure Compliance Or
              Remediate Harm Is At Its Apogee When Protecting The Public Interest .................. 8

        C.    Where Injunctive Relief Is Appropriate and Necessary, Environmental
              Mitigation Orders Should Be Tailored To Address The Harm ................................. 9

III.    TO BRING RUSH ISLAND INTO COMPLIANCE, AMEREN MUST OBTAIN
        A PSD PERMIT FOR THE FACILITY AND MEET AN EMISSIONS LIMITATION
        BASED ON THE APPLICATION OF FGD TECHNOLOGY. ..................................... 10

        A.    BACT Is A Technology-Based Standard For Setting Emissions Rates Based
              On The Maximum Degree Of Achievable Pollution Reductions ............................ 10

        B.    Industry Experience And Ameren's Own Analyses Show FGD Technology Is
              Economically And Technically Feasible At Rush Island ....................................... 12

        C.    Ameren's Arguments For Relaxed Compliance Obligations Are Unavailing. ......... 17

              1.    As A Major Stationary Source That Performed Major Modifications,
                    Ameren
                    Must Abide By Major-Source Permitting Requirements ............................ 17

              2.    Ameren's Argument For DSI Rather Than FGD Technology Is
                    Unpersuasive
                    And Without Precedent ......................................................................... 20

        D.    *Conclusion*: Since At Least The Time Of The Violations, $SO_2$ BACT For Rush
              Island Has Required the Implementation of FGD Technology ............................... 25

IV.    EXCESS EMISSIONS FROM RUSH ISLAND HAVE HARMED DOWNWIND
       COMMUNITIES. ....................................................................................................26

       A.    The Volume Of Rush Island's Excess Pollution ....................................... 26

       B.    The Fate And Transport Of Rush Island's Excess Pollution..................... 26

       C.    The Impact On Human Health And Welfare From Rush Island's Excess Pollution 28

       D.    Ameren's Arguments That Rush Island's Excess Pollution Was Not Harmful Are
             Unavailing. ............................................................................................... 30

             1.    The National Ambient Air Quality Standards Do Not Establish A
                   Threshold Below Which Illegal Pollution Poses No Threat To Human
                   Health Or Welfare. ...................................................................... 30

             2.    The "Significant Impact Levels" Are Not An Appropriate Measure To
                   Assess
                   The Harm From Rush Island's Excess Pollution. ......................... 36

             3.    Ameren's Reliance On Scientific Uncertainty Is Misguided, And Its
                   Reliance
                   On Fringe Toxicological Evidence Is Unpersuasive. ................... 39

       E.    *Conclusion*: Rush Island's Excess Pollution Has Increased The Risk Of
             Premature Mortality And Disease For Downwind Populations, And There
             Is No Basis In Law Or Fact To Overlook That Harm. ..............................42

V.     INJUNCTIVE RELIEF IS WARRANTED TO QUICKLY BRING RUSH
       ISLAND INTO COMPLIANCE AND TO REMEDIATE THE HARM FROM
       THE FACILITY'S DECADE OF EXCESS POLLUTION. ....................................43

       A.    The United States' Proposal For Injunctive Relief ................................... 43

       B.    *Conclusion*: Prospective Compliance At Rush Island Requires The Prompt
             Application For A PSD Permit And The Installation Of FGD Technology
             Within Three Years. .................................................................................. 46

       C.    *Conclusion*: Ameren Must Remediate The Harm From Rush Island's Excess
             Emissions.................................................................................................. 50

       D.    *Conclusion*: Reducing Pollution From The Nearby Labadie Energy Center Will
             Provide A Close Nexus Between The Benefits Of The Remedial Work And The
             Harm That Resulted From Ameren's Violations. ....................................... 53

VI.    CONCLUSIONS....................................................................................................58

## TABLE OF AUTHORITIES

**Cases**

*ADEC v. EPA*
298 F.3d 814 (9th Cir. 2002)................................................................................. 12

*ADEC v. EPA,*
540 U.S. 461 (2004) ........................................................................................... 11

*American Farm Bureau Fed'n v. EPA,*
559 F.3d 512 (D.C. Cir. 2009) ............................................................................ 28

*American Trucking Ass'n v. EPA,*
283 F.3d 355 (D.C. Cir. 2002) ............................................................................ 33

*Amoco Prod. Co. v. Gambell,*
480 U.S. 531 (1987) ................................................................................. 9, 47, 48

*Burlington N. R.R. V. Bair,*
957 F.2d 599 (8th Cir. 1992)............................................................................ 6, 46

*Citizens for Clean Air v. U.S. EPA,*
959 F.2d 839 (9th Cir. 1992).......................................................................... 12, 14

*Chipperfield v. Mo. Air Conserv Comm'n,*
229 S.W.3d 226 (Mo. Ct. App. 2007) ............................................................ 11, 25

*eBay Inc. v. MercExhange LLC*
547 U.S. 388 (2006)............................................................................ 6, 8, 47, 50

*Envtl. Def. v Duke Energy Corp.,*
549 U.S. 561 (2007) ............................................................................. 4, 30, 31

*Federal Trade Comm'n v. Security Rare Coin & Bullion Corp.,*
931 F.2d 1312 (8th Cir. 1991)............................................................................. 54

*Georgia v. Tennessee Copper Co.,*
206 U.S. 230 (1907) ............................................................................................ 9

*Grand Canyon Trust v. Tucson Elec. Power Co.,*
391 F.3d 979 (9th Cir. 2004)............................................................................... 10

*Hawaiian Elec. Co. v. EPA,*
723 F.2d 1440 (9th Cir. 1984)............................................................. 4, 31, 33, 37

*Helping Hand Tools v. U.S. EPA,*
848 F.3d 1185 (9th Cir. 2016)............................................................................. 11

*In re Gen. Motors, Inc.,*
10 E.A.D. 360 (E.A.B. 2002) .............................................................................. 10

*In re N. Mich. Univ. Ripley Heating Plant*,
　14 E.A.D. 283 (E.A.B. 2009) ............................................................................... 11, 14

*In re Steel Dynamics, Inc.*,
　9 E.A.D. 165 (E.A.B. 2000) ...................................................................................... 14

*Louisiana Generating v. Ill. Union Ins.*,
　831 F.3d 618 (5th Cir. 2016) .................................................................................... 44

*Mitchell v. Robert De Mario Jewelry*,
　361 U.S. 288 (1960) ........................................................................ 6, 8, 45, 51, 54

*Natural Res. Def. Council v. SW Marine, Inc.*,
　236 F.3d 985 (9th Cir. 2000) .................................................................................... 54

*New York v. EPA*,
　413 F.3d 3 (D.C. Cir. 2005) ....................................................................................... 4

*New York v. Niagara Mohawk Power Corp.*,
　263 F. Supp. 2d 650 (2003) ................................................................................. 2, 19

*North Carolina v. TVA*,
　593 F. Supp. 2d 812 (W.D.N.C. 2009) ..................................................................... 33

*Ohio Valley Envt'l Coalition v. U.S. Army Corps of Engineers*,
　528 F. Supp. 2d 625 (S.D. W.Va 2007) ................................................................... 47

*Oklahoma v. U.S. EPA*, 723 F.3d 1201, 1212 (10th Cir. 2013) .................................... 21

*Oregon Envtl. Council v. Oregon Dep't of Envtl. Quality*,
　No. 91-13-FR, 1992 WL 252123 (D. Or. Sept. 24, 1992) .................................. 18, 19

*Porter v. Warner Holding Co.*,
　328 U.S. 395 (1946). ................................................................................................ 54

*Sierra Club v. Franklin County Power of Illinois*,
　546 F.3d 918 (7th Cir. 2008) ............................................................................ passim

*Sierra Club v. Otter Tail Power Co.*,
　615 F.3d 1008 (8th Cir. 2010) ..................................................................... 10, 31, 33

*Sierra Club v. Thomas*,
　658 F. Supp. 165 (N.D. Cal. 1987) .......................................................................... 33

*Sierra Club v. Wisconsin DNR*,
　787 N.W.2d 855 (Wis. App. 2010) ........................................................................... 10

*TVA v. Hill*,
　437 U.S. 153 (1978) ............................................................................................. 7, 32

*United States Pub. Int. Research Grp. v. Atl. Salmon of Me., LLC*,
　339 F.3d 23 (1st Cir. 2003) ..................................................................................... 54

iv

*United States v. Ameren Missouri,*
229 F. Supp. 3d 906 (E.D. Mo. 2017) .................................................................................. 5

*United States  v. Cinergy,*
582 F. Supp. 2d 1055 (S.D. Ind. 2008) ............................................................................. 55

*United States  v. Cinergy,*
618 F. Supp. 2d 942 (S.D. Ind. 2008) ......................................................................... passim

*United States v. City of Painesville,*
644 F.2d 1186 (6th Cir. 1981) ............................................................................................ 7

*United States v. Cumberland Farms of Conn.,*
826 F.2d 1151 (1st Cir. 1987) ........................................................................................... 55

*United States v. Deaton,*
332 F.3d 698 (4th Cir. 2003) ................................................................................... 9, 54, 55

*United States v. Holtzman,*
762 F.2d 720 (9th Cir. 1985) ............................................................................................. 55

*United States v. Louisiana-Pacific Corp.,*
682 F. Supp. 1141 (D. Colo. 1988) .................................................................................... 19

*United States v. Marine Shale Processors,*
81 F.3d 1329 (5th Cir. 1996) ........................................................................................ 9, 47

*United States v. Miami Univ.,*
294 F.3d 797 (6th Cir. 2002) ............................................................................................ 54

*United States v. Midwest Generation,*
720 F.3d 644 (7th Cir. 2013) ............................................................................................ 19

*United States v. Oakland Cannabis Buyers' Coop.,*
532 U.S. 483 (2001) .............................................................................................. 7, 8, 46

*United States v. Ohio Edison Co.,*
276 F. Supp. 2d 829 (S.D. Ohio 2003) .............................................................................. 18

*United States v. Oliver,* 2009 WL 10671371 (D. Alaska June 25, 2009) .................................... 47

*United States v. Production Plated Plastics, Inc.,*
762 F. Supp. 722, 729 (W.D. Mich. 1991) .......................................................................... 47

*United States v. Westvaco Corp.,*
MJG-00-2602, 2015 WL 10323214 (Md. Feb. 26, 2015) ........................................ 2, 19, 28, 48

*Utility Air Regulatory Group v. EPA,*
134 S. Ct. 2427 (2014) ...................................................................................................... 8

*Virginian Ry. v. Sys. Fed'n No. 40, AFL,*
300 U.S. 515 (1937) .......................................................................................................... 9

*Wehner v. Syntex Corp.*,
    682 F. Supp. 39 (N.D. Cal. 1987) ................................................................ 54

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ....................................................................... 6, 7, 46

*Whitman v. American Trucking Assoc.*,
    531 U.S. 457 (2001) ................................................................................ 32

*Wis. Elec. Power Co. v. Reilly*,
    893 F.2d 901 (7th Cir. 1990) ................................................................ 4, 10


**Statutes**

29 U.S.C. § 217 ........................................................................................... 45

42 U.S.C. § 7401 ...................................................................................... 4, 9

42 U.S.C. § 7409 ................................................................................. 30, 32

42 U.S.C. § 7411 ....................................................................................... 38

42 U.S.C. § 7413 .............................................................................. 6, 45, 53

42 U.S.C. § 7470 .................................................................................. passim

42 U.S.C. § 7475 .................................................................................. passim

42 U.S.C. § 7479(3) ................................................................... 3, 10, 20, 23


**Regulations**

40 C.F.R. § 52.21(b)(12) .......................................................................... 10

40 C.F.R. § 52.21(b)(23)(i) ...................................................................... 38

40 C.F.R. § 52.21(j)(3) ............................................................................. 18

40 C.F.R. § 52.21(r)(1) ............................................................................. 18

**SUMMARY**

In 2007 and 2010, Ameren performed the largest boiler upgrades in the history of its Rush Island power plant.  But Ameren failed to obtain the requisite PSD permits for those modifications, and it failed to implement state-of-the-art pollution controls.  Had Ameren complied with the law, Rush Island would have emitted tens of thousands of tons less sulfur dioxide in following years.

Sulfur dioxide ($SO_2$) has been regulated under the Clean Air Act for 50 years—and for good reason.  Once emitted, most $SO_2$ is transformed into fine particulate matter ($PM_{2.5}$), a potent air pollutant known to cause increased risks of premature mortality, heart and lung disease, and other adverse health effects.  Modern pollution controls can dramatically reduce $SO_2$ emissions, saving lives in the process.  While the rest of the electric industry made great strides in reducing $SO_2$ pollution, Rush Island took only baby steps, rising steadily in the ranks to become one of the country's biggest $SO_2$ sources.  That pollution contributed to $PM_{2.5}$ levels across much of the eastern U.S., a range extending from Austin to Annapolis, from St. Petersburg to St. Paul.

Plaintiffs seek to remedy these violations by bringing Rush Island into compliance with the law—which will reduce $SO_2$ emissions during operations going forward—and by remediating the harm for its 160,000 (and counting) excess tons of illegal pollution.  To comply, Ameren must do what the statute requires: obtain a PSD permit and implement state-of-the-art pollution controls measures, known as the best available control technology or BACT, in the statute's parlance.  Here, Ameren has already evaluated $SO_2$ control technologies for the Rush Island plant, and the Company confirmed that it can implement the industry benchmark pollution control for $SO_2$: flue gas desulfurization (FGD or scrubber) technology.

1

Once brought into compliance, there will be relatively little subsequent $SO_2$ pollution from the Rush Island plant.  But Ameren must still address the decade of harm from its violations and take steps to reduce pollution from the same areas into which it was emitting.  To that end, Plaintiffs identified several control measures that could be employed at Ameren's nearby Labadie Energy Center.  The pollution from that facility affects the same communities as that from Rush Island, and to the same degree.  As such, efforts to reduce its pollution would—ton-by-ton and over the coming years—pay back the pollution debt Ameren incurred against the public's health and welfare.

