UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> SIERRA CLUB, <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> AMEREN MISSOURI, <br><br> Defendant. | Civil Action No. 4:11-cv-00077-RWS |

**AMEREN'S RESPONSE TO UNITED STATES'
<u>MOTION TO STRUCTURE FURTHER PROCEEDINGS</u>**

Ameren Missouri ("Ameren") submits this response to the Motion to Structure Further Consistent Proceedings Pursuant to the Eighth Circuit's Remand filed by Plaintiff United States and joined by Plaintiff-Intervenor Sierra Club (ECF #1212, "Plaintiffs' Motion to Structure").

Plaintiffs' Motion to Structure asks the Court to order the Parties to meet and confer regarding possible mitigation relief, and to order Ameren to "develop . . . by September 1, 2022 a suite of mitigation possibilities[.]" (Pls.' Mot. at 2.) The Motion further asks the Court to order the Parties to "submit a joint proposed mitigation plan or competing plans with briefing and a proposal for further proceedings" by November 1, 2022. (*Id.*) In important ways, Plaintiff's Motion to Structure puts the cart before the horse. The Motion assumes a predicate that has not been established, and which Ameren contests: whether mitigation relief is available and appropriate after Eighth Circuit's ruling and under the evolving circumstances of this case, which have changed given Ameren's decision to retire Rush Island Energy Center.

The Eighth Circuit reversed the prior mitigation order in this case, which had required Ameren to install SO2 emission controls at Labadie Energy Center to offset SO2 emissions from Rush Island, concluding that that injunctive relief did *not* redress the legal violations proven in the case—namely, the failure to obtain PSD permits for certain construction projects at Rush Island. Plaintiffs had argued to the Eighth Circuit precisely what they argue again now, that requiring Ameren to take certain actions, such as installing controls at Labadie, would mitigate and redress harms associated with Rush Island's emissions and so the mitigation order should be affirmed, but the Eighth Circuit disagreed, and rejected Plaintiffs' argument.  Plaintiffs also had argued to the Eighth Circuit that 42 U.S.C. § 7413(b) grants courts broad jurisdiction to fashion equitable remedies, including mitigation orders, and Plaintiffs reiterate that position now, but the Eighth Circuit also rejected that argument, concluding instead that Section 7413(b)'s grant of remedial jurisdiction is limited.  Plaintiffs disregard the Eighth Circuit's rejection of their appellate arguments, and the implications for any new mitigation order Plaintiffs might seek from this Court. Because any such new order would be subject to another appeal, however, the legal and factual issues warrant a thorough process and full briefing.

Plaintiffs' Motion acknowledges as much, to the extent that it does not ask for any legal or substantive ruling from the Court, and seeks purely procedural relief in the form of a schedule to consider the mitigation issue they seek to raise.  The Motion declines even take any hard position on any specific mitigation relief that could be carried out.  Nor does it attempt to weigh the impact of Ameren's accelerated retirement of the entire generating facility and how the elimination of all emissions of any type, not just SO2, will provide environmental benefits to the public that far exceed the benefits of the prior mitigation order and any new order Plaintiffs might seek.

Plaintiffs' proposed structure is oversimplified and skips over important procedural steps. During the remedy phase of this case, the Parties spent over two years conducting discovery, dispositive motion practice, and a remedy trial. Plaintiffs elected to pursue certain mitigation relief and forego or abandon other such relief. Because Plaintiffs chose not to develop a basis for the specific mitigation relief they pursued during the remedy phase, the evidentiary record for *different* mitigation relief is nonexistent or, at best, incomplete. Plaintiffs cannot skip over those procedural steps now in an attempt to fast-forward to a new mitigation order seeking never-before-requested relief.

