UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>SIERRA CLUB,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>AMEREN MISSOURI,<br><br>Defendant. | Civil Action No. 4:11-cv-00077-RWS |

**UNITED STATES' RESPONSE TO AMEREN'S JUNE 8, 2022
SUPPLEMENTAL BRIEF**[1]

This enforcement action began because of a choice Ameren made over a decade ago: it modified the Rush Island power plant without installing pollution controls required by the Clean Air Act, even though it was "well-known that the types of unpermitted projects Ameren undertook risked triggering PSD requirements." Sept. 30, 2019 Remedy Opinion (ECF 1122), at 105. Had Ameren installed the required controls back when it should have, it "would have reduced its Rush Island pollution by 95% or more." *Id.* at 2. Instead, Rush Island has continued to emit massive quantities of sulfur dioxide pollution ever since.

---

[1] The United States has consulted with Plaintiff-Intervenor Sierra Club, which concurs in this response.

1

Ameren has now made another business decision. On December 14, 2021, Ameren asked to modify this Court's remedy ruling to allow it to retire Rush Island rather than install the required pollution controls. *See* Dec. 14, 2021 Motion (ECF 1196). Ameren "openly concedes" it could afford to install the controls required to bring Rush Island into compliance. Remedy Opinion (ECF 1122), at 55. Rather, Ameren's desire to retire rather than control Rush Island is a financial choice—in part to take advantage of additional incentives enacted by the State of Missouri (Ameren Motion (ECF 1196, at 6)—after Ameren had already "reaped significant financial benefits" from delaying compliance with the law in the first place. Remedy Opinion (ECF 1122), at 9, 108-109. Faced with a court-ordered deadline to comply with the Clean Air Act requirements it skirted long ago, Ameren has now filed a supplemental brief seeking the Court's blessing for even more pollution and more delay, saying it needs time to install new equipment to alleviate grid reliability concerns if Rush Island retires. June 8, 2022 Supp. Br. (ECF 1213), at 14.

This is a problem of Ameren's own making. Ameren's business decision to retire Rush Island rather than retrofit it had foreseeable consequences. In its supplemental brief, Ameren attempts to justify its preferred plan by warning that the reliability of the regional grid is at stake if Rush Island stops operating. Yet, Ameren could keep operating Rush Island by complying with the law and this Court's order—it just does not want to. Alternatively, Ameren could have sought the grid operator's input years ago, after which it could have promptly addressed predictable grid reliability issues—it just chose not to. Ameren's choices and delays created these problems, and it is now attempting to use the predictable result of its own poor planning as a reason for further delaying its obligation to comply with this Court's order.

2

In any event, Ameren's request remains both speculative and premature. The Court should retain its existing March 30, 2024 compliance deadline and continue to take Ameren's motion under advisement, while ordering Ameren to take all possible steps to ensure that compliance will come by then, if not sooner, and that the intervening pollution will be as limited as possible. We agree with Ameren that there is no need for Rush Island to operate during the so-called "shoulder months" (March, April, May, October, and November). Ameren Supp. Br. (ECF 1213), at 16. Such operations should cease beginning this October. As for other operations, the Midcontinent Independent System Operator's (MISO) process for evaluating reliability alternatives and determining the scope of any potential "System Support Resource" (SSR) designation is not yet complete, and the Court should decline Ameren's request to short-circuit that process. The Court should also make clear, as Ameren continues the MISO process, that any interim operation of Rush Island pursuant to a potential SSR designation should be limited to the minimum amount necessary to address the reliability concerns requiring such designation.[2]

## ARGUMENT

Prompt retirement can bring Rush Island into compliance with the Clean Air Act, as Plaintiffs explained in opposing Ameren's original motion. Dec. 28, 2021 Opp. (ECF 1197), at 2, 7; *see United States v. Cinergy Corp.*, 618 F. Supp. 2d 942, 964-65 (S.D. Ind. 2009), *rev'd on other grounds*, 623 F.3d 455 (7th Cir. 2010). However, we also explained the many problems with Ameren's motion, and Ameren's supplemental brief only serves to magnify each of those problems, as further discussed below.

---

[2]  Relatedly, Plaintiffs have requested the Court establish a process for determining the appropriate mitigation of Rush Island's excess pollution, as separately described in a recent motion to structure further remand proceedings. *See* U.S. June 2, 2022 Motion (ECF 1212).

