UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| SIERRA CLUB, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | Case No. 4:11 CV 77 RWS |
| | ) | |
| AMEREN MISSOURI, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM AND ORDER**

During the past 24 months, the parties in this matter have been negotiating an equitable remedy to offset the $SO_2$ pollution that Defendant Ameren Missouri impermissibly emitted into the atmosphere after completing major modifications at its Rush Island electrical power plant facility.  Throughout this time period Ameren has asserted that an equitable remedy was not available and that, if it were, Ameren's decision to retire the Rush Island facility early completely offsets its impermissible emissions.  Ameren's position is unfounded as addressed below.

On January 12, 2011, Plaintiff United States, acting at the request of the Administrator of the Environmental Protection Agency, filed this lawsuit against Defendant Ameren Missouri concerning the operation of its Rush Island Energy

Center in Jefferson County, Missouri.  The United States asserted that Ameren was operating its Rush Island coal-fired power plant in violation of the Clean Air Act, 42 U.S.C. §§ 7401, et seq. (CAA).   On June 28, 2011, the United States filed an amended complaint asserting that Ameren violated: (1) the New Source Review, Prevention of Significant Deterioration provisions (PSD) of the CAA, 42 U.S.C. §§ 7470-92, and applicable implementing regulations; (2) the federally approved and enforceable Missouri State Implementation Plan; (3) Title V of the CAA, 42 U.S.C. §§ 7661-7661f; (4) federal regulations implementing Title V of the CAA at 40 C.F.R. Part 70; and (5) Missouri's federally approved Title V program, 10 C.S.R. 10-6.065.

The amended complaint asserted that Ameren performed major modifications of the Rush Island facility in 2007 and 2010 in violation of the CAA by failing to obtain the required permits for the modifications and by failing to install and operate state-of-the-art air pollution controls, including the best available technology to reduce emissions of sulfur dioxide ($SO_2$).  Following these alleged unpermitted modifications, Ameren's operation of Rush Island released tens of thousands of tons of $SO_2$ pollution into the air over the next 14 years.  $SO_2$ transforms in the atmosphere into fine particulate matter ($PM_{2.5}$). These emissions harm public health and the environment, contribute to premature deaths, asthma

attacks, acid rain, and other adverse effects in downwind communities including the St. Louis Metropolitan Area.[1]

On January 23, 2017, after years of litigation and a twelve-day bench trial, I issued a memorandum opinion and order finding that Ameren's modifications of its coal-fired Rush Island power plant violated the PSD and Title V provisions of the CAA. I found that the evidence showed that:

> [B]y replacing these failing components with new, redesigned components, Ameren should have expected, and did expect, unit availability to improve … allowing the units to operate hundreds of more hours per year after the project. And Ameren should have expected, and did expect, to use that increased availability (and for Unit 2, increased capacity) to burn more coal, generate more electricity, and emit more SO$_2$ pollution.

United States v. Ameren Missouri, 229 F. Supp. 3d 906, 915 (E.D. Mo. 2017) (emphasis added). I concluded that Ameren "violated the Clean Air Act and [Ameren's] operating permit by carrying out the Rush Island projects without obtaining the required permits, installing best-available pollution control technology, and otherwise meeting applicable requirements." Id. at 914, 998-999. As of 2024, the EPA estimated that Ameren's impermissible operation of its Rush Island facility, after its modifications without pollution controls, caused 275,000 tons of SO$_2$ to be release in the atmosphere.[2]

---

[1] For a detailed environmental impact analysis, see my September 30, 2019 order in this matter. United States v. Ameren Missouri, 421 F. Supp. 3d 729, 771 (E.D. Mo. 2019).

[2] Ameren asserts that the actual amount of SO$_2$ through October 15, 2024, will only be approximately 256,000 tons.