Ameren musters several arguments against the imposition of injunctive relief here—none of them convincing.  First, Ameren argues that it does not need to come into compliance with PSD's BACT requirements as a part of remedying its PSD violations.  It does.  Congress' prohibition of unpermitted modifications is unequivocal: the harm of illegal pollution to the public health and welfare is well-understood.  The Company suggests that, had it known better, it might have pursued other, less expensive compliance options.  But Ameren "must suffer the consequences of the action it chose to take—even if these, or some of these, might have been avoided had it taken a different course of action." *United States v. Westvaco Corp.*, 2015 WL 10323214, at *8 (D. Md. Feb. 26, 2015).  Indeed, any other result would turn the pertinent remedy inquiry on its head.  *See*, *e.g.*, *New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 663 (W.D.N.Y. 2003) ("[Defendant's] initial failure to comply with the requirements of the Clean Air Act cannot now inure to its benefit.").

Second, Ameren argues, even if BACT is required, a discount control technology called "dry sorbent injection" or DSI is the best available technology for Rush Island.  It isn't.  About half as effective as scrubber technology, DSI has *never* been accepted as BACT for coal-fired

2

electric generating units.  Ameren would like the BACT analysis to settle on the "least expensive option" capable only of "moderate" emissions reductions—but the Clean Air Act requires emissions limits "based on the maximum degree of reduction" available.  42 U.S.C. § 7479(3).

Finally, Ameren argues that Rush Island's decade of excess $SO_2$ pollution was harmless. It wasn't.  On the law, Ameren suggests that where the National Ambient Air Quality Standards (NAAQS) have not been exceeded, excess emissions caused by its PSD violations need not be remedied.  They do.  Indeed, Ameren's theory is contravened by the statute's language: the PSD program imposes permitting and pollution-control obligations "*notwithstanding* attainment and maintenance of all [NAAQS]." 42 U.S.C. § 7470 (emphasis added).

On the science, Ameren argues that the amount of $PM_{2.5}$ pollution emitted from Rush Island does not have any negative impact on the health of those living downwind.  It does. Pollution from Rush Island is regulated for a reason, and Rush Island remains one of the largest sources of $SO_2$ in the country.  Applied to the record evidence, the broad scientific consensus dictates the conclusion that the $PM_{2.5}$ that resulted from Rush Island's illegal $SO_2$ pollution has harmed and continues to inflict harm to the public in the form of premature mortality and myriad other adverse health effects.

To remedy its violations, Ameren should obtain the necessary PSD permit for the facility, implement the best available control technology, and undertake emissions reductions at its Labadie plant commensurate with the Rush Island's (still growing) volume of illegal pollution.

## ARGUMENT AND CONCLUSIONS OF LAW

## I.    THE STRUCTURE AND PURPOSE OF THE CLEAN AIR ACT

The Clean Air Act (CAA or Act) passed in 1970 was intended in part to "speed up, expand, and intensify the war against air pollution in the United States with a view to assuring

that the air we breathe throughout the Nation is wholesome once again." H.R. Rep. No. 91-1146, at 1 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5356, 5356; *Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990) (quoting legislative history).  One primary purpose of the statute is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1).

Not satisfied with the results achieved under the 1970 statute, Congress added the New Source Review (NSR) program to the Act in 1977 to ensure that additional requirements were imposed on new and modified sources of air pollution.  *New York v. EPA*, 413 F.3d 3, 10 (D.C. Cir. 2005) ("In 1977, Congress amended the Clean Air Act . . . to strengthen the safeguards that protect the nation's air quality.").  The PSD component of NSR—which applies to areas in attainment with NAAQS—was "aimed at giving added protection to air quality" while fostering economic growth in a manner consistent with preservation of existing clean air resources.  *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 567 (2007).  In areas that already meet the NAAQS, this added protection was achieved, in part, by requiring the installation of BACT on new and modified sources that would otherwise increase pollution.  *Hawaiian Elec. Co. v. EPA*, 723 F.2d 1440, 1447 (9th Cir. 1984) ("Congress found that it was important to reduce pollution levels below those mandated by the standards and that the best means of doing so was to require the installation of BACT on all sources which would otherwise increase pollution.").  Congress explicitly set forth five "purposes" for PSD:

(1) to protect public health and welfare from any actual or potential adverse effect which in the Administrator's judgment may reasonably be anticipate[d] to occur from air pollution or from exposures to pollutants in other media . . . notwithstanding attainment and maintenance of all national ambient air quality standards;

(2) to preserve, protect, and enhance the air quality in national parks, national wilderness areas, national monuments, national seashores, and other areas of special national or regional natural, recreational, scenic, or historic value;

4

(3) to insure that economic growth will occur in a manner consistent with the preservation of existing clean air resources;

(4) to assure that emissions from any source in any State will not interfere with any portion of the applicable implementation plan to prevent significant deterioration of air quality for any other State; and

(5) to assure that any decision to permit increased air pollution in any area to which this section applies is made only after careful evaluation of all the consequences of such a decision and after adequate procedural opportunities for informed public participation in the decision making process.

42 U.S.C. § 7470.  Section 165(a) of the PSD provisions effectuates these goals by setting forth requirements for the construction of new and modified major sources of air pollution.  Pertinent here, modification of a major source is prohibited *unless*:

(1) a permit has been issued for such proposed facility in accordance with this part setting forth emission limitations for such facility . . .

(3) the owner or operator of such facility demonstrates . . . that emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess of [among other things] any . . . national ambient air quality standard [NAAQS] in any air quality control region . . .

(4) the proposed facility is subject to the best available control technology for each pollutant subject to regulation . . . .

42 U.S.C. § 7475(a); *see also id.* §7479(2)(C) (explaining that construction of a source includes modification).  As the statute's language and structure make clear, these are co-equal requirements, with no one mandate subsuming any other.

## II.    THE STANDARDS FOR INJUNCTIVE RELIEF

As established following the liability trial, Ameren violated the law when it modified Rush Island Units 1 and 2 "without obtaining the required permits [and] installing best-available pollution control technology." *United States v. Ameren Missouri*, 229 F. Supp. 3d 906, 914 (E.D. Mo. 2017).  The question presented in the remedy phase of this case is what to do about those violations.

5

Section 113(b) authorizes district courts to "restrain such violation[s], to require compliance, . . . and to award any other appropriate relief" where a source owner or operator "has violated or is in violation of" statutory or regulatory prohibitions.  42 U.S.C. § 7413(b).  A court's authority to craft "complete relief in light of the statutory purposes" is comprehensive and "not to be denied or limited in the absence of a clear and valid legislative command." *Mitchell v. Robert De Mario Jewelry*, 361 U.S. 288, 291–92 (1960); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) (courts enjoy the entire range of their historic equitable powers to craft relief unless Congress placed limitations on those powers "in so many words or by necessary and inescapable inference").  The availability of injunctive relief in a given case is informed by the equitable factors set out by the Supreme Court in *eBay Inc. v. MercExchange, L.L.C.*:

> (1) that [plaintiff] has suffered irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for the injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

547 U.S. 388, 391 (2006); *see also* 2/27/2019 Order (Doc. 1045) at 19.  However, given the context of the case, several additional equitable principles inform the analysis.

### A.     The Substantive Requirements Of Compliance At Rush Island Are Settled By Statute.

Where Congress has proscribed certain conduct by legislative enactment, it has balanced the equities already.  *Accord Burlington Northern R.R. V. Bair*, 957 F.2d 599, 601–02 (8th Cir. 1992) ("Congress has already balanced the equities and has determined that, as a matter of public policy, an injunction should issue where the defendant is engaged in, or is about to engage in, any activity which the statute prohibits." (citation omitted)).  Though courts need not issue an injunction in all cases, neither can they "override Congress' policy choice, articulated in a

6

statute, as to what behavior should be prohibited."  *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001); *see also TVA v. Hill*, 437 U.S. 153, 194 (1978) ("it is … the exclusive province of the Congress not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation").  Indeed, where a violation has been established, the law must be enforced:

> Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is ... for the courts to enforce them when enforcement is sought. Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute. *Their choice (unless there is statutory language to the contrary) is simply whether a particular means of enforcing the statute should be chosen over another permissible means; their choice is not whether enforcement is preferable to no enforcement at all*. . . . To the extent the district court considers the public interest and the conveniences of the parties, the court is limited to evaluating how such interest and conveniences are affected by the selection of an injunction over other enforcement mechanisms.

*Oakland Cannabis Buyers' Coop.*, 532 U.S. at 497-98 (emphasis added; citations and quotations omitted); *see also Romero-Barcelo*, 456 U.S. at 315 (approving of an order to require the Navy to obtain a permit, on grounds it "temporarily, not permanently, allowed the Navy to continue its activities without a permit"); *United States v. City of Painesville*, 644 F.2d 1186, 1194 (6th Cir. 1981) ("Congress did not contemplate that its decision would be thwarted by judicial reluctance to require compliance when enforcement proceedings are brought and liability is proven.").

This case involves a sovereign acting in the public interest to remedy an established violation of a public health law—Section 165 of the Clean Air Act (42 U.S.C. § 7475).  As such, though the Court enjoys some discretion in directing *how* or *how quickly* Ameren must come into compliance at the Rush Island plant, the question *whether* compliance is required was answered by Congress.  *Accord Romero*, 456 U.S. at 320 (the Clean Water Act permits a district court to order the "relief it considers necessary to secure prompt compliance with the Act.").

The Clean Air Act's PSD provisions proclaim "[i]t is unlawful to construct or modify a 'major emitting facility' . . . without first obtaining a permit. To qualify for a permit, the facility . . . must comply with emissions limitations that reflect the 'best available control technology' (or BACT)" for each pollutant subject to regulation. *Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2435 (2014) (citing 42 U.S.C. §§ 7475(a), 7479(2)(C)). Specifically, the behavior Congress prohibited was the modification of a major stationary source that is not "subject to" BACT. 42 U.S.C. § 7475(a)(4). As directed by Congress when it enacted the PSD program, BACT emissions limitations must set the minimum standard for compliance going forward. And so, with Ameren's liability established, the primary questions presented to this Court regarding Ameren's compliance at Rush Island are *how* and *when* the Company must implement BACT measures at the facility—not *whether* BACT measures are required at all. *See Oakland Cannabis Buyers' Coop.*, 532 U.S. at 497.

**B.      A Court's Basis To Order Injunctive Relief To Ensure Compliance Or Remediate Harm Is At Its Apogee When Protecting The Public Interest.**

Even those questions in this case that are not already answered by Congressional action—questions of compliance logistics or remedial measures—are nonetheless informed by longstanding principles of equity that guide the *eBay* inquiry.

To begin with, "complete" relief should be crafted with an eye to effectuating a statute's purposes, and courts should award equitable relief where failing to do so would frustrate the statute's explicit goals. *See Mitchell*, 361 U.S. at 296 (noting in a Fair Labor Standards Act case there was "little room for the exercise of discretion not to order" equitable relief in light of the statute's public-interest purpose); *accord Sierra Club v. Franklin County Power of Illinois*, 546 F.3d 918, 936 (7th Cir. 2008) (injunction requiring a valid PSD permit furthered a stated purpose

8

of the Clean Air Act to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare" (citing 42 U.S.C. § 7401(b)(1))).

The Supreme Court has also made clear that sovereigns are "more certainly entitled to specific relief than a private party might be." *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237 (1907). Indeed, "when the United States or a sovereign state sues in its capacity as protector of the public interest, a court may rest an injunction entirely upon a determination that the activity at issue constitutes a risk of danger to the public." *United States v. Marine Shale Processors*, 81 F.3d 1329, 1359 (5th Cir. 1996). Where, as here, the United States seeks to enforce the strictures of a public-interest statute, a court's equitable discretion is narrowed due to the "extraordinary weight courts of equity place upon the public interests in a suit involving more than a mere private dispute . . . and from the deference courts afford the political branches in identifying and protecting the public interest." *Id.* (citing *Tennessee Cooper*, 206 U.S. at 237-38; *Virginian Ry. v. Sys. Fed'n No. 40, AFL*, 300 U.S. 515, 552 (1937)).

Finally, environmental harm, "by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 545 (1987).

### C.      Where Injunctive Relief Is Appropriate and Necessary, Environmental Mitigation Orders Should Be Tailored To Address The Harm.

Where the equities indicate an injunction is appropriate to remediate the harm from the violation, the Court's consideration of available options for remediating harm is further informed by "(1) whether the proposal 'would confer maximum environmental benefit,' (2) whether it is 'achievable as a practical matter,' and (3) whether it bears 'an equitable relationship to the degree and kind of wrong it is intended to remedy.'" *United States v. Deaton*, 332 F.3d 698, 714 (4th Cir. 2003) (quoting cases).

9

**III.    TO BRING RUSH ISLAND INTO COMPLIANCE, AMEREN MUST OBTAIN A PSD PERMIT FOR THE FACILITY AND MEET AN EMISSIONS LIMITATION BASED ON THE APPLICATION OF FGD TECHNOLOGY.**

"[I]n passing the Clean Air Act Amendments, Congress intended to stimulate the advancement of pollution control technology." *Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990). Indeed, this "technology-forcing" was one of the "basic goals of the 1977 Amendments" adopting the PSD program. *Id.* The PSD program's BACT requirement of 42 U.S.C. § 7475(a)(4) is the cornerstone requirement of the PSD program, central to achieving both Congress' public protection and technology-driving aims. As such, any inquiry into the harms and remedies associated with Ameren's violations must begin with an assessment of what the BACT requirement means for the Rush Island facility.

**A.    BACT Is A Technology-Based Standard For Setting Emissions Rates Based On The Maximum Degree Of Achievable Pollution Reductions.**

As defined by Congress in the Clean Air Act, BACT is an "emissions limitation based on the maximum degree of reduction of each pollutant subject to regulation." 42 U.S.C. § 7479(3); *see also Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1011 (8th Cir. 2010). Setting BACT emissions limitations for a pollutant from a specific facility is a case-by-case endeavor that weighs a number of factors, including, "energy, environmental, and economic and other costs." *Id.*; 40 C.F.R. § 52.21(b)(12) (further defining BACT). While BACT is determined on a case-by-case basis, "the permitting authority's analysis must in all circumstances give effect to the purpose of BACT, which is to promote the use of the best technologies as widely as possible." *In re Gen. Motors, Inc.*, 10 E.A.D. 360, 364 (E.A.B. 2002)[1]; *see also Grand Canyon*

---

[1]    The Environmental Appeals Board (EAB) is the final decision-maker on administrative appeals arising under environmental statutes administered by EPA, including the Clean Air Act. *See Sierra Club v. Wisconsin DNR*, 787 N.W.2d 855, 867 n.6 (Wis. App. 2010).