With that said, Ameren certainly recognizes that this case has a long tail, and that a prompt resolution is desired by the Court and all Parties. In addition, and subject to the approval of the Missouri Public Service Commission (MPSC), Ameren is in the process of executing its broader business plan to transition its generation fleet to renewable energy and lower-carbon intensive sources. Thus, while Ameren disagrees with Plaintiffs' position that additional mitigation relief remains available, Ameren does not object to engaging with Plaintiffs in an attempt to reach an efficient and expeditious resolution of these issues provided that such discussions recognize Ameren's broader plans beyond Rush Island and the MPSC's regulations and procedures. To that end, Ameren proposes a modification to the structure proposed by Plaintiffs: the Court should establish a briefing schedule to address the legal issues presented by Plaintiffs' post-remand request for new mitigation relief. It is not possible to meaningfully brief those issues at the present time, because no specific mitigation measure has been identified or proposed by any Party and the specific circumstances of Rush Island's retirement are still taking shape. If the Parties' meet-and-confer process is productive, such briefing may end up not being necessary; but if the Parties have disagreements, then the process and a timeline for resolving those issues will already be in place.

Finally, since June 8, 2022, when Ameren filed its Supplemental Brief in Support of its Motion to Modify the Remedy Ruling (ECF #1213), additional developments have occurred with respect to the MISO Attachment Y process and the status of the transmission system in the MISO region. Ameren provides updates on those issues, for the Court's and Plaintiffs' information, at the end of this response.

I.      **Plaintiffs' Proposed Structure for Addressing Mitigation.**

Ameren disagrees that any mitigation relief remains available after the Eighth Circuit's ruling, or that the current factual record allows for entry of some new form of mitigation relief. While Ameren does not oppose the meet-and-confer process Plaintiffs request, these legal issues warrant full briefing and consideration by the Court, if the Parties are not able to reach agreement. Below, we briefly identify the legal, procedural, and practical problems with certain parts of Plaintiffs' proposed structure. In Section I.F below, we offer a counter-proposal that slightly modifies Plaintiffs' structure.

   A.      **The Eighth Circuit's Rulings Present Threshold Legal Issues.**

Contrary to Plaintiffs' assertion, it is not true that the "legal framework and pertinent facts remain as they were at the time of this Court's Remedy Order." (Pls.' Mem. at 4.) For example, the Eighth Circuit did not adopt Plaintiffs' contention that there is "broad equitable authority under the Clean Air Act to craft remedies that right wrongs and redress harms." (Pls.' Mem. at 6.) Plaintiffs suggest "the Eighth Circuit did not upset" such "broad equitable authority" under 42 U.S.C. § 7413(b), but the Eighth Circuit did, in fact, reject Plaintiffs' broad interpretation of courts' remedial jurisdiction. The Eighth Circuit joined the Third Circuit in ruling as a matter of law that § 7413(b) "'limits a district court's jurisdiction to awarding certain kinds of relief,'" that "'[e]ach type of relief in [§ 7413(b)] (except for civil penalties) is necessarily forward-looking,'" not backward-looking, and that, applying "'the canon of *ejusdem generis*,'" the residual phrase "any

4

other appropriate relief" in § 7413(b) must be interpreted "'as permitting only forward-looking relief, consistent with the preceding types of relief in the list.'" *United States v. Ameren Missouri*, 9 F.4th 989, 1009 (8th Cir. 2021) (quoting *United States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 292-95 (3d Cir. 2013)).  This ruling is significant because in this case the only form of backward-looking relief enumerated under Section 7413(b)'s limited grant of jurisdiction—civil penalties—was expressly relinquished by the United States.

Similarly, the Eighth Circuit ruled that "the injunctive relief a district court may award" under § 7413(b) "must redress a *violation* of the CAA." *United States v. Ameren Missouri*, 9 F.4th at 1010 (emphasis in original).  The Eighth Circuit previously ruled that the "operation of a facility without a permit is not articulated as a basis for a violation" of the PSD program.  *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1015 (8th Cir. 2010) (internal quotation marks omitted).  In *Otter Tail*, the "Sierra Club and EPA as amicus curiae" argued that "PSD permits impose requirements on the operation of the facilities they govern[.]" *Id.* at 1017.  The Eighth Circuit rejected that argument:  "the plain language of the statute and the regulations . . . prohibited only modification of the Big Stone plant without a PSD permit or BACT, not its operation." *Id.* at 1018; *see also Nucor Steel–Arkansas v. Big River Steel, LLC*, 825 F.3d 444, 451 (8th Cir. 2016) (same, quoting *Otter Tail*, 615 F.3d at 1017).