I. **Ameren's Supplemental Brief, Which Requests Even Broader Relief Than Sought In Its Original Motion, Confirms That Ameren Simply Wants To Abide By Its Own Preferred Plan.**

*a. Ameren now seeks delay even beyond the Court's compliance deadline.*

Ameren's supplemental brief proposes an even longer delay than it requested in its original motion. Ameren is currently under a Court order to comply with the Clean Air Act by March 30, 2024. When it originally filed its motion seeking to retire rather than control Rush Island, Ameren represented that the facility would retire "no later" than this existing deadline. Ameren Motion (ECF No. 1196), at 3. Plaintiffs opposed Ameren's motion, in part because Ameren failed to address the potential retirement of Rush Island even sooner, since it no longer needs additional time to construct pollution controls. U.S. Opp. (ECF 1197), at 3-4.

Now, Ameren wants to extend the existing compliance deadline by **18 months**, all the way to September 30, 2025. Ameren Supp. Br. (ECF 1213), at 22.[3] This new request for even more delay—premised again on the company's own preferred timeline for finishing construction projects—is neither justified nor ripe for consideration. As an initial matter, all but one of the projects Ameren says may be necessary to address reliability concerns are actually slated for completion in time to meet the existing March 2024 deadline. *See* Ameren Supp. Br. (ECF 1213), at 14. Apparently, the reason Ameren wants even more time is that it thinks it ***might*** need until 2025 to install the last of four separate "STATCOMs" in the St. Louis area. *Id.* However, even Ameren concedes that it could "perhaps" manage to install the final STATCOM more quickly, and the other three STATCOMs would be up and running even earlier, even under Ameren's preferred schedule. *Id.*

---

[3]   Ameren's new request is only its latest delay tactic. *See* U.S. Memo (ECF 1212-1), at 2-3; U.S. Opp. (ECF 1197), at 4-6; Oct. 28, 2021 Order (ECF 1175), at 3-5.

4

Speculation about whether Ameren might need more time to finish one last project to meet a deadline that is still almost two years in the future provides no basis to modify Ameren's obligation to comply with the Clean Air Act now. It is not this Court's job to conform its compliance deadline simply to meet Ameren's preferred "Estimated Completion Date" for equipment Ameren itself is responsible for installing. *Id.* Rather, in light of the harm caused by Rush Island's still-unabated pollution, *see*, *e.g.*, Oct. 22, 2019 Order (ECF 1137) at 2-3, it is Ameren that should be doing everything in its power—and sparing absolutely no expense—to **beat** the existing March 2024 deadline, not looking for ways to extend it when it is still almost two years away.

      b.  *Ameren's latest request is part of a pattern of delay.*

As it is, Ameren has already wasted precious time by failing to start planning for installation of equipment such as STATCOMs near Rush Island. Ameren was previously aware, based on its experience preparing to retire the Meramec plant, that installing nearby STATCOMs can mitigate reliability issues associated with a plant's retirement. *See* Declaration of Justin Davies (ECF No. 1213-2), at ¶ 14. Yet Ameren did not proactively reach out to MISO to evaluate reliability issues, let alone the apparently obvious possibility of installing STATCOMs near Rush Island. Instead, Ameren waited until October 2021 to request a retirement reliability study from MISO, which was more than a year *after* it had already confidentially told the Missouri Public Service Commission (PSC)—but not the Court or the Plaintiffs—that retirement would likely be the preferred option to comply with this Court's remedy order if Ameren lost its appeal. *See* U.S. Memo (ECF 1212-1), at 3.[4]

---

[4] Ameren refused to produce an un-redacted copy of its PSC submission until ordered to do so following this Court's February 7, 2022 hearing. That document confirms Ameren had in fact determined by no later than September 2020 that "[r]etirement of Rush Island Energy Center by

5

Ameren has previously tried to excuse this delay by claiming it would have "waste[d] both MISO's and Ameren's resources" to ask for a reliability study earlier, because a "study performed in 2020 would fail to capture present day grid conditions and generating resources and would be obsolete shortly after it was prepared." Ameren Jan. 7, 2022 Reply (ECF 1198), at 7 (quoting same argument in ECF 1187). That *post hoc* assertion is unsupported by any citation or declaration, and is contrary to Ameren testimony before the Missouri PSC explaining the importance of obtaining MISO's input on reliability issues *years* prior to a planned retirement. Although Ameren now claims MISO's input would have been a "waste" had Ameren reached out in 2020 (or earlier), Ameren said the opposite when it was challenged on its planned 2022 retirement date for the Meramec plant.