After the liability phase of this case concluded, an additional two-years of litigation ensued regarding the remedy phase of the case culminating in a six-day trial on that issue.  On September 30, 2019, I issued an order and judgment directing Ameren to obtain permits for the modifications it performed in 2007 and 2010; to install state-of-the-art scrubbers at Rush Island to bring $SO_2$ emissions into compliance with the CAA's requirements; and to temporarily reduce its $SO_2$ emissions at its sister power plant, Labadie Energy Center near Labadie, Missouri, by installing pollution controls until emission reductions at Labadie equaled the unpermitted excess $SO_2$ emissions from Rush Island.  The goal of the last remedy was to offset the tens of thousands of tons of $SO_2$ impermissibly emitted into the atmosphere by Ameren's knowing failure to comply with the CAA.

Ameren appealed my judgment to the United States Court of Appeals for the Eighth Circuit.  On August 21, 2021, the Eighth Circuit issued its opinion affirming my judgment in *all* respects, except for the specific remedial reqirement to implement emissions controls at the Labadie plant.  United States v. Ameren Missouri, 9 F.4th 989 (8th Cir. 2021).  The Court of Appeals opinion was authored by then Chief Judge Lavenski R. Smith.  Judge Smith is a former chairman of the Arkansas Public Service Commission (chairman, 1997-1999; commissioner, 2001-2002).  The Eighth Circuit held the Labadie remedy could not be imposed because the United States never provided notice of, or alleged that, the Labadie plant

4

violated the CAA.  Id. at 1009-10.  However, the Eighth Circuit confirmed that I had the authority to order Ameren to take "appropriate actions that remedy, mitigate and offset harms to the public and the environment caused by [Ameren's] proven violations of the CAA."  Id. at 1009.  The Circuit Court remanded the case for further proceedings consistent with its opinion.

On December 14, 2021, after Ameren had exhausted its post-appeal options,[3] Ameren filed a motion to modify my remedy ruling, declaring it was going to retire the Rush Island facility rather than comply with my order to install state-of-the-art air pollution controls by March 30, 2024.[4]  However, Rush Island could not be closed immediately.  The retirement of the facility required the approval of the Midcontinent Independent System Operator, Inc. (MISO) which manages a section of the country's high-voltage electricity grid from Canada to the Gulf of Mexico.

As a result, during the next eighteen months I held multiple hearings in the case to address this new circumstance and monitor Ameren's progress in meeting MISO's requirements for Ameren to complete the retirement of Rush Island while avoiding disruption of the high-voltage electrical grid.

---

[3] On November 30, 2021, the Eighth Circuit denied Ameren's motion for a rehearing or rehearing en banc.
[4] Ameren never provided notice to the Court or to the United States, before its December 2021 motion, the possibility of retiring the Rush Island rather than complying with my order to install state-of-the-art air pollution controls.  However, more than a year earlier in September 2020, Ameren confidentially informed the Missouri Public Service Commission that "[r]etirement of Rush Island Energy Center by the end of 2024 is less costly than energy center modifications."  [ECF #s 1267-1 at 8-9; 1212-2, Integrated Resource Plan and Risk Analysis at 29]

On June 2, 2022, the United States filed a motion seeking an order directing the parties to work together to craft an equitable remedy to replace the vacated Labadie remedy.  In response, on June 21, 2022, Ameren filed a brief questioning whether any mitigation remedy was available based on the Eight Circuit's decision.  In addition, Ameren asserted that even if mitigation is required, its retirement of Rush Island is more than a sufficient remedy because it would provide a larger offset of emissions than the vacated Labadie remedy.  Ameren asserted that the closure of Rush Island will eliminate all of its emissions after October 25, 2024, 15 years before the facility's projected retirement in 2039.[5]

On July 1, 2022, I held a status conference which addressed, among other issues, the United States' request to order the parties to confer regarding a replacement mitigation remedy.  Ameren again questioned whether any mitigation remedy was available after remand from the Eighth Circuit.  But Ameren agreed to continue negotiations with the United States to craft mitigation proposals.  These "negotiations" continued for the next 11 months, culminating in a hearing on July 18, 2023, in which Ameren stated that it had presented the United States with its last and best offer regarding mitigation.

---

[5] In an order on September 30, 2023, I granted Ameren's motion to extend the retirement date of Rush Island to October 25, 2024.