*Trust v. Tucson Elec. Power Co.*, 391 F.3d 979, 983 (9th Cir. 2004) (BACT requires use of "the most current, state-of-the-art pollution controls" available); *Helping Hand Tools v. U.S. EPA*, 848 F.3d 1185, 1194 (9th Cir. 2016) (failure to consider "all" controls that are available in the industry before settling on a less effective option would be clear error).

In practice, the BACT analysis is guided by the "top-down" methodology, an approach long used both by EPA and by Missouri to ensure a thorough review of the statutory factors. As the Supreme Court explained:

> In brief, the top-down process provides that all available control technologies be ranked in descending order of control effectiveness. The PSD applicant first examines the most stringent—or "top"—alternative. That alternative is established as BACT unless the applicant demonstrates, and the permitting authority in its informed judgement agrees, that technical considerations, or energy, environmental, or economic impacts justify a conclusion that the most stringent technology is not "achievable" in that case.

*ADEC v. EPA*, 540 U.S. 461, 475–76 (2004) (quoting EPA's Draft New Source Review Workshop Manual, Oct. 1990 [Pl. Ex. 1190] ("NSR Manual") at B2); *see also Chipperfield v. Mo. Air Conserv. Comm'n*, 229 S.W.3d 226, 239-40 (Mo. Ct. App. 2007). Indeed, "[s]o fixed is the focus on identifying the 'top', or most stringent alternative, that the analysis presumptively ends there and the top option selected" unless the applicant demonstrates something unique about its plant compared to other plants using the same "top" controls. *In re Northern Mich. Univ. Ripley Heating Plant*, 14 E.A.D. 283, 294 (E.A.B. 2009); *accord ADEC*, 540 U.S. at 485-85 (referring to "CAA's strong normative terms 'maximum' and 'achievable'" as providing a safeguard against an "unreasonably lax BACT designation").

The top-down method consists of five steps: (1) identify all available control technologies; (2) analyze the technical feasibility of the controls; (3) rank feasible controls by effectiveness; (4) evaluate the energy, environmental and economic impacts of the most effective

11

options; and (5) select BACT.  Pl. Ex. 1190 [NSR Manual] at AM-REM-00544123-MDNR; *see also* FOF 78, 85, 87–93.  Under this approach, "the burden of proof [is] on the 'applicant to justify why the proposed source is unable to apply the best technology available.'"  *Citizens for Clean Air v. U.S. EPA*, 959 F.2d 839, 845 (9th Cir. 1992) (quoting NSR Manual).  To meet that burden, the source must "demonstrate that the technology is technically or economically infeasible."  *Id.*; *see also* FOF 81.   If the "top" control is eliminated in Step 4, the next most effective technology is considered, and so on, until the most effective remaining option is selected as BACT.  *ADEC*, 298 F.3d 814, 822 (9th Cir. 2002), *aff'd* 540 U.S. 461.

> **B.**     **Industry Experience And Ameren's Own Analyses Show FGD Technology Is Economically And Technically Feasible At Rush Island.**

There is no dispute on the first three steps in the BACT analysis.  As the parties agree, there are four available control technologies—all of which are technically feasible for application at the Rush Island facility.  FOF 128–130.  As ranked in descending order of effectiveness, these are:

(1)     Wet FGD technology (sometimes called a "wet scrubber")

(2)     Dry FGD technology (sometimes called a "dry scrubber")

(3)     DSI implemented in parallel with a fabric filter

(4)     DSI implemented as a stand-alone control

FOF 131–134.  Based on these options, the next question is whether the "top" control—FGD technology—should be eliminated as not "achievable" after an evaluation of its energy, environmental, or economic impacts.  The great weight of evidence presented at trial shows it cannot.

Over the last forty years, tens of thousands of megawatts of coal-fired electric generating capacity have been controlled using wet or dry FGD technology:

12



FOF 17.  In fact, wet or dry scrubbers are currently installed on hundreds of coal-fired electric generating units, including approximately 80% of the coal-fired electric generating capacity in the United States.  *See* FOF 18.  The widespread adoption of FGD technology at large coal-fired power plants across the nation has left Rush Island lagging behind the rest of the utility industry in $SO_2$ emissions reductions.  In 2007, the Rush Island plant ranked 154th in the nation in $SO_2$ emissions.  A decade later, it was one of the very largest $SO_2$ emitting-power plants in the country—tenth in the nation and second in Missouri behind only Ameren's Labadie plant.  FOF 23.

Ameren suggested at trial that FGD technology is more appropriate for new plants as opposed to existing plants that must be retrofit with the controls.  The Company's suggestion is contradicted by the evidence.  Indeed, of the over-170,000 MW of coal-fired electric generating capacity now controlled with wet FGD technology, the vast majority involved retrofitting the controls to existing units—many of them in the decade since Rush Island was modified:

13



FOF 17, 19.  The emissions reductions achievable by FGDs are not dependent on whether or not the technology is constructed alongside a new plant or retrofit on an existing one.  FOF 230.

The prevalence of FGD technology at similar units in the industry is a thumb on the scales in the BACT analysis.  Given the many, many coal-fired electric generating units that have been retrofit with FGD technology, the burden is on Ameren to supply a reason why that top control technology could not be utilized at Rush Island.  *See Citizens for Clean Air*, 959 F.2d at 845; *Ripley Heating Plant*, 14 E.A.D. at 294; *In re Steel Dynamics, Inc.*, 9 E.A.D. 165, 202 (E.A.B. 2000).  As EPA noted in the NSR Manual:

> In the absence of unusual circumstance, the presumption is that sources within the same source category are similar in nature, and that cost and other impacts that have been borne by one source of a given source category may be borne by another source of the same source category.

Pl. Ex. 1190 [NSR Manual] at AM-REM-00544146-MDNR; FOF 92.  The Company has provided no evidence of "unusual circumstance" whatsoever.  FOF 177.  Quite to the contrary, around the time Ameren was implementing the Rush Island overhauls, the Company was also studying the application of FGD technology at the plant.  Ameren's engineering study, undertaken over a period of years and involving thousands of pages of engineering analyses and

14

millions of dollars, concluded that wet FGD technology was both economically and technically feasible at Rush Island—indeed, it was the best option for the plant to control $SO_2$ emissions. FOF 26–53.

In light of its own study and conclusions—around the time of the Rush Island modifications, no less—Ameren would be hard-pressed to rule out FGD in Step 4 of the BACT analysis. The Company did not present any evidence as to why the top control should be excluded from the BACT review based on having unreasonable energy or environmental impacts. FOF 141 & 142. In fact, Ameren itself concluded that wet FGD technology held many advantages over other control technologies lower on the list. *Id.*

Nor can FGD technology be excluded from the BACT analysis based on its economic impacts. Plaintiffs' expert Dr. James Staudt estimated the direct capital costs of implementing wet FGD technology at the Rush Island Units would be $582 million. FOF 179. At Rush Island, that translates to an "average" cost-effectiveness of $3,854 per ton of $SO_2$ removed, well within the acceptable range for pulverized coal-fired electric generating units. FOF 180. Ameren did not present any evidence or testimony to suggest the costs were out-of-line with those incurred by other electric utilities to install FGD controls.[2] *Id.* In fact, Ameren's engineering study concluded that, for Rush Island, wet FGDs would be more economic than the next most effective control and that the associated costs would be consistent with industry benchmarks. FOF 144–148, 182. Given that Missouri DNR and other agencies have concluded that both wet and dry FGD are economically acceptable for power plants, just as Ameren found that the costs of both

---

[2]   Ameren's BACT expert Mr. Campbell testified that he reached no conclusions on whether the average cost-effectiveness of wet FGD would be considered unacceptable in this case. FOF 180. His decision to rely entirely on another cost metric, incremental cost-effectiveness, is problematic for reasons discussed below in Section III.B.

wet and dry FGD are acceptable for power plants like Rush Island (FOF 35, 39–40, 40, 44,153), there is no basis for excluding FGD technology from the BACT assessment at Step 4 of the analysis.

With wet FGD established as the required technology, the last step of the BACT analysis (Step 5) involves determining an achievable emission rate based on that technology.  As with Steps 1 through 3 of the top-down analysis, there is no real dispute in this case about what the achievable emission rates would be for wet FGDs at Rush Island.  FOF 170.  FGDs have not only been widely adopted over the years, their performance continues to improve, driving achievable emissions rates downward as a result:



FOF 173.  As with the selection of the technology, Ameren's own engineering studies echo the broader trend in the industry.  In the first two phases of its study, Ameren identified its Rush Island FGD design-rate as 0.06 lbs/mmBTU.  FOF 48.  In late 2010, Ameren lowered the target design-rate of its planned scrubbers to 0.04 lbs/mmBTU.  FOF 55.

Based on a reasonable compliance margin, Dr. Staudt persuasively testified that BACT for the Rush Island units at the time of the illegal modification would have been 0.08 lb/mmBTU for unit 1 and 0.06 lb/mmBTU for unit 2, both on a 30-day rolling average.  FOF 49, 156.  The record showed these rates were reasonable given the technological capabilities at those times and

16

consistent with the nearly two-dozen contemporaneous BACT determinations at similar facilities.  FOF 127, 159.  Ameren presented no evidence at trial to dispute that these were achievable emissions rates; indeed Ameren's expert witness Colin Campbell testified that .05 lbs/mmBTU was achievable.  FOF 185.  If applied today, the record evidence shows FGDs could meet a 30-day rolling-average emissions limitation no less stringent than 0.05 lbs/mmBTU.  FOF 169.

> **C.**      **Ameren's Arguments For Relaxed Compliance Obligations Are Unavailing.**

Ameren presents two arguments in an effort avoid the consequences of the straight-forward BACT analysis.  First, Ameren argues that it does not need to apply BACT measures because it would have sought less costly ways to stay inside the Clean Air Acts requirements had it known its overhauls would trigger PSD obligations.  According to Ameren, the Company should be given the opportunity to make such arrangements now.  Second, Ameren argues that DSI—a far less-effective (and less costly) control technology than FGDs—should be considered BACT for controlling $SO_2$ from Rush Island.  Neither argument survives examination.

> **1.**      **As A Major Stationary Source That Performed Major Modifications, Ameren Must Abide By Major-Source Permitting Requirements.**

Ameren argues that, had it known its modifications would trigger PSD obligations, it might have sought a minor permit which would have limited Rush Island's emissions to below PSD-triggering levels.  As counsel for Ameren argued on summary judgment:

> So if Ameren, for example, in a hypothetical world, where Ameren had a [liability] ruling from Your Honor the day after we began construction that these projects would constitute a major modification, Ameren would have had available to it the opportunity to seek this minor permit from MDNR, cap its emissions, and proceed accordingly and lawfully.

Hearing Transcript (Feb. 12, 2019) at 55:10–15.  At trial, Ameren presented testimony from its expert Colin Campbell that continued to suggest the Company could have—and would have—

17

sought minor source permitting to avoid triggering NSR had it thought the Rush Island overhauls would constitute an NSR violation. *See* Campbell Test., Tr. Vol. 4-A at 49:9–24; 80:20–83:7.

This argument is a red herring.  By statute and regulation, *all* sources that undergo major modifications have to comply with BACT.  Because Rush Island Units 1 and 2 are in fact modified facilities, the statute and regulations foreclose Ameren's argument that it can instead obtain "minor" permits for its "major modifications." *See* 42 U.S.C. § 7475(a)(1), (4) (PSD permit is required for construction or modification, and facility must be "subject to" BACT); 40 C.F.R. § 52.21(j)(3) (any "major modification *shall* apply best available control technology") (emphasis added); 40 C.F.R. § 52.21(r)(1) (any source that modifies without permit approval is subject to enforcement); *see also United States v. Ohio Edison Co.*, 276 F. Supp.2d 829, 850 (S.D. Ohio 2003) (a "modification triggers permitting requirements under the CAA as well as the duty to install pollution controls").

Thus, for a modified facility to comply with the PSD requirements of the Clean Air Act, it must obtain a PSD permit and, among other things, meet BACT limits.  *See Ohio Edison Co.*, 276 F. Supp. 2d at 850 (a "modification triggers permitting requirements under the CAA as well as the duty to install pollution controls.").  This conclusion follows from the plain language of the Clean Air Act and NSR rules, which require "without exception" that all major modifications are subject to such requirements. *Oregon Envtl. Council v. Oregon Dep't of Envtl. Quality*, No. 91-13-FR, 1992 WL 252123, *22-23 (D. Or. Sept. 24, 1992).  As the Seventh Circuit put it, the failure to obtain a valid PSD permit leaves "the company no option but to obtain this permit before it can commence construction." *Sierra Club v. Franklin County Power of Ill.*, 546 F.3d 918, 936 (7th Cir. 2008).

18

Ameren "must suffer the consequences of the action it chose to take—even if these, or some of these, might have been avoided had it taken a different course of action." *United States v. Westvaco Corp.*, 2015 WL 10323214, at *8 (Md. Feb. 26, 2015).  Indeed, any other result would turn the pertinent remedy inquiry on its head.  *See*, *e.g.*, *Niagara Mohawk Power Corp.*, 263 F. Supp. 2d at 663 ("[Defendant's] initial failure to comply with the requirements of the Clean Air Act cannot now inure to its benefit.").  As the *Oregon Envtl. Council* court explained in the context of the parallel nonattainment NSR program, NSR requirements apply to *all* major modifications, including those illegally constructed:

> The [State Implementation Plan] does not exempt a source of pollutants from the new source review requirements simply because the 'major modification' was constructed prior to the issuance of a requisite permit.  Moreover, if such an exemption were allowed, a windfall would be created for those major new or modified sources that disregarded the SIP-mandated requirements.

1992 WL 252123, at *23; *see also United States v. Midwest Generation*, 720 F.3d 644, 646 (7th Cir. 2013) (modifying plant without a permit is a "risky strategy" because if challenged the plant may need "to undertake a further round of modifications to get the permit"); *Cinergy*, 618 F. Supp. 2d at 961-62, 965 (rejecting post-hoc NSR avoidance theory, and holding that the only compliance alternative "was to apply for the necessary permits or shut down the units"); *United States v. Louisiana-Pacific Corp.*, 682 F. Supp. 1141, 1166 (D. Colo. 1988) ("requirements of the [PSD] program have been met only upon *receipt* of PSD permits") (emphasis in original).