But that is the very same theory underlying Plaintiff's request for mitigation here.  Plaintiffs argue that it is Rush Island's *excess* emissions from the plant's operation—"excess" because they exceed the amount of emissions that theoretically would have occurred with operation under a PSD permit—that must be mitigated.  Taking together the Eighth Circuit's rulings in this case, *Otter Tail*, and *Nucor Steel*, operations without a permit do not violate the CAA, and therefore

5

mitigation of such "excess" emissions would not "redress a *violation* of the CAA." *United States v. Ameren Missouri*, 9 F.4th at 1010.

These important issues present threshold legal and jurisdictional questions that must be briefed, argued, and answered before any mitigation could be ordered—and of course any such order would be subject to another appeal to the Eighth Circuit. These questions cannot be answered in the abstract; rather, they can only be answered once a specific mitigation proposal is before the Court. For that reason, if the parties' meet-and-confer process does not result in an agreement, then Ameren requests that the Court set a process for briefing these legal issues and the other issues discussed below. We propose such a process in Section I.F below.

### B. Factual Circumstances Have Changed.

The pertinent facts have also changed. Ameren has decided to retire Rush Island decades earlier than it otherwise would have if FGD technology were installed. All of the Parties agree that this will result in significant environmental benefits for the public, well above and beyond the benefits realized from installing FGD. Retiring Rush Island will eliminate *all* emissions from the plant, including all emissions of sulfur dioxide (SO2), carbon dioxide (CO2), nitrogen oxides (NOx), particulate matter (PM), and mercury (Hg), for decades. The resulting environmental benefits to the public will be significant, and are greater than the specific mitigation remedy—DSI at Labadie—that Plaintiffs previously sought.

The specific circumstances of Rush Island's retirement are still taking shape. The factual context of early retirement impacts the question whether any mitigation should be available at all, but also, if mitigation were available, the question of what type of mitigation would be appropriate, including its nature and scope. These questions, too, cannot be addressed on the current record, since the facts are still taking shape and evolving quickly. Ameren's proposal below allows for the factual context to become more settled and for the Parties to confer and brief these issues.

6

### C. Plaintiffs' Proposed Structure Skips Over Important Procedural Steps.

During the remedy phase of the case, Plaintiffs elected the remedies they would pursue. It was those specific remedies that framed the scope of the entire remedy phase: fact discovery, expert discovery, dispositive motions, motions *in limine*, and trial. But the Eighth Circuit's ruling has rendered irrelevant the only evidence Plaintiffs chose to develop in the remedy phase. Plaintiffs have not developed any factual record that could support other remedies. Ameren has had no opportunity to develop its factual or legal defenses as to other mitigation remedies. As a result, currently there is no evidentiary basis upon which this Court could evaluate any new request for mitigation relief. Where the reason for a remand might be much narrower—for example, a flawed jury instruction—there is no need to conduct new discovery. That is not the case here.

As a matter of basic due process, Ameren, like any litigant, is entitled to all the protections afforded by the Federal Rules of Civil Procedure. To the extent that Plaintiffs are suggesting that they may skip over those procedural protections through the "structure" they propose, Plaintiffs' argument is incorrect as a matter of law. Moreover, Ameren would have the right to appeal the entry of any new relief that is ordered, and must be able to do so on a complete record. In short, Plaintiffs' proposed structure is oversimplified and skips over important procedural steps.

### D. Plaintiffs' Proposal Numbers 4 and 5 Are Improper

For all of these reasons, Items #4 and #5 of Plaintiffs' proposal are improper. Item #4 asks the Court to order Ameren to "develop and serve upon Plaintiffs by September 1, 2022 a suite of mitigation possibilities that takes into account the nature, extent, and location of Ameren's harms to the public health and welfare, as found by the Court, and describes the scope, cost, and impact of each possibility." (Pls.' Mot. at 2.) Item #5 asks the Court to order the Parties, if the mitigation issue is not resolved through the meet and confer process, to submit "competing [mitigation] plans with briefing and a proposal for further proceedings by November 1, 2022." (*Id.*)

These unconventional proposals would introduce fundamental legal errors, and deprive Ameren of its due process rights. Of course, the burden always rests with the Plaintiffs to identify the relief they seek, and to satisfy the relevant legal standards for imposition of that relief. Plaintiffs' proposal would improperly shift Plaintiffs' burden to Ameren, by ordering Ameren to both identify *and substantiate* new mitigation relief. The proposal gets the entire process backwards—those are Plaintiffs' responsibilities. Even more importantly, by putting the onus on Ameren, the proposal in Item #4 takes a tremendous shortcut around the Federal Rules, depriving Ameren of discovery, dispositive motion practice, and a trial on this new mitigation relief.