There, Ameren explained in 2015 that it had been prudent to start the MISO process more than five years before retirement, because "[i]f Ameren Missouri delays its notification to MISO regarding retirement, [grid reliability] projects may not be completed in time to retire Meramec in 2022." Feb. 2015 Surrebuttal Testimony of Matt Michels before the Missouri PSC, File No. ER-2014-0258, at 6-7 (attached as Ex. 1). That a reliability study may be refined over time is no excuse for failing even to start the study. For instance, Ameren cites the declaration of Andrew Witmeier for the proposition that recent developments have made it more challenging for MISO to maintain system reliability. June 8, 2022 Supp. Br. (ECF 1213), at 3-4. But that obviously

---

the end of 2024 is less costly than the energy center modifications" ordered by this Court. *See* Sept. 2020 Integrated Resource Plan, Ch. 9 [AM-REM-00568743] at -771 (filed at ECF 1212-2). As explained in our opposition to Ameren's original motion, the company had apparently been considering retirement as a compliance option for even longer, but instead continued to submit rote status reports on its by-then-stalled permitting efforts. U.S. Opp. (ECF 1197), at 4-6; *see also* Oct. 28, 2021 Order (ECF 1175) (recounting this Court's conclusions about Ameren's status reports).

6

does not excuse utilities from planning well in advance for the effects of future retirements, as Ameren itself told the PSC prior to retiring Meramec.[5]

Nor was there any other reason for Ameren to wait to seek MISO's input until after its retirement plans had crystallized. Ameren has previously suggested it was somehow prohibited from seeking MISO's review until its retirement decision was "definitive." Ameren Jan. 7, 2022 Reply (ECF 1198), at 2-3 (citing *Midcontinent Indep. Sys. Operator, Inc.*, 164 FERC P 61,214, ¶¶ 2-3, 2018 WL 4625672 (Sept. 25, 2018). But the "definitive" requirement plainly applies to Attachment Y notifications, not the type of "informational" Attachment Y-2 study that Ameren delayed requesting in this case. Indeed, the MISO Tariff specifically encourages utilities to reach out to MISO early, by requesting a non-binding and confidential informational Y-2 reliability study in order to "make more knowledgeable decisions regarding ***potential*** decisions to retire." *Midcontinent Indep. Sys. Operator, Inc.*, 140 FERC P 61,237, ¶ 65, 2012 WL 4319785, *19 (Sept. 21, 2012) (emphasis added); *see* MISO Tariff Section 38.2.7.o ("Non-Binding Informational Studies").[6] Yet Ameren waited until October 20, 2021 to even begin this process.

In short, Ameren's latest request for even more delay is as audacious as it is premature. Given Ameren's well-established pattern of delay so far, retaining the Court's existing compliance deadline as the retirement process continues will at the very least force Ameren to take a more proactive approach to its remaining compliance obligations than it has in the past.

---

[5] Notably, the Witmeier declaration offers absolutely no support for the proposition that early analysis of potential retirement would have been a "waste," nor could it given the MISO Tariff's explicit encouragement of early, non-binding analyses of potential retirements, as discussed below.

[6] The complete MISO Tariff is available at https://www.misoenergy.org/legal/tariff/ The applicable Section 38.2.7, which governs "Generation Suspension, Generation Retirement, and System Support Resources," is attached as Exhibit 2.

7

> c. *The Court should reject Ameren's attempt to impose Ameren's own preferred plan as part of the MISO process.*

Ameren's supplemental brief also asks the Court to reward it with its preferred compliance plan now that MISO has released its Attachment Y reliability study. But issuance of the Attachment Y reliability study is not the end of the MISO process, which also still needs to include an "alternatives analysis" and, if there are no alternatives to the identified reliability issues, a process for determining the scope and terms of any necessary SSR designation. There is no reason to short-circuit this ongoing process, let alone for the Court to grant its imprimatur on a premature plan for further delay and pollution at a facility that has already been operating for more than a decade without complying with the Clean Air Act.

> i. The ongoing MISO process.