Case: 4:11-cv-00077-RWS    Doc. #: 1315    Filed: 06/14/24    Page: 7 of 24 PageID #: 66442

The parties were ultimately unable to agree on a mitigation remedy to replace the vacated Labadie remedy. The purpose of the mitigation remedy is to offset the tens of thousands of tons of $SO_2$ Ameren impermissibly released into the atmosphere throughout the past 14 years. On October 13, 2023, the United States filed a motion for mitigation relief suggesting several remedies. Ameren filed its opposition asserting once again that the closure of Rush Island fulfills any mitigation obligation it has in this matter. On February 13, 2024, in an effort to finally resolve the mitigation issue, I ordered the parties to submit simultaneous mitigation proposals. On March 14, 2024, Ameren filed its proposal and asserted once again that the early retirement of Rush Island provides complete mitigation for its unlawful $SO_2$ emissions. In other words, Ameren proposed that no further mitigation is necessary based on the closure of Rush Island.[6] Furthermore, in a footnote, Ameren once again asserted its position that "mitigation relief to remedy emissions from Rush Island's unpermitted operations is unavailable as a matter of law …" [ECF # 1287 at 3, n. 2]

I am concerned that a major barrier in the mitigation negotiations is Ameren's continued unfounded claim that no equitable remedy is available for its excess $SO_2$ emissions based on its unpermitted operations. Ameren's alternative

---

[6] Ameren also proposed, as a gesture of "good will," to provide 20 electric school buses and 40 associated charging stations in the local St. Louis area.

7

unfounded position that the retirement of Rush Island completely mitigates the harm imposed by its post-modification emissions may also be a barrier for an agreement on the appropriate remedy to offset the harm caused by Rush Island's unpermitted operation.

Ameren's position that an equitable remedy is not available for its unlawful pollution has already been rejected three times. And, over the course of several hearings, I have informed Ameren that its retirement of Rush Island does not mitigate the massive pollution it released into the atmosphere. I address each of these positions in turn.

*Ameren's Reliance on Otter Tail is Without Merit*

Ameren relies on the case of Sierra Club v. Otter Tail Power Co., 615 F.3d 1008 (8th Cir. 2010) for its assertion that I cannot impose an equitable remedy to offset the tens of thousands of tons of $SO_2$ it impermissibly released into the atmosphere. Otter Tail does not control this case. That case was brought solely by Sierra Club under the CAA's "citizen suit" provision, 42 U.S.C. § 7604(a). Sierra Club asserted that the Otter Tail power plant facility made major modifications to the facility that significantly increased emissions without obtaining a PSD permit in violation of 42 U.S.C. § 7475(a). Sierra Club sued the owners of the facility seeking civil penalties and equitable relief for failing to obtain a permit. The United States Court of Appeals for the Eighth Circuit found that the suit was

untimely because it was brought after the five-year statute of limitations period had expired (which began when the modifications were made).  In an attempt to have its claim fall within the statute of limitations, Sierra Club argued that Otter Tail facility's ongoing operation without a permit was a continuing violation of § 7475(a).  The Eighth Circuit rejected that claim finding that operating a facility without a permit is not itself a violation of § 7475(a).

Sierra Club asserted that it could still obtain equitable relief even if its claim for civil penalties was barred by the statute of limitations.  The Eighth Circuit held that any equitable relief was barred by the concurrent remedy doctrine.  That doctrine provides that when a party's legal remedies are barred by a statute of limitations, any concurrent equitable remedies are also barred.  However, the Eighth Circuit did not address whether an equitable remedy for a timely claim was available to offset pollution a facility emitted after it completed unpermitted modifications.

Unlike the claims in Otter Tail, the United States claims in the present case against Ameren were timely filed.  42 U.S.C. § 7413(b) gives the EPA authority to commence a civil action for injunctive relief or civil penalties, "or both," whenever a person "has violated or is in violation of any requirement or prohibition of" EPA air quality control programs including subchapter V.  The CAA authorizes a court

9

to impose an equitable remedy to offset a facility's emissions after making major modifications without seeking or obtaining a permit in violation of Title V.