So: Ameren must come into compliance with the laws it has violated, and compliance for major modifications includes major permitting and the implementation of BACT measures.  Even if it were not a legal *non sequitur*, though, Ameren's argument is unsupported by the evidence.  Ameren now suggests that, had it known better, the Company would have sought a minor source permit, but:

19

- As this Court already held, the PSD standards—and risks of non-compliance—were clear long before Ameren undertook the Rush Island modifications, FOF 357-358;

- Ameren did not present any Company witness or document suggesting the pursuit of a synthetic minor permit was a realistic possibility, FOF 370;

- There is no evidence that Ameren has ever obtained a minor permit to restrict the operations of the Rush Island boilers, FOF 368;

- Restricting Rush Island's operations would have been inconsistent with the purposes of the modifications, FOF 369; and

- Ameren did not seek such a permit when it proposed similar overhaul projects at Labadie even after this Court's liability ruling had been issued. FOF 372; Pl. Ex. 1246.

Indeed, Ameren did not present evidence of *any* baseload power plant operator restricting a facility's operations in the manner Ameren now says it would have—and for good reason. Because they are the cheapest generating sources and so reliably dispatched, utilities like Ameren are loath to put operating or fuel limitations on their baseload plants. *United States v. Cinergy Crop.,* 618 F. Supp. 2d 942, 947 (S.D. Ind. 2009)*, rev'd on other grounds* (quoting testimony of Cinergy witness). As it is neither relevant to the legal inquiry nor plausibly based on any evidence, Ameren's post hoc PSD-avoidance argument should be rejected.

### 2. Ameren's Argument For DSI Rather Than FGD Technology Is Unpersuasive And Without Precedent.

Ameren argues that a discount control technology called "dry sorbent injection" or DSI constitutes BACT for Rush Island. About half as effective as FGD technology, DSI has *never* been accepted as BACT for coal-fired electric generating units. FOF 20, 193. Ameren would like the BACT analysis to settle on the "least expensive option" for emissions reductions, one that is only capable of "moderate" reductions. But the Clean Air Act explicitly requires emissions limits "based on the maximum degree of reduction" available. 42 U.S.C. § 7479(3).

20

In support of its position, Ameren argues that FGD technology should have been excluded at Step 4 of the BACT analysis because of its "economic impacts."  However, the costs Ameren cites are not based on any unique physical or operational characteristics of the facility, nor anything else that distinguishes Rush Island from the rest of the industry or electric market. Instead, Ameren's argument is premised entirely on its experts' flawed economic analyses, which fail to credibly compare the costs of installing FGDs at Rush Island to the costs borne by other similar plants.  *See* 03/27/2019 Order (Doc. 1056) at 5–6.

There are two cost metrics at play in Ameren's argument: (1) average cost-effectiveness, and (2) incremental cost-effectiveness.  First, while Ameren's BACT expert offered no opinions on the average cost-effectiveness of wet FGD,[3] Ameren appears to take issue with the cost estimates that Dr. Staudt relied on for those calculations.  But Ameren's expert Mr. Kenneth Snell did not dispute Dr. Staudt's estimates so much as simply inflate them by adding additional costs into the calculation.  FOF 200–201.  In doing so, Mr. Snell not only presented a larger number, he presented one that he admitted was not prepared for purposes of a BACT analysis. FOF 200–203  Mr. Snell's addition of extra costs into his estimate contradicts EPA's explicit guidance on calculating costs in the BACT setting, which means the numbers Mr. Snell supplied cannot be directly compared with BACT-related costs cited in permitting records or elsewhere. FOF 149–50, 179; *accord Oklahoma v. U.S. EPA*, 723 F.3d 1201, 1212 (10th Cir. 2013) (escalation and AFUDC are not valid costs under overnight costing method).  For the sake of judging whether Rush Island's FGD costs would be unacceptably high for purposes of BACT, Dr. Staudt's cost numbers are both uncontested and reasonable, FOF 202, and they echo what

---

[3]    Ameren's sole reliance on incremental cost-effectiveness to eliminate wet FGD while ignoring average cost-effectiveness is inconsistent with a proper top-down analysis.  FOF 99-100.

every engineering expert to testify at trial said: there is nothing unique about Rush Island when it comes to implementing FGDs.

Second, Ameren presents an incremental cost analysis to try to eliminate FGDs based on their economic impact at Rush Island. Decision-makers sometimes consider the "incremental cost" of one technology option compared to another, that is, the differential cost of reducing additional $SO_2$ pollution with the use of one technology when compared with the costs associated with using a less stringent technology. According to Ameren, the incremental cost-effectiveness of the top controls (wet FGD) compared to the bottom controls (DSI) reveal it to be so expensive that the top technology should be rejected as BACT. FOF 197. But this use of incremental costs contravenes explicit EPA guidance and even the practice and teachings of Ameren's own expert in other settings. FOF 98-100, 198, 208, 221-223. In some cases, measuring the incremental cost can be useful when evaluating two control options that are ranked next to each other in control efficiency. FOF 206. But the removal capabilities of FGDs and DSI are nowhere near each other—FGDs are capable of reducing pollution by more than 90%, while DSI achieve about 50% reductions. FOF 207. Calculating the incremental difference between two technologies with wildly different removal capabilities turns the Congressional mandate for BACT on its head. Pollution control technologies that are far cheaper, but which are capable of only "moderate" pollution reductions, could have an advantage in such an analysis. *Accord* FOF 134. But BACT is defined based on the "maximum degree of reduction" achievable, not the most "cost-effective" pollution control option on a per-ton basis.[4] 42 U.S.C. § 7479(3). As such, Ameren's reliance on incremental costs not only runs afoul of its expert's work in other cases, FOF 208, it runs afoul of the language and purpose of the BACT requirement.

---

[4] Indeed, the zero-cost option of doing nothing would always be the most cost-effective.

22

"[W]here a control technology has been successfully applied to similar sources in a source category, an applicant should concentrate on documenting significant costs differences, if any, between the application of the control technology on those other sources and the particular source under review."  Pl. Ex. 1190 [NSR Manual] at AM-REM-00544148-MDNR.  Ameren's analyses do not provide any distinguishing characteristic of FGD implementation at Rush Island that makes it more expensive than any other application of the technology in the industry. Ameren may wish compliance was easier, but wishing does not make it so.  The emphasis in the BACT analysis has always been the protection of the public health and welfare.  And given the widespread adoption of FGDs, DSI simply does not measure up.[5]

Where it cannot distinguish Rush Island scrubbers from scrubbers elsewhere in the industry as a matter of cost, Ameren attempts to do so as a matter of law.  Specifically, Ameren points out that the New Source Performance Standards (NSPS)—an emissions limit that is generally-applicable across all new emissions sources in a source category—does not apply to the 40-year-old Rush Island facility.  As the Act makes clear, the NSPS emission rate serves as a "floor" for any BACT determination: BACT at any facility cannot be less stringent that the NSPS for that source category.  42 U.S.C. § 7479(3).  Ameren reasons that, where the NSPS does not strictly apply at a specific unit, BACT can be set at levels far exceeding the NSPS for the industry—indeed, Ameren seeks an emissions limitation that is twice the level that would be allowed new sources.  FOF 190-191.  In this way, Ameren's permitting expert Mr. Campbell disregards the lessons of nearly two-dozen permitting decisions, claiming that those decisions were driven by a minimum requirement that does not apply here.

---

[5]   Notably, Ameren itself rejected the use of DSI in its engineering studies because it was "not proven to meet low emissions requirements."  FOF 36.

23

This argument attempts to avoid the requisite factual analysis by inventing a legal loophole.  But as the Court ruled previously, that NSPS sets "a 'floor' on emissions does not fundamentally change the BACT process of determining the 'best' available technology." 3/27/19 Order (Doc. 1057), at 7.  And as EPA explained it the NSR Manual:

> To satisfy the legislative requirements of BACT, EPA believes that the applicant must focus on technologies with a demonstrated potential to achieve the *highest* levels of control … [T]he only reason for comparing control options to an NSPS is to determine whether the control option would result in an emission level less stringent than the NSPS.  If so, the option is unacceptable."

Pl. Ex. 1190 at AM-REM-00544129-MDNR; *see also* FOF 105.  The NSPS may impose a minimum requirement in some cases, but BACT is focused on "maximum" emissions reductions. It is true that operators may permit and install FGDs in order to meet NSPS requirements, others may install them to meet BACT, while still others may install them to meet mercury standards or to reduce emissions under one of the Clean Air Act's emissions trading programs.  But whatever the reason, the use of the technology shows that it is achievable as an economic and engineering matter—and that is the relevant point for the BACT analysis.

Mr. Campbell took pains to distinguish—on his own legal grounds—nearly every permitting action at a similar facility only to then focus on a handful of permits at facilities that bear little resemblance to Rush Island.  FOF 214.  His conclusions—results-driven and out-of-step with decades of BACT implementation and even his own teaching on the topic—should not be credited.  Plaintiffs' expert Dr. Staudt had the right approach when examining past permitting actions: gleaning from them pertinent information about whether scrubbers were viable control options at similar units, and the emissions limitations they could have been expected to achieve over time.  And given the extensive evidence presented at trial, Ameren's argument that DSI constitutes BACT at Rush Island must be rejected.

**D.**    *Conclusion*: **Since At Least The Time Of The Violations, SO₂ BACT For Rush Island Has Required the Implementation of FGD Technology.**

There is no dispute about what control technologies are available to reduce $SO_2$ emissions at Rush Island, whether those technologies could be implemented at the plant, or their relative effectiveness.  Although the specific emission rate may vary somewhat based on case-specific factors, FGDs are plainly the best available $SO_2$ controls at coal-fired power plants. *Chipperfield,* 229 S.W.3d at 240 ("In general, pulverized coal-fired boilers burning low-sulfur coal, such as Powder River Basin ("PRB") coal, may use dry FGD, while boilers burning high-sulfur coals, such as eastern bituminous coal, must use wet FGD."); *United States v. Cinergy Corp.*, 618 F.Supp.2d 942, 955 (S.D. Ind. 2009), *rev'd on other grounds*, 623 F.3d 455 (7th Cir. 2010) ("BACT would require a scrubber that removed 99% of the $SO_2$").  The evidence presented at trial does not provide any reason why FGD technology, the "top control" for $SO_2$ removal, should be ruled-out based on "energy, environmental and economic impacts" associated with its application.  For the foregoing reasons, the United States asks this Court conclude the following:

(1) At all times pertinent to this case, BACT for $SO_2$ pollution from Rush Island would have been determined based on the application of FGD technology.

(2) At the time of the Unit 1 major modification in 2007, BACT for $SO_2$ would have required a 30-day rolling-average emissions rate of no more than 0.08 lbs/mmBTU.

(3) At the time of the Unit 2 major modification in 2010, BACT for $SO_2$ would have required a 30-day rolling-average emissions rate of no more than 0.06 lbs/mmBTU.

(4) At present, BACT for $SO_2$ at the Rush Island facility requires a 30-day rolling-average emissions rate of no more than 0.05 lbs/mmBTU.

25

## IV.    EXCESS EMISSIONS FROM RUSH ISLAND HAVE HARMED DOWNWIND COMMUNITIES.

Had Ameren implemented BACT measures at the Rush Island Units when the law required, $SO_2$ pollution from the plant would have dropped dramatically.  As it was, Ameren's unabated pollution has far-reaching effects.  The $SO_2$ emitted from Rush contributes to ambient $PM_{2.5}$ concentrations hundreds or even thousands of miles away and increases the risks of premature mortality or disease for millions of Americans.  Nothing in the statute, the regulations, or the record for this case suggests those effects should be discounted or ignored.

### A.    The Volume Of Rush Island's Excess Pollution

Comparing what Ameren's emissions rates would have been had the Company implemented BACT measures at Rush Island when they were required (as determined in Section III.D) to the units' uncontrolled emissions since the time of the PSD violations reveals the extent of excess emissions emitted by the Rush Island Plant in the years following its overhaul:

| Year | Excess Emissions |
|---|---|
| **2011** | 25,261 tons |
| **2007–2016** | 162,000 tons |
| **2017 going forward** | ~16,000 tons/year |

FOF 165, 300, 319.

### B.    The Fate And Transport Of Rush Island's Excess Pollution

After it is emitted from a stack, $SO_2$ pollution does not stay still—physically or chemically.  Rather, the emitted $SO_2$ is exposed to other chemicals suspended in the atmosphere as well as catalysts such as moisture and sunlight which drive its transformation into fine particulate matter ($PM_{2.5}$).  FOF 236.  Here, Plaintiffs' expert Mr. Lyle Chinkin performed case-specific photochemical modeling using CAMx to track where Rush Island's excess pollution

26

goes, and how it affects downwind air quality concentrations.  FOF 285.  The results, which were not meaningfully contested by Ameren, reveal Rush Island's excess $SO_2$ pollution contributed to $PM_{2.5}$ levels across much of the eastern U.S. in a range extending from Kansas to the Atlantic coast, from the Great Lakes to the Gulf of Mexico:



Pl. Ex. 1362 (scale in $\mu g/m^3$); FOF 299.  Based on the CAMx results for 2011, in which Rush Island emitted 25,261 excess tons of $SO_2$, Rush Island's excess pollution had a maximum annual average impact on $PM_{2.5}$ concentrations of 0.057 $\mu g/m^3$.  FOF 300.  On more than 250 days that year, Rush Island's excess $SO_2$ pollution added more than 0.1 $\mu g/m^3$ to downwind $PM_{2.5}$ concentrations.  FOF 297.  And during more than 90 days in 2011 (25% of the year)—and about *every other day* during the summer—Rush Island's excess pollution contributed more than 0.25 $\mu g/m^3$ to downwind $PM_{2.5}$ concentrations.  FOF 298.  As Mr. Chinkin testified, these are

27

substantial air quality impacts from a single stationary source—roughly the equivalent of one million heavy duty trucks.  FOF 235.