Moreover, these proposals appear framed to create an argument that Ameren has waived any right to appeal any new order imposing injunctive relief. After all, how can a litigant later contest a remedy that it has itself proposed? There are longstanding, fundamental reasons why Courts require the *plaintiff* to identify the remedy it seeks and to satisfy the relevant legal standards for that remedy. Deviating from these fundamental procedures would violate due process.

During the remedy phase of this case, Plaintiffs made a voluntary, well-informed decision to pursue a mitigation remedy only at Labadie. As part of their strategy, Plaintiffs also chose to metaphorically "swing for the fences"—to forego seeking any other or lesser mitigation relief, and thus elected not to develop any other evidence that could support a claim to such relief on remand. Plaintiffs made those choices knowing that other courts had refused to grant such relief. Having made those choices, Plaintiffs cannot now try to skip over the due process protections afforded to Ameren by seeking to have *Ameren* propose the relief.

E. **Recent Events Show MISO Could Not Have Analyzed Retirement Earlier.**

Plaintiffs continue to argue, without support, that Ameren could have, and should have, begun an Attachment Y retirement process with MISO sooner, and well before the Eighth Circuit issued its decision. This argument is incorrect. Most importantly, MISO's analysis must, by

8

definition, be done when the plant is being considered for retirement, not months or years before. System resources change constantly: plants retire and go off-line; new plants and generating resources come on-line; new transmission system projects are completed every year.

The events of the last two months illustrate precisely why using the most current, up-to-date information for planning changes to the transmission system is of vital importance. Each year, MISO performs a system-wide auction to ascertain its generating capacity for the upcoming year. In 2021's auction, there was substantial generating supply compared to demand, and the clearing price for generating capacity settled at $5 per megawatt-day. But by 2022, the market dynamics had changed entirely. Generating supply was significantly reduced relative to demand, and the 2022 auction, completed in April, resulted in a near-fifty-fold increase in the clearing price: $236 per megawatt-day, a record. "MISO raised an alarm on April 28 when it said that it projects 'insufficient firm resources' to cover the summer peak under typical demand and generation outages." As the Wall Street Journal reported on May 8, MISO said "that capacity shortages may force it to take emergency measures to meet summer demand and flagged the risk of outages." The North American Electric Reliability Corporation ("NERC") concluded that MISO "faces a capacity shortfall in its North and Central areas, resulting in high risk of energy emergencies during peak summer conditions." (*See generally* ECF #1213 at 2-4.)

If MISO's analysis of the effects and timing of Rush Island's retirement on the transmission system had been performed in 2020—as Plaintiffs argue it should have—then that analysis would now be entirely obsolete. MISO has submitted a declaration that further demonstrates why Plaintiffs' argument is off base. (June 7, 2022 Declaration of Andrew Witmeier, ECF #1213-5.) Presumably Plaintiffs were unaware of these developments at the time they filed their memorandum. But the subject matter expert—MISO—has a responsibility to ensure that

9

electricity is reliably supplied within its footprint. MISO's analysis of the reliability of the transmission system must be base the real-world facts on the ground, which are dynamic and are changing now as quickly as ever.