MISO's Attachment Y reliability study identified several reliability issues related to the retirement of Rush Island. But MISO has not yet completed the public process to determine whether there are alternatives that can address these issues, whether to designate Rush Island as a System Support Resource, or, if it determines Rush Island warrants temporary SSR designation, what the parameters of such a designation would be. The next step in the process is for MISO to evaluate potential alternatives to the reliability concerns associated with Rush Island's retirement, in a public process undertaken in coordination with other stakeholders. *See Midcontinent Indep. Sys. Operator, Inc.*, 140 FERC P 61,237, ¶ 74, 2012 WL 4319785, *22 (Sept. 21, 2012) ("After the completion of [the Attachment Y] study, MISO and its stakeholders must evaluate whether there are SSR alternatives available to address the underlying reliability issue, which could result in MISO not pursuing an SSR Agreement"); *see also* MISO Tariff § 38.2.7.b and c (discussing requirements for the "Attachment Y Alternatives Study"). Ultimately, MISO may designate Rush Island as an SSR "only when there are *no* other SSR

8

alternatives." *Midcontinent Indep. Sys. Operator, Inc.*, 140 FERC P 61,237, ¶ 99, 2012 WL 4319785, *27 (emphasis in original). These alternatives may include "redispatch/reconfiguration through operator instruction, remedial action plans, special protection schemes initiated upon generation resource trips or unplanned transmission outages, demand response or generator alternatives, and transmission expansions." *Id*. at ¶ 99 n. 137, 2012 WL 4319785, *27; MISO Tariff § 38.2.7.c. This process has yet to be completed.

Moreover, if there are indeed no alternatives to SSR designation, Ameren will then need to enter into an "SSR Agreement," which will set the operational and financial terms of any necessary operation for reliability purposes. Even if SSR status is deemed appropriate, such an SSR Agreement is to be a "last-resort, short-term measure." *Midcontinent Indep. Sys. Operator, Inc.*, 140 FERC P 61,237, ¶ 99, 2012 WL 4319785, *27; *see* MISO Tariff § 38.2.7.b ("SSR Agreements are a last-resort measure."). The terms of any SSR Agreement (if one is needed) thus will need to "be *limited* and of *short duration*" and "must not exceed a one-year term except in exigent circumstances." *Midcontinent Indep. Sys. Operator, Inc.*, 140 FERC P 61,237, ¶ 106, 2012 WL 4319785, *29 (emphasis in original). Notably, the SSR Agreement will also set the financial terms pursuant to which Ameren will be compensated for operating Rush Island for reliability purposes. *Id*. ¶ 34, 2012 WL 4319785, *9; MISO Tariff § 38.2.7g & j.[7] In addition, the MISO Tariff specifically states that in assessing potential SSR status, MISO should not require continued operation where it would be "contrary to applicable law, regulations, or court … orders." MISO Tariff § 38.2.7.c. Finally, SSR designation is not a broad mandate for additional operation, even during a limited SSR term. Rather, MISO must "make every attempt

---

[7] Ameren's supplemental brief neglects to mention that it would be paid, pursuant to an SSR Agreement it would negotiate with MISO, for continuing to run Rush Island. If there is an SSR Agreement, this Court should not allow Ameren to profit from its dilatory tactics.

9

to *minimize the use* of an SSR Unit for reliability purposes." MISO Tariff § 38.2.7.g (emphasis added). Rush Island has yet to be designated an SSR, and even if it is, the terms of any SSR Agreement still need to be determined and will need to conform to these requirements.

> ii. <u>Ameren's proposed deadline is inconsistent with limited SSR designation</u>.

Ameren's supplemental brief seeks to trump all of these ongoing processes and potential operational limitations, and instead impose its own preferred plan for continued operations. For instance, under the existing MISO process, any initial Rush Island SSR designation beginning in September 2022 (assuming one were deemed appropriate after the alternatives analysis) would be presumptively due to expire no later than September 2023, well before the Court's existing March 2024 compliance deadline. At that point, the facts on the ground may well have changed, particularly if Ameren actually makes best efforts to expedite its equipment installations. And even if MISO needs to evaluate whether to temporarily extend a potential SSR agreement beginning in September 2023, Section 38.2.7.c of the Tariff provides that MISO should specifically consider Ameren's existing environmental compliance obligations when doing so, as described above. Retaining the existing March 2024 deadline will help ensure that MISO has the full context and most up-to-date information necessary to evaluate any reliability issues consistent with these requirements, with a goal of meeting or beating the existing compliance deadline. Yet under Ameren's proposal, its requested September 2025 deadline would instead have already been directly "incorporated into any SSR agreement or extensions" based on Ameren's preferred plan for addressing reliability issues on its own schedule, effectively preempting this entire process and removing a primary incentive for Ameren to expedite its own projects. Ameren Supp. Br. (ECF 1213), at 14, 23.