Ameren asserts that the only equitable remedy a court has is to order the facility to obtain permits. Ameren argues a court is without power to hold a facility responsible to offset the harm to the environment caused by its unpermitted activity. This argument would allow a facility, like Rush Island, to not seek a permit to make major modifications and  thereafter emit tens of thousands of tons of excess pollution into the atmosphere without any obligation to offset the pollution that should never have been released into the atmosphere. This position is without legal merit.

Ameren has continually and unsuccessfully asserted in this Court and on appeal that Otter Tail bars any remedy to offset the tens of thousands of tons of SO$_2$ Ameren emitted into the atmosphere after its unpermitted Rush Island modifications. On February 27, 2019, I issued an order explicitly rejecting Ameren's assertion. United States v. Ameren Missouri, 372 F. Supp. 3d 868, 872 (E.D. Mo. 2019). On September 30, 2019, I again rejected Ameren's reliance on Otter Tail. United States v. Ameren Missouri, 421 F. Supp. 3d 729, 803 (E.D. Mo. 2019). Ameren fully briefed Otter Tail in its appeal of this matter. In its opinion

the Eighth Circuit noted Ameren's <u>Otter Tail</u> argument[7] that I could not impose

any injunctive relief redressing the excess emissions from Rush Island after its

unpermitted modifications were completed.  <u>Ameren Missouri</u>, 9 F.4th 989 at

1008.  The Eighth Circuit rejected this position stating that:

> "[u]nder § 7413, a district court 'has the authority to order [a defendant] to take appropriate actions that remedy, mitigate and offset harms to the public and the environment *caused by the [defendant's] proven violations* of the CAA.'"

<u>Id.</u> at 1009 (quoting <u>United States v. Cinergy Corp.</u>, 582 F. Supp. 2d 1055, 1060

(S.D. Ind. 2008) (emphasis added by the Eighth Circuit).[8]

In <u>Cinergy Corp.</u>, the EPA sued an owner of several power plants for

modifying its plants without obtaining permits required by the CAA.  In addition to

seeking compliance with permit requirements, the United States sought an

equitable remedy of requiring the owners to offset the detrimental health and

environmental effects caused by two decades of illegal pollution the plants emitted

after their unpermitted modifications.  The district court rejected the owner's

argument that this remedy was not available under the CAA.  In support of its

decision, the district court cited the United States Supreme Court's decision in

<u>Porter v. Warner Holding Co.</u>, 328 U.S. 395 (1946).  582 F. Supp. 2d at 1058.  The

---

[7] Although the Eighth Circuit expressly cited <u>Otter Tail</u> for other purposes, it fully recounted the arguments Ameren advanced under <u>Otter Tail</u> and other cases.

[8] Moreover, if an equitable setoff remedy was not available for Ameren's unlawful emissions the Eighth Circuit could simply have stated that result.  It did not do so.  Instead, the Eighth Circuit ruled that the offset remedy at Ameren's Labadie facility was improper due to notice requirements and remanded the case "for further proceedings consistent with this opinion."  9 F.4th at 1010.

Supreme Court held in <u>Porter</u> that when the district court's equitable jurisdiction is invoked, "all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction," unless the statute by "clear and valid legislative command" or "necessary and inescapable inference" restricts the court's equitable powers.   328 U.S. at 398.  When the public interest is involved, the "equitable powers assume[d] an even broader and more flexible character than when only a private controversy is at stake." <u>Id.</u>

I found that Ameren "violated the Clean Air Act and [Ameren's] operating permit by carrying out the Rush Island projects without obtaining the required permits, installing best-available pollution control technology, and otherwise meeting applicable requirements."  229 F. Supp. 3d at 914, 998-999.  The Eighth Circuit has expressly found that I have the authority to impose an equitable remedy to mitigate and offset harms to the public and the environment caused by Ameren's *proven violations* of the CAA.  My previous rulings, the Eighth Circuit's decision, and the Supreme Court's acknowledgement of a court's broad equitable powers all support my ability to impose an equitable remedy in this matter to offset Ameren's 14 years of impermissible pollution, <u>Otter Tail</u> notwithstanding.