###### C.    The Impact On Human Health And Welfare From Rush Island's Excess Pollution

There is no real question that the increases in $PM_{2.5}$ concentrations that resulted from Rush Island's excess emissions had public health consequences.  Sulfur dioxide and particulate matter have both long been regulated under the Clean Air Act specifically because of the risks they pose to public health.  As such, there are a number of assessments of the harm from these pollutants by, for example, Congressional committees, panels of agency experts, and independent commissions charged under the Clean Air Act to review the state of the science.  FOF 242-252.  Statements by the World Health Organization, EPA, the American Heart Association, and a host of other public health organizations, without exception, reflect the scientific consensus that $PM_{2.5}$ exposure causes premature mortality, cardiovascular effects such as heart attacks and strokes, and respiratory problems such as asthma.  FOF 246-247.  Moreover, no ambient air quality threshold has been identified below which increases in $PM_{2.5}$ do not increase risks of these adverse health consequences or below which decreasing ambient concentrations do not result in public health benefits.  FOF 249.  These harms have not only been studiously documented by EPA (and other public health organizations), they have been recognized by the courts.  *See American Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 515 (D.C. Cir. 2009); *see also United States v. Westvaco*, 2015 WL 10323214, at *8-9 (D. Md. Feb. 26, 2015) ("The majority scientific consensus, accepted by the Court, is that the harm from exposure to $PM_{2.5}$ is linear, and there is no known threshold below which $PM_{2.5}$ is not harmful to human health"); *Cinergy*, 618 F. Supp. 2d at 964 (finding irreparable harm from "significant health and environmental effects in the form of $PM_{2.5}$" resulting from excess $SO_2$).

28

The resounding scientific consensus—reflected in the scientific and public health literature and cogently presented at trial by Dr. Joel Schwartz, an internationally-renowned leader in the study of PM health effects—establishes a clear causal link between $PM_{2.5}$ exposures and premature mortality.  Ameren proffered two experts in health effects, but only one—Dr. Lucy Fraiser—offered an opinion about whether changes in ambient concentrations of $PM_{2.5}$ would lead to changes in premature mortality and other health effects.[6]  FOF 278.  Dr. Fraiser— who has never published a peer-reviewed paper on air pollution—admitted she disagreed with each and every one of the many public health organizations to examine the matter, and failed to point to a single study or public health organization that supported her contrary conclusion.  FOF 260, 263.  In light of the overwhelming consensus of the scientific community and EPA's long history regulating $SO_2$ pollution and evaluating the risks associated with $PM_{2.5}$ exposure, Dr. Fraiser's doubts should not be credited.

The evidence regarding the relationship between $PM_{2.5}$ exposure and deleterious health effects is more than enough to establish a cognizable and redressable injury in this case. Nevertheless, to further highlight the scope and severity of that harm, Dr. Schwartz also quantified the effect of Rush Island's illegal pollution on premature mortality in two ways.  First, Dr. Schwartz used a peer-reviewed, "reduced-form" model that he published in 2009.  This model calculated pollution impacts on a per-ton basis for every coal-fired power plant in the country.  FOF 317.  Second, Dr. Schwartz entered Mr. Chinkin's CAMx modeling results into

---

[6]    Ameren's other toxicologist, Dr. Valberg, did not offer an opinion as to whether $PM_{2.5}$ exposure causes premature mortality or other health effects, and instead limited his opinions to whether sulfate—a constituent of ambient PM2.5—had deleterious health effects.  FOF 278.  As discussed below, Dr. Valberg simply disagrees with how $PM_{2.5}$ is regulated by EPA and other public health agencies, and his opinions have been specifically rejected by the public health community.

EPA's Benefits Mapping Analysis Program (or BenMAP), which then associated the modeled changes in pollution concentrations from the fate and transport analysis with information about downwind populations, and then applied a concentration-response function to calculate the consequences to those populations of the increases in ambient $PM_{2.5}$. FOF 311. In both cases, the results revealed Rush Island's excess pollution has led to a substantial loss of human life. FOF 317. A disquieting impact by any measure.

> **D.      Ameren's Arguments That Rush Island's Excess Pollution Was Not Harmful Are Unavailing.**

In defense, Ameren argues that Rush Island's excess $SO_2$ pollution was either harmless as a matter of law (in light of certain regulatory thresholds), or harmless as a matter of fact (based on the testimony of the Company's toxicology experts). These arguments do not withstand scrutiny.

> **1.      The National Ambient Air Quality Standards Do Not Establish A Threshold Below Which Illegal Pollution Poses No Threat To Human Health Or Welfare.**

Ameren first insists that the Court cannot consider harm from Rush Island's pollution to accrue in areas that are "in attainment" with the National Ambient Air Quality Standards for $SO_2$ and $PM_{2.5}$ because, the Company says, those standards establish safe thresholds below which the air pollution poses no risk to human health and welfare. The text, structure, purpose, and history of the NAAQS provisions—as well as the great weight of the scientific evidence—contradict Ameren's argument.

When it was passed in 1970, the Clean Air Act established "federal authority to combat air pollution and directed EPA to devise National Ambient Air Quality Standards (NAAQS) limiting various pollutants, which the States were obliged to implement and enforce." *Environmental Defense v. Duke Energy Corp.* 549 U.S. 561, 566 (2007) (citations omitted). The

30

Act requires the NAAQS, which are set after EPA undertakes a sweeping "integrated science assessment" of current air pollution research, to establish ambient air quality standards "the attainment and maintenance of which . . . are requisite to protect the public health" and "public welfare."  42 U.S.C. § 7409(b).  These NAAQS set a nationally-applicable, regionally-managed standard for air quality that contemplates the pollution from all sources; it is not a "standard against which a single source is measured." *United States v. Cinergy*, 618 F. Supp. 2d 942, 964 (S.D. Ind. 2009), *rev'd on other grounds by* 623 F.3d 455 (7th Cir. 2010).

But not long after it was enacted, Congress recognized a need to "giv[e] added protection to air quality." *Duke Energy Corp.*, 549 U.S. at 567; *see also Hawaiian Elec. Co. v. EPA* (*HECO*), 723 F.2d 1440, 1446–47 (9th Cir. 1984); *Alabama Power v. Costle*, 636 F.2d 323, 349 (D.C. Cir. 1980).  Indeed, Congress noted:

> in no case is there evidence that the [NAAQS] threshold levels have a clear physiological meaning, in the sense that there are genuine adverse health effects at and above some level of pollution, but no effects at all below that level. On the contrary, evidence indicates that the amount of health damage varies with the upward and downward variations in the concentration of the pollutant, with no sharp lower limit.

Committee Report on the 1977 CAA Amendments, H.R. Rep. 95-294, at 110 (May 12, 1977).  Moreover, as the Eighth Circuit later explained, merely setting ambient air quality goals "failed to improve air quality in those areas that had already attained the minimum standards of the NAAQS because polluters had no incentive to diminish emissions below the established limits." *Otter Tail*, 615 F.3d at 1011.

In light of this problem, Congress "amended the CAA . . . in 1977 to add the [PSD] program, which seeks to ensure that the 'air quality floor' established by the NAAQS does not 'in effect become a ceiling.'" *Id.* (quoting *Thomas*, 828 F.2d at 785).  To that end, the PSD program explicitly aims "to protect public health and welfare from any actual or potential

31

adverse effect . . . from air pollution . . . ***notwithstanding*** attainment and maintenance of all national ambient air quality standards."  42 U.S.C. § 7470 (emphasis added); *see also* H.R. Rep. 95-294 at 8 (noting the PSD section aimed to "protect health from harmful exposures occurring at levels below the ambient standards").  And along with the new statutory program, Congress disavowed the notion that the NAAQS should be viewed as a threshold below which regulated pollutants were seen as having no effect on human health and welfare:

> In the absence of evidence to the contrary, for a population of various stages and initial states of health, no threshold should be stipulated below which exposure in harmless. Instead, the response to exposure should be assumed to be directly related to successively greater or lesser concentrations of the toxic materials and the level of resistance of those exposed.

H.R. Rep. 95-294 at 111.  As such, the PSD program was enacted to address pollution occurring in areas already meeting the NAAQS' public health protections.  *Accord TVA v. Hill*, 437 U.S. 153, 194 (1978) ("[I]t is … the exclusive province of the Congress not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation.").  Ameren's claim that the NAAQS serve as a shield against PSD obligations is contradicted by the explicit language and history of the two statutory components.

To be sure, the statute still requires that the NAAQS establish air quality levels for different pollutants that must be attained and maintained for the protection of public health and welfare.  42 U.S.C. § 7409(b).  But because a pollutant like fine particulate matter is a "nonthreshold pollutant" for which there is no evidence of an airborne concentration level that does not pose risks to human life and health, *see* 78 Fed. Reg. 3085, 3119 (Jan. 15, 2013), EPA must "make judgments of degree" to set the NAAQS.  *Accord Whitman v. American Trucking Assoc.*, 531 U.S. 457, 475 (2001).  Congress understood that, *see id.*, and the judiciary has

32

accepted that.[7]   The NAAQS are not "zero-risk" thresholds.  *See*, *e.g.*, 78 Fed. Reg. 3086, 3090 (citing *Lead Industries* v. *EPA,* 647 F.2d at 1156 n.51).

Ameren is not the first company to try to use the NAAQS thresholds to shield against or limit PSD obligations.  Hawaiian Electric (HECO) maintained before the Ninth Circuit that EPA could not "impose emission restrictions that are more stringent than necessary to protect NAAQS" in a PSD permit.  *Hawaiian Electric v. EPA* (*HECO*), 723 F.2d 1440, 1446-47 (9th Cir. 1984).[8]   The court brushed the argument aside.  After recounting the legislative history and examining the statute's text, the court concluded, "it is absurd for HECO to maintain that EPA may not, through a PSD permit, require pollution controls which yield air quality better than NAAQS."  *Id*.  Similarly, it is absurd for Ameren to maintain that, though the emissions above BACT levels were proscribed the Act, the harm from those excess emissions should be—as a matter of law—ignored entirely.  *Cf. HECO*, 723 F.2d at 1447.  Ameren's effort to discount excess emissions in NAAQS-attainment areas contradicts the statute's language, history, and purpose—and seeks to transform the ambient air quality standards from the air quality floor intended by Congress into a ceiling.  *Contra Otter Tail*, 615 F.3d at 1011; *see also Cinergy*, 618 F. Supp. 2d at 964.

In addition to its textual problems, Ameren's legal argument has a structural problem. The Clean Air Act amendments installed two permitting programs for modified sources: PSD imposes permitting and pollution control requirements on new and modified sources located

---

[7]     *American Trucking Ass'n v. EPA*, 283 F.3d 355, 369–70 (D.C. Cir. 2002) (setting the NAAQS does not require EPA to "definitively identify pollutant levels below which risks to public health are negligible"); *North Carolina v. TVA*, 593 F. Supp. 2d 812, 822 n.6 (W.D.N.C. 2009) (noting that "EPA does not purport to set the NAAQS at a level which would entirely preclude negative health outcomes"), *rev'd on other grounds* 615 F.3d 291 (4th Cir. 2010).

[8]     *See also Sierra Club v. Thomas*, 658 F. Supp. 165, 174 n.9 (N.D. Cal. 1987).

33

within attainment areas (42 U.S.C. § 7470 et seq.), while Nonattainment New Source Review (NNSR) installs parallel requirements for new and modified sources in nonattainment areas (42 U.S.C. § 7501 et seq.).  If air pollution from sources in attainment areas was not worth controlling with best available control technology, as Ameren suggests, the PSD provisions should not exist.  Of course, Congress recognized the pollution *was* potentially harmful, and amended the statute to address that harm.  Ameren asks that this Court read—not just a word or sentence—but an entire part of the Clean Air Act out of Congress' enactment.  There is no basis in law to do so.

Finally, Ameren's argument is contradicted by decades of EPA's implementation of the Act.  In the process of setting the PM NAAQS, EPA has emphasized time and again that there *is no known safe threshold* below which incremental increases in exposure do not create incremental increases in risk to human health and welfare (emphases added):

| Citation | Statement |
|---|---|
| 78 FED. REG. 3086, 3098, 3118-19, 3148 (Jan. 15, 2013) | "[E]vidence and risk-based approaches using information from epidemiological studies to inform decisions on $PM_{2.5}$ standards are complicated by the recognition that **no population threshold, below which it can be concluded with confidence that $PM_{2.5}$-related effects do not occur, can be discerned** from the available evidence."<br><br>"[T]he **EPA recognizes that there is no discernible population-level threshold below which effects would not occur, such that it is reasonable to consider that health effects may occur over the full range of concentrations observed in the epidemiological studies, including the lower concentrations in the latter years**." |
| Final Integrated Science Assessment (Dec. 2009) at 2-12, 2-25 & 6-75 [Pl. Ex. 1209][9] | "[T]he evidence is sufficient to conclude that a causal relationship exists between long-term exposures to PM2.5 and mortality." Moreover, **the evidence "supports the use of a no-threshold, log-linear model,** which is consistent with the observations made in studies that examined the PM-mortality relationship." |

---

[9]    EPA is in the process of updating its scientific assessment, and its preliminary review indicates "recent studies **continue to support a linear, no-threshold relationship** for total,

| | |
|---|---|
| | "The concentration-response relationship has been extensively analyzed through studies that have examined the relationship between PM and mortality.  **These studies**, which have focused on short-and long-term exposures to PM **have consistently found no evidence for deviations from linearity or a safe threshold.**" |
| 71 FED. REG. 61144, 61158 (Oct. 17, 2006) | "The EPA notes that, in contrast to the last review when few studies had quantitatively assessed the form of the concentration-response function or the potential for a threshold, **several new studies available in this review have used different methods to examine this question, and most have been unable to detect threshold levels** in time-series mortality studies." |
| 62 FED. REG. 38652, 38670 (July 18, 1997) | "[T]he level or even existence of population thresholds below which no effects occur cannot be reliably determined by an examination of the results from the available studies." |

Indeed, when describing the benefits of the most recent PM NAAQS rule, EPA noted

> We assume that the health impact function for fine particles is log-linear without a threshold in this analysis. Thus, the estimates include health benefits from reducing fine particles in areas with varied concentrations of $PM_{2.5}$, including both areas that do not meet the fine particle standard and those areas that are in attainment, down to the lowest modeled concentrations.