In addition, Plaintiffs' argument that Ameren should have done something differently sooner is contrary to the MISO Tariff and settled law. Under the MISO Tariff, operators like Ameren are prohibited from seeking an Attachment Y review until the decision to retire is final and definitive. "[T]he decision to retire or suspend *must be definitive at the time of Attachment Y Notice submission*[.]" *Midcontinent Indep. Sys. Operator, Inc.*, 164 FERC P 61,214, ¶ 3, 2018 WL 4625672, at *1 (Sep. 25, 2018) (emphasis added); *Midcontinent Indep. Sys. Operator, Inc.*, 156 FERC P 61,116, ¶¶ 24, 32, 34, 2016 WL 4442484, at *5, 7-8 (Aug 19, 2016). Plaintiffs fail to acknowledge or reconcile these authorities, and Plaintiffs do not contend that Ameren had decided to retire Rush Island before December 2021.[1]

### F. Ameren's Counter-Proposal for a More Fulsome Structure.

Ameren agrees that the Court should adopt an orderly schedule for the Parties to engage in a meet-and-confer process to discuss potential mitigation measures, but disagrees that the Court should (or may) order Ameren to propose mitigation relief, as Plaintiffs propose in Item #4, or order the Parties to propose "competing" plans for mitigation relief, as Plaintiffs propose in Item

---

[1] Moreover, Plaintiffs are incorrect to imply that Ameren considered retiring Rush Island before December 2021. As Ameren has demonstrated, Plaintiffs' characterization of Ameren's IRP filings is simply wrong. (ECF #1198 at 6; ECF #1187 at 1-3 & Exs. A & B thereto.) Plaintiffs cherry-pick a single snippet of Ameren's IRP submission, which omits the fact that Ameren studied the potential retirement of *all* of its generating units, not just Rush Island; and did so only at the direction of the MPSC, not of its own volition. Ameren's original IRP filing assumed Rush Island would operate until 2039. After petitioning by the Sierra Club, the MPSC ordered Ameren to conduct additional retirement analysis under a host of scenarios. All of this information is in the publicly-available IRP documents, available to Plaintiffs. Plaintiffs' suggestion that something was "revealed in documents produced at the conclusion of this Court's February 7 hearing" (Pls.' Mem. at 2-3), is contradicted by those publicly-available documents.

#5. Ameren asks that the Court set a briefing schedule for consideration of the legal issues. Specifically, Ameren respectfully suggests that the Court should:

    A.      Order the Parties to meet and confer within 30 days of the entry of this Order regarding potential options to address Plaintiffs' request for mitigation relief;

    B.      If the meet-and-confer process results in an agreement, then the parties will promptly inform the Court;

    C.      If the meet-and-confer process does not result in an agreement, then by September 1, 2022, Plaintiffs shall identify to Ameren, in writing, all of their requested mitigation relief;

    D.      On or before October 7, 2022, the Parties shall file briefs addressing the legal issues posed by the specific mitigation relief requested by Plaintiffs, and proposed next steps.[2]

In addition, Ameren continues to request the entry of the relief sought in its Supplemental Brief in Support of its Motion to Modify the Court's Remedy Ruling (ECF 1213 at 22-23).

## II.    Updates on MISO's Determination Regarding Rush Island.

Since Ameren's June 8 filing, two events have occurred that are relevant to Ameren's Motion to Modify and Supplemental Brief in support thereof.

First, On June 17, 2022, MISO hosted a public stakeholder meeting to discuss its Attachment Y analysis and the proposed System Support Resource ("SSR") designation of Rush Island and the transmission projects necessary to address the identified reliability issues. Attendees included representatives from the MPSC, adjacent utility systems, independent power

---

[2] The Motion to Structure also requests that the Court order Ameren to provide "monthly status reports . . . regarding its plans to retire Rush Island" and to make monthly productions of communications with MISO. (Pls.' Mot. at 2.) Ameren has proposed providing quarterly status reports continuing until retirement occurs. (Ameren's Supplemental Br. in Support of Its Mot. to Modify, ECF #1213, at 23.) Furthermore, Ameren has already produced to Plaintiffs copies of communications between Ameren and MISO related to the Attachment Y and Y-2 processes which is nearing conclusion.

producers, transmission developers, the St. Louis Post-Dispatch, and Ameren. Attached as Exhibit A is MISO's presentation from that public meeting. The MISO presentation notes that unless alternative mitigations are identified, the Rush Island units will be designated as SSRs. (*Id.* at 15.) MISO is requiring all such proposed alternatives to be submitted by June 24, 2022. (*Id.* at 16.)

Second, given the hot weather predicted in the St. Louis region during this time, MISO has issued several alerts and cautions warning operators to prepare for maximum operations to ensure system reliability.