        iii. <u>Ameren's proposed pollution cap would sanction business as usual operations during the covered periods rather than significantly reduce emissions</u>.

Ameren's proposed sulfur dioxide tonnage caps would similarly trump these requirements, including the otherwise applicable obligation to make "every attempt to minimize the use of an SSR Unit for reliability purposes." MISO Tariff § 38.2.7.g. Instead of following the normal MISO process, which would presumptively include this requirement to minimize operations, Ameren is seeking a judicial license to allow Rush Island to continue to emit up to a total of 9,500 tons of sulfur dioxide per year prior to retirement. Ameren Supp. Br. (ECF 1213), at 22. While Ameren touts this as a reduction in emissions, it actually represents Rush Island's ordinary operations during the periods in which the proposed cap would apply.[8] In fact, in 2019, which was the year of this Court's remedy opinion, Ameren emitted only 7,435 tons of sulfur dioxide during the same seven-month period that would be covered by Ameren's proposal, well *less* than the 9,500 "cap" it now wants to Court to approve. *See* Declaration of Ward Burns, ¶ 5 (Ex. 3).[9] Ameren's proposal would thus simply provide for business-as-usual pollution during the months in which the cap applies, rather than a significant effort to minimize pre-retirement

---

[8]     Ameren's proposed 9,500 tons cap only covers the seven months of January, February, June, July, August, September, and December. As Ameren explains, Rush Island would be offline and not emitting sulfur dioxide during the other months of the year (March, April, May, October, and November) and in the event MISO dispatches the units on an emergency basis during those other months, such emissions would not count against its proposed cap. *Id*. at 16-18.

[9]     Ameren's overall annual emissions have actually ***increased*** significantly since 2019, from 13,201 tons of sulfur dioxide during the year of the Court's remedy opinion, to 19,529 tons in 2021. *See* Ameren Supp. Br. (ECF 1213), at 19. Even with its higher emissions after the remedy opinion, Rush Island's average emissions during the seven applicable months in 2019, 2020, and 2021 was 10,317 tons, confirming that Ameren's proposed cap of 9,500 tons is hardly the drastic reduction its supplemental brief suggests. *See* Burns Declaration (Ex. 3), at ¶ 6.

emissions in light of Rush Island's still un-abated Clean Air Act violation,[10] or the sort of limited operation contemplated by the MISO Tariff's requirement to make every effort to "minimize" the use of an SSR.

In essence, Ameren's "proposed plan" would lock in a period of additional operations now through at least 2025, before MISO even completes any SSR evaluation process and determines the minimum amount of operation that actually may be required from Rush Island to avoid any reliability issues. The Court should decline Ameren's invitation to short-circuit the MISO process in favor of its own self-serving plan, particularly so far in advance of the existing March 2024 compliance deadline. Rather, the Court should make clear that Ameren should be doing everything within its power to meet—if not beat—the existing compliance deadline, and minimizing emissions to the greatest extent practicable in the interim.

## II.     Next Steps and Proposed Order.

The prompt retirement of Rush Island will accomplish the compliance goals of this Court's remedy order by bringing the facility's emissions below the limitations set by the Clean Air Act and this Court's remedy order.[11] But as discussed above, Ameren's schedule for

---

[10]     Nor has Ameren proposed measures to limit the facility's lb/mmBTU sulfur dioxide emission rate during any interim period of necessary operations. Notably, at the remedy trial, Ameren touted the results of a ***temporary*** dry sorbent injection system that it set up for short-term testing at Rush Island, which had been "able to achieve 50% $SO_2$ removal efficiency" without needing to construct a permanent DSI system. Ameren May 23, 2019 Proposed Findings (ECF 1110), at 97, ¶ 364.