*Early Retirement of Rush Island Does Not Offset Unpermitted Emissions*

In my September 30, 2019 order and judgment I directed Ameren to obtain permits for the modifications it performed in 2007 and 2010; to install state-of-the-

12

art scrubbers at the Rush Island to bring $SO_2$ emissions into compliance with the CAA's requirements; and to temporarily reduce its $SO_2$ pollution emissions at its Labadie Energy Center to offset the tens of thousands of tons of $SO_2$ Rush Island impermissibly released into the atmosphere.  The placement of scrubbers at Rush Island would reduce $SO_2$ emissions from approximately 16,000 tons per year to approximately 1,000 tons per year starting in March 2024.  Ameren elected to retire the Rush Island rather than install scrubbers.  However, in its continued operation in compliance with MISO's requirements, Ameren is still emitting more than 1,000 tons of $SO_2$ per year.

If Ameren had complied with my order Rush Island would have only been emitting 1,000 tons of $SO_2$ a year from 2024 to its projected termination of operations in 2039.  Retiring the facility in 2024 would only eliminate 15 years of $SO_2$ emissions for a total of 15,000 tons.

Ameren has asserted that any injunctive relief '"must be narrowly tailored to remedy only the specific harms established by the plaintiff[]," [ECF # 1268 at 2-3, ECF # 1287 at 8] (quoting St. Louis Effort for AIDS v. Huff, 782 F.3d 1016, 1022-23 (8th Cir. 2015) (emphasis added by Ameren).  In its proposal to replace the Labadie facility remedy, Ameren asserts that its decision to retire Rush Island in 2024 completely offsets the harm caused by Ameren's impermissible discharge of

over 256,000 tons[9] of $SO_2$ into the atmosphere.  Although the retirement will avoid only 15,000 tons of $SO_2$ that would be lawfully permitted if scrubbers had been installed, Ameren argues that *other pollutants* associated with Rush Island's operations will also be eliminated which will more than offset the unpermitted $SO_2$ emissions.  Those other pollutants are nitrogen oxides ($NO_x$), mercury, and carbon dioxide.

The United States accurately notes that the harm proven at trial from Ameren's unpermitted emissions was caused by excess $SO_2$ emissions and the resulting conversion of $SO_2$ into fine particulate matter known as $PM_{2.5}$.  The harm established in this case was to downwind communities that had a significant increased risk of disease and death resulting from exposure to $PM_{2.5}$.  The United States asserts that Rush Island's mercury emissions are different in the nature and the harm caused by $SO_2$ emissions because mercury emissions lead to mercury poisoning from the consumption of contaminated fish.  Moreover, future mercury emissions from Rush Island would also have been markedly reduced if Ameren had complied with my order and placed scrubbers at the facility.  Ameren's failure to put scrubbers in place in 2011 permitted excess mercury to be emitted along with the $SO_2$ which, if these emissions had been included the unlawful $SO_2$

---

[9] Ameren's estimated amount of unpermitted $SO_2$.

emissions calculation, would increase the total unpermitted emissions sought to be offset.

The United States asserts that the reduction of carbon dioxide emissions, while laudable, should not be considered. $CO_2$ is a greenhouse gas that contributes to climate change. It's reduction benefits the global atmosphere in general. But the harm redressed in this case is $PM_{2.5}$ pollution, derived from $SO_2$ emissions, which directly increases the risks of premature death of local residents due to respiratory and cardiovascular health issues in downwind communities. The elimination of $CO_2$ is not directly targeted to offset the harm to downwind communities that suffered the health consequences of Ameren's unpermitted $SO_2$ emissions.

As for $NO_x$ emissions, the United States cites to Ameren's emission data from 2011 through 2019 indicating around 3,000 tons of $NO_x$ were released from Rush Island each year. Based on Ameren's theory that it should be given equitable credit for the benefits of the early retirement of Rush Island, the closure of Rush Island will eliminate 15 years of $SO_2$ emissions (at 1,000 tons per year) and $NO_x$ emissions (at 3,000 tons per year) for a total of 60,000 tons of emissions. Using Ameren's estimate of 256,000 tons of unpermitted $SO_2$ emissions and allowing an offset of 60,000 tons of pollutants still fails to offset 196,000 tons of $SO_2$ emissions. Even if Ameren's position on $SO_2$ and $NO_x$ is accepted, the retirement

of Rush Island does not offset the benefits that would have been realized by the vacated Labadie facility remedy.[10]

Ameren's central proposal to offset its past pollution is to retire Rush Island and stop polluting in the future. Ameren's proposal is analogous to a company illegally emitting pollution into a river and asserting that by stopping future emissions it has cured the harm caused by its previous illegal activity. This approach simply fails to "remedy, mitigate and offset harms to the public and the environment caused" by 14 years of impermissible pollution.