Ex. FE [PM NAAQS Regulatory Impact Analysis, Feb. 2013] at 5-19.

Finally, EPA's scientific determinations mirror the broad consensus of the world's public health authorities.  As described in the Findings of Fact (*see* FOF 242-252), the great weight of the evidence requires the conclusion that increases in $PM_{2.5}$ exposure are causally associated with increases in premature mortality and a host of other heart and lung diseases, and that there is no safe threshold below which increases in $PM_{2.5}$ do not result in increased risks of those health consequences.  Nothing about the structure or implementation of the Clean Air Act allows—nor

---

nonaccidental, mortality, especially at lower ambient concentrations of $PM_{2.5}$." Draft Integrated Science Assessment (Oct. 2018) at 1-49.  FOF 267 (also available at https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=341593)

even suggests—that the harm from illegal pollution should be ignored when that pollution is emitted in attainment areas.

> ### 2. The "Significant Impact Levels" Are Not An Appropriate Measure To Assess The Harm From Rush Island's Excess Pollution.

In parallel with its argument that pollution below NAAQS-levels is harmless, Ameren argues that pollution impacts below EPA's "significant impact levels" (or SILs) are harmless. Ameren points out that EPA has established a SIL for annual $PM_{2.5}$ impacts of 0.2 µg/m³ for some areas, which is almost four times higher than the maximum annual average impact modeled by Plaintiffs' expert for Rush Island's downwind impact in 2011. But SILs are not, as Ameren seems to suggest, a way to take stock of downwind health effects. Rather, SILs are a regulatory tool for assessing whether a source's emissions are responsible for an exceedance of the NAAQS. See FOF 76, 302-303. As with the $PM_{2.5}$ NAAQS itself, upon examination, Ameren's use of the SILs as a benchmark against which to compare its excess pollution is supported neither by pertinent law nor relevant fact.

As noted in Section I, Clean Air Act Section 165(a)(3) requires operators looking to implement a major modification to demonstrate that the pollution from the modified facility will not cause or contribute to a downwind NAAQS exceedance. 42 U.S.C. § 7475(a)(3). To help permitting agencies evaluate the "cause or contribute" question under subsection (a)(3), EPA established the SILs to be concentration levels against which to compare the impact of a source's emissions. Pl. Ex. 1205 [Guidance on Significant Impact Levels] at USTREXR0003853, -3855. But "[t]he SIL values identified by the EPA have no practical effect unless and until permitting authorities decide to use those values in particular permitting actions." Id. at 3–4. Meanwhile, subsection (a)(4) dictates that new and modified sources install and operate BACT, the cornerstone requirement implementing Congress' intent that harmful pollution be avoided even

36

in NAAQS-attainment areas.  42 U.S.C. § 7475(a)(4).  As co-equal requirements of the PSD permitting program, subsections (a)(3) and (a)(4) set out a common-sense approach to regulating pollution.  Where a modified source would install and operate best available pollution control technology as required by (a)(4), but would nonetheless cause or contribute to a downwind NAAQS violation once up and running, then additional emissions reductions may be required in order to satisfy (a)(3).  Similarly, even where a modified source does not present a threat to a downwind area's attainment status as evaluated under (a)(3), it must still implement BACT to protect the public health and welfare from harmful air pollution in attainment areas under (a)(4), just as Congress intended.

Just as the NAAQS do not establish a "zero-risk" threshold under which pollution is safe, the SILs do not establish a level below which there is no risk or harm from a facility's pollution. The SILs are, at bottom, a compliance demonstration tool, helping permit applicants and permitting authorities determine whether additional air quality modeling of a proposed source is needed.  And once performed, SILs inform whether the source is projected to cause or contribute to an exceedance of an air quality standard such that it must accomplish *additional* reductions— beyond those the PSD permit would normally impose in the form of BACT emissions limitations—before a permit could issue.  *See*, *e.g.*, FOF 302-303; Pl. Ex. 1190 at C.52.  The SILs merely provide NAAQS modeling guidance for a PSD permitting process in which Ameren declined to participate here, necessitating this enforcement action.  But in any event, Ameren's argument is nothing more than HECO's Ninth Circuit argument dressed in regulatory—rather than statutory—language.  There, HECO tried to argue pollution that did not lead to exceedances of the NAAQS could not be controlled under PSD because EPA had already said those emissions were safe.  *HECO*, 723 F.2d at 1446.  The court called the argument "absurd."  Here, Ameren

37

argues that, if Rush Island is not "causing or contributing" to a NAAQS exceedance under Section 165(a)(3), there can be no harm from its emissions and so it should not be required to operate BACT under Section 165(a)(4). But subsection (a)(3) imposes a distinct requirement from (a)(4). And compliance with (a)(3)—even if it could be shown using the modeling proof in this case and comparing the modeled impacts to a SIL—cannot excuse Ameren's violation of (a)(4).

EPA's long practice of assessing the benefits of Clean Air Act regulations further supports this legal analysis. For example, in the Regulatory Impact Analysis prepared for the Clean Air Visibility Rule in 2005, EPA estimated the Rule would avoid substantial deleterious health effects even though 98% of the population would see air quality benefits of *less* than the 0.2 µg/m$^3$ value now cited by Ameren. CAVR RIA (June 2005)[10] at 2-4; *see also* FOF 303.

Finally, Ameren's effort to use SILs values to avoid its NSR permitting obligations contradicts the very structure of the New Source Review program. Congress made clear in passing the Clean Air Act that when a source "increases the amount of *any* air pollutant" it must be subject to NSR (among other requirements). *See, e.g.*, 42 U.S.C. § 7411(a)(4) (emphasis added). In the NSR regulations, EPA has determined that predicted emissions increases of 40 tons per year of SO$_2$ are significant. *See, e.g.*, 40 C.F.R. § 52.21(b)(23)(i). And in the preamble to the rules setting those significance thresholds, EPA explained that it was establishing categorical "significance" levels of emissions, and that predicted emissions increases below such levels would be deemed *de minimis*. 45 Fed. Reg. 52,676, 52,705–09 (Aug. 7, 1980). The Agency found that its significance levels protected against the "cumulative effect" on air quality

---

[10]    Available at https://www.epa.gov/sites/production/files/2016-02/documents/bart_ria_2005_6_15.pdf; *see also id.* at 4-68 (estimating public health benefits).

from "multiple sources in an area each making . . . emissions increase[s] . . . ." *Id.* at 52,707. EPA expressly rejected exempting modifications from NSR based on individualized assessments of a single facility's impacts on air quality: "The Administrator [of EPA] has chosen to specify *de minimis* cutoffs in terms of emissions rate for applicability, BACT and air quality analysis purposes, with no provisions for case-by-case demonstration of a source's air quality impact." *Id.* at 52,707. So, though Ameren points to the SILs, the better comparison is between the 40-ton threshold EPA deemed significant and the excess 16,000 tons-per-year of $SO_2$ now being emitted by Rush Island. Ameren's effort to sidestep BACT compliance by citing the SILs should be rejected.

### 3.   Ameren's Reliance On Scientific Uncertainty Is Misguided, And Its Reliance On Fringe Toxicological Evidence Is Unpersuasive.

In addition to its effort to minimize the Plaintiffs' harm evidence by placing it beside benchmarks developed and used for distinct purposes, Ameren complains there is too much "uncertainty" about any harm from its excess emissions to justify the expense associated with installing scrubbers and remediating that harm. As Ameren's counsel said in closing arguments, "There are uncertainties at every stage of the causal relationship that plaintiffs must prove." Def. Closing., Tr. Vol. 6, at 34:19-21. Indeed, Ameren complains, Plaintiffs do "not identify[] or even predict[] any person's real-world death." Doc. 1068 at 4.

But this argument wholly mischaracterizes the level of scientific certainty in this case. There is widespread consensus amongst public health agencies and scientists that $PM_{2.5}$ causes adverse health effects, including cardiovascular effects such as heart attacks and strokes, respiratory effects such as asthma attacks, and premature mortality. FOF 242-252.

Moreover, Ameren's reliance on supposed uncertainty misconceives the case and misconstrues the harm that must be remedied. This is not a toxic tort case. Congress sought "to

39

protect *public* health and welfare from any actual or *potential* adverse effects" from air pollution. 42 U.S.C. § 7470(1) (emphasis added).  Public health regulation—like public health science—trades in risk, not diagnoses or proximate causes.  The risks resulting from increases in $SO_2$ pollution or ambient levels of $PM_{2.5}$ include an increased threat—to the public—of lung disease or heart disease or premature mortality.  FOF 242-252.  And the harm the Clean Air Act seeks to curb is that suffered by a community whose members—on the whole—enjoy fewer years than they should and spend more of them in hospitals than they otherwise would.  It is a harm borne by a population, not a person.

Even as to those uncertainties that do exist in the evidence presented by Plaintiffs, Ameren overstates and misunderstands their nature.  As noted above, there is no question that $PM_{2.5}$ increases the risk of premature mortality.  The primary uncertainties that exist in Plaintiffs' proof relate to the specific quantifications that Dr. Schwartz presented from his two independent risk assessments, in which he provided estimates of the number of premature mortalities caused by Rush Island's excess pollution.  Dr. Schwartz laid no claim to absolute precision in these analyses.  Indeed, both assessments were accompanied by peer-reviewed, 95% confidence intervals that bounded the reasonable certainty of his estimates.  FOF 309, 313-314, 317.  Taken together, the results of the two assessments provide a high degree of confidence in the conclusion that Rush Island's pollution has substantially harmed public health and welfare.

Ameren points out that these conclusions do not incorporate the possibility that there is a yet-to-be-identified safe-exposure threshold at or below the lowest levels of ambient $PM_{2.5}$ observed in the scientific literature even though EPA has "recognized that it is possible such thresholds exist."  (Doc. 1068 at 8 (*quoting* 78 Fed. Reg. 3119 n.61)).  But even to the extent

there is a yet-to-be-identified threshold, the evidence shows it would be below ambient levels actually occurring in the areas impacted by Rush Island's emissions.  FOF 254.

Finally, in a subtle twist on its "scientific uncertainty" argument, Ameren insists that, though epidemiology can show correlation, it can never establish causation.  Ameren's toxicologists basically argue that "the dose makes the poison," and point out there is no toxicological literature that establishes the poisonous dosage of $PM_{2.5}$ or sulfate, the $PM_{2.5}$ constituent to which $SO_2$ emissions mostly contribute.  This argument relies on a blinkered and inaccurate reading of the scientific literature that was reviewed by Dr. Schwartz, EPA, and the other public health organizations to address the matter.  The scientific consensus that $PM_{2.5}$ exposure is harmful at all relevant exposure levels in the United States does not, as Ameren's argument suggests, rely exclusively on epidemiological research.  *See, e.g.*, FOF 244, 247, 250; *see also, generally,* Pl. Ex. 1209 [NAAQS ISA] (considering, among other things, "controlled human exposure studies" and "toxicological studies").  Rather, as Dr. Schwartz explained, it relies on a totality-of-the-science review.  The various efforts to address the pertinent literature have examined not only epidemiological results, but the findings of toxicologists and medical practitioners as well, endeavoring to settle on a coherent, cross-discipline understanding of the relationship between health effects and changes in ambient $PM_{2.5}$ concentrations.  FOF 244.

For his part, Ameren's expert Dr. Valberg focuses his toxicological criticisms at the 'relative toxicity' of various $PM_{2.5}$ constituents, but his opinions are contrary to EPA's conclusions in regulating $PM_{2.5}$ in the first place, as well as the conclusions of the World Health Organization.  FOF 275-277.[11]  While Dr. Valberg is free to continue to assert that the sulfate

---

[11]  *See also* 78 Fed. Reg. at 3119 (Jan. 13, 2013) ("the current body of scientific evidence indicated that many constituents of PM can be linked with differing health effects . . . and the evidence is not sufficient to support eliminating any component" (quotations omitted);  71 Fed.

portion of PM2.5 is harmless, EPA rejected that view, as well as the other opinions offered by Dr.

Valberg, when he raised them in the administrative process underlying EPA's 2009 Integrated

Science Assessment and setting of the 2012 PM2.5 NAAQS.  FOF 273-274.   When weighed

against those of EPA, the World Health Organization, and other mainstream health

organizations—all of which conclude there are real and concerning health effects related to the

PM2.5 resulting from coal combustion—Dr. Valberg's fringe views hardly register.  *See Cinergy*,

618 F. Supp. 2d at 949-50 (rejecting Dr. Valberg's opinion as a "minority view" that is contrary

to the "bulk of the scientific literature on the subject").

E.      *Conclusion*: **Rush Island's Excess Pollution Has Increased The Risk Of Premature Mortality And Disease For Downwind Populations, And There Is No Basis In Law Or Fact To Overlook That Harm.**

Rush Island's excess SO2 pollution has resulted in increases in PM2.5 concentrations for

hundreds of miles downwind.  Incremental increases in PM2.5 concentrations lead to incremental

increases in risk of heart disease and lung disease and premature mortality.  *Accord United States*

*v. Cinergy*, 618 F. Supp. 2d 942, 950 (concentration response function for PM2.5 and mortality is

linear in the range of ambient PM2.5 in the United States).  Ameren's effort to minimize Rush

Island's decade of illegal pollution by comparing it to irrelevant air pollution benchmarks fails:

the Clean Air Act's obligations are not fungible.  A suggestion of compliance with one provision

---

Reg. at 61163 (Oct. 17, 2006) ("In short, there is not  sufficient evidence that would lead toward the selection of one or more PM components as being primarily responsible for effects associated with fine particles, nor is there sufficient evidence to suggest that any component should be eliminated from the indicator for fine particles. The Staff Paper continued to recognize the importance of an indicator that not only captures all of the most harmful components of fine particles (i.e., an effective indicator), but also emphasizes control of those constituents or fractions, including sulfates, transition metals, and organics that have been associated with health effects."); 62 Fed. Reg. 36,652, 38,666 (July 18, 1997) ("[T]he current review has examined the available evidence to determine whether it would tend to support inclusion or exclusion of any physical or chemical classes of PM, for example sulfates . . . .   [T]he available scientific information does not rule out any one of these components as contributing to fine particle effects.").

or limit does not excuse the violation of another. And the opinions of Drs. Fraiser and Valberg challenging the scientific consensus about $PM_{2.5}$ health effects are unsupported, unpersuasive, and often fail to address relevant facts. The scientific consensus remains unshaken. And given the volume of Rush Island's excess pollution here, the toll—measured in hospital visits, heart attacks, and premature mortality—is significant.