- On June 16, MISO issued this alert: "Current weather forecasts for the week of 6/20th indicate extreme high temperatures across the MISO Footprint. **Current Load forecasts are near or exceed all-time peaks. Maintaining generation availability and transfer capabilities across the footprint will be critical.**" (Exhibit B (emphasis added).)

- On June 17, MISO declared a "Conservative Operations" event from June 21 to 23, followed by a higher-level alert for a "Maximum Generation Capacity Advisory" from June 23 until further notice. (Exhibit C.) In the latter alert, MISO directed operators to "**Prepare to implement the MISO Market Capacity Emergency procedure and follow procedures for emergency conditions.**"

Subject: MISO declares Conservative Operations for Reliability Coordinator Footprint effective 06/21/2022 00:00 EST

Summary:

Due to:

Extreme high temperatures and near record high loads, in order to maximize generation availability and transmission system transfer capability.

The MISO Reliability Coordinator (RC) is declaring Conservative Operations, effective from 06/21/2022 00:00 EST to 06/23/2022 22:00 EST for the following entities: Reliability Coordinator Footprint and instructs that:

- TOPs, GOPs and LBAs are to review outage plans to determine any maintenance or testing, scheduled or being performed on any monitoring, control, generation or transmission equipment that can be deferred, revoked or cancelled. Coordinate with MISO and LBA for completing any maintenance that may enhance BES reliability, monitoring and control. The return to service of equipment on outage should be coordinated between MISO and the applicable entity.

> **Subject:** Capacity Advisory for the Market footprint effective 06/21/2022 06:00 EST
>
> **Summary:**
>
> Current NERC EEA Level = 0
> Current MISO Max Gen Level = Capacity Advisory
> Current Emergency Pricing Level = N/A
>
> **Reliability Actions:**
>
> The MISO Reliability Coordinator is declaring a Maximum Generation Capacity Advisory effective from 06/21/2022 06:00 EST until further notice.
>
> MP's and TOP's please ensure outages are up to date in CROW and offers are up to date in the portal.
>
> The MISO Reliability Coordinator instructs the following:
>
> - Prepare to implement the MISO Market Capacity Emergency procedure and follow procedures for emergency conditions
> - Ensure all market data is updated with best available information
> - If notified by MISO, Implement LMRs

## III. CONCLUSION

As the MISO analysis confirms, the immediate retirement of Rush Island would create unacceptable reliability risks to the metropolitan region unless transmission projects are first implemented. Ameren has proposed an interim operating regime that would greatly reduce emissions while providing necessary generation at critical times to ensure system reliability. Ameren continues to request the entry of the relief sought in its Supplemental Brief in Support of its Motion to Modify the Court's Remedy Ruling (ECF 1213 at 22-23).

In addition, as indicated, Ameren does not object to a meet and confer process to discuss potential options to address Plaintiffs' request for mitigation, but disagrees with some of the components of Plaintiffs' proposed structure. Accordingly, Ameren requests that the Court enter its counterproposal, set forth in Section I.F above.

Dated:  June 21, 2022                    Respectfully submitted,

/s/ *Matthew B. Mock*

Matthew B. Mock (*pro hac vice*)
ARENTFOX SCHIFF LLP
555 W. Fifth St., 48th Floor
Los Angeles, California 90013
Tel:  (415) 901-8700
Fax:  (415) 901-8701

David C. Scott (*pro hac vice*)
Mir Y. Ali (*pro hac vice*)
ARENTFOX SCHIFF LLP
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606
Tel:  (312) 258-5500
Fax:  (312) 258-5600

John F. Cowling
ARMSTRONG TEASDALE LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri  63105
Tel: (314) 621-5070
Fax: (314) 621-5065

Ronald S. Safer (*pro hac vice*)
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison, Suite 2900
Chicago, Illinois 60602
Tel:  (312) 471-8700
Fax:  (312) 471-8701

*Counsel for Defendant Ameren Missouri*

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2022, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system, which will cause an electronic copy to be served on all counsel of record.

/s/  *Matthew B. Mock*
Matthew B. Mock

CH2:26114813.4