[11]     Ameren's supplemental brief claims that retirement of Rush Island will also completely mitigate the harm from Rush Island's excess pollution. *See* June 8 Br. (ECF 1213), at 2 n.1. That is incorrect. As noted in Plaintiffs' recently-filed motion to structure further remand proceedings, retirement of Rush Island will mitigate only about 1,000 tons per year of sulfur dioxide for about 15 years, far short of the approximately 250,000 tons that need to be redressed. *See* June 2 Memo (ECF 1212-1), at 9. Further proceedings are necessary in order to determine how to remedy this remaining harm. *Id.*

retirement is anything but prompt, and its proposed plan would simply lock in even more delay to Rush Island's already belated Clean Air Act compliance. Accordingly, Plaintiffs respectfully suggest that the Court continue to take Ameren's motion under advisement while retaining its existing March 2024 compliance deadline, and order Ameren to:

(1) Expedite and take best efforts to meet or exceed the current compliance deadline, recognizing that the sooner the plant retires the sooner its unpermitted emissions will stop accruing. Such measures should include, but not be limited to, Ameren working with MISO to minimize Rush Island's operations pending retirement, pursuing all potential alternatives to SSR designation, committing additional financial measures to expedite construction of any necessary reliability projects, and providing financial incentives to contractors and suppliers to complete work in time to beat the existing deadline.

(2) Not operate Rush Island during the shoulder months of March, April, May, October, and November, subject only to a duly-issued order by MISO requiring emergency operation;

(3) If either or both Rush Island units are designated by MISO as SSR units: (a) limit their operation to the minimum amount of generation necessary to address the reliability concerns that require SSR designation, rather than the business-as-usual monthly operations proposed by Ameren, and (b) propose a plan to take additional measures to limit Rush Island's lbs/mmBTU sulfur dioxide emission rate pending retirement (e.g., a temporary dry sorbent injection system similar to the one Ameren previously demonstrated could be installed at Rush Island on a short-term basis);

(4) Provide monthly status reports to the Court that include: (a) an update on MISO's alternatives analysis, including the results of the public stakeholder process and an explanation of the effectiveness and viability of any alternatives, (b) a description of the negotiation and terms of any SSR Agreement, including an explanation of how such terms are consistent with Ameren's obligation to minimize emissions and operations pending retirement, (c) a summary of Ameren's efforts and progress in expediting any projects necessary to address the reliability issues that resulted in SSR designation, (d) the number of tons of sulfur dioxide emitted from each Rush Island unit during the period, (e) the amount of generation produced from each Rush Island unit during the period, (f) identification of any MISO orders or other requirements pursuant to which either Rush Island unit was dispatched during the period, along with a description of how such generation was consistent with the obligation to minimize Rush Island's operations, and (g) a full accounting of the revenue generated by Ameren as a result of operating Rush Island during the period;

(5) Produce to Plaintiffs, on a monthly basis, all communications between Ameren and MISO concerning Rush Island's retirement, MISO's alternatives analysis, and any SSR agreement;

(6) Produce to Plaintiffs all draft and final copies of MISO's Attachment Y study, alternatives analysis, and any SSR Agreement.

Dated: June 21, 2022						Respectfully Submitted,

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

 /s Jason A. Dunn
Thomas A. Benson
Jason A. Dunn
Elias L. Quinn
Environmental Enforcement Section
U.S. DEPARTMENT OF JUSTICE
P.O. Box 7611
Washington, DC  20044-7611
Telephone:  (202) 514-1111
E-mail:  Jason.Dunn@usdoj.gov

SUZANNE MOORE
Assistant United States Attorney
United States Attorney's Office
Eastern District of Missouri
Thomas Eagleton U.S. Courthouse
111 South 10th Street, 20th Floor
St. Louis, Missouri 63102
Telephone:  (314) 539-2200
Facsimile:  (314) 539-2309
E-mail: Suzanne.Moore@usdoj.gov

*Attorneys for Plaintiff United States*

OF COUNSEL:

Alex Chen
Sara Hertz Wu
Senior Counsel
Office of Regional Counsel
U.S. EPA, Region 7
11201 Renner Boulevard
Lenexa, Kansas  66219

**CERTIFICATE OF SERVICE**

      I hereby certify that on June 21, 2022, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will cause an electronic copy to be served on all counsel of record.

<u>/s Jason A. Dunn</u>

Jason A. Dunn