*Ameren's Representations to the Missouri Public Service Commission*

In my liability order, I found that Ameren should have expected and <u>did expect</u> its modifications to increase and significantly improve unit availability. I also found that Ameren should have expected, and <u>did expect</u>, to use the increased availability to burn more coal, generate more electricity, and emit more $SO_2$ pollution. <u>Ameren Missouri</u>, 229 F. Supp.3d at 915-916. As a result, I concluded that Ameren violated the PSD and Title V provisions of the CAA.

In my remedy order, I specifically concluded that "*a reasonable power plant operator* would have known that the modifications undertaken at Rush Island Units

---

[10] The United States has represented that $NO_x$ related $PM_{2.5}$ social costs are approximately only 27% of the social costs incurred by that same volume of $SO_2$ related $PM_{2.5}$ social costs. As a result, the benefit of eliminating 45,000 tons of $NO_x$ would be the equivalent of less than 15,000 tons of $SO_2$ emissions. Even if the $NO_x$ reduction equaled 15,000 tons, the combined benefit would be 30,000 tons of eliminated emissions (15,000 tons of $SO_2$ and 15,000 tons of $NO_x$). Using these calculations, Rush Island's retirement would eliminate the equivalent of 30,000 tons of emissions, leaving 226,000 tons of $SO_2$ emissions to be offset (256,000 tons – 30,000 tons). [ECF # 1270 at 10, n.7]

1 and 2 would trigger PSD requirements. I have also concluded that *Ameren's failure to obtain PSD permits was not reasonable.*" Ameren Missouri, 421 F. Supp. 3d at 794. (emphasis added).  I reached that conclusion based my overall analysis of the case and on findings in my liability opinion, including that "Ameren's emissions calculations *are not reasonable analyses* under the PSD rules and therefore do not show that Ameren should not have expected an emissions increase;" "any qualitative analysis they did 'conduct' did not comply with NSR requirements *and therefore was not reasonable under the law*;" and "[b]y limiting availability to 95%, Ameren *failed to perform a reasonable analysis* under the PSD rules." Ameren Missouri, 229 F. Supp. 3d at 1010-14.

In January of this year I read an article about Rush Island in the *Missouri Independent*.[11]  The article addressed Ameren's securitization efforts before the Missouri Public Service Commission (MPSC) to recoup its investment at Rush Island based on its decision to retire that facility early.  The article indicated that Ameren filed with the MPSC testimony from Ameren Missouri President Mark Birk in which he is quoted as stating that "Given the facts and circumstances as they existed at the time, no rational utility would have done anything differently

---

[11] Allison Kite, Ameren Seeks To Shutter Missouri Coal Plant Early, Recoup Investment From Taxpayers, Mo. Independent (Nov. 28, 2023),  https://missouriindependent.com/2023/11/28/ameren-seeks-to-shutter-missouri-coal-plant-early-recoup-investment-from-ratepayers/.

with respect to Rush Island." That statement was directed at Ameren's decision not to seek permits for its major modifications at Rush Island.

On February 8, 2024, at a hearing in this matter regarding mitigation, I questioned Ameren's counsel about Mr. Birk's statement in the article. I reminded counsel that I specifically found that Ameren not only should have known, but actually knew its modifications triggered permit requirements of the CAA. I told counsel that if Mr. Birk's statement to the MPSC was correctly quoted his statement was not true as a matter of law. [ECF # 1283 at 19-21] To discover what statements about this case Ameren was making to the MPSC, I directed counsel to file with the Court any written materials that Ameren had presented to the MPSC concerning this case.