## V. INJUNCTIVE RELIEF IS WARRANTED TO QUICKLY BRING RUSH ISLAND INTO COMPLIANCE AND TO REMEDIATE THE HARM FROM THE FACILITY'S DECADE OF EXCESS POLLUTION.

In light of the severity of the harms caused by Ameren's PSD violations and the ready availability of options to address that harm, the equities heavily favor an award of injunctive relief to bring Rush Island into compliance with the law and ensure the public enjoys benefits of the health and welfare protections Congress enshrined in the Clean Air Act.

### A. The United States' Proposal For Injunctive Relief

To bring Rush Island's operations into compliance with PSD requirements, the United States asks this Court order Ameren to:

(1) Apply for a PSD permit for the Rush Island facility within 90 days of entry of final judgment in this case; and

(2) Operate the Rush Island Units to meet a 30-day, rolling-average BACT emissions limitation of no more than 0.05 lbs/mmBTU within 3 years of final judgment.

The BACT analysis for Rush Island—as well as Ameren's own engineering studies show these requirements are technically and economically achievable. *See* Section III.B.

To remediate the harm caused by Rush Island's pollution, the United States asks that this Court direct Ameren to reduce emissions at its Labadie Energy Center, a near-by, coal-fired facility with four units of the same size and design as Rush Island's two. The $SO_2$ pollution from Labadie affects the same populations—and to the same degree—as the $SO_2$ pollution from Rush.

43

FOF 335-340.  As such, reducing $SO_2$ pollution at Labadie benefits the same populations harmed by Rush Island's excesses.  The Fifth Circuit succinctly described how such offsetting pollution reductions can remediate harm from past excess emissions:

> Because of [a plant's] past emissions, there are today more pollutants and pollutant byproducts in the region's air, and more pollution-related damage to natural resources, than there would be absent the past emissions.  Future emissions contribute to this geographically diffuse, intermingled body of harm exactly the same way.  And crucially, future emissions *reductions* accelerate the diminution of that body of harm . . . .

*Louisiana Generating v. Ill. Union Ins.*, 831 F.3d 618, 630 (5th Cir. 2016) (emphasis in original).  Specifically, the United States asks this Court cap $SO_2$ emissions from Labadie at 18,000 tons per year—about half the level of the facility's current annual emissions.  FOF 328.

The record shows Ameren would have several options for reducing emissions at Labadie below such a threshold.  Indeed, as Counsel for Ameren stated at closing arguments, the Company "can afford anything this Court orders."  FOF 391.  Two of the remediation options were discussed in more detail at trial: the implementation of wet FGD technology at two Labadie units, or the application of DSI at all four units.  FOF 394.  While the costs of these options are not insignificant, neither are they insurmountable—as Ameren readily concedes.  And under either approach, it would take Ameren about 15 years to reduce $SO_2$ pollution commensurate with the excess emitted from Rush Island since the time of its unpermitted modifications—about the time Ameren expects to retire two of the four Labadie units (2036).  FOF 322.

As discussed in the following sections, the United States' request for injunctive relief is more than supported by the record evidence, and the equitable analysis committed to the Court's discretion points in one direction: orders of injunctive relief to bring Rush Island into compliance with PSD and to remediate the harm from its excess pollution.  But as a first-order assessment of

44

the United States' requests, the Court need look no further than the Supreme Court's analysis in *Mitchell*.

In *Mitchell*, the applicable statute awarded district courts "jurisdiction … to restrain violations" of the Act. 361 U.S. at 289 (citing 29 U.S.C. § 217).  Here, the Clean Air Act awards district courts "jurisdiction to restrain such violation, to require compliance, … and to award any other appropriate relief." 42 U.S.C. § 7413(b).

In *Mitchell*, the facts established that an employer had illegally fired employees who then suffered lost wages—and the tally of lost wages grew each day they went without a paycheck. 361 U.S. at 289.  Here, Ameren illegally failed to get a permit and pollution controls; the public suffered excess pollution—and the tally of excess emissions grows each day Rush Island operates without BACT measures.  FOF 165-166.

In *Mitchell*, the district court ordered that the offending employer offer to reinstate the fired employees at their former positions without a loss of seniority, effectively placing the parties in the positions they would have been in without the unlawful termination.  361 U.S. 289. Here, the United States asks that Ameren seek a PSD permit for the Rush Island facility and implement BACT measures as soon as practicable, effectively putting the parties in the position they would have been had Ameren installed the controls as required.  Section III.B.

In *Mitchell*, the Supreme Court indicated back-pay would be appropriate to remedy the harm that resulted from the illegal termination in order to support the purposes of the Fair Labor Standards Act.  361 U.S. at 291–93, 295.  Here, the United States asks that Ameren be required to reduce $SO_2$ pollution from within the same geographic area harmed by its conduct and in an amount commensurate with the excess emitted at Rush Island in order to give the public the benefit of the law's requirements in furtherance of the Clean Air Act's purposes.  Section IV.B.

45

**B.** *Conclusion*: **Prospective Compliance At Rush Island Requires The Prompt Application For A PSD Permit And The Installation Of FGD Technology Within Three Years.**

Ameren must bring Rush Island into compliance with PSD's requirements.  As described in Section II, given Congress' balancing of the equities and policy determination when passing the law, the question isn't *whether* the facility must come into compliance—only *how* and *when* that compliance must be accomplished.  *See Oakland Cannabis Buyers' Coop.*, 532 U.S. at 497–98; *Burlington Northern*, 957 F.2d at 601–02.

Here, the statute clearly requires a PSD permit and the implementation of best available control technologies where a major source undergoes major modifications such as those undertaken at Rush Island.  42 U.S.C. § 7475(a)(1), (a)(4).  Decades of Clean Air Act implementation make it clear that BACT for SO$_2$ at Rush Island is an emissions rate based on FGD technology.  *See* Section III.B.  These requirements were well-known to the industry and to Ameren itself before the Company performed its life-extension work on Rush Island.  *See* FOF 107-120; *accord Franklin County Power*, 546 F.3d at 935–36 (noting "[i]t is an accepted equitable principle that a court does not have to balance the equities in a case where the defendant's conduct has been willful," like where "defendants flaunted environmental laws by, for example, not implementing control systems for hazardous wastes" (citations and quotations omitted)).  While certainly within the Court's authority to do so, no party before the Court has requested that Rush Island be shut down until compliance can be assured.[12]  There is no reason why Ameren cannot promptly apply for a permit, and the Company could have BACT measures

---

[12]   *Cf. Romero-Barcelo*, 456 U.S. at 315 (approving an order that the Navy did not have to cease unpermitted operations while awaiting a permit); *Franklin County Power*, 546 F.3d at 936 ("[A] district court would likely need to balance equities before it granted injunctive relief *and shut down* the facility." (emphasis added)).

installed and operational at Rush Island in three years.  FOF 67.  The Company's ability in this regard should be a mandate.  Ameren's compliance at Rush Island is already a decade overdue. The public health and welfare Congress sought to protect with its enactment should not suffer further dalliance.

Even if Congress' policy choices alongside these longstanding principles of equity did not provide a shortcut through *eBay*'s equitable factors, balancing those factors would point unwaveringly to the same conclusion.

***Irreparable Harm***: There is no dispute that Ameren's failure to obtain a PSD permit and implement BACT measures at Rush Island has caused irreparable harm.  Def. Closing., Tr. Vol. 6, at 33:23–25.  Nor could there be.  Courts regularly find irreparable harm where defendants have violated environmental statutes.  *Amoco*, 480 U.S. at 545 (environmental injuries are "often permanent or at least of long duration"); *United States v. Production Plated Plastics, Inc.*, 762 F. Supp. 722, 729 (W.D. Mich. 1991) (violations of an environmental statute usually result in irreparable injury); *United States v. Oliver*, 2009 WL 10671371, *13 (D. Alaska June 25, 2009) (if environmental "injury is sufficiently likely … the balance of harms will usually favor the issuance of an injunction to protect the environment"); *Ohio Valley Envt'l Coalition v. U.S. Army Corps of Engineers*, 528 F. Supp.2d 625, 630 (S.D. W.Va 2007) ("because to damage the environment is often irreversible, this harm is frequently justification for a restraining order or an injunction").  Moreover, irreparable harm can include programmatic harms associated with non-compliance, or the determination that the conduct constitutes a *risk* of danger to the public. *Marine Shale Processors*, 81 F.3d at 1359.  Here, Ameren has enjoyed the competitive advantage of selling Rush Island's electricity without the added costs of pollution control technology for nearly ten years, *see* FOF 378-379, and, of course Congress directed EPA to

regulate $SO_2$ pollution because it posed a risk to the public health and welfare almost fifty years ago.  As the Seventh Circuit noted in *Sierra Club v. Franklin County Power of Illinois*, construction of a power plant "under [an] expired permit rather than a new permit" would cause irreparable injury since "the former likely includes more relaxed emissions standards."  546 F.3d 918, 936 (7th Cir. 2008).   Here, there is no question that, had Ameren complied with BACT emission limits since the time of the Rush Island modifications, tens of thousands of tons of harmful $SO_2$ pollution never would have entered the air.

This alone is enough to establish an irreparable harm, but the record at trial includes extensive evidence regarding the nature and extent of the risks posed by Rush Island's illegal pollution.  At roughly 16,000 tons per year now, Rush Island's excess pollution results in substantial ongoing harm to public health every year in downwind communities and over an area that extends to the eastern seaboard.  .  FOF 165, 293-301, 304-318.  The continued threat of premature mortality or disease is the most fundamental of irreparable harms.

*Inadequacy Of Legal Remedies:*  As with the first factor, there is no dispute that the second equitable factor is met and weighs in favor of an injunction.  (Def. Closing., Tr. Vol. 6, at 33:23-25).  Environmental harm, "by its nature, can seldom be adequately remedied by money damages." *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 545 (1987).  The increased occurrence of disease and premature mortality downwind from Rush Island is certainly no exception; an "economic award would not sufficiently compensate" for injuries resulting from failure to obtain a PSD permit.  *Franklin County Power*, 546 F.3d at 936; *see also United States v. Westvaco*, 2015 WL 10323214, at *9 (D. Md. Feb. 26, 2015); *Cinergy*, 618 F. Supp. 2d at 961.

*Balance Of Hardships And The Public Interest:*  The balance of hardships points firmly in favor or issuing injunctive relief here.  Weighing the irreparable harm to the public described

48

above against any hardship to Ameren in bringing the facility into compliance (a decade late) is easy: Ameren presented no evidence at trial that it would experience any hardships at all. On the contrary, Ameren repeatedly noted it can readily afford to install any of the control technologies at issue in this case, and its own engineering studies give the Company a head start in designing and implementing the best control technology.  FOF 391, 65-66.

The only argument on this point stems from the rate-payers' potential role in paying for the required pollution controls through an increase in electricity rates.  The parties agree that Ameren could seek to pass on costs of implementing BACT measures at Rush Island to its customers, over time, through an increase in electricity rates.  FOF 400-401.  Ameren appears to suggest that, where the costs of controls may be passed on to ratepayers, it would be a hardship borne by the public that should cut against its interest in remediating the harm.  Whether the rate-payer role is conceived as a discounting hardship or a second public interest weighing against the primary interest in protecting public health, the equitable balance favors an order of injunctive relief.

Though the costs of compliance could result in an increase in consumer electricity rates, those same compliance costs also would have been borne by the ratepayers had Ameren complied with the law when it was required to a decade ago—and they would have had the benefits of cleaner air a decade earlier.  The costs of pollution controls are a cost of doing business; Congress struck that balance when it mandated BACT measures for new and modified sources.  Sections II, III.A.  Moreover, the evidence shows any rate increase resulting from the application of FGD technology would be modest—within the margins of annual fluctuations and more than offset by a recent decrease following a change in the tax code that gave ratepayers the benefit of corporate tax savings.  FOF 404-407.   In addition, Ameren has benefitted by delaying

49

scrubbers for a decade; it has sold more electricity than it otherwise would have, and enjoyed the ability to invest its capital elsewhere.  FOF 378-379.  Finally, while the costs of controls may be a (minor but additional) burden to Ameren's customers, the costs could be a benefit to Ameren itself since utilities are typically allowed a profit on capital spending.  FOF 399.[13]

Ameren's violation of PSD leaves no option but an order that the Company bring its Rush Island facility into compliance, and a balancing of the *eBay* factors confirms as much.  As described in Section III.B, BACT for Rush Island should be no less stringent than a 30-day rolling-average $SO_2$ emissions rate of 0.05 lbs/mmBTU, and the evidence at trial shows the Company can meet that rate by installing scrubbers within three years.  As such, the United States asks this Court order Ameren to apply for a PSD permit within 90 days from the issuance of a final order, and to implement BACT measures no later than 3 years from such an order.

### C.   *Conclusion*: Ameren Must Remediate The Harm From Rush Island's Excess Emissions.

Requiring Ameren to belatedly implement BACT measures at its Rush Island facility will, once done, bring an end to the facility's excess emissions.  But BACT measures will not redress the harm from the decade of excess emissions that have accrued since the Rush Island units were modified, nor alleviate the excess emissions that will result from operations in the coming years while Ameren works to come into compliance.  Whether injunctive relief is warranted to address those harms is committed to the discretion of the Court which is, again, guided by balancing the four factors described in *eBay*.  Section II.  As with the question of future compliance, the record plainly favors an award of injunctive relief to mitigate harm that accrued during Rush Island's years of noncompliance.

---

[13]   Of course, Ameren need not seek a profit on its scrubber spending when it goes to the Missouri Public Service Commission for cost recovery.