On March 14, 2024, Ameren filed the relevant materials it had submitted to the MPSC. Ameren's materials addressed the MPSC's inquiry into why Ameren had failed to obtain permits for its modifications at Rush Island. The materials showed that in August 2022, in response to the MPSC's inquiry, Mr. Birk testified, "we acted prudently because we made reasonable decisions in light of what we knew or should have known when we completed the projects in 2007 and 2010." [ECF # 1285-2 at 13] This representation is contradicted by the findings in this case that "*Ameren's failure to obtain PSD permits was not reasonable.*" 421 F. Supp. 3d at 794 (emphasis added). On November 21, 2023, Mr. Birk testified

18

"[g]iven the facts and circumstances as they existed at the time, no rational utility would have done anything differently with respect to Rush Island." [ECF # 1285-3 at 8] That statement directly contradicts the factual finding, affirmed by the Eighth Circuit, that "*a reasonable power plant operator* would have known that the modifications undertaken at Rush Island Units 1 and 2 would trigger PSD requirements." 421 F. Supp. 3d at 794. (emphasis added). As recently as March 2024, Mr. Birk testified "[w]e believe that permits were required only for projects that would increase potential emissions from the unit, and none of the Rush Island projects were expected to increase potential emissions." [ECF # 1299-4 at 6] This testimony is in direct contradiction to my factual finding that Ameren "should have expected, and <u>did expect</u>, to use that increased availability (and for Unit 2, increased capacity) to burn more coal, generate more electricity, and emit more $SO_2$ pollution." 229 F. Supp. 3d at 915 (emphasis added). Mr. Birk also testified that "[s]everal years after the Rush Island Projects were completed, the courts told us that we were wrong about the law, and that the legal standards we applied to determine that the Rush Island Projects could proceed were not correct. But the courts did not find that our understanding of the law on either of those points was unreasonable at the time we made the relevant permitting decisions …" [ECF # 1299-4 at 6] This representation is contradicted by my conclusion, as affirmed by

19

the Eighth Circuit, that "*Ameren's failure to obtain PSD permits was not reasonable.*" 421 F. Supp. 3d at 794 (emphasis added).

On March 28, 2024, I held another mitigation status hearing. I asked Ameren's counsel why Ameren had represented to the MPSC that I had ruled that Ameren had violated the CAA but failed to tell the MPSC that I had found, as a matter of fact, that Ameren's should have known, and knew that its modifications would trigger the permit requirements of the CAA. I also reminded counsel that I had concluded that Ameren's failure to obtain PSD permits *was not reasonable*. To resolve this omission, I directed Ameren to file a copy of the hearing's transcript with the MPSC to correct the record of my rulings.

On April 10, 2024, Ameren filed notice with this Court that it had complied with my order and provided a copy of the transcript to the MPSC. What Ameren did not say was that Ameren's counsel submitted a memorandum to the MPSC along with the transcript in which Ameren conceded that I "found [Ameren] incorrectly, as a matter of law, concluded that it did not need NSR permits. But the District Court did not rule on … the reasonableness of Ameren Missouri's decision at the time based on what it knew or reasonable should have known - and understood the law - to be." [ECF # 1299-1 at 2][12] These representations are not

---

[12] For some unknown reason, Ameren included a footnote to its memorandum to the MPSC in which Ameren asserts it still has the right to relitigate the Otter Tail decision before the Eighth Circuit. [ECF # 1299-1 at 2]

correct. This memorandum undermined my direction to put the MPSC on notice that I had reached the factual determination that Ameren's decision not to get permits, based at the time what it knew or reasonably should have known, *was not a reasonable decision by a power plant operator*. Moreover, Ameren asserted in the memorandum that it "respectfully submits that the Court did not accurately remember the details of its factual findings. [] at no point in the liability ruling (or the remedy ruling) did the Court find that Ameren Missouri knew it would violate the Clean Air Act." Id. In my liability order and my remedy order I found that Ameren should have known, and knew, that its modifications would result in increased capacity and increased emissions that triggered permit requirements under the CAA. Similarly, I rejected Ameren's claims that the modifications were simply routine maintenance or that the increased emissions were simply the result of demand growth. I found that a reasonable power plan operator would have known that the Rush Island modifications would trigger PSD requirements and that Ameren's failure to obtain PSD requirements was not reasonable. 229 F. Supp.3d at 916, 988, 997-998; 421 F. Supp.3d at 794.