*Irreparable Harm*: An express purpose of the PSD program is to "protect public health and welfare from any actual or *potential* adverse effect" of air pollution.  42 U.S.C. § 7470(1) (emphasis added).  The testimony regarding the well-known public health risks associated with $SO_2$ pollution—along with the inequity to other law-abiding PSD permit holders (and so harm to Congress' vision and program)—would be sufficient to push this factor in favor of granting relief, but the evidence here goes much further.  *Accord Mitchell*, 361 U.S. at 296 (noting "little room for the exercise of discretion not to order" equitable relief of back pay to remediate unlawful termination light of the FLSA's purpose).  The record establishes that Rush Island's more than 160,000 tons of excess $SO_2$ pollution have caused actual and potential adverse health effects, including premature mortality, which Plaintiffs' experts quantified at trial.  FOF 164-166, 304-318.

*Inadequacy Of Legal Remedies:* Here again, Ameren admits there is no adequate remedy at law to address the irreparable harm.  The public and environmental nature of the harm render monetary awards ineffectual.  There is no individual to compensate; rather, the additional risk of heart and lung disease or premature mortality now borne by the downwind population should be put to rights, and legal remedies alone cannot do so.

*Balance Of Hardships:*  Weighed against the actual and potential risk of harm to public health from Ameren's excess pollution are the costs associated with reducing an equivalent amount of pollution from the same airshed.  The costs of such reductions are well within Ameren's financial capabilities.  For example, implementing DSI on the four Labadie units—one of the options Ameren could select to meet an 18,000- ton-per-year cap—would cost roughly $55 million dollars in capital investment and then $53 million a year in operating costs.  FOF 326.   The Company did not present any evidence that doing so would cause it any hardship.  To

51

the contrary, Ameren Missouri's FERC Form 1 filings reveal its strong financial situation (values in millions):

**Ameren Missouri FERC Form 1 Financial Data (2012–2017)**

|  | Net Income | Capital Spending | Dividends | Cash Flow |
|---|---|---|---|---|
| **2012** | 420 | 611 | 400 | 995 |
| **2013** | 399 | 668 | 460 | 1,135 |
| **2014** | 394 | 770 | 340 | 943 |
| **2015** | 356 | 631 | 575 | 1,239 |
| **2016** | 360 | 751 | 355 | 1,161 |
| **2017** | 326 | 786 | 362 | 1,018 |
| *Average* | **376** | **703** | **415** | **1,082** |

Pl. Exs. 1331–36; *see also* FOF 384-385. The capital costs of implementing DSI amount to just 12% of its annual dividend to its parent company; the operating costs would amount to just 5% of its cash flow.

It is somewhat unclear whether Ameren could pass the costs associated with controlling emissions at Labadie to its consumers.  Though it is possible the Missouri Public Service Commission will allow Ameren to pass some costs on to ratepayers, it may also see fit to allow only partial cost-recovery—or even bar such recovery altogether.  FOF 401.[14]  Even where the control costs are passed onto ratepayers in their entirety, the resulting rate increase would be modest.  FOF 404-407.

*Public Interest:* The public interest here further compels an award of appropriate injunctive relief to mitigate the harm from the PSD violations at Rush Island.  Obviously, a court would be hard-pressed to find a greater public interest than the protection of life and health.  And

---

[14]   Whether and to what extent Ameren seeks and obtains a rate increase is a decision that will be made entirely outside the context of this litigation.  If Ameren does not want ratepayers to bear the costs of installing controls, then it can decide not to file a rate-increase request with the Public Service Commission.

whether borne by ratepayers or Ameren itself, the cost of remediating the harm from Rush Island's excess emissions harm pales in comparison to the public health benefit.  Using standard, peer-reviewed estimates of the social costs of air pollution, Dr. Schwartz also estimated the monetary value of the social benefits that would accrue from remediating Rush Island's decade-plus of excess pollution by offsetting future emissions by an equal amount.  Those results dwarf the costs of controls and any hardship faced by Ameren.  FOF 342-343.  In addition, remediating the harm from non-compliance helps ensure violators do not gain an advantage by violating the law and will help place Ameren on equal footing with other companies that followed Congress' directives when they were required to do so.

In light of the record evidence and the clear balance of the equities—as well as in furtherance of the statutory purposes—this Court should award injunctive relief tailored to mitigate the specific harms that resulted from Ameren's violations of PSD at Rush Island.

**D.**    ***Conclusion*: Reducing Pollution From The Nearby Labadie Energy Center Will Provide A Close Nexus Between The Benefits Of The Remedial Work And The Harm That Resulted From Ameren's Violations.**

To remediate the harm from Rush Island's excess pollution, the United States requests Ameren reduce $SO_2$ emissions from the Company's Labadie facility by a commensurate amount, effectively paying the public back for the pollution debt Ameren incurred with its violations. Ameren bristles at the notion that remedial measures could be required at a facility that was not the site of a violation of the Clean Air Act alleged in the Complaint in this case.  But the Act grants district courts jurisdiction, among other things, "to restrain" violations, "to require compliance," and "to award any other appropriate relief."  42 U.S.C. § 7413(b).  The Act's unqualified grant of authority to enter an injunction carries with it the authority to use "all the inherent equitable powers" of the court "for the proper and complete exercise of that

53

jurisdiction." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946); *see also Mitchell*, 361 U.S. at 291–92; *Federal Trade Comm'n v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1314 (8th Cir. 1991) (power to enjoin includes power to grant ancillary equitable relief).

As this Court recognized in its summary judgment ruling, 02/27/2019 Order (Doc. 1045) at 11–16, Ameren's cramped view of this Court's authority to redress excess emissions is contrary to these expansive traditions of equity.  The Supreme Court has instructed that a court "may go beyond the matters immediately underlying its equitable jurisdiction and decide whatever other issues and give whatever other relief may be necessary under the circumstances. Only in that way can equity do complete rather than truncated justice." *Porter*, 328 U.S. at 398; *see also Natural Res. Def. Council v. SW Marine, Inc.*, 236 F.3d 985, 1000 (9th Cir. 2000) ("The authority to 'enforce' . . . is more than the authority to declare that the requirement exists and repeat that it must be followed.").[15]  As the First Circuit explained when faced with a defendant that had failed to obtain a Clean Water Act permit:

> the [district] court may grant additional injunctive relief governing the post-permit operations of the companies *insofar as the court is remedying harm caused by their past violations. . . .* Conventionally, a court's equitable power to enforce a statute includes the power to provide remedies for past violations—an area in which the courts have settled authority and competence.

*United States Pub. Int. Research Grp. v. Atl. Salmon of Me., LLC*, 339 F.3d 23, 31 (1st Cir. 2003) (emphasis in original).[16]  Thus, district courts tasked with remedying Clean Air Act

---

[15]   Indeed, in this public-interest case the Court's "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *Porter*, 328 U.S. at 398; *United States v. Miami Univ.*, 294 F.3d 797, 819 (6th Cir. 2002) ("Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved."); *Wehner v. Syntex Corp.*, 682 F. Supp. 39, 40 (N.D. Cal. 1987) (addressing environmental harm is "within the recognized power and within the highest tradition of a court of equity").

[16]   *See also id.* at 33 ("Injunctive remedies for past harm commonly dictate future conduct so as to mitigate past harm."); *United States v. Deaton*, 332 F.3d 698, 713–14 (4th Cir. 2003)

violations unquestionably retain the authority to "order a full and complete remedy" for the harm caused by violations, "and in doing so may go beyond what is necessary for compliance with the statute." *United States v. Cinergy*, 582 F. Supp. 2d 1055, 1060–61 (S.D. Ind. 2008).

Having established that the equities warrant relief and that this Court has the authority to award it, a proposal to mitigate the harm should be examined to ensure:

(1) it 'would confer maximum environmental benefit,'

(2) it is achievable as a practical matter, and

(3) it bears an equitable relationship to the degree and kind of wrong it is intended to remedy.

*Deaton*, 332 F.3d at 714.  The United States' proposal to cap emissions from the Labadie facility fits the bill in all respects.

First, reducing pollution from Labadie achieves maximum environmental benefit by providing an opportunity for Ameren to pay its pollution debt to the public in full.  There are few sources of $SO_2$ in the country larger than Rush Island, and so few at which opportunities exist to reduce emissions by volumes anything close Rush Island's decade-plus of excess pollution.  FOF 23.  Ameren's Labadie facility is one of those few options.  In other cases, violators may have to stitch together emissions-reduction projects at several facilities and across a broad geographic region to have a hope of making up for the effects of their excess pollution, but here, because

---

(upholding remedial injunction that required more than defendants would have had to do if they had simply obtained a Clean Water Act permit before the violations); *United States v. Cumberland Farms of Conn.*, 826 F.2d 1151, 1164-65 (1st Cir. 1987) (upholding issuance of "restorative order" to reverse effects of Clean Water Act violations); *United States v. Holtzman*, 762 F.2d 720, 724 (9th Cir. 1985) ("A federal court's equity jurisdiction affords it the power to enjoin otherwise lawful activity when necessary and appropriate in the public interest to correct or dissipate the evil effects of past unlawful conduct.") (citing cases).

Labadie's four units are uncontrolled for $SO_2$ emissions, it allows for the entirety of Rush Island's 160,000 (and counting) excess tons of $SO_2$ to be remediated.[17]

Second, reducing Labadie's annual $SO_2$ pollution levels to 18,000 tons per year (roughly half its current rate) is practically achievable.  Plaintiffs identified several technically achievable options for reducing $SO_2$ emissions from Labadie.  Two of the options were discussed in more detail and each could reduce plant wide emissions to below 18,000 tons per year, namely, installing FGDs on two of the four units or DSI on all four.  FOF 328.  Ameren did not present any evidence or testimony that those options were not feasible at the Labadie facility, and, as discussed earlier, the Company admits it can afford either.  By imposing a cap, instead of requiring a specific control, Ameren will have the flexibility to determine for itself the most cost-effective way to achieve the pollution reductions required to remediate the harm from its excess pollution.

Finally, the evidence at trial established that the pollution from Labadie affects the same communities as that from Rush Island, and to the same degree.  FOF 335-340.  As such, any efforts undertaken to reduce at Labadie pollution would—ton-by-ton and over the coming years—pay back the pollution debt Ameren incurred against the public's health and welfare.

---

[17]  This stands in stark contrast with Ameren's undeveloped suggestion that the Company could just retire $SO_2$ allowances it was awarded under a different Clean Air Act program to make up for Rush Island's excess.  The Company presented no evidence at trial that retiring such allowances would actually produce *any* environmental benefit, let alone benefit the same populations harmed by Rush Island's excess—and the limited evidence in the record suggests it would not.  FOF 344-356.



Pl. Ex. 1364 & 1362; FOF 335-340.  In light of the tight geographic nexus between the harms

imposed by Rush Island's excess pollution and the benefits to be gained by reductions in

Labadie's pollution, controlling Labadie's emissions offers a rare opportunity to right the wrong

on the same terms.  Were Ameren to reduce pollution at Labadie commensurate with the total

volume of excess emitted at Rush Island from the time of the unpermitted modifications to their

eventual compliance with PSD, the Company will have put the public back in the place it should

have been with were the law followed in a timely manner, reducing the risks of premature

mortality and disease its pollution poses to downwind communities by an amount equal to the

additional risks created by its violations.  By then it will be 30-years late, but Ameren's debt to

the public will have been repaid in kind and in full.

The harm from Ameren's PSD violations at Rush Island warrants injunctive relief and

remediation.  By the time Rush Island implements BACT measures and comes into compliance

with PSD, the facility will have emitted nearly 275,000 excess tons of $SO_2$.  FOF 166.  Capping

Labadie $SO_2$ pollution at 18,000 tons per year in the near term will cut the facility's emissions about in half.  FOF 328.  The record shows Ameren has multiple options to achieve such reductions, and these measures—so long as they are implemented soon—will reduce $SO_2$ pollution by as much as 250,000 tons before 2036, the year two of the four Labadie units are slated for retirement (which would effectively cut the emissions from the facility in half even without the continued implementation of pollution controls).  Capping Labadie emissions will reduce $SO_2$ pollution in the area commensurate with the volume of Rush Island's excess emissions, and benefit the same communities burdened by the harm caused by the violations.  As such, the United States asks this Court order Ameren to cap $SO_2$ pollution from Labadie at 18,000 tons-per-year beginning three years after this Court's final order.

## VI.    CONCLUSIONS

Given the weight of the evidence and the balance of the equities described above, the United States respectfully requests this Court direct Ameren to redress the harm from its violations as follows:

(1) Ameren must apply for a PSD permit for its Rush Island facility as soon as practicable, but in no event later than 90 days following issuance of this order.  Ameren's PSD permit application must identify flue gas desulfurization as the technology-basis for its BACT proposal;

(2) No later than three (3) years following the issuance of this order, Ameren must operate Rush Island units 1 and 2 in compliance with an emission limit that is no less stringent than 0.05 lbs $SO_2$/mmBTU, on a 30-day rolling average; and

(3) No later than three (3) years following the issuance of this order, Ameren must operate the Labadie Energy Center in compliance with a plant-wide emission limit of 18,000 tons of $SO_2$ per calendar year.  Such limitation shall remain in effect for a period of no less than 15 years.

58

Dated: May 23, 2019

Respectfully Submitted,

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

OF COUNSEL:

Alex Chen
Sara Hertz Wu
Senior Counsel
Office of Regional Counsel
U.S. EPA, Region 7
11201 Renner Boulevard
Lenexa Kansas  66219

/s/  *Elias L. Quinn*
James W. Beers, Jr.
Thomas A. Benson
Anna E. Cross
Jason A. Dunn
Elias L. Quinn, CO Bar No. 42159
Environmental Enforcement Section
U.S. DEPARTMENT OF JUSTICE
P.O. Box 7611
Washington, DC  20044-7611
Telephone:  (202) 514-1111
Facsimile:  (202) 616-6584
E-mail:  Jason.Dunn@usdoj.gov

ANDREW J. LAY #39937MO
Assistant United States Attorney
United States Attorney's Office
Eastern District of Missouri
Thomas Eagleton U.S. Courthouse
111 South 10th Street, 20th Floor
St. Louis, Missouri 63102
Telephone:  (314) 539-2200
Facsimile:  (314) 539-2309
E-mail: Andrew.Lay@usdoj.gov

*Attorneys for Plaintiff United States*

59

**CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2019, I served the foregoing with the Clerk of Court using the CM/ECF system, which will cause an electronic copy to be served on counsel of record.


*/s/ Elias L. Quinn* _____

Elias L. Quinn