To correct Ameren's misrepresentations to the MPSC, I will order Ameren to submit a copy of this order the MPSC. Ameren shall file a notice in this case of its compliance with my order. Ameren shall also file any memorandum it submits to the MPSC with this order. Ameren shall also file any other memorandum or

testimony that it submits to the MPSC in the future that relates to my finding that
Ameren should have known, and knew, its modifications triggered the permit
requirements of the CAA and its decision not to do so was not a reasonable
decision by a power plant operator.

   Additionally, I am reviewing whether Ameren failed to comply with my
post-judgment orders to complete all the required steps to obtain permits for its
modifications while Ameren's appeal was pending in the Eighth Circuit.

   On October 22, 2019, I instructed Ameren to submit its PSD application
within 90 days and "continue to prepare to quickly comply with the full injunction
after the Eighth Circuit issues its mandate." [ECF # 1137] It is unclear whether
Ameren complied with this order.  In February 2020, the government notified the
Court that the Missouri Department of Natural Resources ("MDNR") had deemed
Ameren's PSD permit application incomplete because Ameren had not paid the
full filing fee and did not submit preliminary engineering information, including
the required BACT analysis and air quality modeling.  Ameren also did not
schedule or attend a pre-application meeting with MDNR, which it was required to
do 30 days before submitting its application.  After I directed the parties to meet
and attempt to resolve their disputes, they filed a joint status update in which they
proposed that Ameren would provide the Court with updates on the progress of the
permit application process every 60 days.  The information in these reports was

incomplete in failing to provide pertinent information regarding Ameren's efforts to remedy deficiencies the Missouri Department of Natural Resources identified in Ameren's PSD permit application. Moreover, the three status reports filed in February through June 2021 were devoid of any new information about the permit application process. In fact, the reports were identical. Ameren's next two updates were filed on August 27, 2021 and October 22, 2021. The August report stated that "Ameren is reviewing the [Eighth Circuit's] decision, and the 45-day period for seeking rehearing or rehearing en banc expires on October 4, 2021." The October 22 report stated that both Ameren and the government filed petitions for rehearing and are awaiting the Eighth Circuit's ruling. These "updates" did not comply with my previous order.

Moreover, Ameren failed to provide notice to the United States or me that it had determined in September 2021 that it would be cheaper to retire Rush Island than to comply with my order and place scrubbers at the facility. During subsequent hearings in this matter it became apparent that Ameren did not comply with my orders regarding the permit process,[13] or in the alternative, Ameren failed to begin the process of meeting MISO's procedural requirements for Rush Island's

---

[13] Ameren's President Mark Birk testified to the MPSC that Ameren waited until the Eighth Circuit issued its decision before assessing whether it should comply with my ruling or retire Rush Island early. Mr. Birk testified that "[g]iven the outcome of the litigation, Ameren Missouri assessed whether it should comply with the District Court's ruling (i.e., install scrubbers at Rush Island) or take some other action, such as retire the plant." [ECF # 1285-3 at 25]

early retirement.  As a consequence, Rush Island continued its unpermitted pollution of tens of thousands of tons of $SO_2$ that would have been reduced sooner had Ameren complied with my orders or timely begun the regulatory proceedings to retire Rush Island.

Accordingly,

**IT IS HEREBY ORDERED that** Ameren shall forthwith submit a copy of this order, and any accompanying or supplemental memoranda or statements, to the Missouri Public Service Commission.  Ameren shall file a notice in this case of its compliance with this order.

**IT IS FURTHER ORDERED that** a hearing is set on **July 10, 2024 at 1:30 p.m.** in Courtroom 14 South to address Ameren's Motion Directing the Parties to Mediation [ECF # 1296]; Ameren's Motion to Clarify Applicable Legal Standards [ECF 1302]; and United States' Motion for Protective Order [ECF # 1307].


_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 14th day of June, 2024.